UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 22-MJ-22
vs.                              )
                                 )
ILYA LICHTENSTEIN, also known    )  February 14, 2022
as ILYA DUTCH LICHTENSTEIN,      )  2:29 p.m.
and HEATHER RHIANNON MORGAN,     )  Washington, D.C.
              Defendants.        )
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**<u>APPEARANCES</u>:**

FOR THE UNITED STATES:
                    CATHERINE ALDEN PELKER
                    CHRISTOPHER BRODIE BROWN
                    JESSICA PECK
                    U.S. DEPARTMENT OF JUSTICE
                    950 Pennsylvania Avenue NW
                    Washington, DC 20530
                    (202) 616-5007
                    Email: catherine.pelker@usdoj.gov


FOR THE DEFENDANTS:
                    SAMSON ENZER
                    NOLA BREGLIO HELLER
                    Cahill Gordon & Reindel LLP
                    32 Old Slip
                    New York, New York 10005
                    (212) 701-3000
                    Email: senzer@cahill.com


ALSO PRESENT:      CHRISTINE SCHUCK, Pretrial Services
                   (Appearing telephonically)

Court Reporter:    Elizabeth Saint-Loth, RPR, FCRR
                   Official Court Reporter

        Proceedings reported by machine shorthand, transcript
            produced by computer-aided transcription.

1       **P R O C E E D I N G S**

2    THE COURT:  Matter before the Court, Magistrate

3 Case No. 22-22, United States of America versus

4 Ilya Lichtenstein and Heather Rhiannon Morgan.

5    Your Honor, for the record, pretrial agent

6 Christine Schuck is joining us via telephone.

7    Counsel, please state your names for the record.

8    Come forward.  State your names for the record,

9 starting with the government.

10    MS. PELKER:  Good morning, Chief Judge.

11 Alden Pelker for the United States.

12    THE COURT:  Yes.  Good afternoon, Ms. Pelker.

13    MS. PELKER:  Thank you, Chief Judge.

14    I'm joined at counsel's table by AUSA Christopher

15 Brown and Ms. Jessica Peck.

16    THE COURT:  All right.

17    And for the defense?

18    MR. ENZER:  Good morning, Chief Judge.

19 Samson Enzer from the law firm of Cahill Gordon & Reindel,

20 here for Mr. Lichtenstein and Ms. Morgan.

21    With me at counsel table is my colleague,

22 Nola Heller, also of Cahill.  I want to note that my

23 colleague, Anirudh Bansal of Cahill, intended to be here

24 today but was stuck on the train.  He was taking the train

25 from Connecticut down to D.C.  The train lost power; he is

1    literally still sitting in the train, stuck.

2              And in the courtroom audience are Ms. Morgan's

3    parents, Lee and Gale Morgan, who are sitting there, and our

4    colleague, Taylor Elicegui.

5              THE COURT:  All right.

6              MR. ENZER:  Also, in the back of the courtroom --

7    I'm sorry -- Your Honor, are Mr. Lichtenstein's family, his

8    mother, Irena; his father, Eugene; and his brother Michael.

9              THE COURT:  All right.  Well, thank you for that

10   extensive list of introductions.

11             And although we do count on the reliance of Acela,

12   it's sometimes better to get in the night before to make

13   sure you can appear in court when required.

14             So, Mr. Lichtenstein and Ms. Morgan, you have two

15   lawyers here, I am sure, who are very capable to represent

16   you, but -- and I appreciate that you were probably

17   expecting Mr. Bansal here.

18             So let me just hear first from Mr. Enzer.

19             Do your clients want to proceed today or would

20   they prefer to wait for Mr. Bansal?

21             MR. ENZER:  We have conferred with them about

22   this.  They wish to proceed.

23             THE COURT:  Okay.  Excellent.

24             All right.  So just let me lay out where we are in

25   the case.  Both of the defendants were arrested on

1    February 8th on a criminal complaint.  So they're charged in

2    the criminal complaint -- not indicted -- but in a criminal

3    complaint with one count of conspiracy to commit money

4    laundering, in violation of 18 U.S.C. Section 1956(h); and

5    one count of conspiracy to defraud the United States, in

6    violation of 18 U.S.C. Section 371.

7          And they appeared on the same day as their arrest

8    before a magistrate judge in the Southern District of

9    New York for their initial appearance and detention hearing;

10   and they were ordered released on bond.  And the government

11   sought a stay of that release order pending further review

12   by this Court; and that stay request was denied by the

13   New York magistrate judge.

14         And I granted the stay of the release order to

15   give this Court an opportunity to review all of the merits

16   of the government's pretrial detention request and the

17   arguments presented, apparently persuasively, to the

18   New York magistrate judge by the defense.

19         So the business before the Court today is on the

20   government's motion for pretrial detention.  Cases before

21   me, as the Chief Judge of this Court -- because under our

22   local rules, the Chief Judge shall hear and determine all

23   requests for review of rulings by magistrate judges in

24   criminal matters not already assigned to a district judge.

25   And criminal cases do not get assigned -- randomly

1    assigned -- to a district court judge, my colleagues on this

2    court, or to me, until indictment or the filing of formal

3    charges in an information.

4          So the hearing was originally scheduled for last

5    Friday, on February 11th; but the New York facilities that

6    were holding both defendants were unable to provide timely

7    remote access to them for a hearing on Friday, when this

8    hearing was originally scheduled.

9          And so, after speaking to the parties on Thursday,

10   February 10th, about the difficulty in scheduling remote

11   hearings with the New York facilities, compounded by defense

12   counsel's expressed concerns about inability to communicate

13   with both defendants being held in the New York facilities,

14   I ordered that they be promptly transported to Washington,

15   D.C. to appear today at this hearing.

16         So that the record is clear, I have allowed public

17   access -- the public access telephone line to be operating

18   so that people who wish to hear this proceeding may do so

19   without being physically present in the courtroom.

20         I would like to remind anyone listening to the

21   hearing over the public teleconference line that, under my

22   Standing Order 20-20, recording and rebroadcasting of court

23   proceedings, including those held by videoconference, is

24   strictly prohibited; and violation of the prohibitions may

25   result in sanctions, including removal of Court-issued media

1    credentials, restriction or denial of entry to future

2    hearings, or other sanctions deemed necessary by the

3    presiding judge.

4         All right.  I do have a number of questions for

5    each side.  But I want to begin, as I normally do, by

6    reviewing the materials that I have looked at in connection

7    with this hearing just to make sure we're all on the same

8    page and we're all looking at the same materials.

9         So I have reviewed the criminal complaint docketed

10   at ECF 1.  I have also looked at the government's motion for

11   emergency stay and review of the release order, docketed at

12   ECF 8; and the government's reply brief docketed at ECF 18;

13   the defendants' opposition docketed at ECF 21, which was

14   originally filed as a letter docketed at ECF 15; the release

15   orders issued by the magistrate judge in New York, docketed

16   at ECF 21-1 and 22-2; and I have reviewed the transcript of

17   the detention hearing in New York.

18        One thing that is referenced in that transcript

19   that I have not received -- I don't know whether the parties

20   are going to be relying on it during the course of their

21   argument -- but I haven't received and so haven't reviewed

22   the pretrial services reports for the defendants that were

23   prepared in the Southern District of New York and that the

24   magistrate judge had access to there.  So I just wanted to

25   point that out so if you-all start talking about that

1    pretrial services report and I look puzzled, it's because I

2    only know what is reflected in the transcript about that.

3             Ms. Pelker, did you want to say something?

4             MS. PELKER:  Your Honor, if I may, our

5    understanding is that the Southern District of New York's

6    practice is to not make the pretrial services reports

7    available outside of that hearing so that the government

8    also does not retain a copy of them.

9             THE COURT:  Huh.  They're not even showing their

10   pretrial services reports to other courts?

11            MS. PELKER:  I am not certain whether Your Honor

12   could request it directly from them, but the government

13   doesn't have a copy to share.

14            THE COURT:  Oh.  So you don't have a copy either?

15            MS. PELKER:  No, Your Honor.

16            THE COURT:  Wow.  Okay.

17            Do the defendants have a copy?

18            MR. ENZER:  We do not, Your Honor.

19            I can tell you, as a former prosecutor from that

20   office, that Ms. Pelker has accurately stated the practice

21   there.  The Court might be able to obtain a copy, but we

22   would not be able to obtain a copy.

23            THE COURT:  Well, it must not be that important,

24   then.  You know, that's peculiar.

25            Okay.  Well, let's just move on.

1          So, Ms. Pelker, are you arguing this case?

2          And I'm sorry, my plexiglass is, sort of, blocking

3     you a little.  Let me just turn this way a little.

4          MS. PELKER:  Oh, yes, Your Honor.

5          THE COURT:  Okay.  So let me just start by asking

6     some basic questions, both about the evidence and the motion

7     papers filed by the government.

8          So the government is asking for pretrial detention

9     on only one statutory basis of risk of flight under Section

10     3142(f)(2)(a); is that right?

11          MS. PELKER:  That's correct, Your Honor.

12          THE COURT:  And you are not relying on any basis

13     for detention that defendants present a serious risk of

14     obstruction or not?

15          MS. PELKER:  Your Honor, our papers are

16     specifically related to the risk of flight as related to the

17     access to significant cryptocurrency assets.

18          We certainly do have concerns about risk of

19     obstruction insofar as correlation of the cryptocurrency

20     assets may be considered obstruction, and to the extent that

21     there are additional cloud storage accounts or remotely

22     accessible accounts that the defendants could access and

23     delete.

24          THE COURT:  Well, that's how it appeared to me;

25     but I didn't see obstruction, you know, even the word used

1    in any of your papers.  I just wanted to make sure that

2    we're all clear on what the statutory bases under the Bail

3    Reform Act you-all are relying on.

4                    So if I'm understanding you correctly, your

5    principal reason is serious risk of flight.  But to the

6    extent that you are talking about a concealment money

7    laundering charge and you have also -- your papers are also

8    replete with concern about dissipation of other stolen

9    bitcoin from the August 2016 hack, you are also concerned

10   about further dissipation of those stolen cryptocurrency

11   assets.

12                   MS. PELKER:  Yes, Your Honor.  That's very much

13   accurate.

14                   THE COURT:  All right.  Okay.

15                   So why don't you then -- one of the things that

16   was puzzling to me is -- also, about the charges that I

17   wanted to clarify from the outset is -- the genesis of the

18   case is clearly the August 2016 hack of this victim virtual

19   currency exchange, and that theft resulted in 119,754

20   bitcoin being transferred out of the victim VCE's control to

21   this wallet that your papers have called Wallet ICGA4S,

22   which I am going to refer to as "Wallet 4S" because that's

23   just way too many letters to keep talking about on the

24   record.

25                   And the criminal complaint charges the defendants

1    with conspiring to conduct financial transactions with the

2    proceeds of specified unlawful activity.  And the unlawful

3    activity producing the funds that are the subject matter of

4    that charge is violations of the wire fraud statute, the

5    computer fraud and abuse statute.

6            And the defendants are not charged with committing

7    the actual hack to steal the bitcoin in August 2016, but

8    only with the conspiracy to launder the proceeds of that

9    hack; is that right?

10            MS. PELKER:  That's correct, Your Honor.

11            THE COURT:  Okay.  So, at this point, the

12    government is not accusing either defendant of being the

13    actual hacker in August 2016; is that right?

14            MS. PELKER:  That's correct, as currently charged,

15    Your Honor.

16            THE COURT:  Okay.  And the government hasn't named

17    at all any place, in any of the papers, the person or

18    persons who the government believes is responsible for the

19    August 2016 hack, right?

20            MS. PELKER:  No, Your Honor.  We have simply used

21    the term "the hacker."

22            THE COURT:  The hacker.  Okay.

23            All right.  And just so I am understanding exactly

24    how the bitcoin works, all of the stolen 119,000-plus

25    bitcoin sitting in Wallet 4S could all be seen on the public

```
 1          transaction ledger for bitcoin; is that right?
 2                    MS. PELKER:  That's correct, Your Honor.
 3                    THE COURT:  And -- but the victim VCE could see it
 4          but couldn't access it to take it back; is that right?
 5                    MS. PELKER:  Exactly.  Yes, Your Honor.
 6                    THE COURT:  And in order to access the
 7          119,000-plus bitcoin sitting in Wallet 4S that everybody
 8          could see on the public transaction ledger, a person would
 9          need the private keys of the passcode to move that bitcoin
10          anywhere; is that right?
11                    MS. PELKER:  Yes, Your Honor.
12                    THE COURT:  And the government found those private
13          keys to the WS wallet -- W4S wallet --
14                    MS. PELKER:  Yes, Your Honor.
15                    THE COURT:  -- in Defendant Lichtenstein's cloud
16          storage account, right?
17                    MS. PELKER:  Yes, Your Honor.
18                    THE COURT:  So defense counsel has argued that the
19          government has not presented anything resembling direct
20          proof of the charges in the written filings.
21                    Would you say that finding private keys to
22          Wallet 4S, which was holding the stolen bitcoin in Defendant
23          Lichtenstein's cloud storage account, is pretty clear direct
24          proof of the charges?
25                    MS. PELKER:  I would say so.  Yes, Your Honor.
```

1    THE COURT:  Sort of like the smoking gun?

2    MS. PELKER:  Yes, Your Honor.

3    THE COURT:  Okay.  So using the private keys --

4    and I'm just trying to get straight how this all is working

5    here.

6    Using the private keys to the Wallet 4S that were

7    found in Defendant Lichtenstein's cloud account earlier this

8    month, the government was able to, with search warrants --

9    or seizure warrants, actually, to seize 94,636 bitcoins in

10    Wallet 4S; and that was worth about $3.6 billion under

11    current prices for bitcoin; is that right?

12    MS. PELKER:  That's right, Your Honor.

13    We had obtained the access to those files

14    originally through a search warrant.  The files were

15    encrypted.  We were eventually able to decrypt them.

16    THE COURT:  And so the private keys found in

17    Mr. Lichtenstein's cloud account worked?

18    MS. PELKER:  Yes, Your Honor.  To the tune of

19    $3.6 billion.

20    THE COURT:  Okay.  And the government seized all

21    of that bitcoin in Wallet 4S?

22    MS. PELKER:  Yes.  All of the remaining balance

23    that was still there.

24    THE COURT:  And the government -- could you just

25    explain, how is the government so sure that that 94,636

1    bitcoin in Wallet 4S came from the 2016 hack?

2            MS. PELKER:  This is really before the truly

3    complex laundering occurs.  It is a direct transaction of

4    when we see the funds leaving the addresses that are

5    controlled by that victim exchange.  They're going directly

6    from the exchange's addresses to the addresses in Wallet 4S.

7            THE COURT:  So it's just as simple as looking at a

8    one-hop on the public transaction ledger on the bitcoin

9    blockchain?

10           MS. PELKER:  Exactly, Your Honor.

11           THE COURT:  Got it.  Okay.  I just wanted to make

12    sure that was totally clear.

13            So when the government seizes bitcoin in

14    Wallet 4S, does it actually move the bitcoin into another

15    wallet or does the bitcoin continue to sit in Wallet 4S but

16    it just has new private keys controlled by the government?

17           MS. PELKER:  No, Your Honor.

18            For seizing cryptocurrency, the government obtains

19    authorization to transfer the cryptocurrency from the

20    addresses controlled by those private keys to new addresses

21    whose private keys are controlled by the government and

22    securely stored.

23           THE COURT:  Okay.  And so -- "securely stored."  I

24    want to focus on that a little bit because the government

25    has said that that 94,636 bitcoin is now -- remains secured

1      in the U.S. Government's possession.

2              And I have had experience -- Mr. Brown was the

3      prosecutor -- in another case where the government had also

4      seized bitcoin, thought it was secure in the possession of

5      the government, and then -- right from under the

6      government's nose -- it was moved and transferred out.

7              And in that case, someone else used seed recovery

8      keys to recreate the seized wallets and transfer that

9      bitcoin from the seized wallets or seized addresses under

10     the government's control to new bitcoin wallets that the

11     government could not access, and they lost control of it.

12             I mean, this is a fact that the government has

13     alluded to when it states in its brief that:  Cryptocurrency

14     assets such as these can be accessed with an internet

15     connection from anywhere in the world.  And they can be

16     reconstituted without physical access to the electronic

17     storage media on which the private keys are stored if the

18     user has configured a seed recovery key.

19             So part of my question is how secure is this

20     $3.6 billion worth of bitcoin that the government has seized

21     if the people who had control of it had seed recovery keys,

22     unless the government has found any seed recovery keys or

23     passphrases in execution of search warrants, on any of the

24     defendants' electronic assets or their apartment or storage

25     unit?

1          MS. PELKER:  To address the Court's concern, I do

2     want to assure the Court that the government has taken great

3     strides to ensure that these assets are appropriately

4     secured.

5          In the case that Your Honor is referencing -- and

6     it's not unique to that case -- the situation there was that

7     the government had recovered hardware wallets that did

8     contain the keys but that the government wasn't -- because

9     of security on those hardware wallets -- actually able to

10     access the keys.  So that while we had the hardware wallets

11     in our possession, the funds were still associated with

12     private keys and, by extension, the seed phrases that could

13     exist in multiple other forms including in the defendants'

14     control.

15          Here, part of the reason that we do the seizure --

16     not just taking possession of those keys, but initiating a

17     new transfer -- is to ensure that the only copies of those

18     private keys for the new addresses are government-created

19     and exclusively in the government's control.

20          THE COURT:  So the steps you have taken in this

21     case would preclude the use of seed recovery keys or

22     passphrases to recreate wallets and just take the bit

23     currency out from under your nose?

24          MS. PELKER:  So that the -- well, even if the

25     defendants -- and, again, this is for the 94,000 bitcoin

1    that we have seized.  Even if the defendants did have seed

2    recovery phrases that would allow them to recreate that

3    wallet, that wallet -- their balance is now completely empty

4    because we have transferred all of the money out of it.

5              THE COURT:  I see.  Okay.

6              Okay.  So when the government has alluded to this

7    possibility in its brief, at page 29, where it talks about

8    use of the -- it doesn't use the word -- well, it does use

9    the words "seed recovery keys," that is not really a

10   possibility in this case?

11             Is that what you are saying with respect to the

12   bitcoin in Wallet 4S?

13             MS. PELKER:  It's not a possibility with respect

14   to the bitcoin in Wallet 4S which is now empty.

15             It is very much a possibility with regard to other

16   bitcoin that we have traced in just another -- to use your

17   term -- one-hop, from Wallet 4S, to the tune of another

18   several hundred million dollars that we believe remains in

19   the defendants' possession or accessible by the defendants

20   that we have not been able to locate yet and that we have

21   not seized or secured.

22             THE COURT:  Okay.  So let me -- I want to get to

23   that because those are the 24 email addresses with over

24   320-some-odd million dollars in it that the government has

25   alluded to in its papers.  And the defense has argued there

1    is no connection between those 24 accounts and -- containing

2    the over $300 million worth of bitcoin and these defendants.

3              So I want to, you know, get to that.  But I want

4    to, sort of, start from the beginning, which is -- we

5    started with 119,754 bitcoin stolen from the victim VCE, and

6    94,636 bitcoins have now been seized and secured by the

7    government.

8              So just using my simple math skills here, we're

9    left with 25,118 stolen bitcoins still missing.  And the

10   government says that at least 24 virtual currency addresses

11   linked to the hack and containing about 7,506 bitcoin valued

12   at over $328 million have been identified that were not

13   seized as part of Wallet 4S.  And the government thinks that

14   those 24 addresses or accounts with the over 300 million --

15   are accounts that the defendants control; but that still

16   leaves, you know, a whole bunch of bitcoin that's missing.

17             MS. PELKER:  Yes, Your Honor.

18             THE COURT:  So does the government know where the

19   rest of the bitcoin is?

20             MS. PELKER:  So, Your Honor, the government has

21   continued to conduct analysis here.  We believe that it is,

22   in fact, more than simply the 7500 bitcoin across the two

23   dozen addresses that we may be able to trace through direct

24   sends.

25             But, more notably, much of the funds had

1    previously, over the last several years, been laundered

2    through the very complex set of transactions that the

3    government details in its complaint.  So that some of it has

4    been frozen; some of it is remaining -- sitting out in a

5    variety of different -- what appear to be un-hosted wallets

6    that we don't know the locations of; and some of it has then

7    been transferred into accounts in the defendants' own names

8    and been spent on various things, or otherwise sitting in

9    their accounts.

10           It is worth noting that because of the increase in

11   value of bitcoin, over the time period since the hack, the

12   spends of the same amount of bitcoin would have been spends

13   of an equivalently smaller dollar amount at the time.

14           THE COURT:  Um-hum.  Okay.

15           All right.  Well, I just wanted to make sure my

16   math was working out.  There is a whole bunch of bitcoin

17   that's out there, like, 17,000 bitcoin, that you don't

18   really know what happened to.  Maybe it's been spent; maybe

19   it's been dissipated; you don't know where that is.

20           But let's focus on the 24 accounts of virtual

21   currency addresses linked to the hack with the $328 million

22   worth of bitcoin in them.

23           What's your evidence that links those 24 accounts

24   or addresses with either one of these defendants?

25           MS. PELKER:  Well, Your Honor, we have the seizure

1    of the 4S wallet directly from Mr. Lichtenstein's account.

2    We then have traced the extensive laundering activity coming

3    out of other spends from that 4S wallet to accounts held by

4    both defendants through a variety of intermediaries; and

5    then we have this body of other transfers that is just a

6    single transfer out from the 4S wallet.

7           So, in all of the government's efforts to trace

8    these funds, we have traced them to a variety of different

9    fake personas that come back to the government.  We've

10   traced them to the defendants' true accounts; we've traced

11   them to unhosted wallets.  All of the funds appear to have

12   been controlled by the defendants at various stages in the

13   laundering process.

14          THE COURT:  But back up here a little bit because

15   these 24 -- the 24 accounts with the $328 million which is,

16   you know, relevant to our current discussion because the

17   government's -- one of the government's arguments for risk

18   of flight is the defendants control that $320 million [sic]

19   in that account -- those accounts and can access them to flee.

20          So were these 24 addresses linked to Wallet 4S?

21          MS. PELKER:  Yes, Your Honor.  By just a single

22   transaction.

23          THE COURT:  One single transaction?

24          MS. PELKER:  Yes.

25          THE COURT:  Okay.  And so they were not among the

1    seized bitcoin from Wallet 4S because the 75 -- 7,506

2    bitcoin and these 24 addresses had been transferred out of

3    Wallet S [sic] prior to the government's seizure?

4                    MS. PELKER:  Yes, Your Honor.

5                    THE COURT:  And in the -- Mr. Lichtenstein's cloud

6    account, in addition to the encrypted file with all of the

7    addresses and corresponding private keys for all of the

8    bitcoin in Wallet 4S that the government seized, the

9    government also seized, I thought, a spreadsheet listing all

10   of the different accounts and the status of those

11   accounts -- closed, frozen, whatever.

12                   So were these 24 accounts with the 7,506 bitcoin

13   on that document?

14                   MS. PELKER:  No, Your Honor.  This is a separate

15   set of transactions.

16                   THE COURT:  Okay.  And so the evidence that you

17   have -- the only evidence -- well, so your working -- the

18   government's working theory that these defendants have

19   control of the 24 virtual currency addresses with the 7,506

20   bitcoin in it is that they controlled the seized bitcoin,

21   because he had the private keys to that seized bitcoin; and

22   so if they controlled that bitcoin, they must have

23   controlled the other -- the other 24 accounts?  Is that

24   basically the leap that the government is making?

25                   MS. PELKER:  Well, Your Honor, we know that they

1    controlled the 4S account and we know that these funds were

2    direct spends from addresses in the 4S account to these --

3    this set of two dozen or so addresses; and, then, that those

4    transactions are done over time and then that they sit there

5    and are not further spent out.

6         So if these were payments for other services,

7    transfers to other individuals, presumably they would have

8    continued transferring on; instead, it just appears as

9    though they're setting up different savings accounts at

10   different address locations.

11        THE COURT:  Okay.  And in order to access the

12   bitcoin in the 4S account, you not only need the private

13   keys for each to access the bitcoin, but you also need some

14   sort of access password to Wallet 4S as a whole?

15        MS. PELKER:  You would just need the private keys.

16   Because, however, there are approximately 2,000 -- or were

17   2,000 addresses contained in that Wallet 4S, it seems

18   unlikely that anyone would be able to memorize those private

19   keys and so the wallet file or recovery seed would be saved

20   somewhere.  In the case of the recovery from

21   Mr. Lichtenstein's cloud storage account, that was an

22   encrypted file listing out all of the private keys.

23        THE COURT:  Okay.  But there's -- but so far there

24   is nothing that you found in the cloud account -- and I

25   know, you know, I saw from the papers you seized 50

1    different electronic devices so I am sure the forensic

2    examination of those devices is going to take some time.

3         But so far have you found any evidence other than

4    the access to Wallet 4S's bitcoin showing a reference to

5    these 24 addresses or other private keys for those 24

6    addresses, or anything else tying these defendants to those

7    24 addresses with the 7,506 bitcoin?

8         MS. PELKER:  Not to those addresses, Your Honor.

9         We have, though, found files reference -- that

10   appear to be named -- including the word "wallet" in them,

11   including "dirty wallet," that are saved within that same

12   encrypted portion of the cloud storage account in a folder

13   titled "VM Backup"; "VM" being a presumed reference to

14   virtual machine, essentially a computer within a computer

15   that can exist on a device or server anywhere.

16        It appears there is a VM somewhere that the

17   defendants have access to that has wallet files sitting on

18   them that we have not found, have not yet been able to

19   access.  We don't know that those wallet files are

20   pertaining to the set of two dozen cryptocurrency addresses.

21        But Your Honor is correct that we see the,

22   roughly, $300 million going from Wallet 4S to these new

23   addresses, sitting there, and we don't know where those

24   addresses are and don't have any way of currently accessing

25   them.

1          THE COURT:  Well, you can see the addresses.  Can

2     you see what the -- you can see them on the public ledger?

3          MS. PELKER:  Yes.

4          THE COURT:  Do you know -- can you see what the

5     addresses are for them?

6          MS. PELKER:  Yes, Your Honor; we can see the

7     addresses.  That's how we can see that the balances

8     haven't --

9          THE COURT:  What they are?

10         MS. PELKER:  -- moved.  Yes.

11         THE COURT:  But you don't know -- you suspect it's

12    the defendants who have the private keys to those addresses;

13    but you have found no evidence confirming that yet; is that

14    correct?

15         MS. PELKER:  No direct evidence, Your Honor.

16    I would say strong circumstantial evidence, but yes.

17         THE COURT:  And strong circumstantial evidence

18    that consists of the fact that the defendants had private

19    keys to the other bitcoin in Wallet 4S?

20         MS. PELKER:  Yes.  And that the defendants

21    controlled the funds with all of the other transfers out of

22    Wallet 4S.

23         THE COURT:  Okay.  Now, tell me a little bit about

24    Wallet 4S.  This is the limit of my understanding of wallets.

25         I don't know what metadata you can figure out

1    about a wallet, but can you tell when it was created and can

2    you tell what IP addresses access a wallet?  Can you tell

3    any of that -- or not really because this is an unhosted

4    wallet?

5              MS. PELKER:  It depends on what we are able to

6    actually access.  It's worth noting that the file that we

7    have is a listing of the private keys that appear to be a

8    backup of a version of the wallet that may be -- may have

9    been saved elsewhere.

10             THE COURT:  I don't understand what you just said.

11             MS. PELKER:  So that the -- depending on what

12   information we glean from different devices, sometimes we

13   can tell more information about a wallet than others.  In

14   this instance, because it's, basically, just a file with the

15   private keys and the addresses, there is not much that we

16   can glean as far as additional metadata surrounding the

17   wallet file.

18             THE COURT:  Okay.  So until you find the private

19   keys to the bitcoin in the 24 virtual currency addresses

20   with the $300 million, you can't access it, you can't seize

21   it, you can just look at it?

22             MS. PELKER:  Correct, Your Honor.

23             THE COURT:  Okay.  So let me just turn to another

24   encrypted file found in Lichtenstein's cloud account, and

25   that was the folder that was titled "personas" that

1     contained, according to the government's briefing,

2     subfolders with Russian and Ukrainian biographical

3     information and identification documents for numerous

4     individuals, both male and female.

5              Are these fictitious personas or are they -- does

6     it appear to be real people that -- with, sort of, stolen

7     identification information or are you unable to tell?

8              MS. PELKER:  Your Honor, that's an open line of

9     investigation.  We haven't made a determination at this

10    point.

11             THE COURT:  I see.  All right.

12             So the government has stated that it found a large

13    portion of bitcoin that started with Wallet 4S and ended up

14    in various accounts traced back to either Defendant Morgan

15    or Defendant Lichtenstein or their businesses pass through

16    two accounts at a VCE which the government calls "VCE4."

17             MS. PELKER:  Yes, Your Honor.

18             THE COURT:  And VCE4 had two accounts which the

19    government calls Accounts 2 and 3 where it said that

20    large -- I don't know what that means, but a "large

21    portion" -- that's the government's phrase -- pass first

22    through those VCE -- two VCE4 accounts before going further,

23    in multiple transactions, to ultimately land in accounts

24    held by defendants.

25             And the government says in its papers -- well, in

1    the affidavit supporting the arrest warrants, that these two

2    accounts, Accounts 2 and 3 at VCE4, were both registered in

3    the name of Russian nationals using Russian email addresses.

4            So in the evidence that the government has

5    uncovered in the encrypted files in Defendant Lichtenstein's

6    cloud account, have you seen evidence in the persona file,

7    have you seen evidence in any of the other listing of

8    files -- any evidence tying those Russian credentials of the

9    names and the email addresses for VCE4 Accounts 2 and 3 to

10   these defendants?

11           MS. PELKER:  Russian email address three and four

12   were not included in the spreadsheet that was found in

13   Defendant Lichtenstein's account.  We don't believe that

14   spreadsheet to be a comprehensive listing of all of the

15   accounts that he had set up; but no, those specific Russian

16   email addresses were not included.

17           THE COURT:  Okay.  You said VCE4 Accounts 2 and 3,

18   but the -- I think it's VC 3 and 4.  But I think in the

19   affidavit it says VCE Accounts 2 and 3 -- it calls them that.

20           Let me just put it to you this way, these key VCE4

21   accounts where a lot of the bitcoin from Wallet S4 landed

22   first, before further downstream distribution, were in these

23   two Russian accounts; and so far the names of those Russian

24   email addresses -- the names of the Russian nationals to

25   whom the accounts were registered and the Russian email

1    addresses, you haven't found reference to that in any of the

2    other information so far collected from the defendants; is

3    that right?

4            MS. PELKER:  Not the specific Russian identifiers.

5    The accounts' set up, as far as the styles of the names, and

6    then the practice of abandoning the accounts after being

7    inquired of by the exchange is consistent; but no, we

8    haven't found those specific email addresses in

9    Mr. Lichtenstein's account.

10           THE COURT:  Right.  And I think what you are

11   referring to is that both of those accounts were at some

12   point frozen by VCE4?

13           MS. PELKER:  Yes, Your Honor.

14           THE COURT:  Okay.  So when the government executed

15   the search warrant on Defendant Lichtenstein's cloud

16   account, it says it was able to confirm that the account was

17   used by that defendant.

18           And I take it you were able to do that

19   confirmation because some of the files in that cloud account

20   were not encrypted; they were in plain text so you could see

21   them?

22           MS. PELKER:  Yes, Your Honor.

23           The cloud account was part of a larger platform

24   service offering that was tied directly to one of

25   Mr. Lichtenstein's primary email accounts.  So that the

1    service provider offered the email account along with a

2    variety of other services, including the cloud storage and

3    others; and we were able to look at all of the different

4    contents of the account and determine that it was

5    Mr. Lichtenstein's.

6                THE COURT:  Okay.  And do you have any information

7    that Mr. Lichtenstein's wife was able to access that account?

8                MS. PELKER:  We know that they used common

9    devices.  We don't have anything specifically showing that

10   Ms. Morgan logged into the account, though, because they

11   were living in the same residence and because they were

12   using the same devices at different times, we wouldn't

13   necessarily see whether it was her accessing the account as

14   opposed to him.

15               THE COURT:  Okay.  So a number -- so the

16   government -- even though it searched this account back in

17   2021, it saw these encrypted files in the cloud storage

18   account, including, ultimately, the file that had all of the

19   private keys to the stolen bitcoin in Wallet 4S -- you know,

20   the government goes on to describe this encryption saying,

21   you know, that:  Some of the files in this cloud account

22   were secured with a strong encryption algorithm and lengthy

23   password.  A password of that length would typically prevent

24   even a well-resourced attacker from accessing the file

25   within his lifetime, and yet the government was able to

1    break this encryption between 2021 and January 31, 2022, not

2    precisely a lifetime.

3            So how did the government break it then?

4            MS. PELKER:  Well, Your Honor, without going into

5    details, as far as the government's ability to decrypt or

6    deal with encryption, generally, the way that -- if you are

7    trying to break into someone's files, a common method is to

8    simply randomly guess and use a computer to run through the

9    various iterations of potential guesses.  Sometimes you

10   learn information through other parts of your investigation

11   that may allow you to make more educated guesses.

12           But, ultimately, the point the government was

13   trying to make here was that it was a very well-secured

14   file.  This wasn't just a file that was put up there with,

15   you know, password 1-2-3.  And it was entirely possible,

16   even probable, that the defendant thought that the file was

17   appropriately secured and that the government, even if we

18   could get access to the cloud storage account -- that we

19   wouldn't be able to break into the file.

20           But it's worth noting the defendants, even after

21   the search of their residence, were not aware that we had --

22   we knew about the cloud storage account or that we had

23   searched it.

24           THE COURT:  Okay.  So there was nothing from the

25   January 5 execution of the search warrant at their apartment

1    that gave you a clue that allowed you to break the

2    encryption?

3              MS. PELKER:  Without getting into the details of

4    how we were able to break the encryption, there was

5    nothing -- we didn't take specific evidence from the

6    execution of their search warrant and then use that to

7    decrypt it.  It wasn't as though we went in and saw a sticky

8    note with a password or anything like that, no, Your Honor.

9              THE COURT:  Okay.  And did the same decryption key

10   or method work to decrypt all of the encrypted files in the

11   iCloud account?

12             MS. PELKER:  Your Honor, I would have to go back

13   and ask about that particular detail.  I am not sure whether

14   it was the exact same password for all.

15             THE COURT:  Okay.  And in this cloud account, was

16   it -- everything was not encrypted.  Is it fair to say that

17   only the inculpatory files were encrypted or among the

18   encrypted files was there things that were not necessarily

19   inculpatory?

20             MS. PELKER:  Your Honor, my understanding is that

21   the specific folder that was of interest to us that we were

22   able to decrypt is almost entirely inculpatory.  That said,

23   I would want to confirm with the agents who did the review

24   that there weren't other files that they simply didn't flag

25   for our attention.

1          THE COURT:  Okay.  And the government proffers

2     that it is aware of dozens of accounts the defendants set up

3     in financial institutions around the world using fictitious

4     identities.

5          And were any of those fictitious identifies

6     contained in the personas folder that was found in the cloud

7     storage account?

8          MS. PELKER:  Your Honor, one of our struggles here

9     is that both the nature of the accounts noted in the

10    personas file and just the restrictions on time -- the

11    personas file was split between "UA," indicating Ukraine,

12    and "RU," indicating Russia, and our ability to rapidly

13    receive information from either one of those countries

14    relating to what accounts may have been set up in those

15    names is very limited.  And since we just obtained the

16    information on the 31st, we have not been able to check that

17    or verify it.

18         THE COURT:  Okay.  So the government has, sort of,

19    this very interesting story about how it has traced the

20    stolen bitcoin from the August 2016 hack to be used in the

21    purchase of 70 gold pieces, each weighing one ounce, which

22    is a little over four pounds of gold.

23         And was all of that gold, from what the

24    government's investigation has revealed, shipped by the

25    vendor directly to Defendant Lichtenstein at his home

1    address in New York City?

2              MS. PELKER:  There were different orders placed at

3    different times.  The defendants, at one time, were living

4    in San Francisco; one of the shipments went there.

5    Subsequent shipments, we believe, went to New York City.

6    But we don't have the same visibility into all of the

7    different vendors as far as where the shipments occurred.

8              THE COURT:  I see.  And were they all addressed to

9    Defendant Lichtenstein or were some of them addressed to

10   both defendants or Ms. Morgan or what?

11             MS. PELKER:  All we're able to see, Your Honor, is

12   the payment information from it and, for some of the

13   vendors, additional details related to the shipping.  So

14   we're able to see that this amount of gold coins was

15   purchased and then, at least in some of the instances, it

16   was shipped to Defendant Lichtenstein's home address.

17             THE COURT:  Okay.  Well, you said in your briefing

18   that it went to Defendant Lichtenstein's home address; so I

19   just wondered, was it addressed to him only?  Is that why

20   you're -- because they live together.

21             MS. PELKER:  Yes, Your Honor.  It would be -- I

22   don't have the specific to and from information on how it

23   was addressed --

24             THE COURT:  Okay.

25             MS. PELKER:  -- just knowing that it was sent to

1    the apartments where they were living at the time.

2              THE COURT:  Okay.  And none of that gold has been

3    recovered?

4              MS. PELKER:  No, Your Honor.

5              THE COURT:  And how much is 70 -- how much is over

6    4 pounds of gold worth?

7              MS. PELKER:  I believe that it was estimated at

8    just under 200,000; but the price of gold fluctuates, and I

9    can get a more accurate answer for Your Honor.

10             THE COURT:  Okay.  And the government also seized

11   and has pictures of foreign currency that was seized from

12   the defendants' residence on -- or apartment on January 5th.

13             When you say "substantial amounts," what does that

14   mean?  I mean, like, how much money was there actually

15   taken?

16             Is it, sort of, money left over from a trip?  You

17   know, we all have change that you haven't converted back to

18   U.S. dollars, or is it more substantial than that?

19             MS. PELKER:  Your Honor, we are still trying to

20   get an accounting with the currency conversion rates of what

21   that is.  I think we, in our briefing, said what appears to

22   be substantial amounts.

23             THE COURT:  All right.  So so far -- or based on

24   what I have read, it appears that all of the incriminating

25   files were found in Defendant Lichtenstein's cloud storage

1    account; and you don't have any specific evidence that

2    Defendant Morgan had access to that account, and you have

3    also searched her cloud account.

4          And did you find any overlapping documents between

5    those two cloud accounts or any other incriminating

6    information in Ms. Morgan's account?

7          MS. PELKER:  Your Honor, the specific

8    incriminating files and the most incriminating evidence in

9    this case was from Mr. Lichtenstein's cloud storage account;

10   however, we posit that the significant tracing of funds to

11   both Defendant Morgan and Defendant Lichtenstein's accounts

12   and the extensive laundering that went into that, and the

13   payments through those accounts, is also significant

14   evidence of a money laundering conspiracy.

15         THE COURT:  And when bitcoin was transferred out

16   of Wallet 4S to be sent through a -- you know, I think a

17   large portion -- according to the government's papers --

18   sent to VCE4, to those two accounts and to other VCEs.  Is

19   it -- is the -- the tracing that the government's been able

20   to do, does it show that the accounts that the stolen

21   bitcoin first landed in were controlled by Defendant

22   Lichtenstein before it was transferred to accounts to

23   Defendant Morgan?

24         MS. PELKER:  Your Honor, we see that Defendant

25   Lichtenstein had the spreadsheet of fictitious personas

1   accounting for at least some of the intermediary accounts;

2   but whether those were accounts that were set up exclusively

3   and controlled exclusively by Defendant Lichtenstein or by

4   Defendant Lichtenstein along with Ms. Morgan related to

5   actual physical hands on a keyboard is still unclear.

6          However, it does appear that Ms. Morgan, with her

7   extensive background in economics and her familiarity with

8   cryptocurrency, was an integral part of the scheme.  And,

9   certainly, we can trace those funds and show her knowledge

10  of the funds related to her statements to the virtual

11  currency exchanges when they do ultimately end up in her

12  accounts.

13         THE COURT:  Okay.  So now one of the things that

14  was very -- appeared to be very persuasive to the New York

15  magistrate judge is there is no flight by these defendants

16  after they got notice of a grand jury subpoena for their

17  accounts, not after the execution of the search warrant on

18  January 5th, after multiple discussions, the government

19  laying out its theory of the case to defense counsel, even

20  before their arrest.  So I really -- I, sort of, want to pin

21  down this time frame a little bit to understand it.

22         First, I just want to satisfy my curiosity about

23  the notice that defendants had about -- from their ISP,

24  their internet service provider, about the issuance of a

25  grand jury subpoena for their accounts.  And that's a notice

1    they got from their ISP in November 2021; is that correct?

2          MS. PELKER:  Yes.  That's our understanding

3    through defense counsel's representations, Your Honor, yes.

4          THE COURT:  And how did that happen?  Did the

5    government fail to give the ISP a gag order or did the ISP

6    fail to comply with a gag order?

7          I mean, that's an unusual happening.

8          MS. PELKER:  We believe it's an administrative

9    oversight.  We are uncertain at this point whether it was an

10   oversight out of the U.S. Attorney's Office or on the ISP

11   side.  It appears likely based on the time frame that a

12   nondisclosure order may have expired, but we are still

13   following up on exactly what has occurred there.

14         THE COURT:  Okay.  And, you know, defense counsel,

15   you know, certainly persuasively argued in front of the

16   magistrate judge in New York that, you know, the defendants

17   present no flight risk because, you know, between the

18   execution of the search warrant, January 5 through

19   February 1, when the government started executing seizure

20   warrants on the bitcoin in Wallet 4S, they didn't flee.  And

21   they were still sitting in their apartment where they were

22   arrested on February 8th.

23         So could you just walk me through that timeline

24   and why you think --

25         MS. PELKER:  Yes, Your Honor.

1              THE COURT:  -- that shouldn't be persuasive

2    evidence, as it was found to be persuasive by the New York

3    magistrate judge, that they don't present a flight risk?

4              MS. PELKER:  Your Honor -- well, first, I would

5    note that while the magistrate judge in New York did have a

6    lengthy detention hearing there, the record here before Your

7    Honor related to the risk of flight, and particularly the

8    details of the files found in Mr. Lichtenstein's encrypted

9    folder, as well the couple's activities in Ukraine, really

10   strongly bolster the record that was set out before

11   Magistrate Judge Freeman.

12             That said, I think there was some

13   fundamental misunderstand- --

14             THE COURT:  Just let me just interrupt you.

15             Because she didn't have your briefing; she just

16   had the affidavit in support of the criminal complaint at

17   that point?

18             MS. PELKER:  Correct, Your Honor.  Yes.

19             And, I believe, there also was a fairly

20   fundamental misunderstanding as far as what the defendants

21   knew at the time of the search of their apartment.  The

22   defendants at that point still did not know that we had a

23   search warrant for the cloud storage account where these

24   files were located, and certainly didn't know that we would

25   be able to decrypt the account -- the folder that was in --

1            THE COURT:  Well, let me pause you right there --
2    excuse me for interrupting you -- because this is another
3    question I had.
4            Was the ISP that sent the notice in November
5    2011 -- 2021, sorry, the same ISP that hosted Defendant
6    Lichtenstein's cloud account?
7            MS. PELKER:  We don't believe so, though we are
8    not certain, Your Honor.  But our understanding is that was
9    a notification about a subpoena, which would have been
10   simply for basic subscriber information, not for a search
11   warrant for the full account.
12           THE COURT:  Okay.
13           MS. PELKER:  Again, that's coming on defense
14   counsel's representations.  We haven't seen what notice
15   exactly the clients received.
16           THE COURT:  All right.  So keep walking me through
17   this timeline.
18           MS. PELKER:  So we understand that the defendants
19   get notice.  The government executes a search warrant of
20   their residence on January 5th.
21           At that point, and for the weeks following, the
22   defense doesn't believe that the government has enough to
23   charge them.
24           Their view -- and I think they continued to hold
25   that view until they were arrested -- was that they had

1    succeeded in outsmarting us; that even if we had been able

2    to trace some transactions to their accounts, that they had

3    laundered them well enough that they would have plausible

4    deniability, that it just happened that some small subset of

5    the accounts from the hack went to their accounts.

6            And to the extent that defense counsel is saying

7    that they understood the theory of our case, that is the

8    extent of the quote, unquote theory of our case that we

9    revealed to defense counsel at that time up until their

10   arrest.

11           THE COURT:  So what was the precise date that the

12   defendants learned the government had accessed the smoking

13   gun, the file containing all of the private keys to the

14   stolen bitcoin sitting in Wallet 4S?

15           MS. PELKER:  We believe -- given the amount of

16   press attention -- that the transfer warranted that around

17   February 1st.  So we commenced the transfer and seizure of

18   the bitcoin late in the evening of January 31st; it

19   continued into the morning of February 1st.  And there was a

20   fair amount of press attention related to the transfer;

21   everyone thinking that it was the hackers who were moving

22   the funds.

23           It's likely that the defendants at that point

24   realized that we had gained access to the keys in some

25   manner.  However, it's possible that they thought that that

1    access was through one of the virtual machines on an

2    overseas server that may have been sufficiently attenuated

3    from either Defendant Lichtenstein or Defendant Morgan that

4    they may not have known that we could still tie it directly

5    to them.  But even if they did, Ms. Morgan had just had

6    surgery.  There was a snowstorm coming in through New York.

7    We had seized their electronic devices and their passports.

8              It does take some time to be able to obtain and

9    order new fictitious identities and travel documents; and it

10   appears that they had been planning a flight to Ukraine or

11   Russia, which is not a great time -- place to be traveling

12   right now.

13             THE COURT:  Okay.  And, from your papers, I

14   understand that Russia does not extradite its own citizens;

15   is that right?

16             MS. PELKER:  That's correct, Your Honor.

17             THE COURT:  And the situation with Ukraine and

18   extradition, although Ukraine has a lot more on its plate

19   right now than dealing with U.S. law enforcement concerns,

20   but is there an extradition treaty with Ukraine?

21             MS. PELKER:  There is.  And at the moment, a

22   Russian citizen could be extradited from Ukraine, though

23   that's a complicated situation, as Your Honor might imagine.

24             There is also a very strong concern that the

25   defendants may use that as a launching point of initially

1    setting up in Ukraine and Russia, and then purchasing

2    additional identification documents that would allow them to

3    go elsewhere.

4           And we have Ms. Morgan's very strong ties to Hong

5    Kong, having lived there previously, having businesses set

6    up there.  It would also be very difficult for us to

7    extradite -- it is not impossible, but difficult for us to

8    extradite individuals from Hong Kong.

9           THE COURT:  Okay.  All right.  Is there anything

10   else you think I should know based on the arguments before

11   the magistrate judge or in the filings filed since then?

12          MS. PELKER:  Your Honor, my colleagues did pass me

13   up a note that we do believe we know which ISP made the

14   inadvertent disclosure and that the disclosure would have

15   provided very little information.  It certainly would not

16   have been tied to the cloud storage account, and that it

17   just would have said that the government requested

18   information -- not specific to what violations or any

19   additional details about the government's investigation.

20          THE COURT:  But it was the same ISP --

21          MS. PELKER:  No, it wasn't --

22          THE COURT:  -- that hosted the cloud account?

23          MS. PELKER:  No, Your Honor, it was not the same

24   ISP.

25          THE COURT:  And it was a different ISP?

 1                    MS. PELKER:  Yes, Your Honor.

 2                    THE COURT:  Okay.  So --

 3                    MS. PELKER:  And, Your Honor, one point --

 4                    THE COURT:  How confident are you of that?

 5                    MS. PELKER:  That it was a different ISP?

 6                    THE COURT:  Um-hum.

 7                    MS. PELKER:  Well, I have just received the --

 8      before I say that I am highly confident, I would certainly

 9      want to go back to -- Your Honor, and verify.

10                    But I can consult with my colleagues.

11                    THE COURT:  Of course.

12                    Please, feel free to consult.

13                    MS. PELKER:  Just a moment, Your Honor.

14                    (Whereupon, Government counsel confer.)

15                    MS. PELKER:  I think we have a medium degree of

16      confidence, Your Honor.  We're still following up.

17                    THE COURT:  Medium degree, I see.  Got it.

18                    Okay.  Thank you.

19                    Anything else I should know?

20                    MS. PELKER:  Your Honor, I would just like to

21      address defense's suggestion that Ms. Morgan is some sort of

22      naïve wife who may have been unwittingly co-opted into her

23      husband's scheme here.

24                    It bears noting that Ms. Morgan is highly

25      intelligent, with a graduate degree in economics and

1    sufficient cryptocurrency and technical know-how such that,

2    if she were released, even if her husband were detained, she

3    would absolutely have the ability and the connections to

4    access the stolen crypto to purchase identities off of the

5    darknet and disappear.

6            THE COURT:  But you would agree that the

7    evidence -- given what was found in Defendant Lichtenstein's

8    cloud account -- is much stronger against him than against

9    his wife?

10           MS. PELKER:  I think that our -- to the extent

11   that the evidence against Mr. Lichtenstein is really

12   incredibly strong, to the tune of 3.6 billion -- certainly

13   the evidence against Ms. Morgan may be relatively weaker,

14   but is still incredibly strong.

15           Ms. Morgan's statements -- repeated statements to

16   the financial institutions related to the laundering of the

17   funds showed that she must have known their illicit nature.

18           She laundered, repeatedly, a significant amount of

19   money through her business accounts.  She told financial

20   institutions that the funds were held in cold storage.  She

21   knows crypto; she knows exactly what cold storage is.  She

22   knows she's not actually --

23           THE COURT:  I don't know what "cold storage" is.

24   What is it?

25           MS. PELKER:  "Cold storage" references -- a

1    reference, in Ms. Morgan's own term, that the funds are held

2    in a wallet that is not connected to the internet, so most

3    commonly a hardware wallet.  It's meant to be held in

4    safekeeping so that no one else can access them.

5            So the story here is -- that Ms. Morgan is telling

6    everyone and the financial institutions, is that her

7    husband, then boyfriend, back in 2014, before the hack, gave

8    her bitcoin and that she's held them in cold storage in its

9    own wallet, disconnected from the internet; and they have

10   just sat there, and now she's getting ready to cash them

11   out.

12           But when we look on the blockchain, that's not at

13   all what this is from.  We see that funds are coming from

14   accounts opened in fictitious identities tied to the

15   spreadsheet in Mr. Lichtenstein's account, and then going

16   through a series of transactions into Ms. Morgan's business

17   accounts.  We see that she works with the financial

18   institutions and the virtual currency exchanges to increase

19   the limits on her accounts to go from personal to business

20   because she wants to do more cryptocurrency transactions.

21           But, at the same time, defendants are -- as the

22   agents are looking at the actual cryptocurrency activity

23   through those accounts, these aren't actual customers of her

24   business.  These are payments that are traced from the hack

25   proceeds through these fictitious accounts and that she's

1      using it to launder.

2              She operates this business.  She is the one who is

3      dealing with the clients.  She is the one who is accepting

4      payments from them.  She knows that the hundreds of millions

5      of dollars in cryptocurrency coming through those accounts

6      are from nonexisting customers, are for nonexistent work

7      that her business hasn't actually done or performed.

8              THE COURT:  And in terms of making the statement

9      that Defendant Morgan's businesses actually didn't have

10     business, what is the basis of that?

11             MS. PELKER:  Don't have business where they are

12     receiving cryptocurrency payments.

13             Ms. Morgan has, from our understanding, set up her

14     businesses even before she met Mr. Lichtenstein and offered

15     it as a copywriting, sales, advertising, sort of, assistance

16     for other tech companies.

17             It does appear that she had at least some

18     legitimate clients who were -- she was doing business with;

19     but we haven't found any indication that any of those

20     customers were paying for legitimate services in

21     cryptocurrency.

22             So that -- she has financial -- traditional bank

23     accounts that have been set up for a long time for that

24     business, but that she started setting up these accounts at

25     virtual currency exchanges in the name -- both her personal

1    accounts and then her business, claiming that this was

2    because her business was now doing all of this

3    cryptocurrency -- accepting payment in cryptocurrency.  But,

4    instead, all of the payments in -- are not from actual

5    clients but, instead, traceable to the hack proceeds.

6              THE COURT:  I see.  Okay.  Thank you, Ms. Pelker.

7              All right.  Mr. Enzer.

8              MR. ENZER:  Good afternoon, Your Honor.

9              THE COURT:  Can I just start, Mr. Enzer, with a

10    little bit of a side inquiry?  Because I certainly

11    appreciate that the defendants are a married couple, they

12    retained you all in consultation before any charges were

13    made and before their arrest.

14              But I do have some concern about the potential for

15    conflict of interest -- I am sure you have thought about

16    it -- with joint representation of two defendants,

17    particularly in the face of the arguments that are made

18    by -- in the defendants' briefing, particularly as to

19    Defendant Morgan.  And I quote:  The complaint asserts facts

20    suggesting that Ms. Morgan was an unwitting recipient of the

21    funds that were supposedly tainted, and other arguments that

22    the evidence against Ms. Morgan is far less than against

23    Mr. Lichtenstein.

24              And the Court does have an obligation under

25    Federal Rule of Criminal Procedure 44(c).  In circumstances

1    of a joint representation, according to the rule that

2    states, in relevant part, that:  When two or more defendants

3    have been charged jointly and are represented by the same

4    counsel or counsel who are associated in law practice, the

5    Court must promptly inquire about the propriety of joint

6    representation and must personally advise each defendant of

7    the right to the effective assistance of counsel, including

8    separate representation, unless there is good cause to

9    believe that no conflict of interest is likely to arise.

10        The Court must take appropriate measures to

11   protect each defendant's right to counsel.  The right to

12   counsel certainly attaches at arraignment; it attaches at

13   bail hearings.  And so my view is the best practice is to

14   conduct a Rule 44(c) inquiry at a detention hearing where

15   there is joint representation and arguments are already

16   being made distinguishing the evidence between the two

17   defendants.

18        So let me just ask you, have you or your cocounsel

19   discussed with both defendants their right to conflict-free

20   counsel, the potential risks of conflict in this case, and

21   what steps, if any, have you taken to ensure that joint

22   representation will not present a conflict of interest?

23             MR. ENZER:  Yes, Your Honor.

24        This was discussed before the clients were

25   arrested, both orally and in writing.  Both clients were

1    fully advised of the risks and expressly wanted to proceed

2    with having -- as a married couple, to be represented by the

3    same counsel.

4         After they were arrested -- we have had very

5    limited access to them, and this has very much been an

6    emergency situation; and we do not want to do anything that

7    would delay their ability to be heard on bail.  But we have,

8    in our limited conversations with them after their arrests,

9    reiterated the issue, discussed it with them.

10        I will note, also, that the government was fully

11   aware before the arrests that we were jointly representing

12   both of them and did not object.  After the arrests, they

13   have said that they were not objecting to us jointly

14   representing both of them.

15        We have been engaged in an effort to try to find

16   separate counsel for one of them if it became necessary,

17   and, in fact, have someone ready in the courtroom to do it,

18   if necessary, because we do not want any delay in the bail

19   proceeding.

20        In terms of what steps have been taken, we have

21   not had a lot of time to implement any kind of wall

22   procedure or even discuss, really, how we are going to

23   proceed going forward.  What our view is -- in this

24   situation, we're pre-indictment.

25        A lot of the concerns -- and we have reviewed Your

```
 1          Honor's decision -- it was a case where the defendant's name
 2          started with a "B" -- and forgive me, I am just blanking on
 3          the name --
 4                    THE COURT:  *Bikundi* --
 5                    MR. ENZER:  *Bikundi*.
 6                    THE COURT:  -- another money laundering case with
 7          Mr. Brown.
 8                    MR. ENZER:  If I remember correctly, it was a
 9          stepfather and a son, a different relationship from a
10          husband and wife.
11                    I think here, although it could look like they are
12          comparative arguments, it's not quite the same as when you
13          have a sentencing argument.  Because here, what we're really
14          saying, with respect to Ms. Morgan, is not that she is
15          better than or less bad than somebody else, we're just
16          saying there's not enough evidence against her.  And that
17          argument would be the same whether it's us making it or
18          somebody else.
19                    And I can tell you, Mr. Lichtenstein would want us
20          to make that argument -- aggressively want us to make that
21          point; he fully understands that.
22                    But if the Court wants to inquire of them, we
23          would consent to Your Honor doing a colloquy with them if
24          that would be helpful.
25                    THE COURT:  That was my plan.
```

```
 1              Ms. Pelker?

 2              MS. PELKER:  Your Honor, I don't mean to

 3     interrupt; but I do want to state for the record and correct

 4     the record about the government's position, if that's all

 5     right with the Court.

 6              THE COURT:  Yes.  I was actually going to turn to

 7     you to -- since this is a new issue, I was going to hear

 8     from both sides.  But does the government have any concern

 9     about joint representation of these two defendants?

10              MS. PELKER:  Yes, Your Honor.

11              And prearrest we asked for clarification from

12     defense counsel as to whether they were intending to

13     represent both defendants.

14              And then postarrest we had a conversation with

15     defense counsel where we explicitly raised that we believed

16     that there was a significant conflict issue here.  Defense

17     counsel said that they didn't see it.

18              And then we had a conversation as to whether the

19     government raising the conflict issue was, in fact, the

20     government attempting to interfere with the defendants'

21     constitutional right to their own choice of counsel.

22              THE COURT:  Well, okay.  I want the government to

23     tell me what you perceive to be --

24              Mr. Enzer, sit down, please.

25              I would like the government to tell me what you
```

1    perceive to be some of the potential conflict areas here.

2    Some of them are apparent to me just by my short time in

3    this case -- you-all have been living with this case for a

4    long time and know the evidence better -- but it's apparent

5    to me.

6              So could you, with your much deeper knowledge of

7    the case, tell me what you think are the potential conflicts

8    here?

9              MS. PELKER:  Your Honor, we think that there's --

10   depending on what trajectory each individual defendant may

11   want to take here, that there are multiple different paths

12   that may be very different such that the defendants'

13   interests may not necessarily align in a potential

14   resolution.

15             And, again, I don't want to get into the details

16   of discussions between government counsel and defense

17   counsel; but to the extent that there may be the possibility

18   of a differential resolution, I think that the interests of

19   Ms. Morgan may be very different than the interests of

20   Mr. Lichtenstein here.  And you see that --

21             THE COURT:  And does that also stem from the

22   difference in the proof, at least so far on the record,

23   before the government has even had a lot of time to do

24   forensic examinations of everything seized, that also might

25   pose a potential conflict in terms of the arguments that

1    could be presented by counsel on her behalf and on

2    Mr. Lichtenstein's behalf?

3                MS. PELKER:  Yes, Your Honor.

4                And, certainly, while the government believes that

5    its case against Ms. Morgan is strong, we could certainly

6    see a potential defense -- a strong defense argument about

7    relative culpability, at this stage and then all the way up

8    through sentencing, that we're concerned that defense

9    counsel won't be able to effectively make if they're

10   representing both parties.  And I think you start to see

11   that come out already in defense filings related to

12   detention here.

13               THE COURT:  All right.  Well, I -- let me just

14   tell the prosecutors, when defense counsel throw up threats

15   about making accusations against prosecutors about

16   interfering with the exercise of a defendant's

17   constitutional rights, I still expect the prosecutors to

18   confront and raise issues, particularly ones as serious as

19   the defendant's Sixth Amendment right to effective,

20   conflict-free counsel.

21               It wasn't raised in front of the New York

22   magistrate judge.  The New York magistrate judge did not do

23   a Rule 44(c) conflicts colloquy.  It would have been

24   appropriate then; it's certainly appropriate now.

25               Thank you, Ms. Pelker.

1          MS. PELKER:  Yes, Your Honor.

2          THE COURT:  Okay.  Mr. Enzer, do you really think

3     it's interfering with the defendants' Sixth Amendment

4     constitutional right to have a Rule 44(c) colloquy at this

5     juncture?

6          MR. ENZER:  No, Your Honor.  And I have never said

7     that.

8          THE COURT:  Okay.

9          MR. ENZER:  I have never said anything like that.

10         THE COURT:  Okay.  Well, maybe it was another

11    lawyer on your team.

12         MR. ENZER:  No.  No.  I was on the call with them.

13    And I think I did make a comment on a call with them about

14    the Sixth Amendment, but I never objected to a colloquy.

15    That is nothing I have ever said.

16         THE COURT:  Okay.

17         MR. ENZER:  We have no objection -- as I said

18    before, we have no objection to our clients being colloquied

19    right now.

20         And I will note, Your Honor, it is very common in

21    the Southern District of New York for a defendant -- when

22    there is an urgent situation for bail, it is not uncommon

23    for one lawyer to represent more than one defendant, even if

24    they have potential conflicts that could arise at a later

25    point in the proceedings for purposes of a bail proceeding.

1        We are not at all telling you, Your Honor, that

2    we --

3        THE COURT:  Well, just let me tell you in the

4    practice here, in this Court, that we are very, very

5    protective of each defendant's Sixth Amendment right.  Our

6    magistrate judges will have other counsel on tap, if they

7    have two defendants with one lawyer, in order to ensure that

8    each defendant has separate counsel; that's the practice

9    here.  Just like we have formal filing requirements -- no

10   informal letters.  We are a pretty formal court.

11       All right.  You may be seated.

12       I would ask both defendants to please rise while I

13   engage you in conversation.

14       I do want to explain to you that the Sixth

15   Amendment to the U.S. Constitution guarantees that -- in all

16   criminal prosecutions -- the accused shall have the

17   assistance of counsel for his defense; that right includes

18   the right to representation that is free from conflicts of

19   interests.  That's what the Supreme Court has said.

20       At the same time, the Sixth Amendment does provide

21   a presumption in favor of counsel of your choice since the

22   right to retain counsel of your choice stems from your right

23   to decide what kind of defense you wish to present.

24       Courts recognize that the choice of counsel may be

25   one of the most important decisions a defendant makes in

1    shaping his or her defense.  So you may waive a potential

2    conflict of interest that your counsel may have in jointly

3    representing you both, but I am obliged to make sure that

4    you both understand the potential conflicts that are

5    presented by joint representation of both of you by the same

6    lawyer.  And I want to make sure that your waiver of your

7    right to conflict-free counsel is knowing and on the record.

8             Okay.  So, Ms. Morgan, you may be seated.

9             Mr. Lichtenstein, I am going to ask you the

10   following questions and you can just respond, but speak

11   orally because I can't -- my court reporter can't document a

12   nod of your head.

13            Do you understand that you have a right to

14   effective assistance of counsel which includes conflict-free

15   counsel?

16            DEFENDANT LICHTENSTEIN:  Yes, Your Honor.

17            THE COURT:  And do you understand that you have a

18   right to retain separate counsel from your spouse and, if

19   you qualify, you may have a separate counsel appointed for

20   you by the Court and paid for by the government?

21            DEFENDANT LICHTENSTEIN:  Yes.

22            THE COURT:  And have you discussed the issue of

23   joint representation or separate counsel with your lawyer?

24            DEFENDANT LICHTENSTEIN:  Yes.

25            THE COURT:  And do you understand that, at this

1    stage of the criminal case against you, a lawyer jointly

2    representing you and your spouse may face some conflict in

3    the arguments presented, in the choices presented for,

4    perhaps, an early disposition --

5             DEFENDANT LICHTENSTEIN:  Yes.

6             THE COURT:  -- because of the -- sorry -- because

7    of representing both you and your spouse together at the

8    same time?

9             DEFENDANT LICHTENSTEIN:  Yes.

10            THE COURT:  And do you understand that, as this

11   case proceeds, additional conflicts may arise with the same

12   counsel representing both you and your spouse?

13            DEFENDANT LICHTENSTEIN:  Yes.

14            THE COURT:  And understanding these potential

15   conflicts, do you agree to waive any conflict posed by joint

16   representation by the same counsel with your spouse, at

17   least at this stage of the case and for purposes of this

18   detention hearing?

19            DEFENDANT LICHTENSTEIN:  Yes.

20            THE COURT:  Thank you.  You may be seated.

21            Okay.  Ms. Morgan, please stand.

22            Is it comfortable for you to stand?

23            DEFENDANT MORGAN:  My sciatic has been acting up,

24   but I think I will be okay for now.

25            THE COURT:  All right.  If you need to sit down,

1    just go ahead and do so.  All right?

2            DEFENDANT MORGAN:  Thank you, Your Honor.

3            THE COURT:  Okay.  Do you understand that you have

4    a right, Ms. Morgan, to effective assistance of counsel,

5    which includes conflict-free counsel?

6            DEFENDANT MORGAN:  Yes, Your Honor.

7            THE COURT:  And do you understand that you have a

8    right to retain separate counsel from your spouse and, if

9    you qualify, you may have separate counsel appointed by the

10   Court and paid for by the government?

11           DEFENDANT MORGAN:  Yes, Your Honor.

12           THE COURT:  And have you discussed the issue of

13   joint representation or separate counsel with your lawyer?

14           DEFENDANT MORGAN:  Yes, Your Honor.

15           THE COURT:  And do you understand that, at this

16   stage of the criminal case against you, a lawyer jointly

17   representing both you and your spouse may face some conflict

18   in the arguments presented, for example, comparing the

19   amount of evidence against you versus your spouse, and in

20   other ways the conflict may arise?

21           Do you understand that?

22           DEFENDANT MORGAN:  Yes, Your Honor.

23           THE COURT:  And do you understand that, as the

24   case proceeds, additional conflicts may arise with the same

25   counsel representing both you and your spouse?

1          DEFENDANT MORGAN:  Yes, Your Honor.

2          THE COURT:  And understanding these potential

3     conflicts, do you agree to waive any conflict posed by joint

4     representation by the same counsel with your spouse, at

5     least at this stage of the case and for purposes of this

6     detention hearing?

7          DEFENDANT MORGAN:  Yes, I do, Your Honor.

8          THE COURT:  Okay.  Thank you.  You may be seated.

9          All right.  Mr. Enzer, back to you.

10          MR. ENZER:  Your Honor, I am sure you have

11     questions.  But if you'd like, I have the subpoena

12     notification that my clients received that you were

13     inquiring about, in terms of the sequence of events of how

14     they learned of the investigation; and I can give it to the

15     Court as an exhibit.

16          THE COURT:  Have you given it to government

17     counsel?

18          MR. ENZER:  Not yet.

19          We just gave them a copy.

20          THE COURT:  Okay.  Usually, before you hand

21     something up to the Court, if you can give it to opposing

22     counsel, that usually spares me from having to ask.

23          MR. ENZER:  Will do, Your Honor.

24          And what we have are the nondisclosure order

25     which, I think, expire -- and that's Defense Exhibit 13, and

1    the subpoena itself which was given to our clients which is

2    Defendant's Exhibit 14.

3              And I can hand them up -- if Your Honor would like.

4              THE COURT:  All right.  You can give them to my

5    courtroom deputy.  Thank you.

6              All right.  I will hear from you.

7              MR. ENZER:  Your Honor, what is significant -- so

8    if you look at -- it is correct -- I think the government is

9    right that the subpoena -- the ISP that received the

10   subpoena was not the internet service provider for the

11   cloud.  But if you look at the requests in the rider to the

12   subpoena, it includes a request to a domain which -- the

13   domain is unviral.com.  That is the email domain for the

14   email account that the government says ties Mr. Lichtenstein

15   to the cloud storage account.

16             THE COURT:  Which page are you looking at?  The

17   attachment?

18             MR. ENZER:  It would be the rider -- the rider at

19   the back of the subpoena.

20             THE COURT:  And that attachment -- oh,

21   unviral.com?

22             MR. ENZER:  Unviral.com.  That is the --

23             THE COURT:  That was the hoster of the --

24             MR. ENZER:  -- the email domain for the email

25   account that --

1          THE COURT:  That was attached to the cloud

2     account.

3          MR. ENZER:  To the cloud, right.

4          THE COURT:  Okay.

5          MR. ENZER:  And, Your Honor, the sequence there is

6     November 2021, Mr. Lichtenstein and Ms. Morgan received this

7     notification; they retained counsel at that point.

8          THE COURT:  And you said November 2021?

9          MR. ENZER:  November of 2021.

10          THE COURT:  For the grand jury subpoena issued a

11     year earlier?

12          MR. ENZER:  A year earlier.  So they could infer

13     from the subpoena that this was an investigation that had

14     been going on for at least a year.

15          They learn of that.  They retain counsel at that

16     point -- not Cahill, prior counsel.  They did not run.

17          On January 5th, as the Court knows, federal agents

18     entered their house with a search warrant; seized,

19     essentially, if not all, virtually all of their computers,

20     smartphones, data storage, a bunch of materials that the

21     government casts as incriminating.  They did not run then.

22          I think the next day they retained counsel.  They

23     retained Cahill, us, to represent them; a step that is an

24     indicator that they really were taking this seriously and

25     understood the significance of it -- but did not run.

1          In addition, Your Honor, we then engaged with the

2    government and had significant back and forth with them --

3    so much back and forth with them that we were very, very

4    surprised with the arrest.  In fact, we had been told that a

5    charging decision had not been made, and that they were

6    months away from making one; so we were very, very surprised

7    when the arrests occurred when they did.

8          That said --

9          THE COURT:  You know, I saw in the transcript from

10   the -- before the New York magistrate judge that your

11   cocounsel used the word "shocked" a couple of times -- that

12   he was shocked that after the government had been

13   investigating something for over a year with a grand jury

14   subpoena, had executed a search warrant at your clients'

15   home, and at the storage facility.

16         I would be, sort of, shocked that it took them

17   between January 5th and February 8th to make the arrest as

18   opposed to the fact that they were arrested.

19         MR. ENZER:  Fair enough, Your Honor.

20         But I think it can't be disputed that if -- if

21   they had -- if the government's allegations are correct,

22   they had the means to flee and a warning to flee but didn't

23   flee.

24         The search warrant itself, which we did not really

25   get into at the bail hearing -- and I don't think is

1    discussed much in the parties' briefs -- but the search

2    warrant itself, the government provided it to us -- not the

3    affidavit, but the rider.

4         And it indicated that the government -- that this

5    warrant was authorized as part of a criminal investigation

6    into money laundering, computer fraud and abuse, wire fraud;

7    in other words, the very charges that the government is

8    alleging now as well as some other subject offenses.

9         It indicated that it was alleging violations

10   involving -- quote, "Violations involving Ilya Lichtenstein

11   and Heather Morgan."  It indicated that these alleged

12   violations stemmed from the hack of what it described as a

13   victim virtual currency exchange; it gave a date.  The

14   information it requested started in August of 2016, which we

15   know is the date of the hack at issue.

16        So it was clear -- not only from the fact that

17   agents burst into their house and took virtually everything,

18   but from the rider itself what -- the substance of what the

19   government was investigating.  And they did not run; they

20   did not go anywhere.  They hired us; we engaged with the

21   government.

22        In that -- in the course of those discussions --

23   and, by the way, I should say, we had been told by prior

24   counsel before they hired Cahill -- it is my understanding

25   from prior counsel that someone on the government team told

1    our predecessor counsel that the government could have

2    arrested them on the day that the warrant was executed.  On

3    January 5th, according to the government, what they told

4    prior counsel, they could have arrested our clients.

5           And without waiving privilege, Your Honor, you can

6    assume this information was faithfully conveyed to our

7    clients.  They were well aware in November, and certainly by

8    January 5, that the government was zeroing in on them, what

9    the government was looking at, the seriousness of it -- even

10   some of the things, the threads that the government was

11   pulling to get there; and they did not go anywhere.

12          The government arrested them in the very same

13   place where they were found earlier for the search in their

14   apartment.

15          THE COURT:  But you are just missing some of --

16   the main fact here.

17          At the point that they got the notice of the grand

18   jury subpoena, they realized that the government had sent a

19   subpoena for information about their various electronic

20   accounts the year before, and nothing had happened; so I

21   don't see how that would have made them want to flee.

22          They executed the warrant on January 5.  And based

23   on the evidence that the government was telling defense

24   counsel, as reported by defense counsel in the submissions

25   to this Court, the government was relying on how it was

1    tracking through -- doing the tedious tracking of stolen

2    bitcoin through various accounts to land in the defendants'

3    accounts.

4              They did not know at that point that the

5    government had been able to decrypt -- and the government

6    wasn't able to decrypt until January 31 -- the encrypted

7    files in the iCloud account -- the cloud account -- it is

8    not an "iCloud account," it's a cloud account -- that had

9    the private keys to all of the stolen bitcoin sitting in

10   Wallet 4S.

11             They may have suspected somehow the government got

12   private keys or figured out a way to remove the bitcoin from

13   Wallet 4S late in the night of January 31 through

14   February 1, but probably not until they saw the affidavit in

15   support of the arrest warrants did they know the government

16   had found these incriminating files in the cloud account.

17             MR. ENZER:  Your Honor, by the government's own

18   account, it was February 1 -- February 1, which is a week

19   before the arrest, February 1 that the defendants --

20             THE COURT:  Okay.  So we have gotten the period

21   down to February 1 because the government is giving them a

22   lot of credit for them to think that somehow the government

23   found the private keys to move the bitcoin.

24             Between February 1 and February 8th, the arrest,

25   you are right, the defendants did not flee.  But wasn't

1    Defendant Morgan just recuperating from surgery and wasn't

2    there a snowstorm, and hadn't their passports and a lot of

3    their financial documents and foreign money been taken from

4    the earlier search warrant?

5           So why isn't the government's more nuanced

6    timeline presented to the magistrate judge in the Southern

7    District of New York a pretty good explanation for the

8    no-flight defense?

9           MR. ENZER:  A few reasons, Your Honor.

10           So, first, it is true that Ms. Morgan had surgery

11    on January 31; she was fully mobile, though.  I mean, she

12    has pain; she can't move her right arm.  But I can tell you,

13    she met with me at Cahill's office -- and I can document it

14    if I need to -- the week of the surgery; so she was

15    absolutely able to move around.  You have seen her move

16    around now.

17           And also, you know, jokes -- there are jokes about

18    what happens when it snows in D.C.  In New York, a little

19    bit of snow doesn't stop anybody if they really want to

20    flee.  So the fact -- we have at least a week -- at least a

21    week where, by the government's own admission, it's all on

22    the table, all the cards are on the table.  The money has

23    been -- the bulk of the bitcoin, millions of dollars in

24    bitcoin, as the government says, has been moved to

25    Government-controlled accounts; and they know that the

1    government is hot on their trail.  They have executed a

2    search warrant there.  They're doing subpoenas.  They have

3    already retained counsel.

4            And a little bit of snow -- I mean, if a little

5    bit of snow would stop them, then certainly home detention

6    is a sufficient condition to keep them there.  And, Your

7    Honor, I just think it's preposterous that snow would be a

8    reason that would -- that it would have any relevance here.

9            The fact is, at least a week, they did not go.

10   And I think, Your Honor, you can push that date back further

11   because, while there wasn't definitive confirmation that the

12   government had decrypted the files until February 1, I think

13   it is fair to assume --

14           THE COURT:  Well, how definitive was that on

15   February 1?  I mean, just because of the private keys?

16   Maybe, for all they knew, the government could have done --

17   figured out another way.

18           MR. ENZER:  Well, I think there were a lot of

19   circumstantial indicators.

20           THE COURT:  They didn't know for sure about the

21   decryption of the inculpatory encrypted files in the cloud

22   account until they were arrested.

23           MR. ENZER:  Your Honor, I don't want to get into

24   privileged conversations.  But going from the evidence, I

25   think the evidence in the record is that the only place

1    where these private keys existed were in the cloud storage.

2            So if the funds are moved on February 1 and if the

3    government is already executing a search warrant, talking

4    about arrests, issuing a subpoena, I think there are lots of

5    indicators.  And the DOJ is in an active dialogue with their

6    retained counsel for this investigation.

7            There is a lot of evidence from which someone

8    would infer that the reason $3.6 billion in bitcoin moved

9    not long after agents knocked -- kicked down their door and

10   took everything is because it was the government that seized

11   it, because the government had decrypted the files and

12   gotten in.  They did not run.

13           They did not run because that is not their

14   intention.  Their lives are here.  Their family is right

15   here in the courtroom -- all of them are -- so Ms. Morgan is

16   a U.S. citizen; she is 31; she was born and raised here.

17   Her father, who is in the courtroom, U.S. citizen, lives in

18   the United States, served in the Marines; her mother, a

19   retired librarian.  They live in California.  That is her

20   life aside from Mr. Lichtenstein.  She would never leave

21   them behind.

22           And for Mr. Lichtenstein, yes, he was born in

23   Russia, but he came here as a kid; he grew up here.  He is

24   an American in his own mind.  His brother is an American

25   citizen, was born here.  His parents have lived in the

1  Chicago suburbs for decades.  His mom teaches at

2  Northwestern; she is a scientist there.  His dad works for

3  the housing authority in Cook County, Illinois.

4           They have made their life here.  They would not

5  want to abandon them.  And as we put in our papers, it seems

6  like the only realistic prospect of them having children is

7  to stay here in New York; their embryos are frozen at a

8  hospital in New York.  Ms. Morgan may not be able to

9  conceive without in vitro fertilization.  Their eggs are in

10 New York; they would literally be leaving their future

11 behind if they left.

12          This is not a situation where we --

13          THE COURT:  Could -- well --

14          MR. ENZER:  Yes, Your Honor.

15          THE COURT:  I don't want to spend too much time on

16 frozen embryos.  But, I mean, the procedure through which

17 those embryos were obtained and frozen could be done in

18 other places; isn't that right?

19          MR. ENZER:  You would need eggs -- you would need

20 good eggs.  Those eggs were frozen a long time ago.  So you

21 would be taking the risk that the eggs you would need to

22 freeze now or harvest now for the procedure might not be

23 viable.  Those eggs are believed to be viable; they are in

24 New York.

25          I would also say, Your Honor, I think one of the

1    biggest concerns the government seems to have with bail is

2    the prospect of these 24 private keys.

3            And the government has provided some information

4    to the Court, but there is additional information that I

5    think is important for the Court to know about those 24.  So

6    the Court asked a line of questioning that, I think, fairly

7    well establishes that there is not evidence -- certainly not

8    direct evidence that those -- that the bitcoin in those 24

9    wallets is even attributable -- is even controlled by my

10   clients.

11           But setting that aside, there is technology -- not

12   just the fact that you can view a wallet on the bitcoin

13   blockchain.  Anyone in the public, if you know the address,

14   can view it.  But, beyond that, there are software tools

15   that the government can use to make it virtually impossible

16   for anyone to liquidate those funds or move them.

17           First, there are blockchain-tracing software

18   programs.  And these are used by virtual currency exchanges

19   as part of their Know Your Customer anti-money laundering

20   controls that -- if the government or someone essentially

21   blacklists a wallet, they know not to allow funds from that

22   wallet to be liquidated.

23           And many, many -- I can't say most because I don't

24   know the numbers.  But certainly many of the virtual

25   currency exchanges that were used in this case and that are

1    used by most folks to liquidate bitcoin use these softwares.

2    One of the popular ones is called Chainanalysis KYC [sic];

3    that is the name of one of the leading softwares that is

4    used for this.

5            The government -- they may have already

6    blacklisted these; I don't know.  We haven't asked them.  I

7    would expect that they would have; but it's certainly a step

8    that can be taken to assure the Court, even if you thought

9    there was some chance that our clients had the ability to

10   move these funds --

11           THE COURT:  So are you saying that, I mean, as

12   relayed in the affidavit in support of the arrest warrants,

13   these defendants allegedly used ten or more VCEs to move

14   stolen bitcoin out of Wallet 4S to land either in their

15   personal or their business accounts or to vendors on the

16   darknet and not on the darknet to get products -- and what

17   you are saying is that all of Wallet 4S could have been

18   blocked or blacklisted, and all of those VCEs would have not

19   processed all of those transactions?

20           MR. ENZER:  I can't say "all," Judge, because I am

21   not sure.  But what I can say is I consulted an expert over

22   the weekend, an expert in blockchain tracing.  And my

23   understanding, from the conversations with the expert that I

24   had this weekend, is that many, if -- many of the major

25   exchanges -- so, for example, I think VCE7, which is the

1     account that they linked to -- that is allegedly the key

2     account for Ms. Morgan, VCE7 -- my understanding is they

3     have software like this.  They may even use Chainanalysis

4     KYC; I'm not sure of the particular program they use.

5            But my understanding is the major exchanges,

6     including some of the ones that are -- that come up in the

7     government's allegations, use software like this, and that

8     if you blacklist the main wallet that Your Honor is

9     referring to or these offshoot wallets where the 24 private

10    keys exist -- if you say, Hey, this is a dirty address,

11    they, as part of their Know Your Customer and compliance

12    controls, will take steps not to receive or process funds

13    from them; yes, Your Honor.

14           THE COURT:  Well, how about the darknet?

15           Will darknet vendors be as particular about taking

16    bitcoin on a blacklist -- in a blacklisted wallet?

17           MR. ENZER:  I am sure -- I do not know, Your

18    Honor.  I can't speak to the darknet.

19           I am sure in some sense, perhaps, they wouldn't

20    care; or maybe they would because it's a hot wallet and they

21    don't want to get in trouble and have their whole website

22    get taken down the way that AlphaBay was taken down.  I

23    mean, they may have an incentive.

24           I do not -- I cannot speak -- you know, it's not

25    like I talked to an expert about how the darknet works.  The

1    government has much more access to that kind of information.

2        I do think that if you are -- just using common

3    sense, if you are a criminal running a darknet that's

4    illegal, you don't want to do business with somebody that's

5    hot.

6        THE COURT:  All right.  So, basically, what you

7    are saying is all of these 24 accounts with over

8    $300 million worth of bitcoin in it, you know, the

9    government should just blacklist those accounts and then

10   these defendants would not have access to it, even if they

11   did have the private keys, and you'd be good to go on the --

12       MR. ENZER:  No, Your Honor.

13       What I would say is this:  There is no evidence

14   that my clients control them.  But if the government still

15   has concerns, there are conditions that can be fashioned to

16   satisfy the Court and the government that these funds will

17   not be touched.  And some of those conditions are:  Home

18   detention; no internet access; a bar against cryptocurrency

19   transactions.

20       They can monitor, with the blockchain, those

21   wallets.  They can have an agent sitting outside my client's

22   door.  If a penny moves out of those wallets, go in and

23   arrest them.  And tell the virtual currency exchanges

24   blacklist it so that even if the funds moved, it would be

25   almost impossible to sell, to liquidate, the bitcoin, which

1    would be the main purpose of moving it if you want to cash

2    in on it.

3              THE COURT:  Yes.  Having lived through a case

4    where seized bitcoin evaporated under the government's nose,

5    I know it's not that easy when everybody can see that the

6    bitcoin thought to be secured is gone, to figure out how it

7    happened and who has control of it.

8              MR. ENZER:  Your Honor, it is true that I think

9    there is no fool- -- there is no 100 percent perfect

10   guarantee; there is none.

11             Even jail, actually -- if you had the right

12   person, the right offender, would not stop some of the risks

13   the Court has pointed to.  But we have to remember the Bail

14   Reform Act; the presumption is in favor of release.  It is

15   not -- they are presumed innocent, and the presumption is in

16   favor of release.

17             The statute doesn't say that we're supposed to

18   have a perfect solution.  It says a reasonable assurance

19   that they will appear and come to court.  And a reasonable

20   assurance is provided by the fact that they didn't only --

21   they not only did not run between February 1 and February 8;

22   none of the funds moved.

23             The only movement of funds in that period is the

24   government seizing, you know, $3.6 billion on February 1.

25   It wasn't my clients moving any funds; there is no

1    allegation of that.  They could have done that as well if

2    the government's allegations are true, and they did not.

3              And Your Honor saw fit in the *Harmon* case --

4    *United States versus Harmon* -- to set bail in that case; and

5    I think many of the factors here are at least as strong as

6    that case in favor of bail, if not stronger.

7              Mr. Harmon was alleged to be, and I think

8    ultimately pleaded guilty to, running a dark -- to running

9    a -- was it a mixer -- a tumbler, a bitcoin tumbler.

10             THE COURT:  Helix was a bitcoin tumbler, correct.

11             MR. ENZER:  So he was not only -- this isn't

12   somebody who was alleged to have laundered proceeds from one

13   particular crime; he was in the business of laundering

14   criminal proceeds for years.

15             I have reviewed his plea agreement which is

16   publicly filed on Pacer.  The amount of funds -- the amount

17   of bitcoin he was alleged to have laundered is

18   astronomically higher than the amounts that my clients are

19   accused of participating in, and he was released on bail.

20             It was appropriate in that case, and it is equally

21   appropriate for these two individuals to be released on bail

22   given their extensive contacts to the community, the fact

23   that conditions could be set in this case.

24             THE COURT:  My recollection in the *Harmon* case,

25   though, is that Larry Harmon didn't have a long history or

1    have files with different personas, didn't have transactions

2    with darknets to find bank cards, passports, and other kinds

3    of stolen identity documents.  So his Helix tumbler may have

4    been used to help vendors in that scheme, but he himself was

5    not involved in that.

6         MR. ENZER:  Your Honor, according to what the

7    government said -- and this is the government's

8    representation in the *Harmon* case -- they said that Harmon,

9    quote:  Had extensive familiarity with the darknet -- I'm

10   sorry.

11        The government argued that Harmon's, quote,

12   extensive familiarity with the darknet would render

13   obtaining identity documents inconsequential.  That was

14   their representation.  I wasn't in the case.  I don't know

15   Mr. Harmon, but that's what they said about him.

16        Mr. Harmon had the ability, he had access.  And at

17   bottom, the persona file and these allegations, all they

18   show at most, at bottom, is that Mr. Lichtenstein, who was

19   the alleged owner of the cloud account -- that he could, if

20   he wanted to, obtain travel documents.  That doesn't mean he

21   would, and it doesn't mean that he could do it if the right

22   conditions were set:  home detention; a bracelet --

23        THE COURT:  Are you speculating that those

24   inculpatory encrypted files might have been planted on his

25   cloud account?

1          MR. ENZER:  Your Honor, we are not -- we are not

2    making any proffers of facts here.  I have not had anything

3    close to the opportunity to talk to my client about the

4    allegations.  We have had very, very limited time with our

5    clients.

6          And I will say that's just another reason why bail

7    is appropriate in this case.  It has been virtually

8    impossible to defend them in this case under the current --

9    the situation that we have been dealing with.  And the Court

10   has dealt with some of these frustrations, too, given the

11   fact that we are here today rather than doing the virtual --

12   the hearing virtually from Friday.

13         But just to lay this out, my clients were arrested

14   on Tuesday.  With respect to Mr. Lichtenstein, we did not

15   get to talk to him Tuesday after he was detained.  We did

16   not talk to him Wednesday.  We tried to visit both of them

17   at the jail on Wednesday.  We were told we could see them,

18   and we were turned away because of the COVID quarantine

19   rules.

20         We did not speak to Mr. Lichtenstein on Thursday.

21   Friday we were given a short call with him while he was

22   being transited to this court -- to the District of

23   Columbia.  It was less than an hour; far less than enough

24   time to pour through the extremely convoluted, complex

25   allegations in this case.

1          We didn't get any access to him over the weekend.

2     We were told we could talk to him today at noon by phone at

3     the jail.  We called in the morning; they said call back at

4     noon.  When we called at noon, they said he'd been brought

5     to court.  I only got to see him for less than ten minutes

6     in the back of the pens here.  So I have had a total of two

7     conversations with him since arrest that, collectively, are

8     under an hour.

9          With respect to Ms. Morgan, we have had two legal

10    calls with her, each one under an hour, nothing over the

11    weekend; and then today I saw her in the pen for, roughly,

12    ten minutes.

13         If they were detained -- especially if they are

14    detained in the District of Columbia, hundreds of miles from

15    where they live and where we work in New York -- it will be

16    virtually impossible for us to defend this case.  I expect

17    there is going to be enormous discovery here.  Enormous,

18    voluminous, data-intensive discovery.

19         We are going to have to go through the blockchain

20    and see how these things were traced.  We are going to have

21    to look at account records and see how it is the government

22    is attributing certain accounts to them.  We are going to

23    need to confer with them and say, What was this account?

24    What was that account?  What's the story here?  Did you

25    actually own it?  Did you not own it?

1     These types of conversations simply cannot happen

2    within the confines of a 30-minute, 45-minute legal call

3    where the client is being rushed away because there's about

4    to be a lockdown in the jail or some other situation in the

5    jail; it is just another reason.

6          And I think Your Honor cited that fact, the

7    impracticality of preparing somebody to defend themselves in

8    a case like this in the *Harmon* case; I believe that was one

9    of the factors Your Honor referenced in the transcript of

10    the bail hearing.

11          Additional -- as additional circumstances, Your

12    Honor -- well, Your Honor, do you have other questions --

13          THE COURT:  No.  You can keep going.

14          MR. ENZER:  I think I would also point out, as

15    just additional indicators that they intended to stay, after

16    the agents searched their house, they renewed their lease;

17    they renewed it for a year, reflecting their intent to stay,

18    not leave.

19          With respect to the government's allegations --

20    with respect to the government's allegations about the

21    strength of the proof, I think it's worth pointing out --

22    first of all, Your Honor has characterized the cloud

23    evidence as -- Your Honor called it a "smoking gun."

24          But what I will say, Your Honor, first of all, we

25    have not seen the warrant that was used to procure that

1    evidence, and we have already seen indications of sloppiness

2    by the government that would suggest there may be issues

3    with the warrant that could generate suppression risk on a

4    motion to suppress.  And to be more specific, in the --

5              THE COURT:  But this is not the time to argue

6    that.

7              MR. ENZER:  But it goes to the strength of the

8    evidence, Your Honor, which is a factor for bail, I think.

9              THE COURT:  Yes.  But that is not meant to turn

10   every detention hearing into a suppression hearing --

11             MR. ENZER:  Okay.

12             Your Honor, a couple other points --

13             THE COURT:  -- particularly with documents you

14   have not seen, and I haven't either.

15             MR. ENZER:  Sure.

16             THE COURT:  That would be a waste of our time.

17             MR. ENZER:  Here is something that, hopefully, is

18   not a waste of the Court's time.  The most serious count

19   here with the greatest time is the money laundering

20   conspiracy charge; and we are preparing and intend to make a

21   motion to dismiss on several grounds, and one of the grounds

22   will be lack of venue.

23             There is zero venue for the money laundering

24   charge in this court.  There is no transaction alleged to

25   have gone into or out of the District of Columbia.  Neither

1    of my clients ever -- according to the government's

2    allegations, ever set foot in the District of Columbia.

3    None of the virtual currency exchanges that are referenced

4    in the government's papers, by their allegations, was in the

5    District of Columbia.

6            There was no allegation that a false

7    representation was made in the District of Columbia or to

8    someone in the District of Columbia.  The closest they come

9    is to say that SAR reports were not an omission -- were not

10   sent by certain institutions to the United States treasury

11   department; and that, I think, is the predicate for their

12   371 venue and has nothing to do with what is required under

13   the money laundering statute to establish venue for the

14   money laundering conspiracy charge.  There is zero venue for

15   that charge.

16           And, Your Honor, if you remove that, what you are

17   left with is a five-year cap -- a five-year cap on the 371

18   count.  Five years, at most, would be their maximum

19   exposure, which dramatically reduces the incentive to flee.

20   The combination of their close contacts here, the fact that

21   they didn't run when they knew so much about what the

22   government was doing and zeroing in on them; the fact that

23   their embryos are here; the fact that they renewed their

24   lease; and the fact that they're not looking at that much

25   time when you consider the prospect that the money

1     laundering conspiracy charge is going to go out the window

2     for lack of venue, at least -- they are not strong reasons

3     to keep them in custody.

4             I'd also note, with respect to Ms. Morgan -- and

5     in terms of the strength of the evidence, Your Honor, I

6     won't go into the suppression issue but --

7             THE COURT:  I know; I have read your papers.

8             You think the strength of the evidence is weak;

9     you think it's flimsy.  I totally disagree with that

10    ascertainment and description of the evidence in this case,

11    which I will describe shortly; so it's not flimsy evidence.

12            MR. ENZER:  As to Ms. Morgan -- as to Ms. Morgan,

13    I think it is worth pointing out that the case boils down to

14    allegations that she received funds that are allegedly

15    traceable to the hack, allegation -- and then -- but the

16    unwitting receipt of tainted funds is not a crime.  If it

17    were a crime, we would expect the government to charge the

18    cryptocurrency --

19            THE COURT:  It has to be unwitting.  But she --

20    they have repeated conversations in response to inquiries

21    from VCEs --

22            MR. ENZER:  Your Honor, I think if you --

23            THE COURT:  -- and Know Your Customer

24    conversations --

25            MR. ENZER:  I think, Your Honor, if you examine

1    those statements --

2          THE COURT:  -- where -- let me just finish --

3    where there seems to be pretty clear dissembling about the

4    source of the currency.

5          MR. ENZER:  Your Honor, the allegations that the

6    government makes do not rule out the possibility that she

7    believed the statements.  They do not rule out the

8    possibility that she was told what to say, believed it, and

9    conveyed it.  There is no evidence in the complaint or in

10   the government's supplemental papers.

11         THE COURT:  And what about the conversations with

12   the accountant who was trying to say:  Give me a receipt.

13   Tell me how much you paid for your bitcoin so that I can

14   give it a basis so, when you sell it, you don't have to pay

15   as much capital gains tax.

16         And according to the government's conversations, I

17   guess, with the accountant, Ms. Morgan was the one who said:

18   Just put it down as zero; suggesting she knew that they

19   didn't have receipts to provide a basis for it because they

20   were stolen bitcoin.

21         So how are you going to deal with the accountant

22   information with Ms. Morgan's suggestion to give a basis of

23   zero to bitcoin sales increasing their capital gains

24   enormously?

25         MR. ENZER:  Your Honor, I think there are two

1     responses to that.

2               First is, I think that that --

3               THE COURT:  And while you are responding to that,

4     can you also -- I mean, you have got to admit it is not

5     normal for law-abiding citizens to have access to accounts

6     of vetted darknet vendors that sell debit cards, false

7     passports, and false personas.

8               MR. ENZER:  We're talking about Ms. Morgan now, I

9     think, Your Honor, and I do not --

10              THE COURT:  Well, but some of those personas were

11    for women.

12              MR. ENZER:  Your Honor, I do not think there is

13    any evidence that Ms. Morgan -- and I think the government

14    said this, there is no evidence that Ms. Morgan had access

15    to the cloud account, touched anything in the cloud account,

16    ever looked in the cloud account.  There is no evidence that

17    she touched the spreadsheet that is one of the pillars of

18    the government's case against Mr. Lichtenstein.  The

19    personas file, there is no evidence that she ever touched it.

20              The only allegations in the government's brief

21    about Ms. Morgan and this Ukraine shipment basically boiled

22    down to that she was there.  There is evidence that she was

23    at a hotel and -- went to a hotel where a package may have

24    been delivered; but there is no evidence that she obtained,

25    procured, used false identities.  The accounts attributed to

1        her -- I think the principal accounts are at VCE7.  They're

2        at -- one account in her personal name, one account in her

3        legitimate business, SalesFolk, a legitimate business that

4        does marketing consulting and business-to-business sales.

5        Their website is available online; they have legitimate

6        revenue.

7                    And, Your Honor, with respect to the account, it

8        is equally plausible, when you read those statements, that

9        what is going on -- it is equally plausible that Ms. Morgan

10       is not as sophisticated in the very complicated IRS guidance

11       relating to bitcoin.  The accountant is saying, Look, if you

12       show me this or that, we can get you a lower tax rate.  And

13       she chooses to be conservative and says, fine; go with a

14       zero basis and, fine, we'll just pay a higher tax on that.

15                   THE COURT:  This has nothing to do with, sort of,

16       sophisticated cryptocurrency trading.  This is, like, your

17       basic 101 capital gains tax, isn't it?

18                   MR. ENZER:  I would never, Your Honor, venture --

19       I am not sophisticated in accounting; and I certainly would

20       never characterize the IRS guidance on cryptocurrency as

21       anything "101."

22                   THE COURT:  All right.

23                   MR. ENZER:  But the statements she made to the

24       accountant, there is no -- first of all, there is no proof

25       that they're false.  The evidence that the -- and, Your

1    Honor, it is my understanding there is no evidence that

2    they're false.  What the government is arguing with respect

3    to that statement -- they're arguing in their brief, and

4    this is straight from their brief -- their argument is that

5    if somebody was to opt for higher taxes, it must be a lie;

6    and I think that that is -- that that is not a fair

7    suggestion, to say the least.  It is a ridiculous

8    suggestion.

9          I think many people do not -- they want to play it

10   safe when it comes to taxes.  They don't want to get on the

11   wrong side of the IRS.  They choose the conservative option;

12   that's all that's going on there.  It's not nefarious.  It's

13   certainly not compelling evidence that she was knowingly

14   participating in a huge money laundering conspiracy.

15         These are very thin reeds that the government is

16   pointing to against her.  The weakness of the case against

17   her is a factor that suggests she would believe she can

18   defend this case, does not have an incentive to flee, along

19   with all of the other factors that we have been talking

20   about.

21         And, Your Honor, the conditions here -- Judge

22   Freeman is a very experienced magistrate judge, an excellent

23   judge; she heard extensive argument in this case.  And after

24   hearing the government's concerns, she fashioned a package

25   that was reasonably designed to address the government's

1    concerns, very stringent.

2              THE COURT:  It was so reasonable that we didn't

3    even have the price of the cost of the houses that might be

4    lost, that might be totally -- I expected, when houses are

5    put up for bond -- and I have to tell you, in this

6    District -- well, in the District of Columbia -- for this

7    court and for superior court -- we don't really use money

8    bonds; we don't really use security with houses.  But in

9    those jurisdictions that do, I usually expect a fairly

10   extensive inquiry with the people posting their houses to

11   figure out:  Is this a house worth $100,000 or is this a

12   house worth $2 million; and I didn't see any of that --

13             MR. ENZER:  You are right, Your Honor.

14             THE COURT:   -- in this record.

15             MR. ENZER:  You are right, Your Honor, it didn't.

16             But I think the reason for that, I think the

17   thinking was -- the thinking was the government is saying

18   that these people have lots of money, so much so that it's

19   not really the price that's going to matter here.  What

20   matters is the moral suasion.  And the moral suasion, Your

21   Honor, is sitting right here in the back of this courtroom.

22   They are sitting right here; they are ready to put up their

23   houses.

24             They're ready to basically forfeit their lives if

25   either of these two youngsters here -- because they are

1      young, they are 34 and 31.  They've now been detained for

2      almost a week.  First time in their lives.  They've never

3      been arrested before; never been convicted of a crime.

4              Their families are sitting here and they are

5      prepared to put up their houses and say, if these two were

6      to ever run or fail to comply with any of the conditions set

7      by this Court, they will forfeit their homes.  That is

8      because they have total confidence -- they have total

9      confidence that they will comply with any conditions set by

10     this Court that allows them to be released from jail so that

11     they can return to their home, be detained there with

12     extremely stringent conditions, if necessary and

13     appropriate, and actually engage with their counsel to

14     defend this case which is going to be a very difficult

15     undertaking.

16             As it is, we are going to have to have days and

17     days, weeks and weeks, many, many, many hours of meetings to

18     defend this case, and it's just not going to be possible if

19     they're stuck in jail down here and we're getting one

20     30-minute phone call with them every few days.

21             THE COURT:  Well, let me just say, you know, the

22     D.C. jail here, you know, it provides iPads for defendants

23     to look at electronic evidence.  There are, you know,

24     contactless visits, contact visits; it's seven days a week,

25     I think 24/7.  It's -- I mean, the pandemic has, at

1    different periods, put them into more of a stringent

2    circumstance where they allow videoconferencing with

3    lawyers.  But my understanding from the D.C. jail is, at

4    this point, it's -- they are allowing contact visits this

5    week.

6              MR. ENZER:  Your Honor, we also have concerns, I

7    think -- I know Your Honor is aware of this from the papers,

8    about Ms. Morgan's health.

9              Both of our clients have serious health

10   conditions; but Ms. Morgan, in particular, just had this

11   surgery, is still recovering, does experience pain, cannot

12   use -- does not have full range of motion in her right arm.

13   If you may have noticed, she's been struggling with the pain

14   when she stands up, and plays with it.

15             And she's supposed to have a follow-up surgery --

16   a follow-up visit with her surgeon this week.  It was

17   supposed to be this week; I believe it's Thursday, if I am

18   remembering it correctly.  And if she is detained -- yes,

19   the Bureau of Prisons has doctors; but I think we all know

20   from our experience that BOP doctors who do not have the

21   history are not going to do as good a job as the treating

22   physician.

23             This is a significant -- and it's not the only

24   significant medical issue that Ms. Morgan has that would

25   make bail appropriate.  She has asthma; she has an inhaler

1    for it, and pre -- has serious lung damage from a prior bout

2    of MERS; so she's at heightened risk if she were to contract

3    COVID.  She is vaccinated, but there are breakthrough cases

4    as we all know.  And, in fact, over the weekend she had a

5    serious asthma attack.  She had a very serious asthma attack

6    because the jail did not have her inhaler.  And we notified

7    the government of this issue.

8            We have notified the government of other issues we

9    have encountered with the care that my clients are receiving

10   in jail.  And, essentially, what the government has told us

11   each time is:  The D.C. U.S. Attorney's Office does not have

12   control over the Bureau of Prisons.

13           I understand that they do not have control over

14   the Bureau of Prisons.  I understand that; but it doesn't

15   change the fact that if their incarceration is continued

16   throughout what could be months or years of litigation and

17   these issues keep happening, there could be serious harm,

18   particularly to Ms. Morgan, to her health, if she is held.

19   And it's not satisfying -- it's not a very satisfying

20   response to hear from the government:  Well, we don't have

21   control over the Bureau of Prisons.

22           We don't, as the defense -- the government is

23   probably the only party that can have a conversation with

24   the Bureau of Prisons where the Bureau of Prisons will

25   actually listen.  They certainly don't have much regard for

1    when defense lawyers are saying, Hey, please make sure this

2    person has the inhaler that they need; that is a significant

3    issue, Your Honor, that also, we think, weighs in favor of

4    pretrial release in this case.

5           The Bail Reform Act sets a presumption in favor --

6    Bernard Madoff -- Bernard Madoff was given bail.  He was

7    given bail on very, very strict conditions.  But the

8    allegation in that case I believe, if I remember right, was

9    a $50 billion fraud.  There were serious allegations in the

10   *Madoff* case that he would have access to contacts abroad,

11   that he may have stashed money away.  And I believe there

12   were even allegations that he had violated the bail

13   conditions, or at least an injunction, by moving funds that

14   were restrained to give gifts away, to secrete assets; but

15   Bernard Madoff got bail.

16          Lee Harmon, in this court, got bail.

17          These two individuals who knew, certainly by no

18   later than February 1, that they were the target of this

19   investigation and did not run should be afforded the

20   opportunity to defend themselves in this case from their

21   home under strict conditions.  The conditions set by Judge

22   Freeman were appropriate; they're reasonable.  If Your Honor

23   wants to add to them, we will -- we are not going to object

24   to additional conditions because they're not going to run;

25   they're going to comply with them.

1          All we ask is that they be released from jail,

2     that is it.

3          THE COURT:  Thank you, Mr. Enzer.

4          Does the government want to respond?

5          MS. PELKER:  Briefly, Your Honor.

6          I just wanted to respond to several points the

7     defense counsel raised.

8          First, regarding the nondisclosure order that

9     expired that defense counsel passed up, we just want to

10    clarify that, one, that is the expiration that the

11    government -- the order that the government believed

12    expired.  But the specific reference to the account the

13    defense counsel was noting -- so it's the second entry on

14    the list of identifiers -- is fairly attenuated from that

15    identifier to the cloud storage account.  Essentially, that

16    is a domain that was listed as an identifier for the account

17    that you see the subpoena for there.  That same domain is

18    serviced by the provider that also services the cloud

19    storage account; and Mr. Lichtenstein had several accounts

20    with that domain that Mr. Lichtenstein controlled with

21    vanity names at that domain at the cloud storage account

22    provider in question, and that's what led to it.

23         So there are still several steps one would have to

24    go through to get from the identifier that's listed on the

25    subpoena, and a big leap to think that the government would

1    have had a search warrant for the contents of a cloud

2    storage account for an account of several that's tied to

3    that particular domain.

4           So the defense suggestion that the government has

5    some sort of capability to freeze or blacklist coins --

6    defense is correct that many legitimate cryptocurrency

7    exchanges will flag addresses that they know are connected

8    to suspicious activity.  And, in fact, many of them flagged

9    the addresses that are in that one -- that 4S wallet because

10   the hack of the victim virtual currency exchange was very

11   well-publicized; we were able to trace the funds to the 4S

12   wallet, so were many others in the crypto industry.

13          And that wallet itself was flagged.  That's why

14   you see that the defendants didn't simply take the funds and

15   transfer them directly from the 4S wallet out to individual

16   virtual currency exchanges.  They sent them through this

17   complex series of layering and shuffling; they sent them to

18   darknet markets.  They sent them through chain chopping,

19   through peel chains; all of which means that even if a

20   virtual currency exchange was trying to trace the funds

21   back, was trying to flag any transactions out of this other

22   set of 24 addresses, the defendants would have the

23   capability to do sufficient laundering of the exact sort

24   that we saw them already do to be able to cash out those

25   funds.

1          And there are many virtual currency exchanges,

2    unfortunately, that don't abide by anti-money laundering and

3    Bank Secrecy Act requirements that wouldn't require or

4    freeze those funds, even if they did see that they were

5    coming from the hack's funds.

6          And to defense counsel's --

7          THE COURT:  So let's just take an example of VCE4

8    which, at some point for the accounts -- the two accounts at

9    VCE4 that ultimately got frozen but that -- according to the

10   government -- a large portion of the Wallet 4S stolen

11   bitcoins were sent through, did it take VCE4 some time to

12   complete its Know Your Customer inquiry and shut down those

13   accounts?  And is that why in the period of time between --

14   before they froze those accounts that there was a large

15   portion of bitcoin that went through that account?

16         MS. PELKER:  Yes, Your Honor.

17         And VCE4, when they were doing that inquiry, may

18   not have initially realized at the time that these funds

19   were even necessarily sourced from the hack because they

20   went through several hops before they got to VCE4.

21         So certainly the blockchain analytics software

22   that the exchanges are using has advanced over the last few

23   years as exchanges have sought to be more compliant,

24   implement more robust anti-money laundering controls; but

25   what we have seen is that the defendants' sophistication in

1      their laundering has matched to keep pace with that.

2              THE COURT:  Okay.

3              MS. PELKER:  And as far as defense counsel's

4      repeated statements that they were incredibly surprised or

5      shocked to hear that their defendants -- that the defendants

6      were arrested and that they believed that the government's

7      case is weak here, it all only bolsters the idea that the

8      defendants did not realize the strength of the government's

9      case and the incredibly serious nature of the charges and

10     the prospect of protracted jail time until they were

11     actually arrested so that the calculus related to any

12     incentive to flee dramatically changed before their arrest

13     to after their arrest, and that they have much more

14     incentive to flee now than they did prior to the arrest.

15             THE COURT:  So why is it -- why does the

16     government just think that the connections to their parents,

17     their parents losing their houses, the frozen embryos, does

18     the government -- the government's view is that none of that

19     is really going to be -- play into the calculus for these

20     defendants of whether or not they're going to flee or not?

21             MS. PELKER:  Your Honor, the government doesn't

22     doubt the sincerity of Ms. Morgan and Mr. Lichtenstein's

23     parents; but several hundred million dollars of crypto can

24     buy you a new house and can buy -- it can buy each one of

25     their parents a private island for that amount and can get

1     them access to additional medical care.

2              And, unfortunately, if the argument here is that

3     they are so concerned with their ability to have a family,

4     it's incredibly difficult to have and raise children if you

5     are in jail for 25 years.  It's really only more incentive

6     for them to flee.

7              THE COURT:  All right.

8              Is there anything further?

9              MS. PELKER:  Excuse me, Your Honor?

10             THE COURT:  Is there anything further from the

11    government?

12             MS. PELKER:  I have nothing further from the

13    government, Your Honor.

14             THE COURT:  Okay.  We're going to take a

15    five-minute break.

16             (Whereupon, a recess was taken.)

17             THE COURT:  All right.  Mr. Enzer, did you have

18    something you wanted to say before we broke, for the record?

19             MR. ENZER:  Yes.  Apologizes for forgetting.

20             We have 12 letters of support on behalf of my

21    clients, marked as Defendants' Exhibits 1 through 12.  These

22    are letters attesting that they have the kind of character

23    and wouldn't be flight risks from various people who know

24    them; and we were hoping to give it to the Court.

25             THE COURT:  All right.  Well, it's a little late

1    in the day when I am just about to rule; isn't it?

2            MR. ENZER:  I'm sorry, Your Honor.  I forgot to do

3    it earlier.

4            THE COURT:  This is the kind of thing that's

5    usually filed on the record so I can see it before I come

6    out on the bench.

7            MR. ENZER:  I'm sorry.  I didn't hear that.

8            THE COURT:  I said this is the kind of thing I

9    look at before I come out on the bench.

10           MR. ENZER:  We were not in a position to file them

11   earlier because they have been coming in -- some of them we

12   even received late last night or even today; but I will do

13   whatever Your Honor wants.

14           Should I give them to Your Honor, or not?

15           THE COURT:  Yes.  You can give them to me.  And

16   you can also put them on the docket so that there is a

17   record of them.

18           MR. ENZER:  Certainly.

19           We can file them with a formal motion after the

20   hearing, if Your Honor would like.

21           THE COURT:  Okay.  Why don't you give them to my

22   courtroom deputy.

23           And you don't have to file them as a motion, you

24   can just file them as a notice.

25           So I see that some of these letters refer to

1    Mr. Lichtenstein as "Dutch"; is that what he goes by?

2              MR. ENZER:  Your Honor, his nickname is "Dutch";

3    and I believe it's an a/k/a in the caption of the complaint.

4              (Whereupon, the proceeding pauses.)

5              THE COURT:  Okay.  I have reviewed the letters

6    fairly quickly, since the hour is getting late, and I

7    appreciate that the defendants want to know what my ruling

8    is.

9              All right.  So I am prepared to rule on the

10   government's motion for review of the magistrate judge's

11   release of both defendants pending trial.

12             On a motion to revoke or modify a magistrate

13   judge's order of pretrial release, the district court must

14   conduct a *de novo* review, and must do so promptly under

15   18 U.S.C. Section 3145(a).  Neither 18 U.S.C. Section 3142

16   nor 3145 specifies the standard of review to be applied by a

17   district court reviewing a magistrate judge's release or

18   detention order.

19             The D.C. Circuit has declined to decide the

20   standard applicable to the district court's review of a

21   magistrate judge's release order and whether the magistrate

22   judge's factual or other findings are entitled to any

23   deference; see *U.S. v Munchel*, 991 F.3d 1273, jump cite

24   1280, D.C. Circuit 2021.

25             Nonetheless, for years, this court has exercised

1    *de novo* review based on the text and structure of the Bail

2    Reform Act, and the weight of authority from every other

3    circuit to consider this critical issue has held that

4    *de novo* review applies.  These decisions are all collected

5    in *U.S. v Chrestman*, 525 F. Supp. 3d 14, jump cite 24, at

6    note 5, D.D.C. 2021.  This Court will apply *de novo* review

7    here.

8            The Bail Reform Act requires release of a

9    defendant prior to trial unless a judicial officer

10   determines, after a hearing, that no condition or

11   combination of conditions will reasonably assure the

12   appearance of the person as required and the safety of any

13   other person and the community; see 18 U.S.C. Section

14   3142(e)(1).

15           The government bears the burden to establish, by a

16   preponderance of the evidence, that the defendant poses a

17   serious risk of flight or of obstruction, or of attempted

18   obstruction of justice; see *U.S. v Manafort,* 897 F.3d 340,

19   jump cite 344, D.C. Circuit 2018.  Also, *U.S. v Simpkins*,

20   826 F.2d 94, jump cite 96, D.C. Circuit from 1987 -- and, by

21   clear and convincing evidence, that no conditions of release

22   will assure the safety of any other person or the community

23   under Section 3142(f)(2).

24           In determining whether any conditions of release

25   will reasonably assure the appearance of the person as

1    required and the safety of others, the Court must take into

2    account the available information concerning four factors

3    set out in 18 U.S.C. Section 3142(g).

4            These factors are:  First, the nature and

5    circumstances of the offense charged; second, the weight of

6    the evidence against the person; third, the history and

7    characteristics of the person; fourth, the nature and

8    seriousness of the danger to any person or the community

9    that would be posed by the person's release.

10           I will discuss each of these factors in turn.

11           First, as to the nature and circumstances of the

12   charged offense, this factor weighs heavily in favor of

13   detention for both defendants.

14           They are charged in a two-count criminal

15   complaint.  In Count 1, charged with conspiracy to launder

16   money instruments, in violation of 18 U.S.C. Section

17   1956(h), an offense that carries a penalty of the object of

18   the conspiracy; and here that object of the charged

19   conspiracy is concealment money laundering, in violation of

20   18 U.S.C. Section 1956(a)(1)(B)(i), which carries a maximum

21   sentence of 20 years.

22           Count 2 charges conspiracy to defraud the

23   United States, in violation of 18 U.S.C. Section 371, which

24   carries a penalty of up to 5 years.

25           The charges arise out of the government's

1    investigation of a 2016 hack of one of the world's largest

2    virtual currency exchanges, which I will call "VCE."

3              As the government made clear today, the government

4    has not named the person or persons responsible for the

5    actual hack nor accused either defendant of being the actual

6    hacker.  This still unidentified hacker initiated over 2000

7    unauthorized bitcoin transactions in which approximately

8    1,000 -- 119,754 bitcoin was transferred from wallets held

9    by the victim VCE to an unhosted wallet, which I am going to

10   call Wallet 4S.

11             Bitcoin wallets can either be hosted or unhosted.

12   And a hosted wallet is set up by a third party that retains

13   a customer's funds until the customer is ready to transact

14   with those funds, while an unhosted wallet allows users to

15   exercise total independent control over their funds.  This

16   is in the statement of facts attached to the affidavit in

17   support of the search warrants at -- attached to the

18   criminal complaint, at 3, Note 11.

19             At the time of the hack, the stolen funds were

20   valued at approximately $71 million, but are now valued at

21   over 5 billion as of February 2022.

22             The government proffers that, beginning around

23   January 2017, the defendants began moving a portion of the

24   stolen bitcoin out of Wallet 4S in a series of small complex

25   transactions across multiple accounts and platforms.

1    Ultimately, the government was able, in a painstaking way,

2    to trace the stolen bitcoin to multiple accounts controlled

3    by Defendants including accounts held by their businesses.

4        I agree with the Southern District of New York

5    magistrate judge that the nature of this offense involves a

6    lot of sophistication.  There is no way to overstate the

7    multitude of complex money laundering techniques the

8    government proffers that the defendants used to conceal

9    their activities.

10        Those techniques included:  One, using accounts

11   set up with fictitious identities; two, moving the stolen

12   funds in a series of small amounts totaling thousands of

13   transactions, as opposed to moving the funds all at once or

14   in large chunks; three, utilizing computer programs to

15   automate transactions; four, layering the stolen funds by

16   depositing them into accounts at a variety of virtual

17   currency exchanges and darknet markets and then withdrawing

18   the funds, which obfuscates the trail of the transaction

19   history by breaking up the fund flow, and certainly makes it

20   more time-consuming and challenging to trace; five,

21   converting the bitcoin into other forms of virtual currency,

22   including anonymity-enhanced virtual currency, in a practice

23   known has chain hopping; and six, using U.S.-based business

24   accounts to legitimize activity.

25        In tandem with these transactions, the government

1    proffers that Defendants repeatedly provided false

2    information to and deceived VCEs and other financial

3    institutions doing business in the U.S. for the purpose of

4    frustrating these institutions' due diligence efforts

5    required by the Bank Secrecy Act.

6            The government proffers that examples of this

7    conduct includes both defendants lying to VCEs in response

8    to Know Your Client inquiries; lying about the source of the

9    virtual currency funds held in their accounts; stating that

10   those funds came from investments dating back to 2015 or

11   earlier, sometime before the August 2016 hack, when, in

12   fact, the primary source of funding was from VCE accounts

13   directly linked to funds stolen in August 2016.

14           The government contends -- and the Court agrees --

15   that the defendants' alleged disregard for the U.S.

16   Government's anti-money laundering and Know Your Customer

17   requirements shows some willingness to use deception to

18   circumvent legal and regulatory requirements.

19           The Court also agrees with the government that in

20   avoiding -- in the government's proffer, there are multiple

21   examples of the defendants avoiding answering Know Your

22   Customer questions and dissembling in response to such

23   questions that it undermines confidence that they can be

24   trusted to comply honestly with pretrial release orders from

25   this Court or instructions from pretrial services regarding

1    conditions of release.

2              But even with the defendants' activity traced back

3    to spending and transferring stolen bitcoin out of Wallet

4    4S, the majority of the stolen funds remained in Wallet 4S.

5              On January 31, 2022, law enforcement gained access

6    to the wallet by decrypting a file saved to Defendant

7    Lichtenstein's cloud storage accounts; that file contained

8    2000 virtual currency addresses, along with the

9    corresponding private keys; and blockchain analysis

10   confirmed that almost all of the 2,000 addresses were

11   directly linked to the hack using the private keys

12   discovered in Defendant Lichtenstein's encrypted file.  The

13   government was able to seize approximately 94,636 bitcoin

14   worth approximately 3.6 billion at the time of the seizure.

15             Based on all of this evidence, the defendants are

16   charged with serious federal felonies.  As a Southern

17   District of New York magistrate judge found, the charges

18   against the defendants are indeed serious.  She said that in

19   the transcript, at page 42, which weighs in favor of

20   detention.

21             The two charges have a statutory maximum of 20

22   years and 5 years respectively, and the defendants also face

23   a significant financial penalty if convicted.  Although, a

24   conviction -- a conviction under 18 U.S.C. Section 1956(h)

25   carries the potential of significant financial penalties

1    including a fine of not more than $500,000 or twice the

2    value of the property involved in the transaction, as well

3    as forfeiture.

4           There is no question -- as the New York magistrate

5    judge found, there is a lot of money at stake here, and the

6    defendants face serious financial penalties as well as

7    significant prison time if convicted of the charges that are

8    currently pending and set out in the criminal complaint.

9           This is considerable exposure, and such

10   considerable exposure does create an incentive to flee; see

11   *U.S. v Bikundi*, 47 F. Supp. 3d 131, jump cite 134, a

12   D.D.C. case from 2014.  See, also, *U.S. v Hong Vo*, 978

13   F. Supp. 2d, 41, jump cite 43, a D.D.C. case from 2013.

14          Facing serious charges, potentially high financial

15   penalties, and long prison terms is not the only reason that

16   the nature of the charges here favors pretrial detention.

17          Other aspects of the nature and circumstances of

18   Defendants' offense conduct are highly probative of

19   Defendants' intent and both risk and capability of flight.

20          Specifically, the government proffers that the

21   government's searches and seizures related to these charges

22   revealed, among other things, the following:

23          Defendant Lichtenstein's cloud storage account,

24   which held the files critical for the government to be able

25   to seize the majority of the stolen funds, also held other

1    incriminating documents.

2              For example, the government found a text file

3    named "passport ideas" that included links to different

4    darknet vendor accounts that appeared to be offering

5    passports or identification cards for sale.

6              Another file in the cloud storage account titled

7    "vetted vendors" contains a list of darknet vendors offering

8    for sale identification documents, passports, and debit and

9    bank cards.  And the government attached this list of

10   vendors -- or at least part of it -- to its reply brief.

11             The list of vendors, for example, has one vendor

12   that can provide Ukraine internet passport fakes, photo

13   paste, with internal delivery in Ukraine.

14             Another file titled "couriers" -- another

15   encrypted file -- shows actual use of at least one of the

16   darknet vendors on that vendor list, since the list shows

17   tracking numbers for packages from darknet vendors including

18   a shipment from Russia to Kiev, Ukraine, arriving on

19   September 9th, 2019, when the defendants were actually in

20   Kiev during the period of August to September 2019.

21             We can't be sure precisely what was in the Russian

22   package to the defendants sent to them in Kiev; but two text

23   files in the cloud account were created on September 10,

24   2019, the day after the Russian package delivery, that

25   contained detailed identification information for Russian

1    personas, with a notation referenced to a vendor on the

2    vetted vendor list contained in Defendant Lichtenstein's

3    cloud account.

4          Third, the cloud storage account also had several

5    folders containing Russian and Ukrainian persona information

6    in the form of passports, identification information, and

7    biographical information for numerous individuals, both male

8    and female.  The government hasn't been able to ascertain

9    whether those are actual people and they're stolen

10   biographical and identification information or not because

11   of difficulties in communicating with Russian law

12   enforcement to confirm.

13         Law enforcement also seized numerous items from

14   the defendants' residence that could be used to conceal

15   their whereabouts and facilitate flight to foreign countries

16   including bags containing multiple cell phones and SIM

17   cards, one of which was labeled "burner phone," as well as a

18   substantial amount of foreign currency.

19         The magistrate judge found the evidence concerning

20   personas, passports -- false passports, particularly

21   troubling and weighing in favor of detention, and I share

22   that concern.

23         This evidence indicates the defendants are no

24   strangers to and, in fact, are skilled and quite resourceful

25   in using lawful and unlawful means to avoid detection and

1    create fake foreign identities.

2        Defendant Morgan's conduct while the government

3    executed the search on January 5, 2022, is also concerning.

4    After agents secured the scene, Defendants advised that they

5    did not want to remain on the premises but wanted to take

6    their cat with them.  And when Defendant Morgan was

7    supposedly attempting to retrieve the cat from underneath

8    the bed, she grabbed one of her cell phones from a nearby

9    nightstand and allegedly attempted to lock the phone in a

10   way to make it difficult for law enforcement to search its

11   contents.  Ultimately, law enforcement had to wrest the

12   phone from her hands.  Altogether, this conduct raises

13   serious concerns about Defendants' willingness to comply in

14   an honest fashion with release conditions and the

15   effectiveness of such release conditions from deterring them

16   from flight.

17       In sum, it's difficult to overstate the gravity of

18   the alleged conduct, which suggests that Defendants are

19   sophisticated money laundering offenders who are also savvy

20   with technology, willing to accumulate and utilize multiple

21   fictitious identities to bypass law enforcement efforts to

22   detect their behavior.  But these items seized from their

23   apartment on January 5th occurred approximately one month

24   before the defendants' arrest; and the defendants point to

25   the fact that they did not flee during that month, even

1    after execution of the search warrant at their New York City

2    apartment.  This was an argument that was considered quite

3    persuasive by the magistrate judge in New York, and I am

4    going to address what I call the no-flight argument in more

5    detail shortly.

6            As to the first factor, the Court finds that the

7    nature and circumstances of the offense conduct weigh

8    heavily in favor of detention of both defendants.

9            The second factor I have to consider is the weight

10   of the evidence.

11           The government asserts that its case against the

12   defendants is strong, noting that, while Defendants went to

13   elaborate lengths to conceal their identifies -- once these

14   strands are untangled, the defendants' activities are clear.

15           Defendants, on the other hand, say that there is

16   nothing resembling direct proof of the charges and describe

17   the complaint as depending on circumstantial inferences

18   drawn from analysis of a confusing series of blockchain

19   transactions, as well as conclusory allegations and

20   assumptions imputing nefarious intentions to critical links

21   in the chain of transactions.

22           Based on this description of the evidence

23   underlying the charges, defendants say they have no reason

24   to flee to avoid the government's allegations; in other

25   words, in the defendants' view, the government -- the

1    evidence is so weak, why would they have to flee?

2         The defense description minimizing the evidentiary

3    proffer tries to use the advocate's trick, to my mind, of

4    using a complex case to confuse the evidence, and it will

5    not work here.  A series of blockchain transactions may be

6    long and tedious to track and trace, but the blockchain

7    leaves a clear path for those with the patience to follow

8    it.  It is not as confusing as defense counsel describes it.

9         To say, as Defendants briefing does, that there is

10   no direct proof without a witness, a wiretap, consensual

11   recording, email or text messages of Defendants making

12   admissions about the purposes of the transactions is a vast

13   oversimplification of the proof presented and an obvious

14   misdirection to draw attention away from the heavy weight of

15   the evidence.  Not every case has a wiretap and not every

16   case has consensual recordings; that doesn't make it a

17   circumstantial case, and it doesn't make it a flimsy case.

18        So let's start with what could literally be called

19   the electronic version of the smoking gun in his hand.

20   Defendant Lichtenstein's cloud account held the encrypted

21   file with the private keys to unlock the Wallet 4S holding

22   the stolen bitcoins, and those private keys worked for the

23   government to be able to access and seize the stolen

24   bitcoin.  Proof of Defendant Lichtenstein's control and

25   possession of the stolen bitcoin does not get more direct

1    than that.

2        The magistrate judge was unable to decide how

3    strong the evidence was -- see the transcript at 42 -- or

4    what to make of these arguments concerning the strength of

5    the evidence -- see the transcript at 46.  This Court has no

6    such hesitancy.  The strength of the evidence in this case

7    is very strong and, thus, the second factor decisively

8    weighs in favor of detention.

9        First, as the government aptly points out, the

10   defendants fail to address the uncontroverted fact that the

11   funds from the 2016 hack held in Wallet 4S were seized using

12   virtual currency addresses and private keys found in

13   Defendant Lichtenstein's cloud storage account, constituting

14   direct evidence tying defendants to the unlawful activity at

15   issue.

16       To appreciate the significance of this evidence,

17   this Court appreciates that owners of bitcoin jealously

18   guard the private keys, the seed recovery keys, and

19   passphrases allowing access and transfer to this valuable

20   asset.

21       Defendants' conduct here makes this fact readily

22   apparent.  A file in Defendant Lichtenstein's cloud storage

23   listed all of the addresses within Wallet ICGA4S -- which

24   I'm calling "4S" -- and their corresponding private keys,

25   and that file was secured with strong encryption and a

1    lengthy password; one that, as I've already mentioned, the

2    government says would typically prevent a well-resourced

3    hacker from attacking the file within his lifetime.  This

4    direct evidence of ownership and control of the original

5    source of the laundered funds is a significant hole in

6    Defendants' argument that they cannot fill and would like to

7    ignore.

8            Additionally, contrary to the defense position, it

9    is basic Evidence 101 that circumstantial evidence is just

10   as reliable, probative, and persuasive as direct evidence

11   and, in some cases, so weighty as to be overwhelming in

12   establishing the strength of the government's case; that is

13   the situation here.

14           The government has strong evidence that both

15   defendants knowingly conspired to transfer and launder the

16   proceeds of an unlawful activity, i.e., the stolen bitcoin

17   from the 2016 hack of the victim VCE through a series of

18   complex financial transactions designed to conceal the

19   nature, location, source, ownership, or control of the

20   proceeds.

21           This evidence is thoroughly outlined in the

22   government's reply and the complaint's statement of facts;

23   that evidence includes:  Defendant Lichtenstein's possession

24   of, in a carefully safeguarded encrypted file under his

25   control, the virtual addresses and access keys for all of

1    the addresses within Wallet 4S, the initial repository of

2    all the stolen bitcoin.  This is already highly probative

3    evidence that Defendants had the means to transfer the

4    stolen bitcoin.

5         Blockchain evidence showing the subsequent

6    laundering of the stolen bitcoin through darknet markets,

7    accounts at various VCEs, and the conversion into an

8    anonymously-enhanced virtual currency and other currency,

9    also includes financial records for the defendants showing

10   how numerous accounts held in both defendants' names

11   received deposits traceable to the 2016 hack, and evidence

12   of purchases by both defendants, including 70 one-ounce gold

13   coins that can be traced to the stolen bitcoin.

14        The evidence grows only stronger when considered

15   alongside other incriminating documents found in Defendant

16   Lichtenstein's cloud storage account.  For one, he had a

17   spreadsheet that detailed the login information and the

18   status of many of the VCE accounts used to launder the

19   stolen funds traced back to the hack, including notations

20   confirming those accounts' status as either frozen or

21   emptied.  And the government has corroborated that the

22   relevant VCEs did freeze the accounts as reflected in this

23   spreadsheet due to suspicious activity.

24        References in Defendant Lichtenstein's files to

25   having some dirty and some clean wallets holding

1    cryptocurrency, including wallets with file names that

2    included variations of the word "dirty" also reflect that he

3    knew the difference between the two and was trying to keep

4    track of where he was stashing the bitcoin derived from

5    Wallet 4S with the stolen bitcoin.

6         Other evidence also supports that both defendants

7    knew that funds being used to launder proceeds were from

8    unlawful activity.  Both defendants made false statements to

9    various VCEs attempting to conduct anti-money laundering due

10   diligence into the nature of their account activity and the

11   source of their account funds, which constitutes further

12   evidence of consciousness of guilt.

13        Although the path from Wallet 4S to Defendants'

14   accounts involved complex transactions allegedly initiated

15   by Defendants to conceal the source and flow of the funds,

16   as the government's charts and explanations illuminate, one

17   need only carefully follow the blockchain road in order to

18   discover how the stolen funds traveled from the unhosted

19   Wallet 4S controlled by the defendants all the way back home

20   to Defendants' accounts.

21        In short, the story of how the defendants

22   allegedly moved the funds from the anonymous wallet to

23   accounts held in their name is clear and not "confusing" as

24   defendants claim.

25        Defendants do attempt to poke holes in this

1     evidence by noting that transactions involving units of

2     private cryptocurrency do not reflect criminal intent to

3     conceal funds because these types of cryptocurrency are

4     common and used for legitimate purposes in thousands of

5     transactions; see the defendants' opposition at page 5.

6     Similarly, they contend that transactions involving chain

7     hopping, which involve exchanging bitcoin for other types of

8     cryptocurrency, is just an example of exchanges of one type

9     of currency for another that are the bedrock for numerous

10    lawful currency trading markets and exchanges and, thus,

11    cannot be used to impute nefarious intents to the chain of

12    transactions at issue in this case.

13         Of course, use of these techniques are not per se

14    illegal, but they have to be viewed in context here where a

15    defendant is trying to conceal the source of bitcoin that

16    originated from a large hack from a VCE -- the largest VCE

17    in the world, apparently, according to the government's

18    papers -- and all of these techniques, which on their own

19    may be lawful, in this context were used to obscure activity

20    on the blockchain.

21         Defendants also claim that the evidence against

22    Defendant Morgan is especially flimsy and fails to show that

23    Defendant Morgan had any knowing involvement in any of the

24    alleged efforts to conceal the source of the funds that she

25    received or that she had any knowledge of the alleged

1    illicit nature of the funds.

2           I agree with the magistrate judge that the

3    evidence against Defendant Morgan is not as strong as the

4    evidence against Defendant Lichtenstein because of the

5    highly inculpatory encrypted files in his cloud account.  At

6    the same time, however, the government has put forth strong

7    circumstantial evidence demonstrating Defendant Morgan's

8    knowledge that the funds she received were derived from

9    unlawful activity.  She actively participated in the efforts

10   to conceal the source of the funds, and used a number of

11   accounts to hide the source of the funds before the funds

12   could land in her own personal account or other accounts.

13          For example, when a VCE directly inquired about

14   the source of the funds Defendant Morgan intended to deposit

15   into her accounts, she stated that deposits would come from

16   customer payments or from funds she received from 2015 or

17   before from Defendant Lichtenstein that she had been keeping

18   in cold storage.

19          Blockchain and other evidence shows that no

20   customers ever made payments to those accounts and, instead,

21   the accounts received crypto payments -- and, instead, the

22   accounts received payment from a shell account funded from

23   the 2016 hack and shell companies that had ties to both

24   defendants' legitimate businesses.  None of the bitcoin

25   originated from funds held in cold storage.

1          These and other demonstrably false statements

2     would allow a jury to reasonably infer that Defendant Morgan

3     knowingly agreed to participate in the money laundering

4     scheme and did, in fact, participate.

5          The strength of the government's evidence weighs

6     heavily in favor of the government's contention that the

7     defendants do present a risk of flight.

8          As discussed earlier, the nature of the offense,

9     particularly the substantial criminal and financial

10    penalties Defendants face, creates an incentive to flee; and

11    that incentive only increases where, as here, the evidence

12    the government has proffered at this stage of the case is

13    overwhelmingly strong.

14         Accordingly, the likelihood that there are

15    conditions of release that will reasonably assure the

16    defendants' appearance correspondingly decreases.

17         In sum, the weight of the evidence supporting the

18    charges against both defendants is strong and does support

19    pretrial detention.

20         As to the third factor, history and

21    characteristics of the defendants, the Court appreciates

22    that they have no criminal convictions or prior arrests, and

23    they also have strong family ties in the United States; both

24    defendants grew up in the United States.  And although

25    Defendant Lichtenstein was born in Russia, he spent the bulk

1    of his childhood in Chicago; and his mother, father, and

2    brother all reside and are employed in the United States and

3    are present in the courtroom.

4            The Court also agrees with the magistrate judge

5    that there are other aspects of the defendants' personal

6    circumstances that may make them less likely to flee the

7    United States, including Defendant Morgan's recent breast

8    surgery, which has limited the mobility of her right arm,

9    and requires some follow-up doctor visits.

10           Defendants have vigorously argued that any flight

11   would deprive them of the ability to vigorously contest the

12   charges against them, which the defendants have

13   characterized as flimsy and filled with significant holes.

14   No doubt, as I said before, this case is a complex one with

15   voluminous evidence, and the defendants would be essential

16   to their own defense so that desire should be a strong

17   anchor while the defendants await trial.

18           At the same time, other evidence in this case

19   raises significant concerns about conditions that will

20   reasonably -- whether there are any conditions that will

21   reasonably assure their appearance.

22           The financial resources available to the

23   defendants could easily be used to facilitate flight.

24           The government has pointed to 24 accounts holding

25   more than $300 million of stolen bitcoin that -- to which

1    the government has been unable to seize because they have

2    not gained access to the private keys.  But the government

3    says that since that -- those accounts and that bitcoin

4    originally came from Wallet 4S to which the defendants did

5    have control, it is highly likely -- and the Court agrees --

6    that these defendants also highly likely have access to

7    those 24 accounts containing the $300 million -- over

8    $300 million in stolen bitcoin.  They also have the skill

9    set to monetize that bitcoin or otherwise dispose of it in

10   an effort to escape detection, which -- and in addition to

11   that, the government has also not been able to trace the 70

12   one-ounce gold coins that the defendants apparently had

13   delivered to their home address both in California and in

14   New York.  These are all substantial resources to use for

15   activity to flee and avoid accountability in this case.

16           Defendants' past conduct and the items that were

17   found in the cloud account of Defendant Lichtenstein also

18   show that they have resources and knowledge of how to obtain

19   false passports and may have already, as the government

20   said, taken steps to put into place a contingency plan for

21   life elsewhere.

22           They are both tech and crypto savvy.

23           Defendant Lichtenstein has a background in coding,

24   and his own bio touts that he's been reverse engineering

25   hardware and writing code since nine -- the age of nine.

1          Defendant Morgan is also well-educated, has

2     significant experience with cryptocurrency, holding multiple

3     cryptocurrency accounts, minting her own non-fungible

4     tokens; she's written several articles on cybersecurity.

5          They both have extensive international travel.

6          Defendant Lichtenstein is both a Russian and a

7     U.S. citizen.  And although he says he hasn't traveled to

8     Russia, he actively maintains a Russian passport which he

9     renewed in 2019 and is valid through 2029.

10         They both speak Russian.  Defendant Morgan was

11    apparently learning it and was observed at the time of the

12    execution of either the arrest warrant or the execution of

13    the search warrant that she spoke to her spouse in Russian.

14    And the folders in Defendant Lichtenstein's cloud storage

15    account does contain files with biographical information,

16    identification documents for numerous individuals, male and

17    female, organized in folders titled "RU" for Russia and "UA"

18    for Ukraine.

19         A cloud storage file named "passport ideas" --

20    that was the title of it -- included links to darknet

21    vendors offering passports or identification cards for sale,

22    and files also in the cloud storage account that indicate

23    that Defendant Lichtenstein has access to numerous accounts

24    at Russian financial institutions.

25         The magistrate judge, in deciding to release the

1    defendants, relied almost exclusively on the no-flight

2    defense.  The defendants had not to this date gone anywhere

3    over the last two to three months despite being aware of the

4    investigation since at least November of 2021, and even

5    after the search warrants were executed at their apartment.

6         The magistrate judge did not find persuasive the

7    government's arguments that Defendants' motivation to flee

8    was low until the seizure of the funds or that it would have

9    taken Defendants some time to obtain false passports after

10   their awareness of the investigation and seizure of their

11   passports on January 5th of 2022.

12        I do disagree with the magistrate judge's

13   assessment based on the full chronology of events that are

14   reflected in the record here.

15        First, I don't agree that learning from an ISP

16   provider, in November 2021, that the government used a grand

17   jury subpoena to seek records pertaining to the defendants'

18   electronic accounts an entire year earlier would raise

19   sufficient red flags for the defendants to flee immediately.

20        Indeed, the passage of a year from the grand jury

21   subpoena without any criminal charges more likely gave the

22   defendants false confidence that the strong encryption being

23   used on inculpatory files worked or that all of the multiple

24   thousands of transactions, including some to fictitious

25   accounts that they controlled, had obfuscated the trace of

1    the bitcoin funds in their accounts to the stolen bitcoin in

2    Wallet 4S; and they probably thought the government had come

3    up empty-handed even if able to see inside the electronic

4    accounts due to the strong encryption being used.

5         The government's execution on January 5, 2022, of

6    a search warrant on Defendants' residence and storage unit

7    would be more cause for alarm.  And during that search,

8    Defendant Morgan actively tried to make it difficult for law

9    enforcement to conduct a search of her cell phone,

10   indicating a heightened concern about what the government

11   was going to find.

12        From January 11th through January 31, defense

13   counsel and the government engaged in discussions concerning

14   the investigation.

15        On January 22 the government provided a written

16   summary of its theory of how the stolen bitcoin was traced

17   through various transaction paths to numerous accounts

18   controlled by Defendants, and counsel provided that written

19   summary to Defendants.

20        It is reasonable to assume by then that Defendants

21   had awareness of the government's focus and belief that they

22   were intimately involved with the laundering of the stolen

23   bitcoin but still, at that point, the defendants had no

24   indication that the government had discovered and decrypted

25   the highly inculpatory files in Defendant Lichtenstein's

1    storage directly linking them to the immense amount of

2    stolen virtual currency from the 2016 hack.

3              The government says this decryption did not occur

4    until January 31, 2022.  And the earliest indication the

5    defendants would have had of that fact would have been on

6    February 1, 2022, when the government -- or late -- the

7    night of January 31, when the government, apparently,

8    accessed the stolen bitcoin, and anyone watching the public

9    blockchain ledger could see movement out of Wallet 4S.  The

10   realization could have easily changed the flight calculus

11   for any defendant.

12             But the government had seized significant

13   resources during the January 5, 2022, search that could have

14   been stumbling blocks for the defendants immediate flight,

15   including seizure of Defendants' passports, electronic

16   devices -- almost 50 -- and the seizure of wallets holding

17   cryptocurrency, cell phones, and substantial amounts of

18   foreign currency including $40,000 in cash.

19             Additional obstacles hindered the defendants from

20   fleeing in that short period, including Defendant Morgan's

21   impending surgery on January 31 and her limited mobility

22   after that surgery and her need for follow-up appointments;

23   plus a major snowstorm on February 4 that caused widespread

24   flight cancellations and making travel difficult.

25             Now that those obstacles have been mostly

1     mitigated, the government has revealed the strength of its

2     evidence and the predictions about the significant financial

3     and criminal penalties given the strength of that evidence

4     that the defendants potentially face, the motivation to flee

5     has increased exponentially; and given their still-available

6     resources the government has been unable to seize and skill

7     sets -- all of this could facilitate flight, and is of huge

8     concern to the Court.

9          The defendants are not similarly situated here,

10    and the Court is required to take into account when weighing

11    factors, including relevant differences in the history and

12    characteristics of each defendant.

13         As it currently stands, the evidence strongly

14    suggests that Defendant Lichtenstein has more facility and

15    skill than Defendant Morgan in acquiring fake identities,

16    setting up fake accounts, accessing and manipulating

17    cryptocurrency.  It was in his account that the personas

18    file with fake identities, the darknet vendor file, was

19    found; and, most importantly, the spreadsheet listing all of

20    the various fictitious accounts and others used for the

21    transactions to launder the stolen bitcoin; as well as, most

22    importantly, the file with the private keys to the stolen

23    bitcoin in Wallet 4S.

24         I do think that the weight of the evidence against

25    Defendant Morgan is also strong; but there is no evidence

1    that she had access to all of that information; and that it

2    appears to me, from looking closely at some of the tracing

3    analysis done by the government, that Defendant Morgan's

4    access to the stolen bitcoin and her participation in the

5    laundering only came after that bitcoin had been removed

6    from Wallet 4S.  And so I do think that for Defendant Morgan

7    I am going to affirm the magistrate judge's release order

8    and release her under very stringent conditions.

9            Defendant Lichtenstein will remain in detention

10   given his facility -- clear control over the private keys to

11   access the stolen bitcoin and, therefore, his ability to

12   access resources that would facilitate flight to avoid the

13   charges in this case.

14           So upon consideration of the hearing evidence and

15   proffered evidence presented, the factors set forth in

16   18 U.S.C. Section 3142(g), the possible release conditions

17   set forth in Section 3142(c), the Court finds that the

18   relevant statutory factors weigh in favor of detention for

19   Defendant Lichtenstein and that the government has met its

20   burden to show, by a preponderance of the evidence, that:

21   No condition or combination of conditions can reasonably

22   assure the appearance of Defendant Lichtenstein.  But as to

23   Defendant Morgan, she will be released on all of the

24   stringent conditions that were set out by the magistrate

25   judge in New York, which includes home incarceration with

1     location monitoring.

2           We don't really do bonds here, but I am going to

3     not disturb those conditions of release for Defendant

4     Morgan; and I am going to leave it to our clerk's office to

5     figure out how to do that here because it is not the norm.

6           All right.  So to be clear, the magistrate judge's

7     February 8, 2022, release order is overruled as to Defendant

8     Lichtenstein but affirmed as to Defendant Morgan.

9           I will issue a written order setting out my

10    written findings of fact and written statement of the

11    reasons for the detention of Defendant Lichtenstein.

12          All right.  Is there anything further?

13          Because Defendant Morgan will be under the

14    conditions set by the New York magistrate judge, she's going

15    to be held until all of those conditions are satisfied.

16          MR. ENZER:  Okay.  Your Honor.  Thank you, Your

17    Honor for your ruling.

18          One request -- two requests.

19          First, the government, I understand from their

20    papers, does not object to Mr. Lichtenstein being detained

21    at a jail in New York City -- in the New York City area;

22    it's in a footnote in their brief.

23          THE COURT:  Well, I saw that.  But he is a

24    defendant in this Court, it's very difficult, and we do not

25    have priority, as I relayed at our Thursday conversation, to

1    get access for court hearings to defendants held in New York

2    facilities; so it made it very difficult to schedule any

3    hearing with Defendant Lichtenstein through the New York

4    facilities.  So I don't care -- let me put it more bluntly,

5    I don't care what the government agrees to.

6           He is a D.C. defendant.  And believe me, with the

7    January 6th cases, we have had defendants from all around

8    the country; and they are defendants in this Court, no

9    matter where they originated or where they were arrested, so

10   they are in Washington, D.C. facilities.

11          MR. ENZER:  I understand, Your Honor.  It's not

12   just that he is from New York, it's that we are based in

13   New York, and this will make it very difficult for us to

14   meet with him to talk about the case.

15          THE COURT:  Well, the Acela will run more

16   regularly hopefully and with -- better than it occurred

17   today for your cocounsel.

18          MR. ENZER:  Our last request is we would

19   appreciate the opportunity just to confer with our clients

20   briefly after this proceeding today.

21          THE COURT:  The marshal is already on overtime.

22   Sorry.  I have kept you all very late, so I will give you

23   ten minutes.

24          MR. ENZER:  Thank you, Your Honor.

25          THE COURT:  Anything further from the government?

```
1              MS. PELKER:  No, Your Honor.
2              THE COURT:  All right.  So you are all excused.
3              MS. SCHUCK:  Your Honor, this is Christine Schuck
4    with pretrial services.
5              THE COURT:  Ms. Schuck?  I can barely hear you,
6    Ms. Schuck.
7              MS. SCHUCK:  I apologize, Your Honor.  Is that any
8    better?
9              THE COURT:  Yes.
10             MS. SCHUCK:  I apologize.
11             Just two quick questions for clarification.
12             Would Your Honor like the defendant placed on GPS
13   monitoring?
14             THE COURT:  Correct.
15             MS. SCHUCK:  To allow --
16             THE COURT:  Correct.  I want an ankle bracelet.
17             MS. SCHUCK:  The ankle bracelet can either be
18   RF -- some districts can be RF.  (Indiscernible.)
19             What the Southern District of New York was going
20   to do was give the office in that district on the discretion
21   to --
22             THE COURT:  I am going to give discretion -- I am
23   going to give discretion to pretrial services in New York.
24             MS. SCHUCK:  Okay.
25             THE COURT:  And I trust you to competently arrange
```

1   that, Ms. Schuck.

2           MS. SCHUCK:  I will certainly do that for you,

3   Your Honor.

4           And pretrial just wanted to ask Your Honor if you

5   would like two additional conditions:  Not to use

6   internet-connected devices except for meetings with counsel,

7   and a freeze on any new financial accounts and no

8   cryptocurrency transactions to be conducted by the

9   defendant.

10          THE COURT:  Yes.  That's all correct.

11          I think the magistrate judge order in New York had

12  some more complicated financial strictures including a

13  $10,000 cap per month on expenditures, which is going to be

14  monitored in ways I am not particularly clear.  But I think

15  that the defendant is going to have to give pretrial

16  services access to her accounts so you can check that the

17  cap is met.

18          MS. SCHUCK:  Okay.

19          THE COURT:  Does the government want to explain

20  that?

21          MS. SCHUCK:  I will --

22          THE COURT:  Ms. Schuck, I am asking the government

23  to explain what that cap is.

24          MS. PELKER:  Your Honor, our understanding, again,

25  is that this may be a unique SDNY practice but related, as

1    we understood, to ensure that the defendants are able to

2    continue paying for counsel out of those accounts --

3              THE COURT:  Well, no.  It was $10,000, and then

4    any lawyer fees above that.

5              MS. PELKER:  Yes.  And that the $10,000 was

6    estimated to allow them to cover living expenses to the

7    extent --

8              THE COURT:  New York is expensive.

9              MS. PELKER:  -- to the extent they are released to

10   make rent payments and pay for food.

11             THE COURT:  Right.  Exactly.

12             Ms. Schuck, it's all written down in the

13   magistrate judge's order.

14             MS. SCHUCK:  I will transfer it to our order and

15   have it to your desk for your review, Your Honor.

16             THE COURT:  I didn't really understand you.

17             MS. SCHUCK:  I will have everything sent over to

18   your deputy, Your Honor.

19             THE COURT:  Okay.  Thank you.

20             MS. SCHUCK:  Thank you.

21             (Whereupon, the proceeding concludes, 5:41 p.m.)

22

23

24

25

## CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 17th day of February, 2022

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter

**$**

**$10,000** [3] - 128:13, 129:3, 129:5
**$100,000** [1] - 86:11
**$300** [7] - 17:2, 22:22, 24:20, 72:8, 117:25, 118:7, 118:8
**$320** [1] - 19:18
**$328** [3] - 17:12, 18:21, 19:15
**$40,000** [1] - 124:12
**$50** [1] - 90:9
**$500,000** [1] - 104:1
**$71** [1] - 100:20

**/**

**/s** [1] - 130:16

**1**

**1** [17] - 6:10, 36:19, 64:14, 64:18, 64:19, 64:21, 64:24, 66:12, 66:15, 67:2, 73:21, 73:24, 90:18, 95:21, 99:15, 122:6
**1,000** [1] - 100:8
**1-2-3** [1] - 29:15
**10** [1] - 105:23
**100** [1] - 73:9
**10005** [1] - 1:19
**101** [3] - 84:17, 84:21, 111:9
**10th** [1] - 5:10
**11** [1] - 100:18
**119,000-plus** [2] - 10:24, 11:7
**119,754** [3] - 9:19, 17:5, 100:8
**11th** [2] - 5:5, 121:12
**12** [2] - 95:20, 95:21
**1273** [1] - 97:23
**1280** [1] - 97:24
**13** [1] - 58:25
**131** [1] - 104:11
**134** [1] - 104:11
**14** [3] - 1:5, 59:2, 98:5
**15** [1] - 6:14
**17,000** [1] - 18:17
**17th** [1] - 130:14
**18** [12] - 4:4, 4:6, 6:12, 97:15, 98:13, 99:3, 99:16, 99:20, 99:23, 103:24, 124:16
**1956(a)(1)(B)(i** [1] - 99:20

**1956(h** [3] - 4:4, 99:17, 103:24
**1987** [1] - 98:20
**1st** [2] - 39:17, 39:19

**2**

**2** [7] - 25:19, 26:2, 26:9, 26:17, 26:19, 86:12, 99:22
**2,000** [3] - 21:16, 21:17, 103:10
**20** [2] - 99:21, 103:21
**20-20** [1] - 5:22
**200,000** [1] - 33:8
**2000** [2] - 100:6, 103:8
**2011** [1] - 38:5
**2013** [1] - 104:13
**2014** [2] - 44:7, 104:12
**2015** [2] - 102:10, 115:16
**2016** [16] - 9:9, 9:18, 10:7, 10:13, 10:19, 13:1, 31:20, 62:14, 100:1, 102:11, 102:13, 110:11, 111:17, 112:11, 115:23, 122:2
**2017** [1] - 100:23
**2018** [1] - 98:19
**2019** [4] - 105:19, 105:20, 105:24, 119:9
**202** [1] - 1:14
**2021** [11] - 28:17, 29:1, 36:1, 38:5, 60:6, 60:8, 60:9, 97:24, 98:6, 120:4, 120:16
**2022** [12] - 1:5, 29:1, 100:21, 103:5, 107:3, 120:11, 121:5, 122:4, 122:6, 122:13, 125:7, 130:14
**2029** [1] - 119:9
**20530** [1] - 1:14
**21** [1] - 6:13
**21-1** [1] - 6:16
**212** [1] - 1:19
**22** [1] - 121:15
**22-1** [1] - 6:16
**22-22** [1] - 2:3
**22-MJ-22** [1] - 1:3
**24** [26] - 16:23, 17:1, 17:10, 17:14, 18:20, 18:23, 19:15, 19:20, 20:2, 20:12, 20:19, 20:23, 22:5, 22:7, 24:19, 69:2, 69:5,

69:8, 71:9, 72:7, 92:22, 98:5, 117:24, 118:7
**24/7** [1] - 87:25
**25** [1] - 95:5
**25,118** [1] - 17:9
**29** [1] - 16:7
**2:29** [1] - 1:5
**2d** [1] - 104:13

**3**

**3** [7] - 25:19, 26:2, 26:9, 26:17, 26:18, 26:19, 100:18
**3.6** [7] - 12:10, 12:19, 14:20, 43:12, 67:8, 73:24, 103:14
**30-minute** [2] - 78:2, 87:20
**300** [1] - 17:14
**31** [11] - 29:1, 64:6, 64:13, 65:11, 67:16, 87:1, 103:5, 121:12, 122:4, 122:7, 122:21
**3142** [1] - 97:15
**3142(c** [1] - 124:17
**3142(e)(1)** [1] - 98:14
**3142(f)(2)** [1] - 98:23
**3142(f)(2)(a** [1] - 8:10
**3142(g** [1] - 124:16
**3142(g)** [1] - 99:3
**3145** [1] - 97:16
**3145(a)** [1] - 97:15
**31st** [2] - 31:16, 39:18
**32** [1] - 1:18
**320-some-odd** [1] - 16:24
**34** [1] - 87:1
**340** [1] - 98:18
**344** [1] - 98:19
**371** [4] - 4:6, 80:12, 80:17, 99:23
**3d** [2] - 98:5, 104:11

**4**

**4** [3] - 26:18, 33:6, 122:23
**41** [1] - 104:13
**42** [2] - 103:19, 110:3
**43** [1] - 104:13
**44(c** [3] - 47:14, 52:23, 53:4
**44(c)** [1] - 46:25
**45-minute** [1] - 78:2
**46** [1] - 110:5
**47** [1] - 104:11

**4S** [59] - 9:22, 10:25, 11:7, 11:22, 12:6, 12:10, 12:21, 13:1, 13:6, 13:14, 13:15, 16:12, 16:14, 16:17, 17:13, 19:1, 19:3, 19:6, 19:20, 20:1, 20:8, 21:1, 21:2, 21:12, 21:14, 21:17, 22:22, 23:19, 23:22, 23:24, 25:13, 28:19, 34:16, 36:20, 39:14, 64:10, 64:13, 70:14, 70:17, 92:9, 92:11, 92:15, 93:10, 100:10, 100:24, 103:4, 109:21, 110:11, 110:24, 112:1, 113:5, 113:13, 113:19, 118:4, 121:2, 122:9, 123:23, 124:6
**4S's** [1] - 22:4

**5**

**5** [12] - 29:25, 36:18, 63:8, 63:22, 98:6, 99:24, 100:21, 103:22, 107:3, 114:5, 121:5, 122:13
**50** [2] - 21:25, 122:16
**525** [1] - 98:5
**5:41** [1] - 129:21
**5th** [8] - 33:12, 35:18, 38:20, 60:17, 61:17, 63:3, 107:23, 120:11

**6**

**616-5007** [1] - 1:14
**6th** [1] - 126:7

**7**

**7,506** [5] - 17:11, 20:1, 20:12, 20:19, 22:7
**70** [4] - 31:21, 33:5, 112:12, 118:11
**701-3000** [1] - 1:19
**75** [1] - 20:1
**7500** [1] - 17:22

**8**

**8** [3] - 6:12, 73:21, 125:7
**826** [1] - 98:20

**897** [1] - 98:18
**8th** [4] - 4:1, 36:22, 61:17, 64:24

**9**

**94** [1] - 98:20
**94,000** [1] - 15:25
**94,636** [5] - 12:9, 12:25, 13:25, 17:6, 103:13
**950** [1] - 1:13
**96** [1] - 98:20
**978** [1] - 104:12
**991** [1] - 97:23
**9th** [1] - 105:19

**A**

**a/k/a** [1] - 97:3
**abandon** [1] - 68:5
**abandoning** [1] - 27:6
**abide** [1] - 93:2
**abiding** [1] - 83:5
**ability** [10] - 29:5, 31:12, 43:3, 48:7, 70:9, 75:16, 95:3, 117:11, 124:11, 130:7
**able** [40] - 7:21, 7:22, 12:8, 12:15, 15:9, 16:20, 17:23, 21:18, 22:18, 24:5, 27:16, 27:18, 28:3, 28:7, 28:25, 29:19, 30:4, 30:22, 31:16, 32:11, 32:14, 34:19, 37:25, 39:1, 40:8, 52:9, 64:5, 64:6, 65:15, 68:8, 92:11, 92:24, 101:1, 103:13, 104:24, 106:8, 109:23, 118:11, 121:3, 129:1
**abroad** [1] - 90:10
**absolutely** [2] - 43:3, 65:15
**abuse** [2] - 10:5, 62:6
**accepting** [2] - 45:3, 46:3
**access** [52] - 5:7, 5:17, 6:24, 8:17, 8:22, 11:4, 11:6, 12:13, 14:11, 14:16, 15:10, 19:19, 21:11, 21:13, 21:14, 22:4, 22:17, 22:19, 24:2, 24:6, 24:20, 28:7, 29:18, 34:2, 39:24, 40:1,

43:4, 44:4, 48:5, 72:1, 72:10, 72:18, 75:16, 77:1, 83:5, 83:14, 90:10, 95:1, 103:5, 109:23, 110:19, 111:25, 118:2, 118:6, 119:23, 124:1, 124:4, 124:11, 124:12, 126:1, 128:16
**accessed** [3] - 14:14, 39:12, 122:8
**accessible** [2] - 8:22, 16:19
**accessing** [4] - 22:24, 28:13, 28:24, 123:16
**according** [9] - 25:1, 34:17, 47:1, 63:3, 75:6, 80:1, 82:16, 93:9, 114:17
**accordingly** [1] - 116:14
**account** [98] - 11:16, 11:23, 12:7, 12:17, 19:1, 19:19, 20:6, 21:1, 21:2, 21:12, 21:21, 21:24, 22:12, 24:24, 26:6, 26:13, 27:9, 27:16, 27:19, 27:23, 28:1, 28:4, 28:7, 28:10, 28:13, 28:16, 28:18, 28:21, 29:18, 29:22, 30:11, 30:15, 31:7, 34:1, 34:2, 34:3, 34:6, 34:9, 37:23, 37:25, 38:6, 38:11, 41:16, 41:22, 43:8, 44:15, 59:14, 59:15, 59:25, 60:2, 64:7, 64:8, 64:16, 64:18, 66:22, 71:1, 71:2, 75:19, 75:25, 77:21, 77:23, 77:24, 83:15, 83:16, 84:2, 84:7, 91:12, 91:15, 91:16, 91:19, 91:21, 92:2, 93:15, 99:2, 104:23, 105:6, 105:23, 106:3, 106:4, 109:20, 110:13, 112:16, 113:10, 113:11, 115:5, 115:12, 115:22, 118:17, 119:15, 119:22, 123:10, 123:17
**accountability** [1] - 118:15
**accountant** [5] -

82:12, 82:17, 82:21, 84:11, 84:24
**accounting** [3] - 33:20, 35:1, 84:19
**Accounts** [5] - 25:19, 26:2, 26:9, 26:17, 26:19
**accounts** [112] - 8:21, 8:22, 17:1, 17:14, 17:15, 18:7, 18:9, 18:20, 18:23, 19:3, 19:10, 19:15, 19:19, 20:10, 20:11, 20:12, 20:23, 21:9, 25:14, 25:16, 25:18, 25:22, 25:23, 26:2, 26:15, 26:21, 26:23, 26:25, 27:6, 27:11, 27:25, 31:2, 31:9, 31:14, 34:5, 34:11, 34:13, 34:18, 34:20, 34:22, 35:1, 35:2, 35:12, 35:17, 35:25, 39:2, 39:5, 43:19, 44:14, 44:17, 44:19, 44:23, 44:25, 45:5, 45:23, 45:24, 46:1, 63:20, 64:2, 64:3, 65:25, 70:15, 72:7, 72:9, 77:22, 83:5, 83:25, 84:1, 91:19, 93:8, 93:13, 93:14, 100:25, 101:2, 101:3, 101:10, 101:16, 101:24, 102:9, 102:12, 103:7, 105:4, 112:7, 112:10, 112:18, 112:22, 113:14, 113:20, 113:23, 115:11, 115:12, 115:15, 115:20, 115:21, 115:22, 117:24, 118:3, 118:7, 119:3, 119:23, 120:18, 120:25, 121:1, 121:4, 121:17, 123:16, 123:20, 128:7, 128:16, 129:2
**accounts'** [2] - 27:5, 112:20
**accumulate** [1] - 107:20
**accurate** [3] - 9:13, 33:9, 130:4
**accurately** [1] - 7:20
**accusations** [1] - 52:15
**accused** [3] - 54:16,

74:19, 100:5
**accusing** [1] - 10:12
**Acela** [2] - 3:11, 126:15
**acquiring** [1] - 123:15
**Act** [7] - 9:3, 73:14, 90:5, 93:3, 98:2, 98:8, 102:5
**acting** [1] - 56:23
**Action** [1] - 1:3
**active** [1] - 67:5
**actively** [3] - 115:9, 119:8, 121:8
**activities** [3] - 37:9, 101:9, 108:14
**activity** [15] - 10:2, 10:3, 19:2, 44:22, 92:8, 101:24, 103:2, 110:14, 111:16, 112:23, 113:8, 113:10, 114:19, 115:9, 118:15
**actual** [10] - 10:7, 10:13, 35:5, 44:22, 44:23, 46:4, 100:5, 105:15, 106:9
**add** [1] - 90:23
**addition** [3] - 20:6, 61:1, 118:10
**additional** [15] - 8:21, 24:16, 32:13, 41:2, 41:19, 56:11, 57:24, 69:4, 78:11, 78:15, 90:24, 95:1, 122:19, 128:5
**additionally** [1] - 111:8
**address** [13] - 15:1, 21:10, 26:11, 32:1, 32:16, 32:18, 42:21, 69:13, 71:10, 85:25, 108:4, 110:10, 118:13
**addressed** [4] - 32:8, 32:9, 32:19, 32:23
**addresses** [49] - 13:4, 13:6, 13:20, 14:9, 15:18, 16:23, 17:10, 17:14, 17:23, 18:21, 18:24, 19:20, 20:2, 20:7, 20:19, 21:2, 21:3, 21:17, 22:5, 22:6, 22:7, 22:8, 22:20, 22:23, 22:24, 23:1, 23:5, 23:7, 23:12, 24:2, 24:15, 24:19, 26:3, 26:9, 26:16, 26:24, 27:1, 27:8, 92:7, 92:9, 92:22, 103:8,

103:10, 110:12, 110:23, 111:25, 112:1
**administrative** [1] - 36:8
**admission** [1] - 65:21
**admissions** [1] - 109:12
**admit** [1] - 83:4
**advanced** [1] - 93:22
**advertising** [1] - 45:15
**advise** [1] - 47:6
**advised** [2] - 48:1, 107:4
**advocate's** [1] - 109:3
**affidavit** [7] - 26:1, 26:19, 37:16, 62:3, 64:14, 70:12, 100:16
**affirm** [1] - 124:7
**affirmed** [1] - 125:8
**afforded** [1] - 90:19
**afternoon** [2] - 2:12, 46:8
**age** [1] - 118:25
**agent** [2] - 2:5, 72:21
**agents** [7] - 30:23, 44:22, 60:17, 62:17, 67:9, 78:16, 107:4
**aggressively** [1] - 49:20
**ago** [1] - 68:20
**agree** [6] - 43:6, 56:15, 58:3, 101:4, 115:2, 120:15
**agreed** [1] - 116:3
**agreement** [1] - 74:15
**agrees** [5] - 102:14, 102:19, 117:4, 118:5, 126:5
**ahead** [1] - 57:1
**aided** [1] - 1:25
**alarm** [1] - 121:7
**ALDEN** [1] - 1:11
**Alden** [1] - 2:11
**algorithm** [1] - 28:22
**align** [1] - 51:13
**allegation** [4] - 74:1, 80:6, 81:15, 90:8
**allegations** [17] - 61:21, 71:7, 74:2, 75:17, 76:4, 76:25, 78:19, 78:20, 80:2, 80:4, 81:14, 82:5, 83:20, 90:9, 90:12, 108:19, 108:24
**alleged** [10] - 62:11, 74:7, 74:12, 74:17, 75:19, 79:24, 102:15, 107:18, 114:24, 114:25

**allegedly** [6] - 70:13, 71:1, 81:14, 107:9, 113:14, 113:22
**alleging** [2] - 62:8, 62:9
**allow** [8] - 16:2, 29:11, 41:2, 69:21, 88:2, 116:2, 127:15, 129:6
**allowed** [2] - 5:16, 30:1
**allowing** [2] - 88:4, 110:19
**allows** [2] - 87:10, 100:14
**alluded** [3] - 14:13, 16:6, 16:25
**almost** [6] - 30:22, 72:25, 87:2, 103:10, 120:1, 122:16
**alongside** [1] - 112:15
**AlphaBay** [1] - 71:22
**ALSO** [1] - 1:21
**altogether** [1] - 107:12
**Amendment** [6] - 52:19, 53:3, 53:14, 54:5, 54:15, 54:20
**AMERICA** [1] - 1:3
**America** [1] - 2:3
**American** [1] - 67:24
**amount** [12] - 18:12, 18:13, 32:14, 39:15, 39:20, 43:18, 57:19, 74:16, 94:25, 106:18, 122:1
**amounts** [5] - 33:13, 33:22, 74:18, 101:12, 122:17
**analysis** [4] - 17:21, 103:9, 108:18, 124:3
**analytics** [1] - 93:21
**anchor** [1] - 117:17
**Anirudh** [1] - 2:23
**ankle** [2] - 127:16, 127:17
**anonymity** [1] - 101:22
**anonymity-enhanced** [1] - 101:22
**anonymous** [1] - 113:22
**anonymously** [1] - 112:8
**anonymously-enhanced** [1] - 112:8
**answer** [1] - 33:9
**answering** [1] - 102:21
**anti** [5] - 69:19, 93:2, 93:24, 102:16, 113:9

**anti-money** [5] - 69:19, 93:2, 93:24, 102:16, 113:9
**apartment** [9] - 14:24, 29:25, 33:12, 36:21, 37:21, 63:14, 107:23, 108:2, 120:5
**apartments** [1] - 33:1
**apologize** [2] - 127:7, 127:10
**apologizes** [1] - 95:19
**apparent** [3] - 51:2, 51:4, 110:22
**appear** [10] - 3:13, 5:15, 18:5, 19:11, 22:10, 24:7, 25:6, 35:6, 45:17, 73:19
**appearance** [6] - 4:9, 98:12, 98:25, 116:16, 117:21, 124:22
**APPEARANCES** [1] - 1:10
**appeared** [4] - 4:7, 8:24, 35:14, 105:4
**appearing** [1] - 1:22
**applicable** [1] - 97:20
**applied** [1] - 97:16
**applies** [1] - 98:4
**apply** [1] - 98:6
**appointed** [2] - 55:19, 57:9
**appointments** [1] - 122:22
**appreciate** [5] - 3:16, 46:11, 97:7, 110:16, 126:19
**appreciates** [2] - 110:17, 116:21
**appropriate** [9] - 47:10, 52:24, 74:20, 74:21, 76:7, 87:13, 88:25, 90:22
**appropriately** [2] - 15:3, 29:17
**aptly** [1] - 110:9
**area** [1] - 125:21
**areas** [1] - 51:1
**argue** [1] - 79:5
**argued** [5] - 11:18, 16:25, 36:15, 75:11, 117:10
**arguing** [3] - 8:1, 85:2, 85:3
**argument** [11] - 6:21, 49:13, 49:17, 49:20, 52:6, 85:4, 85:23, 95:2, 108:2, 108:4, 111:6
**arguments** [12] - 4:17,

19:17, 41:10, 46:17, 46:21, 47:15, 49:12, 51:25, 56:3, 57:18, 110:4, 120:7
**arise** [6] - 47:9, 53:24, 56:11, 57:20, 57:24, 99:25
**arm** [3] - 65:12, 88:12, 117:8
**arraignment** [1] - 47:12
**arrange** [1] - 127:25
**arrest** [18] - 4:7, 26:1, 35:20, 39:10, 46:13, 61:4, 61:17, 64:15, 64:19, 64:24, 70:12, 72:23, 77:7, 94:12, 94:13, 94:14, 107:24, 119:12
**arrested** [15] - 3:25, 36:22, 38:25, 47:25, 48:4, 61:18, 63:2, 63:4, 63:12, 66:22, 76:13, 87:3, 94:6, 94:11, 126:9
**arrests** [6] - 48:8, 48:11, 48:12, 61:7, 67:4, 116:22
**arriving** [1] - 105:18
**articles** [1] - 119:4
**ascertain** [1] - 106:8
**ascertainment** [1] - 81:10
**aside** [2] - 67:20, 69:11
**aspects** [2] - 104:17, 117:5
**asserts** [2] - 46:19, 108:11
**assessment** [1] - 120:13
**asset** [1] - 110:20
**assets** [7] - 8:17, 8:20, 9:11, 14:14, 14:24, 15:3, 90:14
**assigned** [3] - 4:24, 4:25, 5:1
**assistance** [5] - 45:15, 47:7, 54:17, 55:14, 57:4
**associated** [2] - 15:11, 47:4
**assume** [3] - 63:6, 66:13, 121:20
**assumptions** [1] - 108:20
**assurance** [2] - 73:18, 73:20
**assure** [8] - 15:2, 70:8, 98:11, 98:22,

98:25, 116:15, 117:21, 124:22
**asthma** [3] - 88:25, 89:5
**astronomically** [1] - 74:18
**attached** [4] - 60:1, 100:16, 100:17, 105:9
**attaches** [2] - 47:12
**attachment** [2] - 59:17, 59:20
**attack** [2] - 89:5
**attacker** [1] - 28:24
**attacking** [1] - 111:3
**attempt** [1] - 113:25
**attempted** [2] - 98:17, 107:9
**attempting** [3] - 50:20, 107:7, 113:9
**attention** [4] - 30:25, 39:16, 39:20, 109:14
**attenuated** [2] - 40:2, 91:14
**attesting** [1] - 95:22
**Attorney's** [2] - 36:10, 89:11
**attributable** [1] - 69:9
**attributed** [1] - 83:25
**attributing** [1] - 77:22
**audience** [1] - 3:2
**August** [10] - 9:9, 9:18, 10:7, 10:13, 10:19, 31:20, 62:14, 102:11, 102:13, 105:20
**AUSA** [1] - 2:14
**authority** [2] - 68:3, 98:2
**authorization** [2] - 13:19, 130:11
**authorized** [1] - 62:5
**automate** [1] - 101:15
**available** [5] - 7:7, 84:5, 99:2, 117:22, 123:5
**Avenue** [1] - 1:13
**avoid** [4] - 106:25, 108:24, 118:15, 124:12
**avoiding** [2] - 102:20, 102:21
**await** [1] - 117:17
**aware** [6] - 29:21, 31:2, 48:11, 63:7, 88:7, 120:3
**awareness** [2] - 120:10, 121:21

# B

**background** [2] - 35:7, 118:23
**Backup** [1] - 22:13
**backup** [1] - 24:8
**bad** [1] - 49:15
**bags** [1] - 106:16
**Bail** [5] - 9:2, 73:13, 90:5, 98:1, 98:8
**bail** [20] - 47:13, 48:7, 48:18, 53:22, 53:25, 61:25, 69:1, 74:4, 74:6, 74:19, 74:21, 76:6, 78:10, 79:8, 88:25, 90:6, 90:7, 90:12, 90:15, 90:16
**balance** [2] - 12:22, 16:3
**balances** [1] - 23:7
**bank** [3] - 45:22, 75:2, 105:9
**Bank** [2] - 93:3, 102:5
**Bansal** [3] - 2:23, 3:17, 3:20
**bar** [1] - 72:18
**barely** [1] - 127:5
**based** [9] - 33:23, 36:11, 41:10, 63:22, 98:1, 103:15, 108:22, 120:13, 126:12
**bases** [1] - 9:2
**basic** [4] - 8:6, 38:10, 84:17, 111:9
**basis** [7] - 8:9, 8:12, 45:10, 82:14, 82:19, 82:22, 84:14
**bears** [2] - 42:24, 98:15
**became** [1] - 48:16
**bed** [1] - 107:8
**bedrock** [1] - 114:9
**BEFORE** [1] - 1:8
**began** [1] - 100:23
**begin** [1] - 6:5
**beginning** [2] - 17:4, 100:22
**behalf** [3] - 52:1, 52:2, 95:20
**behavior** [1] - 107:22
**behind** [2] - 67:21, 68:11
**belief** [1] - 121:21
**believes** [2] - 10:18, 52:4
**below** [1] - 130:12
**bench** [2] - 96:6, 96:9
**Bernard** [3] - 90:6,

90:15
**BERYL** [1] - 1:8
**best** [2] - 47:13, 130:6
**better** [5] - 3:12, 49:15, 51:4, 126:16, 127:8
**between** [12] - 17:1, 29:1, 31:11, 34:4, 36:17, 47:16, 51:16, 61:17, 64:24, 73:21, 93:13, 113:3
**beyond** [1] - 69:14
**big** [1] - 91:25
**biggest** [1] - 69:1
**Bikundi** [3] - 49:4, 49:5, 104:11
**billion** [9] - 12:10, 12:19, 14:20, 43:12, 67:8, 73:24, 90:9, 100:21, 103:14
**bio** [1] - 118:24
**biographical** [4] - 25:2, 106:7, 106:10, 119:15
**bit** [9] - 13:24, 15:22, 19:14, 23:23, 35:21, 46:10, 65:19, 66:4, 66:5
**bitcoin** [119] - 9:9, 9:20, 10:7, 10:24, 10:25, 11:1, 11:7, 11:9, 11:22, 12:11, 12:21, 13:1, 13:8, 13:13, 13:14, 13:15, 13:25, 14:4, 14:9, 14:10, 14:20, 15:25, 16:12, 16:14, 16:16, 17:2, 17:5, 17:11, 17:16, 17:19, 17:22, 18:11, 18:12, 18:16, 18:17, 18:22, 20:1, 20:2, 20:8, 20:12, 20:20, 20:21, 20:22, 21:12, 21:13, 22:4, 22:7, 23:19, 24:19, 25:13, 26:21, 28:19, 31:20, 34:15, 34:21, 36:20, 39:14, 39:18, 44:8, 64:2, 64:9, 64:12, 64:23, 65:23, 65:24, 67:8, 69:8, 69:12, 70:1, 70:14, 71:16, 72:8, 72:25, 73:4, 73:6, 74:9, 74:10, 74:17, 82:13, 82:20, 82:23, 84:11, 93:15, 100:7, 100:8, 100:11, 100:24, 101:2, 101:21, 103:3, 103:13,

109:24, 109:25, 110:17, 111:16, 112:2, 112:4, 112:6, 112:13, 113:4, 113:5, 114:7, 114:15, 115:24, 117:25, 118:3, 118:8, 118:9, 121:1, 121:16, 121:23, 122:8, 123:21, 123:23, 124:4, 124:5, 124:11
**bitcoins** [5] - 12:9, 17:6, 17:9, 93:11, 109:22
**blacklist** [5] - 71:8, 71:16, 72:9, 72:24, 92:5
**blacklisted** [3] - 70:6, 70:18, 71:16
**blacklists** [1] - 69:21
**blanking** [1] - 49:2
**blockchain** [17] - 13:9, 44:12, 69:13, 69:17, 70:22, 72:20, 77:19, 93:21, 103:9, 108:18, 109:5, 109:6, 112:5, 113:17, 114:20, 115:19, 122:9
**blockchain-tracing** [1] - 69:17
**blocked** [1] - 70:18
**blocking** [1] - 8:2
**blocks** [1] - 122:14
**bluntly** [1] - 126:4
**body** [1] - 19:5
**boiled** [1] - 83:21
**boils** [1] - 81:13
**bolster** [1] - 37:10
**bolsters** [1] - 94:7
**bond** [2] - 4:10, 86:5
**bonds** [2] - 86:8, 125:2
**BOP** [1] - 88:20
**born** [4] - 67:16, 67:22, 67:25, 116:25
**bottom** [2] - 75:17, 75:18
**bout** [1] - 89:1
**boyfriend** [1] - 44:7
**bracelet** [3] - 75:22, 127:16, 127:17
**break** [7] - 29:1, 29:3, 29:7, 29:19, 30:1, 30:4, 95:15
**breaking** [1] - 101:19
**breakthrough** [1] - 89:3
**breast** [1] - 117:7

**BREGLIO** [1] - 1:17
**brief** [8] - 6:12, 14:13, 16:7, 83:20, 85:3, 85:4, 105:10, 125:22
**briefing** [6] - 25:1, 32:17, 33:21, 37:15, 46:18, 109:9
**briefly** [2] - 91:5, 126:20
**briefs** [1] - 62:1
**BRODIE** [1] - 1:12
**broke** [1] - 95:18
**brother** [3] - 3:8, 67:24, 117:2
**brought** [1] - 77:4
**BROWN** [1] - 1:12
**Brown** [3] - 2:15, 14:2, 49:7
**bulk** [2] - 65:23, 116:25
**bunch** [3] - 17:16, 18:16, 60:20
**burden** [2] - 98:15, 124:20
**Bureau** [6] - 88:19, 89:12, 89:14, 89:21, 89:24
**burner** [1] - 106:17
**burst** [1] - 62:17
**business** [22] - 4:19, 43:19, 44:16, 44:19, 44:24, 45:2, 45:7, 45:10, 45:11, 45:18, 45:24, 46:1, 46:2, 70:15, 72:4, 74:13, 84:3, 84:4, 101:23, 102:3
**business-to-business** [1] - 84:4
**businesses** [6] - 25:15, 41:5, 45:9, 45:14, 101:3, 115:24
**buy** [1] - 94:24
**bypass** [1] - 107:21

## C

**Cahill** [7] - 1:18, 2:19, 2:22, 2:23, 60:16, 60:23, 62:24
**Cahill's** [1] - 65:13
**calculus** [3] - 94:11, 94:19, 122:10
**California** [2] - 67:19, 118:13
**cancellations** [1] - 122:24
**cannot** [5] - 71:24, 78:1, 88:11, 111:6,

114:11
**cap** [5] - 80:17, 128:13, 128:17, 128:23
**capability** [3] - 92:5, 92:23, 104:19
**capable** [1] - 3:15
**capital** [3] - 82:15, 82:23, 84:17
**caption** [1] - 97:3
**cards** [7] - 65:22, 75:2, 83:6, 105:5, 105:9, 106:17, 119:21
**care** [5] - 71:20, 89:9, 95:1, 126:4, 126:5
**carefully** [2] - 111:24, 113:17
**carries** [4] - 99:17, 99:20, 99:24, 103:25
**Case** [1] - 2:3
**case** [74] - 3:25, 8:1, 9:18, 14:3, 14:7, 15:5, 15:6, 15:21, 16:10, 21:20, 34:9, 35:19, 39:7, 39:8, 47:20, 49:1, 49:6, 51:3, 51:7, 52:5, 56:1, 56:11, 56:17, 57:16, 57:24, 58:5, 69:25, 73:3, 74:3, 74:4, 74:6, 74:20, 74:23, 74:24, 75:8, 75:14, 76:7, 76:8, 76:25, 77:16, 78:8, 81:10, 81:13, 83:18, 85:16, 85:18, 85:23, 87:14, 87:18, 90:4, 90:8, 90:10, 90:20, 94:7, 94:9, 104:12, 104:13, 108:11, 109:4, 109:15, 109:16, 109:17, 110:6, 111:12, 114:12, 116:12, 117:14, 117:18, 118:15, 124:13, 126:14
**cases** [5] - 4:20, 4:25, 89:3, 111:11, 126:7
**cash** [4] - 44:10, 73:1, 92:24, 122:18
**casts** [1] - 60:21
**cat** [2] - 107:6, 107:7
**CATHERINE** [1] - 1:11
**catherine.pelker@usdoj.gov** [1] - 1:15
**caused** [1] - 122:23
**cell** [2] - 106:16, 107:8, 121:9, 122:17

**certain** [4] - 7:11, 38:8, 77:22, 80:10
**certainly** [25] - 8:18, 35:9, 36:15, 37:24, 41:15, 42:8, 43:12, 46:10, 47:12, 52:4, 52:5, 52:24, 63:7, 66:5, 69:7, 69:24, 70:7, 84:19, 85:13, 89:25, 90:17, 93:21, 96:18, 101:19, 128:2
**CERTIFICATE** [1] - 130:1
**certificate** [1] - 130:9
**certify** [1] - 130:4
**chain** [5] - 92:18, 101:23, 108:21, 114:6, 114:11
**Chainanalysis** [2] - 70:2, 71:3
**chains** [1] - 92:19
**challenging** [1] - 101:20
**chance** [1] - 70:9
**change** [2] - 33:17, 89:15
**changed** [2] - 94:12, 122:10
**character** [1] - 95:22
**characteristics** [3] - 99:7, 116:21, 123:12
**characterize** [1] - 84:20
**characterized** [2] - 78:22, 117:13
**charge** [9] - 9:7, 10:4, 38:23, 79:20, 79:24, 80:14, 80:15, 81:1, 81:17
**charged** [10] - 4:1, 10:6, 10:14, 47:3, 99:5, 99:12, 99:14, 99:15, 99:18, 103:16
**charges** [22] - 5:3, 9:16, 9:25, 11:20, 11:24, 46:12, 62:7, 94:9, 99:22, 99:25, 103:17, 103:21, 104:7, 104:14, 104:16, 104:21, 108:16, 108:23, 116:18, 117:12, 120:21, 124:13
**charging** [1] - 61:5
**charts** [1] - 113:16
**check** [2] - 31:16, 128:16
**Chicago** [2] - 68:1, 117:1
**Chief** [5] - 2:10, 2:13,

2:18, 4:21, 4:22
**CHIEF** [1] - 1:9
**childhood** [1] - 117:1
**children** [2] - 68:6, 95:4
**choice** [4] - 50:21, 54:21, 54:22, 54:24
**choices** [1] - 56:3
**choose** [1] - 85:11
**chooses** [1] - 84:13
**chopping** [1] - 92:18
**Chrestman** [1] - 98:5
**CHRISTINE** [1] - 1:21
**Christine** [2] - 2:6, 127:3
**Christopher** [1] - 2:14
**CHRISTOPHER** [1] - 1:12
**chronology** [1] - 120:13
**chunks** [1] - 101:14
**Circuit** [4] - 97:19, 97:24, 98:19, 98:20
**circuit** [1] - 98:3
**circumstance** [1] - 88:2
**circumstances** [7] - 46:25, 78:11, 99:5, 99:11, 104:17, 108:7, 117:6
**circumstantial** [7] - 23:16, 23:17, 66:19, 108:17, 109:17, 111:9, 115:7
**circumvent** [1] - 102:18
**cite** [6] - 97:23, 98:5, 98:19, 98:20, 104:11, 104:13
**cited** [1] - 78:6
**citizen** [5] - 40:22, 67:16, 67:17, 67:25, 119:7
**citizens** [2] - 40:14, 83:5
**City** [5] - 32:1, 32:5, 108:1, 125:21
**claim** [2] - 113:24, 114:21
**claiming** [1] - 46:1
**clarification** [2] - 50:11, 127:11
**clarify** [2] - 9:17, 91:10
**clean** [1] - 112:25
**clear** [14] - 5:16, 9:2, 11:23, 13:12, 62:16, 82:3, 98:21, 100:3, 108:14, 109:7, 113:23, 124:10, 125:6, 128:14

**clearly** [1] - 9:18
**clerk's** [1] - 125:4
**Client** [1] - 102:8
**client** [2] - 76:3, 78:3
**client's** [1] - 72:21
**clients** [24] - 3:19, 38:15, 45:3, 45:18, 46:5, 47:24, 47:25, 53:18, 58:12, 59:1, 63:4, 63:7, 69:10, 70:9, 72:14, 73:25, 74:18, 76:5, 76:13, 80:1, 88:9, 89:9, 95:21, 126:19
**clients'** [1] - 61:14
**close** [2] - 76:3, 80:20
**closed** [1] - 20:11
**closely** [1] - 124:2
**closest** [1] - 80:8
**cloud** [64] - 8:21, 11:15, 11:23, 12:7, 12:17, 20:5, 21:21, 21:24, 22:12, 24:24, 26:6, 27:15, 27:19, 27:23, 28:2, 28:17, 28:21, 29:18, 29:22, 30:15, 31:6, 33:25, 34:3, 34:5, 34:9, 37:23, 38:6, 41:16, 41:22, 43:8, 59:11, 59:15, 60:1, 60:3, 64:7, 64:8, 64:16, 66:21, 67:1, 75:19, 75:25, 78:22, 83:15, 83:16, 91:15, 91:18, 91:21, 92:1, 103:7, 104:23, 105:6, 105:23, 106:3, 106:4, 109:20, 110:13, 110:22, 112:16, 115:5, 118:17, 119:14, 119:19, 119:22
**clue** [1] - 30:1
**co** [1] - 42:22
**co-opted** [1] - 42:22
**cocounsel** [3] - 47:18, 61:11, 126:17
**code** [1] - 118:25
**coding** [1] - 118:23
**coins** [4] - 32:14, 92:5, 112:13, 118:12
**cold** [7] - 43:20, 43:21, 43:23, 43:25, 44:8, 115:18, 115:25
**colleague** [3] - 2:21, 2:23, 3:4
**colleagues** [3] - 5:1, 41:12, 42:10
**collected** [2] - 27:2,

98:4
**collectively** [1] - 77:7
**colloquied** [1] - 53:18
**colloquy** [4] - 49:23, 52:23, 53:4, 53:14
**Columbia** [8] - 76:23, 77:14, 79:25, 80:2, 80:5, 80:7, 80:8, 86:6
**COLUMBIA** [1] - 1:1
**combination** [3] - 80:20, 98:11, 124:21
**comfortable** [1] - 56:22
**coming** [7] - 19:2, 38:13, 40:6, 44:13, 45:5, 93:5, 96:11
**commenced** [1] - 39:17
**comment** [1] - 53:13
**commit** [1] - 4:3
**committing** [1] - 10:6
**common** [5] - 28:8, 29:7, 53:20, 72:2, 114:4
**commonly** [1] - 44:3
**communicate** [1] - 5:12
**communicating** [1] - 106:11
**community** [4] - 74:22, 98:13, 98:22, 99:8
**companies** [2] - 45:16, 115:23
**comparative** [1] - 49:12
**comparing** [1] - 57:18
**compelling** [1] - 85:13
**competently** [1] - 127:25
**complaint** [14] - 4:1, 4:2, 4:3, 6:9, 9:25, 18:3, 37:16, 46:19, 82:9, 97:3, 99:15, 100:18, 104:8, 108:17
**complaint's** [1] - 111:22
**complete** [2] - 93:12, 130:6
**completely** [1] - 16:3
**complex** [10] - 13:3, 18:2, 76:24, 92:17, 100:24, 101:7, 109:4, 111:18, 113:14, 117:14
**compliance** [1] - 71:11
**compliant** [1] - 93:23

**complicated** [3] - 40:23, 84:10, 128:12
**comply** [6] - 36:6, 87:6, 87:9, 90:25, 102:24, 107:13
**compounded** [1] - 5:11
**comprehensive** [1] - 26:14
**computer** [7] - 1:25, 10:5, 22:14, 29:8, 62:6, 101:14
**computer-aided** [1] - 1:25
**computers** [1] - 60:19
**conceal** [9] - 101:8, 106:14, 108:13, 111:18, 113:15, 114:3, 114:15, 114:24, 115:10
**concealment** [2] - 9:6, 99:19
**conceive** [1] - 68:9
**concern** [8] - 9:8, 15:1, 40:24, 46:14, 50:8, 106:22, 121:10, 123:8
**concerned** [3] - 9:9, 52:8, 95:3
**concerning** [5] - 99:2, 106:19, 107:3, 110:4, 121:13
**concerns** [11] - 5:12, 8:18, 40:19, 48:25, 69:1, 72:15, 85:24, 86:1, 88:6, 107:13, 117:19
**concludes** [1] - 129:21
**conclusory** [1] - 108:19
**condition** [3] - 66:6, 98:10, 124:21
**conditions** [31] - 72:15, 72:17, 74:23, 75:22, 85:21, 87:6, 87:9, 87:12, 88:10, 90:7, 90:13, 90:21, 90:24, 98:11, 98:21, 98:24, 103:1, 107:14, 107:15, 116:15, 117:19, 117:20, 124:8, 124:16, 124:21, 124:24, 125:3, 125:14, 125:15, 128:5
**conduct** [14] - 10:1, 17:21, 47:14, 97:14, 102:7, 104:18,

107:2, 107:12, 107:18, 108:7, 110:21, 113:9, 118:16, 121:9
**conducted** [1] - 128:8
**confer** [3] - 42:14, 77:23, 126:19
**conferred** [1] - 3:21
**confidence** [5] - 42:16, 87:8, 87:9, 102:23, 120:22
**confident** [2] - 42:4, 42:8
**configured** [1] - 14:18
**confines** [1] - 78:2
**confirm** [3] - 27:16, 30:23, 106:12
**confirmation** [2] - 27:19, 66:11
**confirmed** [1] - 103:10
**confirming** [2] - 23:13, 112:20
**conflict** [19] - 46:15, 47:9, 47:19, 47:20, 47:22, 50:16, 50:19, 51:1, 51:25, 52:20, 55:2, 55:7, 55:14, 56:2, 56:15, 57:5, 57:17, 57:20, 58:3
**conflict-free** [5] - 47:19, 52:20, 55:7, 55:14, 57:5
**conflicts** [9] - 51:7, 52:23, 53:24, 54:18, 55:4, 56:11, 56:15, 57:24, 58:3
**confront** [1] - 52:18
**confuse** [1] - 109:4
**confusing** [3] - 108:18, 109:8, 113:23
**connected** [3] - 44:2, 92:7, 128:6
**Connecticut** [1] - 2:25
**connection** [3] - 6:6, 14:15, 17:1
**connections** [2] - 43:3, 94:16
**consciousness** [1] - 113:12
**consensual** [2] - 109:10, 109:16
**consent** [1] - 49:23
**conservative** [2] - 84:13, 85:11
**consider** [3] - 80:25, 98:3, 108:9
**considerable** [2] - 104:9, 104:10
**consideration** [1] -

124:14
**considered** [4] - 8:20, 108:2, 112:14, 130:9
**consistent** [1] - 27:7
**consists** [1] - 23:18
**conspiracy** [12] - 4:3, 4:5, 10:8, 34:14, 79:20, 80:14, 81:1, 85:14, 99:15, 99:18, 99:19, 99:22
**conspired** [1] - 111:15
**conspiring** [1] - 10:1
**constitutes** [2] - 113:11, 130:4
**constituting** [1] - 110:13
**Constitution** [1] - 54:15
**constitutional** [3] - 50:21, 52:17, 53:4
**consult** [2] - 42:10, 42:12
**consultation** [1] - 46:12
**consulted** [1] - 70:21
**consulting** [1] - 84:4
**consuming** [1] - 101:20
**contact** [2] - 87:24, 88:4
**contactless** [1] - 87:24
**contacts** [3] - 74:22, 80:20, 90:10
**contain** [2] - 15:8, 119:15
**contained** [6] - 21:17, 25:1, 31:6, 103:7, 105:25, 106:2
**containing** [6] - 17:1, 17:11, 39:13, 106:5, 106:16, 118:7
**contains** [1] - 105:7
**contend** [1] - 114:6
**contends** [1] - 102:14
**contention** [1] - 116:6
**contents** [3] - 28:4, 92:1, 107:11
**contest** [1] - 117:11
**context** [2] - 114:14, 114:19
**contingency** [1] - 118:20
**continue** [2] - 13:15, 129:2
**continued** [5] - 17:21, 21:8, 38:24, 39:19, 89:15
**contract** [1] - 89:2
**contrary** [1] - 111:8

**control** [21] - 9:20, 14:10, 14:11, 14:21, 15:14, 15:19, 17:15, 19:18, 20:19, 72:14, 73:7, 89:12, 89:13, 89:21, 100:15, 109:24, 111:4, 111:19, 111:25, 118:5, 124:10
**controlled** [19] - 13:5, 13:16, 13:20, 13:21, 19:12, 20:20, 20:22, 20:23, 21:1, 23:21, 34:21, 35:3, 65:25, 69:9, 91:20, 101:2, 113:19, 120:25, 121:18
**controls** [3] - 69:20, 71:12, 93:24
**conversation** [5] - 50:14, 50:18, 54:13, 89:23, 125:25
**conversations** [9] - 48:8, 66:24, 70:23, 77:7, 78:1, 81:20, 81:24, 82:11, 82:16
**conversion** [2] - 33:20, 112:7
**converted** [1] - 33:17
**converting** [1] - 101:21
**conveyed** [2] - 63:6, 82:9
**convicted** [3] - 87:3, 103:23, 104:7
**conviction** [2] - 103:24
**convictions** [1] - 116:22
**convincing** [1] - 98:21
**convoluted** [1] - 76:24
**Cook** [1] - 68:3
**copies** [1] - 15:17
**copy** [7] - 7:8, 7:13, 7:14, 7:17, 7:21, 7:22, 58:19
**copywriting** [1] - 45:15
**correct** [18] - 8:11, 10:10, 10:14, 11:2, 22:21, 23:14, 24:22, 36:1, 37:18, 40:16, 50:3, 59:8, 61:21, 74:10, 92:6, 127:14, 127:16, 128:10
**correctly** [3] - 9:4, 49:8, 88:18
**correlation** [1] - 8:19
**corresponding** [3] - 20:7, 103:9, 110:24

**correspondingly** [1] - 116:16
**corroborated** [1] - 112:21
**cost** [1] - 86:3
**counsel** [71] - 2:7, 2:21, 11:18, 35:19, 36:14, 39:6, 39:9, 42:14, 47:4, 47:7, 47:11, 47:12, 47:20, 48:3, 48:16, 50:12, 50:15, 50:17, 50:21, 51:16, 51:17, 52:1, 52:9, 52:14, 52:20, 54:6, 54:8, 54:17, 54:21, 54:22, 54:24, 55:2, 55:7, 55:14, 55:15, 55:18, 55:19, 55:23, 56:12, 56:16, 57:4, 57:5, 57:8, 57:9, 57:13, 57:25, 58:4, 58:17, 58:22, 60:7, 60:15, 60:16, 60:22, 62:24, 62:25, 63:1, 63:4, 63:24, 66:3, 67:6, 87:13, 91:7, 91:9, 91:13, 109:8, 121:13, 121:18, 128:6, 129:2
**counsel's** [6] - 2:14, 5:12, 36:3, 38:14, 93:6, 94:3
**Count** [2] - 99:15, 99:22
**count** [6] - 3:11, 4:3, 4:5, 79:18, 80:18, 99:14
**countries** [2] - 31:13, 106:15
**country** [1] - 126:8
**County** [1] - 68:3
**couple** [4] - 46:11, 48:2, 61:11, 79:12
**couple's** [1] - 37:9
**couriers** [1] - 105:14
**course** [4] - 6:20, 42:11, 62:22, 114:13
**court** [17] - 3:13, 5:1, 5:2, 5:22, 54:10, 55:11, 73:19, 76:22, 77:5, 79:24, 86:7, 90:16, 97:13, 97:17, 97:25, 126:1
**COURT** [199] - 1:1, 1:9, 2:2, 2:12, 2:16, 3:5, 3:9, 3:23, 7:9, 7:14, 7:16, 7:23, 8:5, 8:12, 8:24, 9:14, 10:11, 10:16, 10:22, 11:3, 11:6, 11:12,

11:15, 11:18, 12:1, 12:3, 12:16, 12:20, 12:24, 13:7, 13:11, 13:23, 15:20, 16:5, 16:22, 17:18, 18:14, 19:14, 19:23, 19:25, 20:5, 20:16, 21:11, 21:23, 23:1, 23:4, 23:9, 23:11, 23:17, 23:23, 24:10, 24:18, 24:23, 25:11, 25:18, 26:17, 27:10, 27:14, 28:6, 28:15, 29:24, 30:9, 30:15, 31:1, 31:18, 32:8, 32:17, 32:24, 33:2, 33:5, 33:10, 33:23, 34:15, 35:13, 36:4, 36:14, 37:1, 37:14, 38:1, 38:12, 38:16, 39:11, 40:13, 40:17, 41:9, 41:20, 41:22, 41:25, 42:2, 42:4, 42:6, 42:11, 42:17, 43:6, 43:23, 45:8, 46:6, 46:9, 49:4, 49:6, 49:25, 50:6, 50:22, 51:21, 52:13, 53:2, 53:8, 53:10, 53:16, 54:3, 55:17, 55:22, 55:25, 56:6, 56:10, 56:14, 56:20, 56:25, 57:3, 57:7, 57:12, 57:15, 57:23, 58:2, 58:8, 58:16, 58:20, 59:4, 59:16, 59:20, 59:23, 60:1, 60:4, 60:8, 60:10, 61:9, 63:15, 64:20, 66:14, 66:20, 68:13, 68:15, 70:11, 71:14, 72:6, 73:3, 74:10, 74:24, 75:23, 78:13, 79:5, 79:9, 79:13, 79:16, 81:7, 81:19, 81:23, 82:2, 82:11, 83:3, 83:10, 84:15, 84:22, 86:2, 86:14, 87:21, 91:3, 93:7, 94:2, 94:15, 95:7, 95:10, 95:14, 95:17, 95:25, 96:4, 96:8, 96:15, 96:21, 97:5, 125:23, 126:15, 126:21, 126:25, 127:2, 127:5, 127:9, 127:14, 127:16, 127:22, 127:25, 128:10, 128:19, 128:22, 129:3, 129:8, 129:11,

129:16, 129:19
**Court** [50] - 1:23, 1:23, 2:2, 4:12, 4:15, 4:19, 4:21, 5:25, 7:21, 15:2, 46:24, 47:5, 47:10, 49:22, 50:5, 54:4, 54:19, 55:20, 57:10, 58:15, 58:21, 60:17, 63:25, 69:4, 69:5, 69:6, 70:8, 72:16, 73:13, 76:9, 87:7, 87:10, 95:24, 98:6, 99:1, 102:14, 102:19, 102:25, 108:6, 110:5, 110:17, 116:21, 117:4, 118:5, 123:8, 123:10, 124:17, 125:24, 126:8, 130:16
**Court's** [2] - 15:1, 79:18
**court's** [1] - 97:20
**Court-issued** [1] - 5:25
**courtroom** [10] - 3:2, 3:6, 5:19, 48:17, 59:5, 67:15, 67:17, 86:21, 96:22, 117:3
**courts** [2] - 7:10, 54:24
**cover** [1] - 129:6
**COVID** [2] - 76:18, 89:3
**create** [2] - 104:10, 107:1
**created** [3] - 15:18, 24:1, 105:23
**creates** [1] - 116:10
**credentials** [2] - 6:1, 26:8
**credit** [1] - 64:22
**crime** [4] - 74:13, 81:16, 81:17, 87:3
**Criminal** [2] - 1:3, 46:25
**criminal** [22] - 4:1, 4:2, 4:24, 4:25, 6:9, 9:25, 37:16, 54:16, 56:1, 57:16, 62:5, 72:3, 74:14, 99:14, 100:18, 104:8, 114:2, 116:9, 116:22, 120:21, 123:3
**critical** [3] - 98:3, 104:24, 108:20
**crypto** [6] - 43:4, 43:21, 92:12, 94:23, 115:21, 118:22

**cryptocurrency** [30] - 8:17, 8:19, 9:10, 13:18, 13:19, 14:13, 22:20, 35:8, 43:1, 44:20, 44:22, 45:5, 45:12, 45:21, 46:3, 72:18, 81:18, 84:16, 84:20, 92:6, 113:1, 114:2, 114:3, 114:8, 119:2, 119:3, 122:17, 123:17, 128:8
**culpability** [1] - 52:7
**curiosity** [1] - 35:22
**currency** [35] - 9:19, 15:23, 17:10, 18:21, 20:19, 24:19, 33:11, 33:20, 35:11, 44:18, 45:25, 62:13, 69:18, 69:25, 72:23, 80:3, 82:4, 92:10, 92:16, 92:20, 93:1, 100:2, 101:17, 101:21, 101:22, 102:9, 103:8, 106:18, 110:12, 112:8, 114:9, 114:10, 122:2, 122:18
**current** [3] - 12:11, 19:16, 76:8
**custody** [1] - 81:3
**Customer** [6] - 69:19, 71:11, 81:23, 93:12, 102:16, 102:22
**customer** [2] - 100:13, 115:16
**customer's** [1] - 100:13
**customers** [4] - 44:23, 45:6, 45:20, 115:20
**cybersecurity** [1] - 119:4

# D

**D.C** [13] - 1:6, 2:25, 5:15, 65:18, 87:22, 88:3, 89:11, 97:19, 97:24, 98:19, 98:20, 126:6, 126:10
**D.D.C** [3] - 98:6, 104:12, 104:13
**dad** [1] - 68:2
**damage** [1] - 89:1
**danger** [1] - 99:8
**dark** [1] - 74:8
**darknet** [20] - 43:5, 70:16, 71:14, 71:15, 71:18, 71:25, 72:3,

75:9, 75:12, 83:6,
92:18, 101:17,
105:4, 105:7,
105:16, 105:17,
112:6, 119:20,
123:18
**darknets** [1] - 75:2
**data** [2] - 60:20, 77:18
**data-intensive** [1] -
77:18
**date** [5] - 39:11, 62:13,
62:15, 66:10, 120:2
**Dated** [1] - 130:14
**dating** [1] - 102:10
**days** [4] - 87:16,
87:17, 87:20, 87:24
**DC** [1] - 1:14
**de** [4] - 97:14, 98:1,
98:4, 98:6
**deal** [2] - 29:6, 82:21
**dealing** [3] - 40:19,
45:3, 76:9
**dealt** [1] - 76:10
**debit** [2] - 83:6, 105:8
**decades** [1] - 68:1
**deceived** [1] - 102:2
**deception** [1] - 102:17
**decide** [3] - 54:23,
97:19, 110:2
**deciding** [1] - 119:25
**decision** [2] - 49:1,
61:5
**decisions** [2] - 54:25,
98:4
**decisively** [1] - 110:7
**declined** [1] - 97:19
**decreases** [1] - 116:16
**decrypt** [8] - 12:15,
29:5, 30:7, 30:10,
30:22, 37:25, 64:5,
64:6
**decrypted** [3] - 66:12,
67:11, 121:24
**decrypting** [1] - 103:6
**decryption** [3] - 30:9,
66:21, 122:3
**deemed** [1] - 6:2
**deeper** [1] - 51:6
**defend** [7] - 76:8,
77:16, 78:7, 85:18,
87:14, 87:18, 90:20
**defendant** [20] -
10:12, 27:17, 29:16,
47:6, 51:10, 53:21,
53:23, 54:8, 54:25,
98:9, 98:16, 100:5,
114:15, 122:11,
123:12, 125:24,
126:6, 127:12,
128:9, 128:15

**DEFENDANT** [15] -
55:16, 55:21, 55:24,
56:5, 56:9, 56:13,
56:19, 56:23, 57:2,
57:6, 57:11, 57:14,
57:22, 58:1, 58:7
**Defendant** [76] -
11:15, 11:22, 12:7,
25:14, 25:15, 26:5,
26:13, 27:15, 31:25,
32:9, 32:16, 32:18,
33:25, 34:2, 34:11,
34:21, 34:23, 34:24,
35:3, 35:4, 38:5,
40:3, 43:7, 45:9,
46:19, 65:1, 103:6,
103:12, 104:23,
106:2, 107:2, 107:6,
109:20, 109:24,
110:13, 110:22,
111:23, 112:15,
112:24, 114:22,
114:23, 115:3,
115:4, 115:7,
115:14, 115:17,
116:2, 116:25,
117:7, 118:17,
118:23, 119:1,
119:6, 119:10,
119:14, 119:23,
121:8, 121:25,
122:20, 123:14,
123:15, 123:25,
124:3, 124:6, 124:9,
124:19, 124:22,
124:23, 125:3,
125:7, 125:8,
125:11, 125:13,
126:3
**defendant's** [5] -
47:11, 49:1, 52:16,
52:19, 54:5
**Defendant's** [1] - 59:2
**defendants** [118] -
3:25, 5:6, 5:13, 6:22,
7:17, 8:13, 8:22,
9:25, 10:6, 15:25,
16:1, 16:19, 17:2,
17:15, 18:24, 19:4,
19:12, 19:18, 20:18,
22:6, 22:17, 23:12,
23:18, 23:20, 25:24,
26:10, 27:2, 29:20,
31:2, 32:3, 32:10,
35:15, 35:23, 36:16,
37:20, 37:22, 38:18,
39:12, 39:23, 40:25,
44:21, 46:11, 46:16,
47:2, 47:17, 47:19,
50:9, 50:13, 54:7,

54:12, 64:19, 64:25,
70:13, 72:10, 87:22,
92:14, 92:22, 94:5,
94:8, 94:20, 97:7,
97:11, 99:13,
100:23, 101:8,
102:7, 102:21,
103:15, 103:18,
103:22, 104:6,
105:19, 105:22,
106:23, 107:24,
108:8, 108:12,
108:15, 108:23,
110:10, 110:14,
111:15, 112:9,
112:12, 113:6,
113:8, 113:19,
113:21, 113:24,
113:25, 114:21,
116:7, 116:18,
116:21, 116:24,
117:10, 117:12,
117:15, 117:17,
117:23, 118:4,
118:6, 118:12,
120:1, 120:2,
120:19, 120:22,
121:23, 122:5,
122:14, 122:19,
123:4, 123:9, 126:1,
126:7, 126:8, 129:1
**Defendants** [15] - 1:6,
101:3, 102:1, 107:4,
107:18, 108:12,
109:9, 109:11,
112:3, 113:15,
116:10, 120:9,
121:18, 121:19,
121:20
**DEFENDANTS** [1] -
1:16
**defendants'** [27] -
6:13, 14:24, 15:13,
16:19, 18:7, 19:10,
33:12, 46:18, 50:20,
51:12, 53:3, 64:2,
93:25, 102:15,
103:2, 106:14,
107:24, 108:14,
108:25, 110:21,
112:10, 114:5,
115:24, 116:16,
117:5, 118:16,
120:17
**Defendants'** [10] -
95:21, 104:18,
104:19, 107:13,
111:6, 113:13,
113:20, 120:7,
121:6, 122:15

**Defense** [1] - 58:25
**defense** [42] - 2:17,
4:18, 5:11, 11:18,
16:25, 35:19, 36:3,
36:14, 38:13, 38:22,
39:6, 39:9, 50:12,
50:15, 50:16, 51:16,
52:6, 52:8, 52:11,
52:14, 54:17, 54:23,
55:1, 63:23, 63:24,
65:8, 89:22, 90:1,
91:7, 91:9, 91:13,
92:4, 92:6, 93:6,
94:3, 109:2, 109:8,
111:8, 117:16,
120:2, 121:12
**defense's** [1] - 42:21
**deference** [1] - 97:23
**definitive** [2] - 66:11,
66:14
**defraud** [2] - 4:5,
99:22
**degree** [3] - 42:15,
42:17, 42:25
**delay** [2] - 48:7, 48:18
**delete** [1] - 8:23
**delivered** [2] - 83:24,
118:13
**delivery** [2] - 105:13,
105:24
**demonstrably** [1] -
116:1
**demonstrating** [1] -
115:7
**deniability** [1] - 39:4
**denial** [1] - 6:1
**denied** [1] - 4:12
**DEPARTMENT** [1] -
1:13
**department** [1] - 80:11
**deposit** [1] - 115:14
**depositing** [1] -
101:16
**deposits** [2] - 112:11,
115:15
**deprive** [1] - 117:11
**deputy** [3] - 59:5,
96:22, 129:18
**derived** [2] - 113:4,
115:8
**describe** [3] - 28:20,
81:11, 108:16
**described** [1] - 62:12
**describes** [1] - 109:8
**description** [3] -
81:10, 108:22, 109:2
**designed** [2] - 85:25,
111:18
**desire** [1] - 117:16
**desk** [1] - 129:15

**despite** [1] - 120:3
**detail** [2] - 30:13,
108:5
**detailed** [2] - 105:25,
112:17
**details** [7] - 18:3, 29:5,
30:3, 32:13, 37:8,
41:19, 51:15
**detained** [8] - 43:2,
76:15, 77:13, 77:14,
87:1, 87:11, 88:18,
125:20
**detect** [1] - 107:22
**detection** [2] - 106:25,
118:10
**detention** [26] - 4:9,
4:16, 4:20, 6:17, 8:8,
8:13, 37:6, 47:14,
52:12, 56:18, 58:6,
66:5, 72:18, 75:22,
79:10, 97:18, 99:13,
103:20, 104:16,
106:21, 108:8,
110:8, 116:19,
124:9, 124:18,
125:11
**determination** [1] -
25:9
**determine** [2] - 4:22,
28:4
**determines** [1] - 98:10
**determining** [1] -
98:24
**deterring** [1] - 107:15
**device** [1] - 22:15
**devices** [8] - 22:1,
22:2, 24:12, 28:9,
28:12, 40:7, 122:16,
128:6
**dialogue** [1] - 67:5
**difference** [2] - 51:22,
113:3
**differences** [1] -
123:11
**different** [21] - 18:5,
19:8, 20:10, 21:9,
21:10, 22:1, 24:12,
28:3, 28:12, 32:2,
32:3, 32:7, 41:25,
42:5, 49:9, 51:11,
51:12, 51:19, 75:1,
88:1, 105:3
**differential** [1] - 51:18
**difficult** [11] - 41:6,
41:7, 87:14, 95:4,
107:10, 107:17,
121:8, 122:24,
125:24, 126:2,
126:13
**difficulties** [1] -

106:11
**difficulty** [1] - 5:10
**diligence** [2] - 102:4, 113:10
**direct** [13] - 11:19, 11:23, 13:3, 17:23, 21:2, 23:15, 69:8, 108:16, 109:10, 109:25, 110:14, 111:4, 111:10
**directly** [11] - 7:12, 13:5, 19:1, 27:24, 31:25, 40:4, 92:15, 102:13, 103:11, 115:13, 122:1
**dirty** [4] - 22:11, 71:10, 112:25, 113:2
**disagree** [2] - 81:9, 120:12
**disappear** [1] - 43:5
**disassembled** [1] - 130:10
**disclosure** [2] - 41:14
**disconnected** [1] - 44:9
**discover** [1] - 113:18
**discovered** [2] - 103:12, 121:24
**discovery** [2] - 77:17, 77:18
**discretion** [3] - 127:20, 127:22, 127:23
**discuss** [2] - 48:22, 99:10
**discussed** [7] - 47:19, 47:24, 48:9, 55:22, 57:12, 62:1, 116:8
**discussion** [1] - 19:16
**discussions** [4] - 35:18, 51:16, 62:22, 121:13
**dismiss** [1] - 79:21
**dispose** [1] - 118:9
**disposition** [1] - 56:4
**disputed** [1] - 61:20
**disregard** [1] - 102:15
**dissembling** [2] - 82:3, 102:22
**dissipated** [1] - 18:19
**dissipation** [2] - 9:8, 9:10
**distinguishing** [1] - 47:16
**distribution** [1] - 26:22
**district** [6] - 4:24, 5:1, 97:13, 97:17, 97:20, 127:20
**District** [17] - 4:8,

6:23, 7:5, 53:21, 65:7, 76:22, 77:14, 79:25, 80:2, 80:5, 80:7, 80:8, 86:6, 101:4, 103:17, 127:19
**DISTRICT** [3] - 1:1, 1:1, 1:9
**districts** [1] - 127:18
**disturb** [1] - 125:3
**docket** [1] - 96:16
**docketed** [6] - 6:9, 6:11, 6:12, 6:13, 6:14, 6:15
**doctor** [1] - 117:9
**doctors** [2] - 88:19, 88:20
**document** [2] - 20:13, 55:11, 65:13
**documents** [13] - 25:3, 34:4, 40:9, 41:2, 65:3, 75:3, 75:13, 75:20, 79:13, 105:1, 105:8, 112:15, 119:16
**DOJ** [1] - 67:5
**dollar** [1] - 18:13
**dollars** [6] - 16:18, 16:24, 33:18, 45:5, 65:23, 94:23
**domain** [9] - 59:12, 59:13, 59:24, 91:16, 91:17, 91:20, 91:21, 92:3
**done** [6] - 21:4, 45:7, 66:16, 68:17, 74:1, 124:3
**door** [2] - 67:9, 72:22
**doubt** [2] - 94:22, 117:14
**down** [14] - 2:25, 35:21, 50:24, 56:25, 64:21, 67:9, 71:22, 81:13, 82:18, 83:22, 87:19, 93:12, 129:12
**downstream** [1] - 26:22
**dozen** [3] - 17:23, 21:3, 22:20
**dozens** [1] - 31:2
**dramatically** [2] - 80:19, 94:12
**draw** [1] - 109:14
**drawn** [1] - 108:18
**due** [6] - 102:4, 112:23, 113:9, 121:4
**during** [5] - 6:20, 105:20, 107:25, 121:7, 122:13
**DUTCH** [1] - 1:5

**Dutch** [2] - 97:1, 97:2

### E

**earliest** [1] - 122:4
**early** [1] - 56:4
**easily** [2] - 117:23, 122:10
**easy** [1] - 73:5
**ECF** [6] - 6:10, 6:12, 6:13, 6:14, 6:16
**economics** [2] - 35:7, 42:25
**educated** [2] - 29:11, 119:1
**effective** [4] - 47:7, 52:19, 55:14, 57:4
**effectively** [1] - 52:9
**effectiveness** [1] - 107:15
**effort** [2] - 48:15, 118:10
**efforts** [5] - 19:7, 102:4, 107:21, 114:24, 115:9
**eggs** [6] - 68:9, 68:19, 68:20, 68:21, 68:23
**either** [14] - 7:14, 10:12, 18:24, 25:14, 31:13, 40:3, 70:14, 79:14, 86:25, 100:5, 100:11, 112:20, 119:12, 127:17
**elaborate** [1] - 108:13
**electronic** [10] - 14:16, 14:24, 22:1, 40:7, 63:19, 87:23, 109:19, 120:18, 121:3, 122:15
**Elicegui** [1] - 3:4
**Elizabeth** [2] - 1:23, 130:16
**ELIZABETH** [1] - 130:3
**elsewhere** [3] - 24:9, 41:3, 118:21
**Email** [2] - 1:15, 1:20
**email** [15] - 16:23, 26:3, 26:9, 26:11, 26:16, 26:24, 26:25, 27:8, 27:25, 28:1, 59:13, 59:14, 59:24, 109:11
**embryos** [5] - 68:7, 68:16, 68:17, 80:23, 94:17
**emergency** [2] - 6:11, 48:6
**employed** [1] - 117:2

**emptied** [1] - 112:21
**empty** [3] - 16:3, 16:14, 121:3
**empty-handed** [1] - 121:3
**encountered** [1] - 89:9
**encrypted** [21] - 12:15, 20:6, 21:22, 22:12, 24:24, 26:5, 27:20, 28:17, 30:10, 30:16, 30:17, 30:18, 37:8, 64:6, 66:21, 75:24, 103:12, 105:15, 109:20, 111:24, 115:5
**encryption** [9] - 28:20, 28:22, 29:1, 29:6, 30:2, 30:4, 110:25, 120:22, 121:4
**end** [1] - 35:11
**ended** [1] - 25:13
**enforcement** [8] - 40:19, 103:5, 106:12, 106:13, 107:10, 107:11, 107:21, 121:9
**engage** [2] - 54:13, 87:13
**engaged** [4] - 48:15, 61:1, 62:20, 121:13
**engineering** [1] - 118:24
**enhanced** [2] - 101:22, 112:8
**enormous** [2] - 77:17
**enormously** [1] - 82:24
**ensure** [5] - 15:3, 15:17, 47:21, 54:7, 129:1
**entered** [1] - 60:18
**entire** [1] - 120:18
**entirely** [2] - 29:15, 30:22
**entitled** [1] - 97:22
**entry** [2] - 6:1, 91:13
**Enzer** [7] - 2:19, 46:9, 50:24, 53:2, 58:9, 91:3, 95:17
**ENZER** [65] - 1:17, 2:18, 3:6, 3:21, 7:18, 46:8, 47:23, 49:5, 49:8, 53:6, 53:9, 53:12, 53:17, 58:10, 58:18, 58:23, 59:7, 59:18, 59:22, 59:24, 60:3, 60:5, 60:9, 60:12, 61:19, 64:17, 65:9, 66:18, 66:23, 68:14, 68:19, 70:20,

71:17, 72:12, 73:8, 74:11, 75:6, 76:1, 78:14, 79:7, 79:11, 79:15, 79:17, 81:12, 81:22, 81:25, 82:5, 82:25, 83:8, 83:12, 84:18, 84:23, 86:13, 86:15, 88:6, 95:19, 96:2, 96:7, 96:10, 96:18, 97:2, 125:16, 126:11, 126:18, 126:24
**enzer** [2] - 3:18, 46:7
**equally** [4] - 74:20, 84:8, 84:9
**equivalently** [1] - 18:13
**escape** [1] - 118:10
**especially** [2] - 77:13, 114:22
**essential** [1] - 117:15
**essentially** [5] - 22:14, 60:19, 69:20, 89:10, 91:15
**establish** [2] - 80:13, 98:15
**establishes** [1] - 69:7
**establishing** [1] - 111:12
**estimated** [2] - 33:7, 129:6
**Eugene** [1] - 3:8
**evaporated** [1] - 73:4
**evening** [1] - 39:18
**events** [2] - 58:13, 120:13
**eventually** [1] - 12:15
**evidence** [98] - 8:6, 18:23, 20:16, 20:17, 22:3, 23:13, 23:15, 23:16, 23:17, 26:4, 26:6, 26:7, 26:8, 30:5, 34:1, 34:8, 34:14, 37:2, 43:7, 43:11, 43:13, 46:22, 47:16, 49:16, 51:4, 57:19, 63:23, 66:24, 66:25, 67:7, 69:7, 69:8, 72:13, 78:23, 79:1, 79:8, 81:5, 81:8, 81:10, 81:11, 82:9, 83:13, 83:14, 83:16, 83:19, 83:22, 83:24, 84:25, 85:1, 85:13, 87:23, 98:16, 98:21, 99:6, 103:15, 106:19, 106:23, 108:10, 108:22, 109:1, 109:4, 109:15, 110:3,

110:5, 110:6,
110:14, 110:16,
111:4, 111:9,
111:10, 111:14,
111:21, 111:23,
112:3, 112:5,
112:11, 112:14,
113:6, 113:12,
114:1, 114:21,
115:3, 115:4, 115:7,
115:19, 116:5,
116:11, 116:17,
117:15, 117:18,
123:2, 123:3,
123:13, 123:24,
123:25, 124:14,
124:15, 124:20
**Evidence** [1] - 111:9
**evidentiary** [1] - 109:2
**exact** [2] - 30:14,
92:23
**exactly** [7] - 10:23,
11:5, 13:10, 36:13,
38:15, 43:21, 129:11
**examination** [1] - 22:2
**examinations** [1] -
51:24
**examine** [1] - 81:25
**example** [7] - 57:18,
70:25, 93:7, 105:2,
105:11, 114:8,
115:13
**examples** [2] - 102:6,
102:21
**excellent** [2] - 3:23,
85:22
**except** [1] - 128:6
**exchange** [6] - 9:19,
13:5, 27:7, 62:13,
92:10, 92:20
**exchange's** [1] - 13:6
**exchanges** [18] -
35:11, 44:18, 45:25,
69:18, 69:25, 70:25,
71:5, 72:23, 80:3,
92:7, 92:16, 93:1,
93:22, 93:23, 100:2,
101:17, 114:8,
114:10
**exchanging** [1] -
114:7
**exclusively** [4] -
15:19, 35:2, 35:3,
120:1
**excuse** [2] - 38:2, 95:9
**excused** [1] - 127:2
**executed** [7] - 27:14,
61:14, 63:2, 63:22,
66:1, 107:3, 120:5
**executes** [1] - 38:19

**executing** [2] - 36:19,
67:3
**execution** [9] - 14:23,
29:25, 30:6, 35:17,
36:18, 108:1,
119:12, 121:5
**exercise** [2] - 52:16,
100:15
**exercised** [1] - 97:25
**exhibit** [1] - 58:15
**Exhibit** [2] - 58:25,
59:2
**Exhibits** [1] - 95:21
**exist** [3] - 15:13,
22:15, 71:10
**existed** [1] - 67:1
**expect** [5] - 52:17,
70:7, 77:16, 81:17,
86:9
**expected** [1] - 86:4
**expecting** [1] - 3:17
**expenditures** [1] -
128:13
**expenses** [1] - 129:6
**expensive** [1] - 129:8
**experience** [4] - 14:2,
88:11, 88:20, 119:2
**experienced** [1] -
85:22
**expert** [4] - 70:21,
70:22, 70:23, 71:25
**expiration** [1] - 91:10
**expire** [1] - 58:25
**expired** [3] - 36:12,
91:9, 91:12
**explain** [4] - 12:25,
54:14, 128:19,
128:23
**explanation** [1] - 65:7
**explanations** [1] -
113:16
**explicitly** [1] - 50:15
**exponentially** [1] -
123:5
**exposure** [3] - 80:19,
104:9, 104:10
**expressed** [1] - 5:12
**expressly** [1] - 48:1
**extension** [1] - 15:12
**extensive** [10] - 3:10,
19:2, 34:12, 35:7,
74:22, 75:9, 75:12,
85:23, 86:10, 119:5
**extent** [8] - 8:20, 9:6,
39:6, 39:8, 43:10,
54:17, 129:7, 129:9
**extradite** [3] - 40:14,
41:7, 41:8
**extradited** [1] - 40:22
**extradition** [2] - 40:18,

40:20
**extremely** [2] - 76:24,
87:12

**F**

**F.2d** [1] - 98:20
**F.3d** [2] - 97:23, 98:18
**face** [7] - 46:17, 56:2,
57:17, 103:22,
104:6, 116:10, 123:4
**facilitate** [1] - 106:15,
117:23, 123:7,
124:12
**facilities** [6] - 5:5,
5:11, 5:13, 126:2,
126:4, 126:10
**facility** [3] - 61:15,
123:14, 124:10
**Facing** [1] - 104:14
**fact** [31] - 14:12,
17:22, 23:18, 48:17,
50:19, 61:4, 61:18,
62:16, 63:16, 65:20,
66:9, 69:12, 73:20,
74:22, 76:11, 78:6,
80:20, 80:22, 80:23,
80:24, 89:4, 89:15,
92:8, 102:12,
106:24, 107:25,
110:10, 110:21,
116:4, 122:5, 125:10
**factor** [7] - 79:8,
85:17, 99:12, 108:6,
108:9, 110:7, 116:20
**factors** [9] - 74:5,
78:9, 85:19, 99:2,
99:4, 99:10, 123:11,
124:15, 124:18
**facts** [4] - 46:19, 76:2,
100:16, 111:22
**factual** [1] - 97:22
**fail** [4] - 36:5, 36:6,
87:6, 110:10
**fails** [1] - 114:22
**fair** [5] - 30:16, 39:20,
61:19, 66:13, 85:6
**fairly** [5] - 37:19, 69:6,
86:9, 91:14, 97:6
**faithfully** [1] - 63:6
**fake** [5] - 19:9, 107:1,
123:15, 123:16,
123:18
**fakes** [1] - 105:12
**false** [13] - 80:6, 83:6,
83:7, 83:25, 84:25,
85:2, 102:1, 106:20,
113:8, 116:1,
118:19, 120:9,

120:22
**familiarity** [3] - 35:7,
75:9, 75:12
**families** [1] - 87:4
**family** [4] - 3:7, 67:14,
95:3, 116:23
**far** [14] - 21:23, 22:3,
24:16, 26:23, 27:2,
27:5, 29:5, 32:7,
33:23, 37:20, 46:22,
51:22, 76:23, 94:3
**fashion** [1] - 107:14
**fashioned** [2] - 72:15,
85:24
**father** [3] - 3:8, 67:17,
117:1
**favor** [13] - 54:21,
73:14, 73:16, 74:6,
90:3, 90:5, 99:12,
103:19, 106:21,
108:8, 110:8, 116:6,
124:18
**favors** [1] - 104:16
**FCRR** [3] - 1:23,
130:3, 130:16
**February** [28] - 1:5,
4:1, 5:5, 5:10, 36:19,
36:22, 39:17, 39:19,
61:17, 64:14, 64:18,
64:19, 64:21, 64:24,
66:12, 66:15, 67:2,
73:21, 73:24, 90:18,
100:21, 122:6,
122:23, 125:7,
130:14
**federal** [2] - 60:17,
103:16
**Federal** [1] - 46:25
**fees** [1] - 129:4
**felonies** [1] - 103:16
**female** [1] - 25:4,
106:8, 119:17
**fertilization** [1] - 68:9
**few** [3] - 65:9, 87:20,
93:22
**fictitious** [11] - 25:5,
31:3, 31:5, 34:25,
40:9, 44:14, 44:25,
101:11, 107:21,
120:24, 123:20
**figure** [4] - 23:25,
73:6, 86:11, 125:5
**figured** [2] - 64:12,
66:17
**file** [40] - 20:6, 21:19,
21:22, 24:6, 24:14,
24:17, 24:24, 26:6,
28:18, 28:24, 29:14,
29:16, 29:19, 31:10,
31:11, 39:13, 75:17,

83:19, 96:10, 96:19,
96:23, 96:24, 103:6,
103:7, 103:12,
105:2, 105:6,
105:14, 105:15,
109:21, 110:22,
110:25, 111:3,
111:24, 113:1,
119:19, 123:18,
123:22
**filed** [5] - 6:14, 8:7,
41:11, 74:16, 96:5
**files** [13] - 12:13,
12:14, 22:9, 22:17,
22:19, 26:5, 26:8,
27:19, 28:17, 28:21,
29:7, 30:10, 30:17,
30:18, 30:24, 33:25,
34:8, 37:8, 37:24,
64:7, 64:16, 66:12,
66:21, 67:11, 75:1,
75:24, 104:24,
105:23, 112:24,
115:5, 119:15,
119:22, 120:23,
121:25
**filing** [2] - 5:2, 54:9
**filings** [3] - 11:20,
41:11, 52:11
**fill** [1] - 111:6
**filled** [1] - 117:13
**financial** [21] - 10:1,
31:3, 43:16, 43:19,
44:6, 44:17, 45:22,
65:3, 102:2, 103:23,
103:25, 104:6,
104:14, 111:18,
112:9, 116:9,
117:22, 119:24,
123:2, 128:7, 128:12
**findings** [2] - 97:22,
125:10
**fine** [3] - 84:13, 84:14,
104:1
**finish** [1] - 82:2
**firm** [1] - 2:19
**first** [20] - 3:18, 25:21,
26:22, 34:21, 35:22,
37:4, 65:10, 69:17,
78:22, 78:24, 83:2,
84:24, 87:2, 91:8,
99:4, 99:11, 108:6,
110:9, 120:15,
125:19
**fit** [1] - 74:3
**five** [5] - 80:17, 80:18,
95:15, 101:20
**five-minute** [1] - 95:15
**five-year** [2] - 80:17
**flag** [3] - 30:24, 92:7,

92:21
**flagged** [2] - 92:8, 92:13
**flags** [1] - 120:19
**flee** [24] - 19:19, 36:20, 61:22, 61:23, 63:21, 64:25, 65:20, 80:19, 85:18, 94:12, 94:14, 94:20, 95:6, 104:10, 107:25, 108:24, 109:1, 116:10, 117:6, 118:15, 120:7, 120:19, 123:4
**fleeing** [1] - 122:20
**flight** [25] - 8:9, 8:16, 9:5, 19:18, 35:15, 36:17, 37:3, 37:7, 40:10, 65:8, 95:23, 98:17, 104:19, 106:15, 107:16, 108:4, 116:7, 117:10, 117:23, 120:1, 122:10, 122:14, 122:24, 123:7, 124:12
**flimsy** [5] - 81:9, 81:11, 109:17, 114:22, 117:13
**flow** [2] - 101:19, 113:15
**fluctuates** [1] - 33:8
**focus** [3] - 13:24, 18:20, 121:21
**folder** [6] - 22:12, 24:25, 30:21, 31:6, 37:9, 37:25
**folders** [3] - 106:5, 119:14, 119:17
**folks** [1] - 70:1
**follow** [6] - 88:15, 88:16, 109:7, 113:17, 117:9, 122:22
**follow-up** [4] - 88:15, 88:16, 117:9, 122:22
**following** [5] - 36:13, 38:21, 42:16, 55:10, 104:22
**food** [1] - 129:10
**fool** [1] - 73:9
**foot** [1] - 80:2
**footnote** [1] - 125:22
**FOR** [3] - 1:1, 1:11, 1:16
**foregoing** [1] - 130:4
**foreign** [6] - 33:11, 65:3, 106:15, 106:18, 107:1, 122:18

**forensic** [2] - 22:1, 51:24
**forfeit** [2] - 86:24, 87:7
**forfeiture** [1] - 104:3
**forgetting** [1] - 95:19
**forgive** [1] - 49:2
**forgot** [1] - 96:2
**form** [1] - 106:6
**formal** [4] - 5:2, 54:9, 54:10, 96:19
**former** [1] - 7:19
**forms** [2] - 15:13, 101:21
**forth** [5] - 61:2, 61:3, 115:6, 124:15, 124:17
**forward** [2] - 2:8, 48:23
**four** [4] - 26:11, 31:22, 99:2, 101:15
**fourth** [1] - 99:7
**frame** [2] - 35:21, 36:11
**Francisco** [1] - 32:4
**fraud** [5] - 10:4, 10:5, 62:6, 90:9
**free** [7] - 42:12, 47:19, 52:20, 54:18, 55:7, 55:14, 57:5
**Freeman** [3] - 37:11, 85:22, 90:22
**freeze** [5] - 68:22, 92:5, 93:4, 112:22, 128:7
**Friday** [4] - 5:5, 5:7, 76:12, 76:21
**front** [2] - 36:15, 52:21
**froze** [1] - 93:14
**frozen** [10] - 18:4, 20:11, 27:12, 68:7, 68:16, 68:17, 68:20, 93:9, 94:17, 112:20
**frustrating** [1] - 102:4
**frustrations** [1] - 76:10
**full** [4] - 38:11, 88:12, 120:13, 130:5
**fully** [4] - 48:1, 48:10, 49:21, 65:11
**fund** [1] - 101:19
**fundamental** [2] - 37:13, 37:20
**funded** [1] - 115:22
**funding** [1] - 102:12
**funds** [71] - 10:3, 13:4, 15:11, 17:25, 19:8, 19:11, 21:1, 23:21, 34:10, 35:9, 35:10, 39:22, 43:17, 43:20, 44:1, 44:13, 46:21,

67:2, 69:16, 69:21, 70:10, 71:12, 72:16, 72:24, 73:22, 73:23, 73:25, 74:16, 81:14, 81:16, 90:13, 92:11, 92:14, 92:20, 92:25, 93:4, 93:5, 93:18, 100:13, 100:14, 100:15, 100:19, 101:12, 101:13, 101:15, 101:18, 102:9, 102:10, 102:13, 103:4, 104:25, 110:11, 111:5, 112:19, 113:7, 113:11, 113:15, 113:18, 113:22, 114:3, 114:24, 115:1, 115:8, 115:10, 115:11, 115:14, 115:16, 115:25, 120:8, 121:1
**fungible** [1] - 119:3
**future** [2] - 6:1, 68:10

# G

**gag** [2] - 36:5, 36:6
**gained** [3] - 39:24, 103:5, 118:2
**gains** [3] - 82:15, 82:23, 84:17
**Gale** [1] - 3:3
**generally** [1] - 29:6
**generate** [1] - 79:3
**genesis** [1] - 9:17
**gifts** [1] - 90:14
**given** [12] - 39:15, 43:7, 58:16, 59:1, 74:22, 76:10, 76:21, 90:6, 90:7, 123:3, 123:5, 124:10
**glean** [2] - 24:12, 24:16
**gold** [9] - 31:21, 31:22, 31:23, 32:14, 33:2, 33:6, 33:8, 112:12, 118:12
**Gordon** [2] - 1:18, 2:19
**Government** [2] - 42:14, 65:25
**government** [196] - 2:9, 4:10, 7:7, 7:12, 8:7, 8:8, 10:12, 10:16, 10:18, 11:12, 11:19, 12:8, 12:20, 12:24, 12:25, 13:13, 13:16, 13:18, 13:21,

13:24, 14:3, 14:5, 14:11, 14:12, 14:20, 14:22, 15:2, 15:7, 15:8, 15:18, 16:6, 16:24, 17:7, 17:10, 17:13, 17:18, 17:20, 18:3, 19:9, 20:8, 20:9, 20:24, 25:12, 25:16, 25:19, 25:25, 26:4, 27:14, 28:16, 28:20, 28:25, 29:3, 29:12, 29:17, 31:1, 31:18, 33:10, 35:18, 36:5, 36:19, 38:19, 38:22, 39:12, 41:17, 48:10, 50:8, 50:19, 50:20, 50:22, 50:25, 51:16, 51:23, 52:4, 55:20, 57:10, 58:16, 59:8, 59:14, 60:21, 61:2, 61:12, 62:2, 62:4, 62:7, 62:19, 62:21, 62:25, 63:1, 63:3, 63:8, 63:9, 63:10, 63:12, 63:18, 63:23, 63:25, 64:5, 64:11, 64:15, 64:21, 64:22, 65:24, 66:1, 66:12, 66:16, 67:3, 67:10, 67:11, 69:1, 69:3, 69:15, 69:20, 70:5, 72:1, 72:9, 72:14, 72:16, 73:24, 75:7, 75:11, 77:21, 79:2, 80:22, 81:17, 82:6, 83:13, 85:2, 85:15, 86:17, 89:7, 89:8, 89:10, 89:20, 89:22, 91:4, 91:11, 91:25, 92:4, 93:10, 94:16, 94:18, 94:21, 95:11, 95:13, 98:15, 100:3, 100:22, 101:1, 101:8, 101:25, 102:6, 102:14, 102:19, 103:13, 104:20, 104:24, 105:2, 105:9, 106:8, 107:2, 108:11, 108:25, 109:23, 110:9, 111:2, 111:14, 112:21, 115:6, 116:12, 117:24, 118:1, 118:2, 118:11, 118:19, 120:16, 121:2, 121:10, 121:13, 121:15, 121:24, 122:3, 122:6, 122:7, 122:12, 123:1,

123:6, 124:3, 124:19, 125:19, 126:5, 126:25, 128:19, 128:22
**government's** [55] - 4:16, 4:20, 6:10, 6:12, 14:6, 14:10, 15:19, 19:7, 19:17, 20:3, 20:18, 25:1, 25:21, 29:5, 31:24, 34:17, 34:19, 41:19, 50:4, 61:21, 64:17, 65:5, 65:21, 71:7, 73:4, 74:2, 75:7, 78:19, 78:20, 80:1, 80:4, 82:10, 82:16, 83:18, 83:20, 85:24, 85:25, 94:6, 94:8, 94:18, 97:10, 99:25, 102:20, 104:21, 108:24, 111:12, 111:22, 113:16, 114:17, 116:5, 116:6, 120:7, 121:5, 121:21
**Government's** [2] - 14:1, 102:16
**Government-controlled** [1] - 65:25
**government-created** [1] - 15:18
**GPS** [1] - 127:12
**grabbed** [1] - 107:8
**graduate** [1] - 42:25
**grand** [7] - 35:16, 35:25, 60:10, 61:13, 63:17, 120:16, 120:20
**granted** [1] - 4:14
**gravity** [1] - 107:17
**great** [2] - 15:2, 40:11
**greatest** [1] - 79:19
**grew** [2] - 67:23, 116:24
**grounds** [2] - 79:21
**grows** [1] - 112:14
**guarantee** [1] - 73:10
**guarantees** [1] - 54:15
**guard** [1] - 110:18
**guess** [2] - 29:8, 82:17
**guesses** [2] - 29:9, 29:11
**guidance** [2] - 84:10, 84:20
**guilt** [1] - 113:12
**guilty** [1] - 74:8
**gun** [4] - 12:1, 39:13, 78:23, 109:19

## H

**hack** [31] - 9:9, 9:18, 10:7, 10:9, 10:19, 13:1, 17:11, 18:11, 18:21, 31:20, 39:5, 44:7, 44:24, 46:5, 62:12, 62:15, 81:15, 92:10, 93:19, 100:1, 100:5, 100:19, 102:11, 103:11, 110:11, 111:17, 112:11, 112:19, 114:16, 115:23, 122:2
**hack's** [1] - 93:5
**hacker** [6] - 10:13, 10:21, 10:22, 100:6, 111:3
**hackers** [1] - 39:21
**hand** [4] - 58:20, 59:3, 108:15, 109:19
**handed** [1] - 121:3
**hands** [2] - 35:5, 107:12
**hardware** [5] - 15:7, 15:9, 15:10, 44:3, 118:25
**harm** [1] - 89:17
**Harmon** [10] - 74:3, 74:4, 74:24, 74:25, 75:8, 75:15, 75:16, 78:8, 90:16
**harmon** [1] - 74:7
**Harmon's** [1] - 75:11
**harvest** [1] - 68:22
**head** [1] - 55:12
**health** [3] - 88:8, 88:9, 89:18
**hear** [9] - 3:18, 4:22, 5:18, 50:7, 59:6, 89:20, 94:5, 96:7, 127:5
**heard** [2] - 48:7, 85:23
**hearing** [23] - 4:9, 5:4, 5:7, 5:8, 5:15, 5:21, 6:7, 6:17, 7:7, 37:6, 47:14, 56:18, 58:6, 61:25, 76:12, 78:10, 79:10, 85:24, 96:20, 98:10, 124:14, 126:3
**HEARING** [1] - 1:8
**hearings** [4] - 5:11, 6:2, 47:13, 126:1
**Heather** [2] - 2:4, 62:11
**HEATHER** [1] - 1:6
**heavily** [3] - 99:12, 108:8, 116:6

**heavy** [1] - 109:14
**heightened** [2] - 89:2, 121:10
**held** [22] - 5:13, 5:23, 19:3, 25:24, 43:20, 44:1, 44:3, 44:8, 89:18, 98:3, 100:8, 101:3, 102:9, 104:24, 104:25, 109:20, 110:11, 112:10, 113:23, 115:25, 125:15, 126:1
**helix** [1] - 74:10
**Helix** [1] - 75:3
**HELLER** [1] - 1:17
**Heller** [1] - 2:22
**help** [1] - 75:4
**helpful** [1] - 49:24
**hereby** [1] - 130:3
**hesitancy** [1] - 110:6
**hide** [1] - 115:11
**high** [1] - 104:14
**higher** [3] - 74:18, 84:14, 85:5
**highly** [8] - 42:8, 42:24, 104:18, 112:2, 115:5, 118:5, 118:6, 121:25
**himself** [1] - 75:4
**hindered** [1] - 122:19
**hired** [2] - 62:20, 62:24
**history** [6] - 74:25, 88:21, 99:6, 101:19, 116:20, 123:11
**hold** [1] - 38:24
**holding** [7] - 5:6, 11:22, 109:21, 112:25, 117:24, 119:2, 122:16
**hole** [1] - 111:5
**holes** [2] - 113:25, 117:13
**home** [12] - 31:25, 32:16, 32:18, 61:15, 66:5, 72:17, 75:22, 87:11, 90:21, 113:19, 118:13, 124:25
**homes** [1] - 87:7
**honest** [1] - 107:14
**honestly** [1] - 102:24
**Hong** [3] - 41:4, 41:8, 104:12
**Honor** [162] - 2:5, 3:7, 7:4, 7:11, 7:15, 7:18, 8:4, 8:11, 8:15, 9:12, 10:10, 10:15, 10:20, 11:2, 11:5, 11:11,

11:14, 11:17, 11:25, 12:2, 12:12, 12:18, 13:10, 13:17, 15:5, 17:17, 17:20, 18:25, 19:21, 20:4, 20:14, 20:25, 22:8, 22:21, 23:6, 23:15, 24:22, 25:8, 25:17, 27:13, 27:22, 29:4, 30:8, 30:12, 30:20, 31:8, 32:11, 32:21, 33:4, 33:9, 33:19, 34:7, 34:24, 36:3, 36:25, 37:4, 37:7, 37:18, 38:8, 40:16, 40:23, 41:12, 41:23, 42:1, 42:3, 42:9, 42:13, 42:16, 42:20, 46:8, 47:23, 49:23, 50:2, 50:10, 51:9, 52:3, 53:1, 53:6, 53:20, 54:1, 55:16, 57:2, 57:6, 57:11, 57:14, 57:22, 58:1, 58:7, 58:10, 58:23, 59:3, 59:7, 60:5, 61:1, 61:19, 63:5, 64:17, 65:9, 66:7, 66:10, 66:23, 68:14, 68:25, 71:8, 71:13, 71:18, 72:12, 73:8, 74:3, 75:6, 76:1, 78:6, 78:9, 78:12, 78:22, 78:23, 78:24, 79:8, 79:12, 80:16, 81:5, 81:22, 81:25, 82:5, 82:25, 83:9, 83:12, 84:7, 84:18, 85:1, 85:21, 86:13, 86:15, 86:21, 88:6, 88:7, 90:3, 90:22, 91:5, 93:16, 94:21, 95:9, 95:13, 96:2, 96:13, 96:14, 96:20, 97:2, 125:16, 125:17, 126:11, 126:24, 127:1, 127:3, 127:7, 127:12, 128:3, 128:4, 128:24, 129:15, 129:18
**Honor's** [1] - 49:1
**HONORABLE** [1] - 1:8
**hop** [2] - 13:8, 16:17
**hopefully** [2] - 79:17, 126:16
**hoping** [1] - 95:24
**hopping** [2] - 101:23, 114:7
**hops** [1] - 93:20
**hospital** [1] - 68:8

**hosted** [5] - 18:5, 38:5, 41:22, 100:11, 100:12
**hoster** [1] - 59:23
**hot** [3] - 66:1, 71:20, 72:5
**hotel** [2] - 83:23
**hour** [4] - 76:23, 77:8, 77:10, 97:6
**hours** [1] - 87:17
**house** [6] - 60:18, 62:17, 78:16, 86:11, 86:12, 94:24
**houses** [7] - 86:3, 86:4, 86:8, 86:10, 86:23, 87:5, 94:17
**housing** [1] - 68:3
**HOWELL** [1] - 1:7
**huge** [2] - 85:14, 123:7
**hum** [2] - 18:14, 42:6
**hundred** [2] - 16:18, 94:23
**hundreds** [2] - 45:4, 77:14
**husband** [3] - 43:2, 44:7, 49:10
**husband's** [1] - 42:23

## I

**i.e** [1] - 111:16
**ICGA4S** [2] - 9:21, 110:23
**iCloud** [3] - 30:11, 64:7, 64:8
**idea** [1] - 94:7
**ideas** [2] - 105:3, 119:19
**identification** [10] - 25:3, 25:7, 41:2, 105:5, 105:8, 105:25, 106:6, 106:10, 119:16, 119:21
**identified** [1] - 17:12
**identifier** [3] - 91:15, 91:16, 91:24
**identifiers** [2] - 27:4, 91:14
**identifies** [2] - 31:5, 108:13
**identities** [10] - 31:4, 40:9, 43:4, 44:14, 83:25, 101:11, 107:1, 107:21, 123:15, 123:18
**identity** [2] - 75:3, 75:13
**ignore** [1] - 111:7

**illegal** [2] - 72:4, 114:14
**illicit** [2] - 43:17, 115:1
**Illinois** [1] - 68:3
**illuminate** [1] - 113:16
**Ilya** [2] - 2:4, 62:10
**ILYA** [2] - 1:5, 1:5
**imagine** [1] - 40:23
**immediate** [1] - 122:14
**immediately** [1] - 120:19
**immense** [1] - 122:1
**impending** [1] - 122:21
**implement** [2] - 48:21, 93:24
**important** [2] - 7:23, 54:25, 69:5
**importantly** [2] - 123:19, 123:22
**impossible** [5] - 41:7, 69:15, 72:25, 76:8, 77:16
**impracticality** [1] - 78:7
**impute** [1] - 114:11
**imputing** [1] - 108:20
**inability** [1] - 5:12
**inadvertent** [1] - 41:14
**incarceration** [2] - 89:15, 124:25
**incentive** [9] - 71:23, 80:19, 85:18, 94:12, 94:14, 95:5, 104:10, 116:10, 116:11
**included** [6] - 26:12, 26:16, 101:10, 105:3, 113:2, 119:20
**includes** [8] - 54:17, 55:14, 57:5, 59:12, 102:7, 111:23, 112:9, 124:25
**including** [24] - 5:23, 5:25, 15:13, 22:10, 22:11, 28:2, 28:18, 47:7, 71:6, 101:3, 101:22, 104:1, 105:17, 106:16, 112:12, 112:19, 113:1, 117:7, 120:24, 122:15, 122:18, 122:20, 123:11, 128:12
**inconsequential** [1] - 75:13
**increase** [2] - 18:10, 44:18
**increased** [1] - 123:5
**increases** [1] - 116:11

**increasing** [1] - 82:23
**incredibly** [5] - 43:12, 43:14, 94:4, 94:9, 95:4
**incriminating** [8] - 33:24, 34:5, 34:8, 60:21, 64:16, 105:1, 112:15
**inculpatory** [8] - 30:17, 30:19, 30:22, 66:21, 75:24, 115:5, 120:23, 121:25
**indeed** [2] - 103:18, 120:20
**independent** [1] - 100:15
**indicate** [1] - 119:22
**indicated** [3] - 62:4, 62:9, 62:11
**indicates** [1] - 106:23
**indicating** [3] - 31:11, 31:12, 121:10
**indication** [3] - 45:19, 121:24, 122:4
**indications** [1] - 79:1
**indicator** [1] - 60:24
**indicators** [3] - 66:19, 67:5, 78:15
**indicted** [1] - 4:2
**indictment** [2] - 5:2, 48:24
**indiscernible** [1] - 127:18
**individual** [2] - 51:10, 92:15
**individuals** [7] - 21:7, 25:4, 41:8, 74:21, 90:17, 106:7, 119:16
**industry** [1] - 92:12
**infer** [3] - 60:12, 67:8, 116:2
**inferences** [1] - 108:17
**informal** [1] - 54:10
**information** [33] - 5:3, 24:12, 24:13, 25:3, 25:7, 27:2, 28:6, 29:10, 31:13, 31:16, 32:12, 32:22, 34:6, 38:10, 41:15, 41:18, 62:14, 63:6, 63:19, 69:3, 69:4, 72:1, 82:22, 99:2, 102:2, 105:25, 106:5, 106:6, 106:7, 106:10, 112:17, 119:15, 124:1
**inhaler** [3] - 88:25, 89:6, 90:2
**initial** [2] - 4:9, 112:1

**initiated** [2] - 100:6, 113:14
**initiating** [1] - 15:16
**injunction** [1] - 90:13
**innocent** [1] - 73:15
**inquire** [2] - 47:5, 49:22
**inquired** [2] - 27:7, 115:13
**inquiries** [2] - 81:20, 102:8
**inquiring** [1] - 58:13
**inquiry** [5] - 46:10, 47:14, 86:10, 93:12, 93:17
**inside** [1] - 121:3
**insofar** [1] - 8:19
**instance** [1] - 24:14
**instances** [1] - 32:15
**instead** [5] - 21:8, 46:4, 46:5, 115:20, 115:21
**institutions** [3] - 31:3, 43:16, 43:20, 44:6, 44:18, 80:10, 102:3, 119:24
**institutions'** [1] - 102:4
**instructions** [1] - 102:25
**instruments** [1] - 99:16
**integral** [1] - 35:8
**intelligent** [1] - 42:25
**intend** [1] - 79:20
**intended** [3] - 2:23, 78:15, 115:14
**intending** [1] - 50:12
**intensive** [1] - 77:18
**intent** [3] - 78:17, 104:19, 114:2
**intention** [1] - 67:14
**intentions** [1] - 108:20
**intents** [1] - 114:11
**interest** [5] - 30:21, 46:15, 47:9, 47:22, 55:2
**interesting** [1] - 31:19
**interests** [4] - 51:13, 51:18, 51:19, 54:19
**interfere** [1] - 50:20
**interfering** [2] - 52:16, 53:3
**intermediaries** [1] - 19:4
**intermediary** [1] - 35:1
**internal** [1] - 105:13
**international** [1] - 119:5
**internet** [8] - 14:14,

35:24, 44:2, 44:9, 59:10, 72:18, 105:12, 128:6
**internet-connected** [1] - 128:6
**interrupt** [2] - 37:14, 50:3
**interrupting** [1] - 38:2
**intimately** [1] - 121:22
**introductions** [1] - 3:10
**investigating** [2] - 61:13, 62:19
**investigation** [13] - 25:9, 29:10, 31:24, 41:19, 58:14, 60:13, 62:5, 67:6, 90:19, 100:1, 120:4, 120:10, 121:14
**investments** [1] - 102:10
**involve** [1] - 114:7
**involved** [4] - 75:5, 104:2, 113:14, 121:22
**involvement** [1] - 114:23
**involves** [1] - 101:5
**involving** [4] - 62:10, 114:1, 114:6
**IP** [1] - 24:2
**iPads** [1] - 87:22
**Irena** [1] - 3:8
**IRS** [3] - 84:10, 84:20, 85:11
**island** [1] - 94:25
**ISP** [14] - 35:23, 36:1, 36:5, 36:10, 38:4, 38:5, 41:13, 41:20, 41:24, 41:25, 42:5, 52:9, 120:15
**issuance** [1] - 35:24
**issue** [15] - 48:9, 50:7, 50:16, 50:19, 55:22, 57:12, 62:15, 81:6, 88:24, 89:7, 90:3, 98:3, 110:15, 114:12, 125:9
**issued** [3] - 5:25, 6:15, 60:10
**issues** [4] - 52:18, 79:2, 89:8, 89:17
**issuing** [1] - 67:4
**items** [3] - 106:13, 107:22, 118:16
**iterations** [1] - 29:9
**itself** [5] - 59:1, 61:24, 62:2, 62:18, 92:13

**J**

**jail** [15] - 73:11, 76:17, 77:3, 78:4, 78:5, 87:10, 87:19, 87:22, 88:3, 89:6, 89:10, 91:1, 94:10, 95:5, 125:21
**January** [29] - 29:1, 29:25, 33:12, 35:18, 36:18, 38:20, 39:18, 60:17, 61:17, 63:3, 63:8, 63:22, 64:6, 64:13, 65:11, 100:23, 103:5, 107:3, 107:23, 120:11, 121:5, 121:12, 121:15, 122:4, 122:7, 122:13, 122:21, 126:7
**jealously** [1] - 110:17
**Jessica** [1] - 2:15
**JESSICA** [1] - 1:12
**job** [1] - 88:21
**joined** [1] - 2:14
**joining** [1] - 2:6
**joint** [11] - 46:16, 47:1, 47:5, 47:15, 47:21, 50:9, 55:5, 55:23, 56:15, 57:13, 58:3
**jointly** [6] - 47:3, 48:11, 48:13, 55:2, 56:1, 57:16
**jokes** [2] - 65:17
**JUDGE** [1] - 1:9
**Judge** [9] - 2:10, 2:13, 2:18, 4:21, 4:22, 37:11, 70:20, 85:21, 90:21
**judge** [32] - 4:8, 4:13, 4:18, 4:24, 5:1, 6:3, 6:15, 6:24, 35:15, 36:16, 37:3, 37:5, 41:11, 52:22, 61:10, 65:6, 85:22, 85:23, 101:5, 103:17, 104:5, 106:19, 108:3, 110:2, 115:2, 117:4, 119:25, 120:6, 124:25, 125:14, 128:11
**judge's** [9] - 97:10, 97:13, 97:17, 97:21, 97:22, 120:12, 124:7, 125:6, 129:13
**judges** [2] - 4:23, 54:6
**judicial** [1] - 98:9
**jump** [6] - 97:23, 98:5,

98:19, 98:20, 104:11, 104:13
**juncture** [1] - 53:5
**jurisdictions** [1] - 86:9
**jury** [8] - 35:16, 35:25, 60:10, 61:13, 63:18, 116:2, 120:17, 120:20
**JUSTICE** [1] - 1:13
**justice** [1] - 98:18

**K**

**keep** [8] - 9:23, 38:16, 66:6, 78:13, 81:3, 89:17, 94:1, 113:3
**keeping** [1] - 115:17
**kept** [1] - 126:22
**key** [4] - 14:18, 26:20, 30:9, 71:1
**keyboard** [1] - 35:5
**keys** [55] - 11:9, 11:13, 11:21, 12:3, 12:6, 12:16, 13:16, 13:20, 13:21, 14:8, 14:17, 14:21, 14:22, 15:8, 15:10, 15:12, 15:16, 15:18, 15:21, 16:9, 20:7, 20:21, 21:13, 21:15, 21:19, 21:22, 22:5, 23:12, 23:19, 24:7, 24:15, 24:19, 28:19, 39:13, 39:24, 64:9, 64:12, 64:23, 66:15, 67:1, 69:2, 71:10, 72:11, 103:9, 103:11, 109:21, 109:22, 110:12, 110:18, 110:24, 111:25, 118:2, 123:22, 124:10
**kicked** [1] - 67:9
**kid** [1] - 67:23
**Kiev** [3] - 105:18, 105:20, 105:22
**kind** [6] - 48:21, 54:23, 72:1, 95:22, 96:4, 96:8
**kinds** [1] - 75:2
**knocked** [1] - 67:9
**know-how** [1] - 43:1
**knowing** [3] - 32:25, 55:7, 114:23
**knowingly** [3] - 85:13, 111:15, 116:3
**knowledge** [5] - 35:9, 51:6, 114:25, 115:8, 118:18
**known** [4] - 1:5, 40:4,

43:17, 101:23
**knows** [5] - 43:21,
43:22, 45:4, 60:17
**Kong** [2] - 41:5, 41:8
**KYC** [2] - 70:2, 71:4

## L

**labeled** [1] - 106:17
**lack** [2] - 79:22, 81:2
**land** [4] - 25:23, 64:2,
70:14, 115:12
**landed** [2] - 26:21,
34:21
**large** [8] - 25:12,
25:20, 34:17, 93:10,
93:14, 101:14,
114:16
**larger** [1] - 27:23
**largest** [2] - 100:1,
114:16
**Larry** [1] - 74:25
**last** [6] - 5:4, 18:1,
93:22, 96:12, 120:3,
126:18
**late** [7] - 39:18, 64:13,
95:25, 96:12, 97:6,
122:6, 126:22
**launching** [1] - 40:25
**launder** [7] - 10:8,
45:1, 99:15, 111:15,
112:18, 113:7,
123:21
**laundered** [6] - 18:1,
39:3, 43:18, 74:12,
74:17, 111:5
**laundering** [31] - 4:4,
9:7, 13:3, 19:2,
19:13, 34:12, 34:14,
43:16, 49:6, 62:6,
69:19, 74:13, 79:19,
79:23, 80:13, 80:14,
81:1, 85:14, 92:23,
93:2, 93:24, 94:1,
99:19, 101:7,
102:16, 107:19,
112:6, 113:9, 116:3,
121:22, 124:5
**law** [11] - 2:19, 40:19,
47:4, 83:5, 103:5,
106:11, 106:13,
107:10, 107:11,
107:21, 121:8
**law-abiding** [1] - 83:5
**lawful** [3] - 106:25,
114:10, 114:19
**lawyer** [9] - 53:11,
53:23, 54:7, 55:6,
55:23, 56:1, 57:13,

57:16, 129:4
**lawyers** [3] - 3:15,
88:3, 90:1
**lay** [2] - 3:24, 76:13
**layering** [2] - 92:17,
101:15
**laying** [1] - 35:19
**leading** [1] - 70:3
**leap** [2] - 20:24, 91:25
**learn** [2] - 29:10,
60:15
**learned** [2] - 39:12,
58:14
**learning** [2] - 119:11,
120:15
**lease** [2] - 78:16,
80:24
**least** [18] - 17:10,
72:15, 35:1, 45:17,
51:22, 56:17, 58:5,
60:14, 65:20, 66:9,
74:5, 81:2, 85:7,
90:13, 105:10,
105:15, 120:4
**leave** [3] - 67:20,
78:18, 125:4
**leaves** [2] - 17:16,
109:7
**leaving** [2] - 13:4,
68:10
**led** [1] - 91:22
**ledger** [5] - 11:1, 11:8,
13:8, 23:2, 122:9
**lee** [1] - 90:16
**Lee** [1] - 3:3
**left** [4] - 17:9, 33:16,
68:11, 80:17
**legal** [2] - 77:9, 78:2,
102:18
**legitimate** [8] - 45:18,
45:20, 84:3, 84:5,
92:6, 114:4, 115:24
**legitimize** [1] - 101:24
**length** [1] - 28:23
**lengths** [1] - 108:13
**lengthy** [3] - 28:22,
37:6, 111:1
**less** [6] - 46:22, 49:15,
76:23, 77:5, 117:6
**letter** [1] - 6:14
**letters** [6] - 9:23,
54:10, 95:20, 95:22,
96:25, 97:5
**librarian** [1] - 67:19
**LICHTENSTEIN** [9] -
1:5, 1:5, 55:16,
55:21, 55:24, 56:5,
56:9, 56:13, 56:19
**Lichtenstein** [44] -
2:4, 2:20, 3:14,

25:15, 31:25, 32:9,
34:22, 34:25, 35:3,
35:4, 40:3, 43:11,
45:14, 46:23, 49:19,
51:20, 55:9, 59:14,
60:6, 62:10, 67:20,
67:22, 75:18, 76:14,
76:20, 83:18, 91:19,
91:20, 97:1, 115:4,
115:17, 116:25,
118:17, 118:23,
119:6, 119:23,
123:14, 124:9,
124:19, 124:22,
125:8, 125:11,
125:20, 126:3
**Lichtenstein's** [40] -
3:7, 11:15, 11:23,
12:7, 12:17, 19:1,
20:5, 21:21, 24:24,
26:5, 26:13, 27:9,
27:15, 27:25, 28:5,
28:7, 32:16, 32:18,
33:25, 34:9, 34:11,
37:8, 38:6, 43:7,
44:15, 52:2, 94:22,
103:7, 103:12,
104:23, 106:2,
109:20, 109:24,
110:13, 110:22,
111:23, 112:16,
112:24, 119:14,
121:25
**lie** [1] - 85:5
**life** [3] - 67:20, 68:4,
118:21
**lifetime** [3] - 28:25,
29:2, 111:3
**likelihood** [1] - 116:14
**likely** [7] - 36:11,
39:23, 47:9, 117:6,
118:5, 118:6, 120:21
**limit** [1] - 23:24
**limited** [6] - 31:15,
48:5, 48:8, 76:4,
117:8, 122:21
**limits** [1] - 44:19
**line** [4] - 5:17, 5:21,
25:8, 69:6
**linked** [6] - 17:11,
18:21, 19:20, 71:1,
102:13, 103:11
**linking** [1] - 122:1
**links** [4] - 18:23,
105:3, 108:20,
119:20
**liquidate** [3] - 69:16,
70:1, 72:25
**liquidated** [1] - 69:22
**list** [8] - 3:10, 91:14,

105:7, 105:9,
105:11, 105:16,
106:2
**listed** [3] - 91:16,
91:24, 110:23
**listen** [1] - 89:25
**listening** [1] - 5:20
**listing** [6] - 20:9,
21:22, 24:7, 26:7,
26:14, 123:19
**literally** [3] - 3:1,
68:10, 109:18
**litigation** [1] - 89:16
**live** [3] - 32:20, 67:19,
77:15
**lived** [3] - 41:5, 67:25,
73:3
**lives** [4] - 67:14,
67:17, 86:24, 87:2
**living** [5] - 28:11, 32:3,
33:1, 51:3, 129:6
**LLP** [1] - 1:18
**local** [1] - 4:22
**locate** [1] - 16:20
**located** [1] - 37:24
**location** [2] - 111:19,
125:1
**locations** [2] - 18:6,
21:10
**lock** [1] - 107:9
**lockdown** [1] - 78:4
**logged** [1] - 28:10
**login** [1] - 112:17
**look** [10] - 7:1, 24:21,
28:3, 44:12, 49:11,
59:8, 59:11, 77:21,
87:23, 96:9
**Look** [1] - 84:11
**looked** [3] - 6:6, 6:10,
83:16
**looking** [7] - 6:8, 13:7,
44:22, 59:16, 63:9,
80:24, 124:2
**losing** [1] - 94:17
**lost** [3] - 2:25, 14:11,
86:4
**Loth** [2] - 1:23, 130:16
**LOTH** [1] - 130:3
**low** [1] - 120:8
**lower** [1] - 84:12
**lung** [1] - 89:1
**lying** [2] - 102:7, 102:8

## M

**machine** [2] - 1:24,
22:14
**machines** [1] - 40:1
**Madoff** [4] - 90:6,

90:10, 90:15
**magistrate** [39] - 4:8,
4:13, 4:18, 4:23,
6:15, 6:24, 35:15,
36:16, 37:3, 37:5,
41:11, 52:22, 54:6,
61:10, 65:6, 85:22,
97:10, 97:12, 97:17,
97:21, 101:5,
103:17, 104:4,
106:19, 108:3,
110:2, 115:2, 117:4,
119:25, 120:6,
120:12, 124:7,
124:24, 125:6,
125:14, 128:11,
129:13
**Magistrate** [2] - 2:2,
37:11
**main** [3] - 63:16, 71:8,
73:1
**maintains** [1] - 119:8
**major** [3] - 70:24,
71:5, 122:23
**majority** [2] - 103:4,
104:25
**male** [3] - 25:4, 106:7,
119:16
**Manafort** [1] - 98:18
**manipulating** [1] -
123:16
**manner** [2] - 39:25,
130:11
**Marines** [1] - 67:18
**marked** [1] - 95:21
**marketing** [1] - 84:4
**markets** [4] - 92:18,
101:17, 112:6,
114:10
**married** [2] - 46:11,
48:2
**marshal** [1] - 126:21
**matched** [1] - 94:1
**materials** [2] - 6:6,
6:8, 60:20
**math** [2] - 17:8, 18:16
**matter** [4] - 2:2, 10:3,
86:19, 126:9
**matters** [2] - 4:24,
86:20
**maximum** [3] - 80:18,
99:20, 103:21
**mean** [15] - 14:12,
33:14, 36:7, 50:2,
65:11, 66:4, 66:15,
68:16, 70:11, 71:23,
75:20, 75:21, 83:4,
87:25
**means** [5] - 25:20,
61:22, 92:19,

106:25, 112:3
**meant** [2] - 44:3, 79:9
**measures** [1] - 47:10
**media** [2] - 5:25, 14:17
**medical** [2] - 88:24, 95:1
**medium** [2] - 42:15, 42:17
**meet** [1] - 126:14
**meetings** [2] - 87:17, 128:6
**memorize** [1] - 21:18
**mentioned** [1] - 111:1
**merits** [1] - 4:15
**MERS** [1] - 89:2
**messages** [1] - 109:11
**met** [4] - 45:14, 65:13, 124:19, 128:17
**metadata** [2] - 23:25, 24:16
**method** [2] - 29:7, 30:10
**Michael** [1] - 3:8
**might** [7] - 7:21, 40:23, 51:24, 68:22, 75:24, 86:3, 86:4
**miles** [1] - 77:14
**million** [17] - 16:18, 16:24, 17:2, 17:12, 17:14, 18:21, 19:15, 19:18, 22:22, 24:20, 72:8, 86:12, 94:23, 100:20, 117:25, 118:7, 118:8
**millions** [2] - 45:4, 65:23
**mind** [2] - 67:24, 109:3
**minimizing** [1] - 109:2
**minting** [1] - 119:3
**minute** [1] - 95:15
**minutes** [3] - 77:5, 77:12, 126:23
**misdirection** [1] - 109:14
**missing** [3] - 17:9, 17:16, 63:15
**misunderstand** [1] - 37:13
**misunderstanding** [1] - 37:20
**mitigated** [1] - 123:1
**mixer** [1] - 74:9
**mobile** [1] - 65:11
**mobility** [2] - 117:8, 122:21
**modify** [1] - 97:12
**mom** [1] - 68:1
**moment** [2] - 40:21, 42:13

**monetize** [1] - 118:9
**money** [31] - 4:3, 9:6, 16:4, 33:14, 33:16, 34:14, 43:19, 49:6, 62:6, 65:3, 65:22, 69:19, 79:19, 79:23, 80:13, 80:14, 80:25, 85:14, 86:7, 86:18, 90:11, 93:2, 93:24, 99:16, 99:19, 101:7, 102:16, 104:5, 107:19, 113:9, 116:3
**monitor** [1] - 72:20
**monitored** [1] - 128:14
**monitoring** [2] - 125:1, 127:13
**month** [4] - 12:8, 107:23, 107:25, 128:13
**months** [3] - 61:6, 89:16, 120:3
**moral** [2] - 86:20
**Morgan** [35] - 2:4, 2:20, 3:3, 25:14, 32:10, 34:2, 34:11, 34:23, 40:3, 42:24, 44:5, 45:13, 46:19, 56:21, 57:4, 62:11, 65:1, 77:9, 81:4, 107:6, 114:22, 114:23, 115:3, 115:14, 116:2, 119:1, 119:10, 121:8, 123:15, 123:25, 124:6, 124:23, 125:4, 125:8, 125:13
**morgan** [30] - 3:14, 28:10, 35:4, 35:6, 40:5, 42:21, 43:13, 46:20, 46:22, 49:14, 51:19, 52:5, 55:8, 60:6, 65:10, 67:15, 68:8, 71:2, 81:12, 82:17, 83:8, 83:13, 83:14, 83:21, 84:9, 88:10, 88:24, 89:18, 94:22
**MORGAN** [9] - 1:6, 56:23, 57:2, 57:6, 57:11, 57:14, 57:22, 58:1, 58:7
**Morgan's** [14] - 3:2, 34:6, 41:4, 43:15, 44:1, 44:16, 45:9, 82:22, 88:8, 107:2, 115:7, 117:7, 122:20, 124:3
**morning** [4] - 2:10, 2:18, 39:19, 77:3

**most** [10] - 34:8, 44:2, 54:25, 69:23, 70:1, 75:18, 79:18, 80:18, 123:19, 123:21
**mostly** [1] - 122:25
**mother** [3] - 3:8, 67:18, 117:1
**motion** [10] - 4:20, 6:10, 8:6, 79:4, 79:21, 88:12, 96:19, 96:23, 97:10, 97:12
**motivation** [2] - 120:7, 123:4
**move** [10] - 7:25, 11:9, 13:14, 64:23, 65:12, 65:15, 69:16, 70:10, 70:13
**moved** [8] - 14:6, 23:10, 65:24, 67:2, 67:8, 72:24, 73:22, 113:22
**movement** [2] - 73:23, 122:9
**moves** [1] - 72:22
**moving** [7] - 39:21, 73:1, 73:25, 90:13, 100:23, 101:11, 101:13
**MR** [64] - 2:18, 3:6, 3:21, 7:18, 46:8, 47:23, 49:5, 49:8, 53:6, 53:9, 53:12, 53:17, 58:10, 58:18, 58:23, 59:7, 59:18, 59:22, 59:24, 60:3, 60:5, 60:9, 60:12, 61:19, 64:17, 65:9, 66:18, 66:23, 68:14, 68:19, 70:20, 71:17, 72:12, 73:8, 74:11, 75:6, 76:1, 78:14, 79:7, 79:11, 79:15, 79:17, 81:12, 81:22, 81:25, 82:5, 82:25, 83:8, 83:12, 84:8, 84:23, 86:13, 86:15, 88:6, 95:19, 96:2, 96:7, 96:10, 96:18, 97:2, 125:16, 126:11, 126:18, 126:24
**MS** [118] - 2:10, 2:13, 7:4, 7:11, 7:15, 8:4, 8:11, 8:15, 9:12, 10:10, 10:14, 10:20, 11:2, 11:5, 11:11, 11:14, 11:17, 11:25, 12:2, 12:12, 12:18, 12:22, 13:2, 13:10, 13:17, 15:1, 15:24,

16:13, 17:17, 17:20, 18:25, 19:21, 19:24, 20:4, 20:14, 20:25, 21:15, 22:8, 23:3, 23:6, 23:10, 23:15, 23:20, 24:5, 24:11, 24:22, 25:8, 25:17, 26:11, 27:4, 27:13, 27:22, 28:8, 29:4, 30:3, 30:12, 30:20, 31:8, 32:2, 32:11, 32:21, 32:25, 33:4, 33:7, 33:19, 34:7, 34:24, 36:2, 36:8, 36:25, 37:4, 37:18, 38:7, 38:13, 38:18, 39:15, 40:16, 40:21, 41:12, 41:21, 41:23, 42:1, 42:3, 42:5, 42:7, 42:13, 42:15, 42:20, 43:10, 43:25, 45:11, 50:2, 50:10, 51:9, 52:3, 53:1, 91:5, 93:16, 94:3, 94:21, 95:9, 95:12, 127:1, 127:3, 127:7, 127:10, 127:15, 127:17, 127:24, 128:2, 128:18, 128:21, 128:24, 129:5, 129:9, 129:14, 129:17, 129:20
**multiple** [11] - 15:13, 25:23, 35:18, 51:11, 100:25, 101:2, 102:20, 106:16, 107:20, 119:2, 120:23
**multitude** [1] - 101:7
**Munchel** [1] - 97:23
**must** [10] - 7:23, 20:22, 43:17, 47:5, 47:6, 47:10, 85:5, 97:13, 97:14, 99:1

**N**

**name** [7] - 26:3, 45:25, 49:1, 49:3, 70:3, 84:2, 113:23
**named** [5] - 10:16, 22:10, 100:4, 105:3, 119:19
**names** [11] - 2:7, 2:8, 18:7, 26:9, 26:23, 26:24, 27:5, 31:15, 91:21, 112:10, 113:1
**nationals** [2] - 26:3, 26:24

**nature** [14] - 31:9, 43:17, 94:9, 99:4, 99:7, 99:11, 101:5, 104:16, 104:17, 108:7, 111:19, 113:10, 115:1, 116:8
**naïve** [1] - 42:22
**nearby** [1] - 107:8
**necessarily** [4] - 28:13, 30:18, 51:13, 93:19
**necessary** [4] - 6:2, 48:16, 48:18, 87:12
**need** [13] - 11:9, 21:12, 21:13, 21:15, 56:25, 65:14, 68:19, 68:21, 77:23, 90:2, 113:17, 122:22
**nefarious** [3] - 85:12, 108:20, 114:11
**never** [8] - 53:6, 53:9, 53:14, 67:20, 84:18, 84:20, 87:2, 87:3
**New** [48] - 1:19, 4:9, 4:13, 4:18, 5:5, 5:11, 5:13, 6:15, 6:17, 6:23, 7:5, 32:1, 32:5, 35:14, 36:16, 37:2, 37:5, 40:6, 52:21, 52:22, 53:21, 61:10, 65:7, 65:18, 68:7, 68:8, 68:10, 68:24, 77:15, 101:4, 103:17, 104:4, 108:1, 108:3, 118:14, 124:25, 125:14, 125:21, 126:1, 126:3, 126:12, 126:13, 127:19, 127:23, 128:11, 129:8
**new** [10] - 13:16, 13:20, 14:10, 15:17, 15:18, 22:22, 40:9, 50:7, 94:24, 128:7
**next** [1] - 60:22
**nickname** [1] - 97:2
**night** [4] - 3:12, 64:13, 96:12, 122:7
**nightstand** [1] - 107:9
**nine** [2] - 118:25
**no-flight** [3] - 65:8, 108:4, 120:1
**Nola** [1] - 2:22
**NOLA** [1] - 1:17
**non** [1] - 119:3
**non-fungible** [1] - 119:3
**nondisclosure** [3] - 36:12, 58:24, 91:8

**none** [6] - 33:2, 73:10, 73:22, 80:3, 94:18, 115:24
**Nonetheless** [1] - 97:25
**nonexistent** [1] - 45:6
**nonexisting** [1] - 45:6
**noon** [3] - 77:2, 77:4
**norm** [1] - 125:5
**normal** [1] - 83:5
**normally** [1] - 6:5
**Northwestern** [1] - 68:2
**nose** [3] - 14:6, 15:23, 73:4
**notably** [1] - 17:25
**notation** [1] - 106:1
**notations** [1] - 112:19
**Note** [1] - 100:18
**note** [8] - 2:22, 30:8, 37:5, 41:13, 48:10, 53:20, 81:4, 98:6
**noted** [1] - 31:9
**notes** [1] - 130:5
**nothing** [10] - 21:24, 29:24, 30:5, 53:15, 63:20, 77:10, 80:12, 84:15, 95:12, 108:16
**notice** [8] - 35:16, 35:23, 35:25, 38:4, 38:14, 38:19, 63:17, 96:24
**noticed** [1] - 88:13
**notification** [3] - 38:9, 58:12, 60:7
**notified** [2] - 89:6, 89:8
**noting** [7] - 18:10, 24:6, 29:20, 42:24, 91:13, 108:12, 114:1
**November** [8] - 36:1, 38:4, 60:6, 60:8, 60:9, 63:7, 120:4, 120:16
**novo** [4] - 97:14, 98:1, 98:4, 98:6
**nuanced** [1] - 65:5
**null** [1] - 130:9
**number** [3] - 6:4, 28:15, 115:10
**numbers** [2] - 69:24, 105:17
**numerous** [8] - 25:3, 106:7, 106:13, 112:10, 114:9, 119:16, 119:23, 121:17
**NW** [1] - 1:13

**O**

**obfuscated** [1] - 120:25
**obfuscates** [1] - 101:18
**object** [5] - 48:12, 90:23, 99:17, 99:18, 125:20
**objected** [1] - 53:14
**objecting** [1] - 48:13
**objection** [2] - 53:17, 53:18
**obligation** [1] - 46:24
**obliged** [1] - 55:3
**obscure** [1] - 114:19
**observed** [1] - 119:11
**obstacles** [2] - 122:19, 122:25
**obstruction** [6] - 8:14, 8:19, 8:20, 8:25, 98:17, 98:18
**obtain** [6] - 7:21, 7:22, 40:8, 75:20, 118:18, 120:9
**obtained** [4] - 12:13, 31:15, 68:17, 83:24
**obtaining** [1] - 75:13
**obtains** [1] - 13:18
**obvious** [1] - 109:13
**occur** [1] - 122:3
**occurred** [5] - 32:7, 36:13, 61:7, 107:23, 126:16
**occurs** [1] - 13:3
**OF** [4] - 1:1, 1:3, 1:8, 1:13
**offender** [1] - 73:12
**offenders** [1] - 107:19
**offense** [9] - 99:5, 99:12, 99:17, 101:5, 104:18, 108:7, 116:8
**offenses** [1] - 62:8
**offered** [2] - 28:1, 45:14
**offering** [4] - 27:24, 105:4, 105:7, 119:21
**Office** [2] - 36:10, 89:11
**office** [4] - 7:20, 65:13, 125:4, 127:20
**officer** [1] - 98:9
**Official** [1] - 1:23
**official** [1] - 130:16
**offshoot** [1] - 71:9
**Old** [1] - 1:18
**omission** [1] - 80:9
**once** [2] - 101:13, 108:13

**one** [59] - 4:3, 4:5, 6:18, 8:9, 9:15, 13:8, 16:17, 18:24, 19:17, 19:23, 27:24, 31:8, 31:13, 31:21, 32:3, 32:4, 35:13, 40:1, 42:3, 44:4, 45:2, 45:3, 48:16, 53:23, 54:7, 54:25, 61:6, 68:25, 70:2, 70:3, 74:12, 77:10, 78:8, 79:21, 82:17, 83:17, 84:2, 87:19, 91:10, 91:23, 92:9, 94:24, 100:1, 101:10, 105:11, 105:15, 106:17, 107:8, 107:23, 111:1, 112:12, 112:16, 113:16, 114:8, 117:14, 118:12, 125:18
**one-hop** [2] - 13:8, 16:17
**one-ounce** [2] - 112:12, 118:12
**ones** [3] - 52:18, 70:2, 71:6
**online** [1] - 84:5
**open** [1] - 25:8
**opened** [1] - 44:14
**operates** [1] - 45:2
**operating** [1] - 5:17
**opportunity** [4] - 4:15, 76:3, 90:20, 126:19
**opposed** [3] - 28:14, 61:18, 101:13
**opposing** [1] - 58:21
**opposition** [2] - 6:13, 114:5
**opt** [1] - 85:5
**opted** [1] - 42:22
**option** [1] - 85:11
**orally** [2] - 47:25, 55:11
**order** [23] - 4:11, 4:14, 6:11, 11:6, 21:11, 36:5, 36:6, 36:12, 40:9, 54:7, 58:24, 91:8, 91:11, 97:13, 97:18, 97:21, 113:17, 124:7, 125:7, 125:9, 128:11, 129:13, 129:14
**Order** [1] - 5:22
**ordered** [2] - 4:10, 5:14
**orders** [3] - 6:15, 32:2, 102:24

**organized** [1] - 119:17
**original** [1] - 111:4
**originally** [5] - 5:4, 5:8, 6:14, 12:14, 118:4
**originated** [3] - 114:16, 115:25, 126:9
**otherwise** [2] - 18:8, 118:9
**ounce** [3] - 31:21, 112:12, 118:12
**outlined** [1] - 111:21
**outset** [1] - 9:17
**outside** [2] - 7:7, 72:21
**outsmarting** [1] - 39:1
**overlapping** [1] - 34:4
**overruled** [1] - 125:7
**overseas** [1] - 40:2
**oversight** [2] - 36:9, 36:10
**oversimplification** [1] - 109:13
**overstate** [2] - 101:6, 107:17
**overtime** [1] - 126:21
**overwhelming** [1] - 111:11
**overwhelmingly** [1] - 116:13
**own** [15] - 18:7, 40:14, 44:1, 44:9, 50:21, 64:17, 65:21, 67:24, 77:25, 114:18, 115:12, 117:16, 118:24, 119:3
**owner** [1] - 75:19
**owners** [1] - 110:17
**ownership** [2] - 111:4, 111:19

**P**

**p.m** [2] - 1:5, 129:21
**pace** [1] - 94:1
**Pacer** [1] - 74:16
**package** [4] - 83:23, 85:24, 105:22, 105:24
**packages** [1] - 105:17
**page** [5] - 6:8, 16:7, 59:16, 103:19, 114:5
**paid** [3] - 55:20, 57:10, 82:13
**pain** [3] - 65:12, 88:11, 88:13
**painstaking** [1] - 101:1

**pandemic** [1] - 87:25
**papers** [18] - 8:7, 8:15, 9:1, 9:7, 9:21, 10:17, 16:25, 21:25, 25:25, 34:17, 40:13, 68:5, 80:4, 81:7, 82:10, 88:7, 114:18, 125:20
**parents** [6] - 3:3, 67:25, 94:16, 94:17, 94:23, 94:25
**part** [10] - 14:19, 15:15, 17:13, 27:23, 35:8, 47:2, 62:5, 69:19, 71:11, 105:10
**participate** [2] - 116:3, 116:4
**participated** [1] - 115:9
**participating** [2] - 74:19, 85:14
**participation** [1] - 124:4
**particular** [6] - 30:13, 71:4, 71:15, 74:13, 88:10, 92:3
**particularly** [9] - 37:7, 46:17, 46:18, 52:18, 79:13, 89:18, 106:20, 116:9, 128:14
**parties** [3] - 5:9, 6:19, 52:10
**parties'** [1] - 62:1
**parts** [1] - 29:10
**party** [3] - 89:23, 100:12, 130:11
**pass** [3] - 25:15, 25:21, 41:12
**passage** [1] - 120:20
**passcode** [1] - 11:9
**passed** [1] - 91:9
**passphrases** [3] - 14:23, 15:22, 110:19
**passport** [4] - 105:3, 105:12, 119:8, 119:19
**passports** [14] - 40:7, 65:2, 75:2, 83:7, 105:5, 105:8, 106:6, 106:20, 118:19, 119:21, 120:9, 120:11, 122:15
**password** [7] - 21:14, 28:23, 29:15, 30:8, 30:14, 111:1
**past** [1] - 118:16
**paste** [1] - 105:13
**path** [2] - 109:7, 113:13
**paths** [2] - 51:11,

121:17
**patience** [1] - 109:7
**pause** [1] - 38:1
**pauses** [1] - 97:4
**pay** [3] - 82:14, 84:14, 129:10
**paying** [1] - 45:20, 129:2
**payment** [3] - 32:12, 46:3, 115:22
**payments** [10] - 21:6, 34:13, 44:24, 45:4, 45:12, 46:4, 115:16, 115:20, 115:21, 129:10
**Peck** [1] - 2:15
**PECK** [1] - 1:12
**peculiar** [1] - 7:24
**peel** [1] - 92:19
**PELKER** [107] - 1:11, 2:10, 2:13, 7:4, 7:11, 7:15, 8:4, 8:11, 8:15, 9:12, 10:10, 10:14, 10:20, 11:2, 11:5, 11:11, 11:14, 11:17, 11:25, 12:2, 12:12, 12:18, 12:22, 13:2, 13:10, 13:17, 15:1, 15:24, 16:13, 17:17, 17:20, 18:25, 19:21, 19:24, 20:4, 20:14, 20:25, 21:15, 22:8, 23:3, 23:6, 23:10, 23:15, 23:20, 24:5, 24:11, 24:22, 25:8, 25:17, 26:11, 27:4, 27:13, 27:22, 28:8, 29:4, 30:3, 30:12, 30:20, 31:8, 32:2, 32:11, 32:21, 32:25, 33:4, 33:7, 33:19, 34:7, 34:24, 36:2, 36:8, 36:25, 37:4, 37:18, 38:7, 38:13, 38:18, 39:15, 40:16, 40:21, 41:12, 41:21, 41:23, 42:1, 42:3, 42:5, 42:7, 42:13, 42:15, 42:20, 43:10, 43:25, 45:11, 50:2, 50:10, 51:9, 52:3, 53:1, 91:5, 93:16, 94:3, 94:21, 95:9, 95:12, 127:1, 128:24, 129:5, 129:9
**Pelker** [8] - 2:11, 2:12, 7:3, 7:20, 8:1, 46:6, 50:1, 52:25
**pen** [1] - 77:11
**penalties** [5] - 103:25,

104:6, 104:15, 116:10, 123:3
**penalty** [3] - 99:17, 99:24, 103:23
**pending** [3] - 4:11, 97:11, 104:8
**Pennsylvania** [1] - 1:13
**penny** [1] - 72:22
**pens** [1] - 77:6
**people** [8] - 5:18, 14:21, 25:6, 85:9, 86:10, 86:18, 95:23, 106:9
**per** [2] - 114:13, 128:13
**perceive** [2] - 50:23, 51:1
**percent** [1] - 73:9
**perfect** [2] - 73:9, 73:18
**performed** [1] - 45:7
**perhaps** [2] - 56:4, 71:19
**period** [6] - 18:11, 64:20, 73:23, 93:13, 105:20, 122:20
**periods** [1] - 88:1
**person** [12] - 10:17, 11:8, 73:12, 90:2, 98:12, 98:13, 98:22, 98:25, 99:6, 99:7, 99:8, 100:4
**person's** [1] - 99:9
**persona** [3] - 26:6, 75:17, 106:5
**personal** [6] - 44:19, 45:25, 70:15, 84:2, 115:12, 117:5
**personally** [1] - 47:6
**personas** [14] - 19:9, 24:25, 25:5, 31:6, 31:10, 31:11, 34:25, 75:1, 83:7, 83:10, 83:19, 106:1, 106:20, 123:17
**persons** [2] - 10:18, 100:4
**persuasive** [6] - 35:14, 37:1, 37:2, 108:3, 111:10, 120:6
**persuasively** [2] - 4:17, 36:15
**pertaining** [2] - 22:20, 120:17
**phone** [6] - 77:2, 87:20, 106:17, 107:9, 107:12, 121:9
**phones** [3] - 106:16, 107:8, 122:17

**photo** [1] - 105:12
**photocopied** [1] - 130:10
**phrase** [1] - 25:21
**phrases** [2] - 15:12, 16:2
**physical** [2] - 14:16, 35:5
**physically** [1] - 5:19
**physician** [1] - 88:22
**pictures** [1] - 33:11
**pieces** [1] - 31:21
**pillars** [1] - 83:17
**pin** [1] - 35:20
**place** [5] - 10:17, 40:11, 63:13, 66:25, 118:20
**placed** [2] - 32:2, 127:12
**places** [1] - 68:18
**plain** [1] - 27:20
**plan** [2] - 49:25, 118:20
**planning** [1] - 40:10
**planted** [1] - 75:24
**plate** [1] - 40:18
**platform** [1] - 27:23
**platforms** [1] - 100:25
**plausible** [3] - 39:3, 84:8, 84:9
**play** [2] - 85:9, 94:19
**plays** [1] - 88:14
**plea** [1] - 74:15
**pleaded** [1] - 74:8
**plexiglass** [1] - 8:2
**plus** [1] - 122:23
**point** [23] - 6:25, 10:11, 25:10, 27:12, 29:12, 36:9, 37:17, 37:22, 38:21, 39:23, 40:25, 42:3, 49:21, 53:25, 60:7, 60:16, 63:17, 64:4, 78:14, 88:4, 93:8, 107:24, 121:23
**pointed** [2] - 73:13, 117:24
**pointing** [3] - 78:21, 81:13, 85:16
**points** [3] - 79:12, 91:6, 110:9
**poke** [1] - 113:25
**popular** [1] - 70:2
**portion** [7] - 22:12, 25:13, 25:21, 34:17, 93:10, 93:15, 100:23
**pose** [1] - 51:25
**posed** [3] - 56:15, 58:3, 99:9
**poses** [1] - 98:16

**posit** [1] - 34:10
**position** [3] - 50:4, 96:10, 111:8
**possession** [7] - 14:1, 14:4, 15:11, 15:16, 16:19, 109:25, 111:23
**possibility** [7] - 16:7, 16:10, 16:13, 16:15, 51:17, 82:6, 82:8
**possible** [4] - 29:15, 39:25, 87:18, 124:16
**postarrest** [1] - 50:14
**posting** [1] - 86:10
**potential** [14] - 29:9, 46:14, 47:20, 51:1, 51:7, 51:13, 51:25, 52:6, 53:24, 55:1, 55:4, 56:14, 58:2, 103:25
**potentially** [2] - 104:14, 123:4
**pounds** [2] - 31:22, 33:6
**pour** [1] - 76:24
**power** [1] - 2:25
**practice** [9] - 7:6, 7:20, 27:6, 47:4, 47:13, 54:4, 54:8, 101:22, 128:25
**pre** [2] - 48:24, 89:1
**pre-indictment** [1] - 48:24
**prearrest** [1] - 50:11
**precise** [1] - 39:11
**precisely** [2] - 29:2, 105:21
**preclude** [1] - 15:21
**predecessor** [1] - 63:1
**predicate** [1] - 80:11
**predictions** [1] - 123:2
**prefer** [1] - 3:20
**premises** [1] - 107:5
**prepared** [2] - 6:23, 87:5, 97:9
**preparing** [2] - 78:7, 79:20
**preponderance** [2] - 98:16, 124:20
**preposterous** [1] - 66:7
**present** [8] - 5:19, 8:13, 36:17, 37:3, 47:22, 54:23, 116:7, 117:3
**PRESENT** [1] - 1:21
**presented** [10] - 4:17, 11:19, 52:1, 55:5, 56:3, 57:18, 65:6, 109:13, 124:15

**presiding** [1] - 6:3
**press** [2] - 39:16, 39:20
**presumably** [1] - 21:7
**presumed** [2] - 22:13, 73:15
**presumption** [4] - 54:21, 73:14, 73:15, 90:5
**Pretrial** [1] - 1:21
**pretrial** [18] - 2:5, 4:16, 4:20, 6:22, 7:1, 7:6, 7:10, 8:8, 90:4, 97:13, 102:24, 102:25, 104:16, 116:19, 127:4, 127:23, 128:4, 128:15
**pretty** [4] - 11:23, 54:10, 65:7, 82:3
**prevent** [2] - 28:23, 111:2
**previously** [2] - 18:1, 41:5
**price** [3] - 33:8, 86:3, 86:19
**prices** [1] - 12:11
**primary** [2] - 27:25, 102:12
**principal** [2] - 9:5, 84:1
**priority** [1] - 125:25
**prison** [2] - 104:7, 104:15
**Prisons** [6] - 88:19, 89:12, 89:14, 89:21, 89:24
**private** [46] - 11:9, 11:12, 11:21, 12:3, 12:6, 12:16, 13:16, 13:20, 13:21, 14:17, 15:12, 15:18, 20:7, 20:21, 21:12, 21:15, 21:18, 21:22, 22:5, 23:12, 23:18, 24:7, 24:15, 24:18, 28:19, 39:13, 64:9, 64:12, 64:23, 66:15, 67:1, 69:2, 71:9, 72:11, 94:25, 103:9, 103:11, 109:21, 109:22, 110:12, 110:18, 110:24, 114:2, 118:2, 123:22, 124:10
**privilege** [1] - 63:5
**privileged** [1] - 66:24
**probable** [1] - 29:16
**probative** [3] - 104:18, 111:10, 112:2

147

**procedure** [3] - 48:22, 68:16, 68:22
**Procedure** [1] - 46:25
**proceed** [4] - 3:19, 3:22, 48:1, 48:23
**proceeding** [6] - 5:18, 48:19, 53:25, 97:4, 126:20, 129:21
**Proceedings** [1] - 1:24
**proceedings** [3] - 5:23, 53:25, 130:6
**proceeds** [11] - 10:2, 10:8, 44:25, 46:5, 56:11, 57:24, 74:12, 74:14, 111:16, 111:20, 113:7
**process** [2] - 19:13, 71:12
**processed** [1] - 70:19
**procure** [1] - 78:25
**procured** [1] - 83:25
**produced** [1] - 1:25
**producing** [1] - 10:3
**products** [1] - 70:16
**proffer** [2] - 102:20, 109:3
**proffered** [2] - 116:12, 124:15
**proffers** [7] - 31:1, 76:2, 100:22, 101:8, 102:1, 102:6, 104:20
**program** [1] - 71:4
**programs** [2] - 69:18, 101:14
**prohibited** [1] - 5:24
**prohibitions** [1] - 5:24
**promptly** [3] - 5:14, 47:5, 97:14
**proof** [9] - 11:20, 11:24, 51:22, 78:21, 84:24, 108:16, 109:10, 109:13, 109:24
**property** [1] - 104:2
**propriety** [1] - 47:5
**prosecutions** [1] - 54:16
**prosecutor** [2] - 7:19, 14:3
**prosecutors** [3] - 52:14, 52:15, 52:17
**prospect** [4] - 68:6, 69:2, 80:25, 94:10
**protect** [1] - 47:11
**protective** [1] - 54:5
**protracted** [1] - 94:10
**provide** [4] - 5:6, 54:20, 82:19, 105:12
**provided** [7] - 41:15, 62:2, 69:3, 73:20,

102:1, 121:15, 121:18
**provider** [6] - 28:1, 35:24, 59:10, 91:18, 91:22, 120:16
**provides** [1] - 87:22
**public** [9] - 5:16, 5:17, 5:21, 10:25, 11:8, 13:8, 23:2, 69:13, 122:8
**publicized** [1] - 92:11
**publicly** [1] - 74:16
**pulling** [1] - 63:11
**purchase** [2] - 31:21, 43:4
**purchased** [1] - 32:15
**purchases** [1] - 112:12
**purchasing** [1] - 41:1
**purpose** [2] - 73:1, 102:3
**purposes** [5] - 53:25, 56:17, 58:5, 109:12, 114:4
**push** [1] - 66:10
**put** [12] - 26:20, 29:14, 68:5, 82:18, 86:5, 86:22, 87:5, 88:1, 96:16, 115:6, 118:20, 126:4
**puzzled** [1] - 7:1
**puzzling** [1] - 9:16

## Q

**qualify** [2] - 55:19, 57:9
**quarantine** [1] - 76:18
**questioning** [1] - 69:6
**questions** [8] - 6:4, 8:6, 55:10, 58:11, 78:12, 102:22, 102:23, 127:11
**quick** [1] - 127:11
**quickly** [1] - 97:6
**quite** [3] - 49:12, 106:24, 108:2
**quote** [5] - 39:8, 46:19, 62:10, 75:9, 75:11

## R

**raise** [3] - 52:18, 95:4, 120:18
**raised** [4] - 50:15, 52:21, 67:16, 91:7
**raises** [2] - 107:12, 117:19

**raising** [1] - 50:19
**randomly** [2] - 4:25, 29:8
**range** [1] - 88:12
**rapidly** [1] - 31:12
**rate** [1] - 84:12
**rates** [1] - 33:20
**rather** [1] - 76:11
**read** [3] - 33:24, 81:7, 84:8
**readily** [1] - 110:21
**ready** [5] - 44:10, 48:17, 86:22, 86:24, 100:13
**real** [1] - 25:6
**realistic** [1] - 68:6
**realization** [1] - 122:10
**realize** [1] - 94:8
**realized** [3] - 39:24, 63:18, 93:18
**really** [20] - 13:2, 16:9, 18:18, 24:3, 35:20, 37:9, 43:11, 48:22, 49:13, 53:2, 60:24, 61:24, 65:19, 86:7, 86:8, 86:19, 94:19, 95:5, 125:2, 129:16
**reason** [9] - 9:5, 15:15, 66:8, 67:8, 76:6, 78:5, 86:16, 104:15, 108:23
**reasonable** [5] - 73:18, 73:19, 86:2, 90:22, 121:20
**reasonably** [8] - 85:25, 98:11, 98:25, 116:2, 116:15, 117:20, 117:21, 124:21
**reasons** [3] - 65:9, 81:2, 125:11
**rebroadcasting** [1] - 5:22
**receipt** [2] - 81:16, 82:12
**receipts** [1] - 82:19
**receive** [2] - 31:13, 71:12
**received** [15] - 6:19, 6:21, 38:15, 42:7, 58:12, 59:9, 60:6, 81:14, 96:12, 112:11, 114:25, 115:8, 115:16, 115:21, 115:22
**receiving** [2] - 45:12, 89:9
**recent** [1] - 117:7
**recess** [1] - 95:16

**recipient** [1] - 46:20
**recognize** [1] - 54:24
**recollection** [1] - 74:24
**reconstituted** [1] - 14:16
**record** [17] - 2:5, 2:7, 2:8, 5:16, 9:24, 37:6, 37:10, 50:3, 50:4, 51:22, 55:7, 66:25, 86:14, 95:18, 96:5, 96:17, 120:14
**recording** [2] - 5:22, 109:11
**recordings** [1] - 109:16
**records** [3] - 77:21, 112:9, 120:17
**recovered** [2] - 15:7, 33:3
**recovering** [1] - 88:11
**recovery** [10] - 14:7, 14:18, 14:21, 14:22, 15:21, 16:2, 16:9, 21:19, 21:20, 110:18
**recreate** [3] - 14:8, 15:22, 16:2
**recuperating** [1] - 65:1
**red** [1] - 120:19
**reduces** [1] - 80:19
**reeds** [1] - 85:15
**refer** [2] - 9:22, 96:25
**reference** [6] - 22:4, 22:9, 22:13, 27:1, 44:1, 91:12
**referenced** [4] - 6:18, 78:9, 80:3, 106:1
**references** [2] - 43:25, 112:24
**referencing** [1] - 15:5
**referring** [2] - 27:11, 71:9
**reflect** [2] - 113:2, 114:2
**reflected** [3] - 7:2, 112:22, 120:14
**reflecting** [1] - 78:17
**Reform** [5] - 9:3, 73:14, 90:5, 98:2, 98:8
**regard** [2] - 16:15, 89:25
**regarding** [2] - 91:8, 102:25
**registered** [2] - 26:2, 26:25
**regularly** [1] - 126:16
**regulatory** [1] - 102:18
**Reindel** [1] - 1:18,

2:19
**reiterated** [1] - 48:9
**related** [12] - 8:16, 32:13, 35:4, 35:10, 37:7, 39:20, 43:16, 52:11, 94:11, 104:21, 128:25
**relating** [2] - 31:14, 84:11
**relationship** [1] - 49:9
**relative** [1] - 52:7
**relatively** [1] - 43:13
**relayed** [2] - 70:12, 125:25
**release** [26] - 4:11, 4:14, 6:11, 6:14, 73:14, 73:16, 90:4, 97:11, 97:13, 97:17, 97:21, 98:8, 98:21, 98:24, 99:9, 102:24, 103:1, 107:14, 107:15, 116:15, 119:25, 124:7, 124:8, 124:16, 125:3, 125:7
**released** [8] - 4:10, 43:2, 74:19, 74:21, 87:10, 91:1, 124:23, 129:9
**relevance** [1] - 66:8
**relevant** [9] - 19:16, 47:2, 112:22, 123:11, 124:18
**reliable** [1] - 111:10
**reliance** [1] - 3:11
**relied** [1] - 120:1
**relying** [4] - 6:20, 8:12, 9:3, 63:25
**remain** [2] - 107:5, 124:9
**remained** [1] - 103:4
**remaining** [2] - 12:22, 18:4
**remains** [2] - 13:25, 16:18
**remember** [3] - 49:8, 73:13, 90:8
**remembering** [1] - 88:18
**remind** [1] - 5:20
**remote** [2] - 5:7, 5:10
**remotely** [1] - 8:21
**removal** [1] - 5:25
**remove** [2] - 64:12, 80:16
**removed** [1] - 124:5
**render** [1] - 75:12
**renewed** [4] - 78:16, 78:17, 80:23, 119:9
**rent** [1] - 129:10

repeated [3] - 43:15, 81:20, 94:4
repeatedly [2] - 43:18, 102:1
replete [1] - 9:8
reply [3] - 6:12, 105:10, 111:22
report [1] - 7:1
reported [2] - 1:24, 63:24
reporter [1] - 55:11
Reporter [3] - 1:23, 1:23, 130:16
reports [4] - 6:22, 7:6, 7:10, 80:9
repository [1] - 112:1
represent [4] - 3:15, 50:13, 53:23, 60:23
representation [16] - 46:16, 47:1, 47:6, 47:8, 47:15, 47:22, 50:9, 54:18, 55:5, 55:23, 56:16, 57:13, 58:4, 75:8, 75:14, 80:7
representations [2] - 36:3, 38:14
represented [2] - 47:3, 48:2
representing [9] - 48:11, 48:14, 52:10, 55:3, 56:2, 56:7, 56:12, 57:17, 57:25
request [6] - 4:12, 4:16, 7:12, 59:12, 125:18, 126:18
requested [2] - 41:17, 62:14
requests [3] - 4:23, 59:11, 125:18
require [1] - 93:3
required [6] - 3:13, 80:12, 98:12, 99:1, 102:5, 123:10
requirements [4] - 54:9, 93:3, 102:17, 102:18
requires [2] - 98:8, 117:9
resembling [2] - 11:19, 108:16
reside [1] - 117:2
residence [2] - 28:11, 29:21, 33:12, 38:20, 106:14, 121:6
resolution [2] - 51:14, 51:18
resourced [2] - 28:24, 111:2
resourceful [1] -

106:24
resources [6] - 117:22, 118:14, 118:18, 122:13, 123:6, 124:12
respect [10] - 16:11, 16:13, 49:14, 76:14, 77:9, 78:19, 78:20, 81:4, 84:7, 85:2
respectively [1] - 103:22
respond [3] - 55:10, 91:4, 91:6
responding [1] - 83:3
response [4] - 81:20, 89:20, 102:7, 102:22
responses [1] - 83:1
responsible [2] - 10:18, 100:4
rest [1] - 17:19
restrained [1] - 90:14
restriction [1] - 6:1
restrictions [1] - 31:10
result [1] - 5:25
resulted [1] - 9:19
retain [5] - 7:8, 54:22, 55:18, 57:8, 60:15
retained [4] - 46:12, 60:7, 60:22, 60:23, 66:3, 67:6
retains [1] - 100:12
retired [1] - 67:19
retrieve [1] - 107:7
return [1] - 87:11
revealed [4] - 31:24, 39:9, 104:22, 123:1
revenue [1] - 84:6
reverse [1] - 118:24
review [13] - 4:11, 4:15, 4:23, 6:11, 30:23, 97:10, 97:14, 97:16, 97:20, 98:1, 98:4, 98:6, 129:15
reviewed [6] - 6:9, 6:16, 6:21, 48:25, 74:15, 97:5
reviewing [2] - 6:6, 97:17
revoke [1] - 97:12
RF [2] - 127:18
Rhiannon [1] - 2:4
RHIANNON [1] - 1:6
rider [5] - 59:11, 59:18, 62:3, 62:18
ridiculous [1] - 85:7
rights [1] - 52:17
rise [1] - 54:12
risk [15] - 8:9, 8:13, 8:16, 8:18, 9:5, 19:17, 36:17, 37:3,

37:7, 68:21, 79:3, 89:2, 98:17, 104:19, 116:7
risks [4] - 47:20, 48:1, 73:12, 95:23
road [1] - 113:17
robust [1] - 93:24
roughly [2] - 22:22, 77:11
RPR [3] - 1:23, 130:3, 130:16
RU [2] - 31:12, 119:17
Rule [4] - 46:25, 47:14, 52:23, 53:4
rule [5] - 47:1, 82:6, 82:7, 96:1, 97:9
rules [4] - 4:22, 76:19
ruling [2] - 97:7, 125:17
rulings [1] - 4:23
run [13] - 29:8, 60:16, 60:21, 60:25, 62:19, 67:12, 67:13, 73:21, 80:21, 87:6, 90:19, 90:24, 126:15
running [3] - 72:3, 74:8
rushed [1] - 78:3
Russia [9] - 31:12, 40:11, 40:14, 41:1, 67:23, 105:18, 116:25, 119:8, 119:17
Russian [22] - 25:2, 26:3, 26:8, 26:11, 26:15, 26:23, 26:24, 26:25, 27:4, 40:22, 105:21, 105:24, 105:25, 106:5, 106:11, 119:6, 119:8, 119:10, 119:13, 119:24

**S**

S4 [1] - 26:21
safe [1] - 85:10
safeguarded [1] - 111:24
safekeeping [1] - 44:4
safety [3] - 98:12, 98:22, 99:1
SAINT [1] - 130:3
Saint [2] - 1:23, 130:16
SAINT-LOTH [1] - 130:3
Saint-Loth [2] - 1:23, 130:16

sale [3] - 105:5, 105:8, 119:21
sales [3] - 45:15, 82:23, 84:4
SalesFolk [1] - 84:3
SAMSON [1] - 1:17
Samson [2] - 2:19
San [1] - 32:4
sanctions [2] - 5:25, 6:2
SAR [1] - 80:9
sat [1] - 44:10
satisfied [1] - 125:15
satisfy [2] - 35:22, 72:16
satisfying [1] - 89:19
saved [4] - 21:19, 22:11, 24:9, 103:6
savings [1] - 21:9
savvy [2] - 107:19, 118:22
saw [9] - 21:25, 28:17, 30:7, 61:9, 64:14, 74:3, 77:11, 92:24, 125:23
scene [1] - 107:4
schedule [1] - 126:2
scheduled [2] - 5:4, 5:8
scheduling [1] - 5:10
scheme [4] - 35:8, 42:23, 75:4, 116:4
SCHUCK [13] - 1:21, 127:3, 127:7, 127:10, 127:15, 127:17, 127:24, 128:2, 128:18, 128:21, 129:14, 129:17, 129:20
Schuck [7] - 2:6, 127:3, 127:5, 127:6, 128:1, 128:22, 129:12
sciatic [1] - 56:23
scientist [1] - 68:2
SDNY [1] - 128:25
se [1] - 114:13
search [32] - 12:8, 12:14, 14:23, 27:15, 29:21, 29:25, 30:6, 35:17, 36:18, 37:21, 37:23, 38:10, 38:19, 60:18, 61:14, 61:24, 62:1, 63:13, 65:4, 66:2, 67:3, 92:1, 100:17, 107:3, 107:10, 108:1, 119:13, 120:5, 121:6, 121:7, 121:9, 122:13

searched [4] - 28:16, 29:23, 34:3, 78:16
searches [1] - 104:21
seated [4] - 54:11, 55:8, 56:20, 58:8
second [4] - 91:13, 99:5, 108:9, 110:7
Secrecy [2] - 93:3, 102:5
secrete [1] - 90:14
Section [4] - 4:4, 4:6, 8:9, 97:15, 98:13, 98:23, 99:3, 99:16, 99:20, 99:23, 103:24, 124:16, 124:17
secure [2] - 14:4, 14:19
secured [10] - 13:25, 15:4, 16:21, 17:6, 28:22, 29:13, 29:17, 73:6, 107:4, 110:25
securely [2] - 13:22, 13:23
security [2] - 15:9, 86:8
see [49] - 8:25, 11:3, 11:8, 13:4, 16:5, 22:21, 23:1, 23:2, 23:4, 23:6, 23:7, 25:11, 27:20, 28:13, 32:8, 32:11, 32:14, 34:24, 42:17, 44:13, 44:17, 46:6, 50:17, 51:20, 52:6, 52:10, 63:21, 73:5, 76:17, 77:5, 77:20, 77:21, 86:12, 91:17, 92:14, 93:4, 96:5, 96:25, 97:23, 98:13, 98:18, 104:10, 104:12, 110:3, 110:5, 114:5, 121:3, 122:9
seed [10] - 14:7, 14:18, 14:21, 14:22, 15:12, 15:21, 16:1, 16:9, 21:19, 110:18
seek [1] - 120:17
seize [7] - 12:9, 24:20, 103:13, 104:25, 109:23, 118:1, 123:6
seized [27] - 12:20, 14:4, 14:8, 14:9, 14:20, 16:1, 16:21, 17:6, 17:13, 20:1, 20:8, 20:9, 20:20, 20:21, 21:25, 33:10, 33:11, 40:7, 51:24, 60:18, 67:10, 73:4, 106:13, 107:22,

110:11, 122:12
**seizes** [1] - 13:13
**seizing** [2] - 13:18,
73:24
**seizure** [11] - 12:9,
15:15, 18:25, 20:3,
36:19, 39:17,
103:14, 120:8,
120:10, 122:15,
122:16
**seizures** [1] - 104:21
**sell** [3] - 72:25, 82:14,
83:6
**sends** [1] - 17:24
**sense** [2] - 71:19, 72:3
**sent** [12] - 32:25,
34:16, 34:18, 38:4,
63:18, 80:10, 92:16,
92:17, 92:18, 93:11,
105:22, 129:17
**sentence** [1] - 99:21
**sentencing** [2] -
49:13, 52:8
senzer@cahill.com
[1] - 1:20
**separate** [10] - 20:14,
47:8, 48:16, 54:8,
55:18, 55:19, 55:23,
57:8, 57:9, 57:13
**September** [3] -
105:19, 105:20,
105:23
**sequence** [2] - 58:13,
60:5
**series** [7] - 44:16,
92:17, 100:24,
101:12, 108:18,
109:5, 111:17
**serious** [17] - 8:13,
9:5, 52:18, 79:18,
88:9, 89:1, 89:5,
89:17, 90:9, 94:9,
98:17, 103:16,
103:18, 104:6,
104:14, 107:13
**seriously** [1] - 60:24
**seriousness** [2] -
63:9, 99:8
**served** [1] - 67:18
**server** [2] - 22:15,
40:2
**service** [4] - 27:24,
28:1, 35:24, 59:10
**serviced** [1] - 91:18
**services** [12] - 6:22,
7:1, 7:6, 7:10, 21:6,
28:2, 45:20, 91:18,
102:25, 127:4,
127:23, 128:16
**Services** [1] - 1:21

**set** [30] - 18:2, 20:15,
21:3, 22:20, 26:15,
27:5, 31:2, 31:14,
35:2, 37:10, 41:5,
45:13, 45:23, 74:4,
74:23, 75:22, 80:2,
87:6, 87:9, 90:21,
92:22, 99:3, 100:12,
101:11, 104:8,
118:9, 124:15,
124:17, 124:24,
125:14
**sets** [2] - 90:5, 123:7
**setting** [6] - 21:9,
41:1, 45:24, 69:11,
123:16, 125:9
**seven** [1] - 87:24
**several** [11] - 16:18,
18:1, 79:21, 91:6,
91:19, 91:23, 92:2,
93:20, 94:23, 106:4,
119:4
**shall** [3] - 4:22, 54:16,
130:9
**shaping** [1] - 55:1
**share** [2] - 7:13,
106:21
**shell** [2] - 115:22,
115:23
**shipment** [2] - 83:21,
105:18
**shipments** [3] - 32:4,
32:5, 32:7
**shipped** [2] - 31:24,
32:16
**shipping** [1] - 32:13
**shocked** [4] - 61:11,
61:12, 61:16, 94:5
**short** [4] - 51:2, 76:21,
113:21, 122:20
**shorthand** [1] - 1:24
**shortly** [2] - 81:11,
108:5
**show** [7] - 34:20, 35:9,
75:18, 84:12,
114:22, 118:18,
124:20
**showed** [1] - 43:17
**showing** [5] - 7:9,
22:4, 28:9, 112:5,
112:9
**shows** [4] - 102:17,
105:15, 105:16,
115:19
**shuffling** [1] - 92:17
**shut** [1] - 93:12
**sic** [3] - 19:18, 20:3,
70:2
**side** [4] - 6:5, 36:11,
46:10, 85:11

**sides** [1] - 50:8
**signatory** [1] - 130:11
**significance** [2] -
60:25, 110:16
**significant** [19] - 8:17,
34:10, 34:13, 43:18,
50:16, 59:7, 61:2,
88:23, 88:24, 90:2,
103:23, 103:25,
104:7, 111:5,
117:13, 117:19,
119:2, 122:12, 123:2
**SIM** [1] - 106:16
**similarly** [1] - 114:6,
123:9
**Simpkins** [1] - 98:19
**simple** [2] - 13:7, 17:8
**simply** [7] - 10:20,
17:22, 29:8, 30:24,
38:10, 78:1, 92:14
**sincerity** [1] - 94:22
**single** [3] - 19:6,
19:21, 19:23
**sit** [4] - 13:15, 21:4,
50:24, 56:25
**sitting** [15] - 3:1, 3:3,
10:25, 11:7, 18:4,
18:8, 22:17, 22:23,
36:21, 39:14, 64:9,
72:21, 86:21, 86:22,
87:4
**situated** [1] - 123:9
**situation** [10] - 15:6,
40:17, 40:23, 48:6,
48:24, 53:22, 68:12,
76:9, 78:4, 111:19
**six** [1] - 101:23
**Sixth** [6] - 52:19, 53:3,
53:14, 54:5, 54:14,
54:20
**skill** [3] - 118:8, 123:6,
123:15
**skilled** [1] - 106:24
**skills** [1] - 17:8
**Slip** [1] - 1:18
**sloppiness** [1] - 79:1
**small** [3] - 39:4,
100:24, 101:12
**smaller** [1] - 18:13
**smartphones** [1] -
60:20
**smoking** [4] - 12:1,
39:12, 78:23, 109:19
**snow** [4] - 65:19, 66:4,
66:5, 66:7
**snows** [1] - 65:18
**snowstorm** [3] - 40:6,
65:2, 122:23
**software** [5] - 69:14,
69:17, 71:3, 71:7,

93:21
**softwares** [2] - 70:1,
70:3
**solution** [1] - 73:18
**someone** [6] - 14:7,
48:17, 62:25, 67:7,
69:20, 80:8
**sometime** [1] - 102:11
**sometimes** [3] - 3:12,
24:12, 29:9
**somewhere** [2] -
21:20, 22:16
**son** [1] - 49:9
**sophisticated** [4] -
84:10, 84:16, 84:19,
107:19
**sophistication** [2] -
93:25, 101:6
**sorry** [8] - 3:7, 8:2,
38:5, 56:6, 75:10,
96:2, 96:7, 126:22
**sort** [14] - 8:2, 12:1,
17:4, 21:14, 25:6,
31:18, 33:16, 35:20,
42:21, 45:15, 61:16,
84:15, 92:5, 92:23
**sought** [2] - 4:11,
93:23
**source** [12] - 82:4,
102:8, 102:12,
111:5, 111:19,
113:11, 113:15,
114:15, 114:24,
115:10, 115:11,
115:14
**sourced** [1] - 93:19
**Southern** [8] - 4:8,
6:23, 7:5, 53:21,
65:6, 101:4, 103:16,
127:19
**spares** [1] - 58:22
**speaking** [1] - 5:9
**specific** [11] - 26:15,
27:4, 27:8, 30:5,
30:21, 32:22, 34:1,
34:7, 41:18, 79:4,
91:12
**specifically** [3] - 8:16,
28:9, 104:20
**specified** [1] - 10:2
**specifies** [1] - 97:16
**speculating** [1] -
75:23
**spend** [1] - 68:15
**spending** [1] - 103:3
**spends** [4] - 18:12,
19:3, 21:2
**spent** [4] - 18:8,
18:18, 21:5, 116:25
**split** [1] - 31:11

**spouse** [11] - 55:18,
56:2, 56:7, 56:12,
56:16, 57:8, 57:17,
57:19, 57:25, 58:4,
119:13
**spreadsheet** [9] -
20:9, 26:12, 26:14,
34:25, 44:15, 83:17,
112:17, 112:23,
123:19
**stage** [6] - 52:7, 56:1,
56:17, 57:16, 58:5,
116:12
**stages** [1] - 19:12
**stake** [1] - 104:5
**stand** [2] - 56:21,
56:22
**standard** [2] - 97:16,
97:20
**Standing** [1] - 5:22
**stands** [2] - 88:14,
123:13
**start** [6] - 6:25, 8:5,
17:4, 46:9, 52:10,
109:18
**started** [6] - 17:5,
25:13, 36:19, 45:24,
49:2, 62:14
**starting** [1] - 2:9
**stashed** [1] - 90:11
**stashing** [1] - 113:4
**state** [3] - 2:7, 2:8,
50:3
**statement** [5] - 45:8,
85:3, 100:16,
111:22, 125:10
**statements** [10] -
35:10, 43:15, 82:1,
82:7, 84:8, 84:23,
94:4, 113:8, 116:1
**states** [2] - 14:13, 47:2
**STATES** [4] - 1:1, 1:3,
1:9, 1:11
**States** [11] - 2:3, 2:11,
4:5, 67:18, 74:4,
80:10, 99:23,
116:23, 116:24,
117:2, 117:7
**stating** [1] - 102:9
**status** [3] - 20:10,
112:18, 122:20
**statute** [4] - 10:4,
10:5, 73:17, 80:13
**statutory** [4] - 8:9, 9:2,
103:21, 124:18
**stay** [7] - 4:11, 4:12,
4:14, 6:11, 68:7,
78:15, 78:17
**steal** [1] - 10:7
**stem** [1] - 51:21

stemmed [1] - 62:12
stems [1] - 54:22
stenographic [1] -
130:5
step [2] - 60:23, 70:7
stepfather [1] - 49:9
steps [6] - 15:20,
47:21, 48:20, 71:12,
91:23, 118:20
sticky [1] - 30:7
still [20] - 3:1, 12:23,
15:11, 17:9, 17:15,
33:19, 35:5, 36:12,
36:21, 37:22, 40:4,
42:16, 43:14, 52:17,
72:14, 88:11, 91:23,
100:6, 121:23, 123:5
still-available [1] -
123:5
stolen [50] - 9:8, 9:10,
10:24, 11:22, 17:5,
17:9, 25:6, 28:19,
31:20, 34:20, 39:14,
43:4, 64:1, 64:9,
70:14, 75:3, 82:20,
93:10, 100:19,
100:24, 101:2,
101:11, 101:15,
102:13, 103:3,
103:4, 104:25,
106:9, 109:22,
109:23, 109:25,
111:16, 112:2,
112:4, 112:6,
112:13, 112:19,
113:5, 113:18,
117:25, 118:8,
121:1, 121:16,
121:22, 122:2,
122:8, 123:21,
123:22, 124:4,
124:11
stop [3] - 65:19, 66:5,
73:12
storage [43] - 8:21,
11:16, 11:23, 14:17,
14:24, 21:21, 22:12,
28:2, 28:17, 29:18,
29:22, 31:7, 33:25,
34:9, 37:23, 41:16,
43:20, 43:21, 43:23,
43:25, 44:8, 59:15,
60:20, 61:15, 67:1,
91:15, 91:19, 91:21,
92:2, 103:7, 104:23,
105:6, 106:4,
110:13, 110:22,
112:16, 115:18,
115:25, 119:14,
119:19, 119:22,

121:6, 122:1
stored [3] - 13:22,
13:23, 14:17
story [4] - 31:19, 44:5,
77:24, 113:21
straight [2] - 12:4,
85:4
strands [1] - 108:14
strangers [1] - 106:24
strength [11] - 78:21,
79:7, 81:5, 81:8,
94:8, 110:4, 110:6,
111:12, 116:5,
123:1, 123:3
strict [2] - 90:7, 90:21
strictly [1] - 5:24
strictures [1] - 128:12
strides [1] - 15:3
stringent [5] - 86:1,
87:12, 88:1, 124:8,
124:24
strong [25] - 23:16,
23:17, 28:22, 40:24,
41:4, 43:12, 43:14,
52:5, 52:6, 74:5,
81:2, 108:12, 110:3,
110:7, 110:25,
111:14, 115:3,
115:6, 116:13,
116:18, 116:23,
117:16, 120:22,
121:4, 123:25
stronger [3] - 43:8,
74:6, 112:14
strongly [2] - 37:10,
123:13
structure [1] - 98:1
struggles [1] - 31:8
struggling [1] - 88:13
stuck [2] - 2:24, 3:1,
87:19
stumbling [1] - 122:14
styles [1] - 27:5
suasion [2] - 86:20
subfolders [1] - 25:2
subject [2] - 10:3,
62:8
submissions [1] -
63:24
subpoena [19] - 35:16,
35:25, 38:9, 58:11,
59:1, 59:9, 59:10,
59:12, 59:19, 60:10,
60:13, 61:14, 63:18,
63:19, 67:4, 91:17,
91:25, 120:17,
120:21
subpoenas [1] - 66:2
subscriber [1] - 38:10
subsequent [1] - 32:5,

112:5
subset [1] - 39:4
substance [1] - 62:18
substantial [7] -
33:13, 33:18, 33:22,
106:18, 116:9,
118:14, 122:17
suburbs [1] - 68:1
succeeded [1] - 39:1
sufficient [4] - 43:1,
66:6, 92:23, 120:19
sufficiently [1] - 40:2
suggest [1] - 79:2
suggesting [2] -
46:20, 82:18
suggestion [5] -
42:21, 82:22, 85:7,
85:8, 92:4
suggests [3] - 85:17,
107:18, 123:14
sum [2] - 107:17,
116:17
summary [2] - 121:16,
121:19
superior [1] - 86:7
Supp [2] - 98:5,
104:11
supp [1] - 104:13
supplemental [1] -
82:10
support [6] - 37:16,
64:15, 70:12, 95:20,
100:17, 116:18
supporting [2] - 26:1,
116:17
supports [1] - 113:6
supposed [3] - 73:17,
88:15, 88:17
supposedly [2] -
46:21, 107:7
suppress [1] - 79:4
suppression [3] -
79:3, 79:10, 81:6
Supreme [1] - 54:19
surgeon [1] - 88:16
surgery [9] - 40:6,
65:1, 65:10, 65:14,
88:11, 88:15, 117:8,
122:21, 122:22
surprised [3] - 61:4,
61:6, 94:4
surrounding [1] -
24:16
suspect [1] - 23:11
suspected [1] - 64:11
suspicious [2] - 92:8,
112:23

**T**

table [4] - 2:14, 2:21,
65:22
tainted [2] - 46:21,
81:16
talks [1] - 16:7
tandem [1] - 101:25
tap [1] - 54:6
target [1] - 90:18
tax [4] - 82:15, 84:12,
84:14, 84:17
taxes [2] - 85:5, 85:10
Taylor [1] - 3:4
teaches [1] - 68:1
team [2] - 53:11, 62:25
tech [2] - 45:16,
118:22
technical [1] - 43:1
techniques [4] -
101:7, 101:10,
114:13, 114:18
technology [2] -
69:11, 107:20
tedious [2] - 64:1,
109:6
teleconference [1] -
5:21
telephone [2] - 2:6,
5:17
telephonically [1] -
1:22
ten [4] - 70:13, 77:5,
77:12, 126:23
term [3] - 10:21,
16:17, 44:1
terms [6] - 45:8,
48:20, 51:25, 58:13,
81:5, 104:15
text [5] - 27:20, 98:1,
105:2, 105:22,
109:11
THE [201] - 1:1, 1:8,
1:11, 1:16, 2:2, 2:12,
2:16, 3:5, 3:9, 3:23,
7:9, 7:14, 7:16, 7:23,
8:5, 8:12, 8:24, 9:14,
10:11, 10:16, 10:22,
11:3, 11:6, 11:12,
11:15, 11:18, 12:1,
12:3, 12:16, 12:20,
12:24, 13:7, 13:11,
13:23, 15:20, 16:5,
16:22, 17:18, 18:14,
19:14, 19:23, 19:25,
20:5, 20:16, 21:11,
21:23, 23:1, 23:4,
23:9, 23:11, 23:17,
23:23, 24:10, 24:18,

24:23, 25:11, 25:18,
26:17, 27:10, 27:14,
28:6, 28:15, 29:24,
30:9, 30:15, 31:1,
31:18, 32:8, 32:17,
32:24, 33:2, 33:5,
33:10, 33:23, 34:15,
35:13, 36:4, 36:14,
37:1, 37:14, 38:1,
38:12, 38:16, 39:11,
40:13, 40:17, 41:9,
41:20, 41:22, 41:25,
42:2, 42:4, 42:6,
42:11, 42:17, 43:6,
43:23, 45:8, 46:6,
46:9, 49:4, 49:6,
49:25, 50:6, 50:22,
51:21, 52:13, 53:2,
53:8, 53:10, 53:16,
54:3, 55:17, 55:22,
55:25, 56:6, 56:10,
56:14, 56:20, 56:25,
57:3, 57:7, 57:12,
57:15, 57:23, 58:2,
58:8, 58:16, 58:20,
59:4, 59:16, 59:20,
59:23, 60:1, 60:4,
60:8, 60:10, 61:9,
63:15, 64:20, 66:14,
66:20, 68:13, 68:15,
70:11, 71:14, 72:6,
73:3, 74:10, 74:24,
75:23, 78:13, 79:5,
79:9, 79:13, 79:16,
81:7, 81:19, 81:23,
82:2, 82:11, 83:3,
83:10, 84:15, 84:22,
86:2, 86:14, 87:21,
91:3, 93:7, 94:2,
94:15, 95:7, 95:10,
95:14, 95:17, 95:25,
96:4, 96:8, 96:15,
96:21, 97:5, 125:23,
126:15, 126:21,
126:25, 127:2,
127:5, 127:9,
127:14, 127:16,
127:22, 127:25,
128:10, 128:19,
128:22, 129:3,
129:8, 129:11,
129:16, 129:19
theft [1] - 9:19
themselves [2] - 78:7,
90:20
theory [5] - 20:18,
35:19, 39:7, 39:8,
121:16
therefore [1] - 124:11
they've [2] - 87:1, 87:2

**thin** [1] - 85:15
**thinking** [3] - 39:21, 86:17
**thinks** [1] - 17:13
**third** [4] - 99:6, 100:12, 106:4, 116:20
**thoroughly** [1] - 111:21
**thousands** [3] - 101:12, 114:4, 120:24
**threads** [1] - 63:10
**threats** [1] - 52:14
**three** [3] - 26:11, 101:14, 120:3
**throughout** [1] - 89:16
**throw** [1] - 52:14
**Thursday** [4] - 5:9, 76:20, 88:17, 125:25
**tie** [1] - 40:4
**tied** [4] - 27:24, 41:16, 44:14, 92:2
**ties** [4] - 41:4, 59:14, 115:23, 116:23
**time-consuming** [1] - 101:20
**timeline** [3] - 36:23, 38:17, 65:6
**timely** [1] - 5:6
**title** [1] - 119:20
**titled** [5] - 22:13, 24:25, 105:6, 105:14, 119:17
**today** [11] - 2:24, 3:19, 4:19, 5:15, 76:11, 77:2, 77:11, 96:12, 100:3, 126:17, 126:20
**together** [2] - 32:20, 56:7
**tokens** [1] - 119:4
**took** [3] - 61:16, 62:17, 67:10
**tools** [1] - 69:14
**total** [4] - 77:6, 87:8, 100:15
**totaling** [1] - 101:12
**totally** [3] - 13:12, 81:9, 86:4
**touched** [4] - 72:17, 83:15, 83:17, 83:19
**touts** [1] - 118:24
**trace** [11] - 17:23, 19:7, 35:9, 39:2, 92:11, 92:20, 101:2, 101:20, 109:6, 118:11, 120:25
**traceable** [3] - 46:5, 81:15, 112:11

**traced** [13] - 16:16, 19:2, 19:8, 19:10, 25:14, 31:19, 44:24, 77:20, 103:2, 112:13, 112:19, 121:16
**tracing** [5] - 34:10, 34:19, 69:17, 70:22, 124:2
**track** [2] - 109:6, 113:4
**tracking** [2] - 64:1, 105:17
**trading** [2] - 84:16, 114:10
**traditional** [1] - 45:22
**trail** [2] - 66:1, 101:18
**train** [4] - 2:24, 2:25, 3:1
**trajectory** [1] - 51:10
**transact** [1] - 100:13
**transaction** [10] - 11:1, 11:8, 13:3, 13:8, 19:22, 19:23, 79:24, 101:18, 104:2, 121:17
**transactions** [30] - 10:1, 18:2, 20:15, 21:4, 25:23, 39:2, 44:16, 44:20, 70:19, 72:19, 75:1, 92:21, 100:7, 100:25, 101:13, 101:15, 101:25, 108:19, 108:21, 109:5, 109:12, 111:18, 113:14, 114:1, 114:5, 114:6, 114:12, 120:24, 123:21, 128:8
**transcript** [12] - 1:24, 6:16, 6:18, 7:2, 61:9, 78:9, 103:19, 110:3, 110:5, 130:5, 130:6, 130:10
**TRANSCRIPT** [1] - 1:8
**transcription** [1] - 1:25
**transfer** [12] - 13:19, 14:8, 15:17, 19:6, 39:16, 39:17, 39:20, 92:15, 110:19, 111:15, 112:3, 129:14
**transferred** [8] - 9:20, 14:6, 16:4, 18:7, 20:2, 34:15, 34:22, 100:8
**transferring** [2] - 21:8, 103:3
**transfers** [3] - 19:5,

21:7, 23:21
**transited** [1] - 76:22
**transported** [1] - 5:14
**travel** [4] - 40:9, 75:20, 119:5, 122:24
**traveled** [2] - 113:18, 119:7
**traveling** [1] - 40:11
**treasury** [1] - 80:10
**treating** [1] - 88:21
**treaty** [1] - 40:20
**trial** [3] - 97:11, 98:9, 117:17
**trick** [1] - 109:3
**tried** [2] - 76:16, 121:8
**tries** [1] - 109:3
**trip** [1] - 33:16
**trouble** [1] - 71:21
**troubling** [1] - 106:21
**true** [6] - 19:10, 65:10, 73:8, 74:2, 130:4, 130:5
**truly** [1] - 13:2
**trust** [1] - 127:25
**trusted** [1] - 102:24
**try** [1] - 48:15
**trying** [9] - 12:4, 29:7, 29:13, 33:19, 82:12, 92:20, 92:21, 113:3, 114:15
**Tuesday** [2] - 76:14, 76:15
**tumbler** [4] - 74:9, 74:10, 75:3
**tune** [3] - 12:18, 16:17, 43:12
**turn** [5] - 8:3, 24:23, 50:6, 79:9, 99:10
**turned** [1] - 76:18
**twice** [1] - 104:1
**two** [33] - 3:14, 17:22, 21:3, 22:20, 25:16, 25:18, 25:22, 26:1, 26:23, 34:5, 34:18, 46:16, 47:2, 47:16, 50:9, 54:7, 74:21, 77:6, 77:9, 82:25, 86:25, 87:5, 90:17, 93:8, 99:14, 101:11, 103:21, 105:22, 113:3, 120:3, 125:18, 127:11, 128:5
**two-count** [1] - 99:14
**tying** [3] - 22:6, 26:8, 110:14
**type** [1] - 114:8
**types** [3] - 78:1, 114:3, 114:7
**typically** [2] - 28:23,

111:2

## U

**U.S** [18] - 1:13, 14:1, 33:18, 36:10, 40:19, 54:15, 67:16, 67:17, 89:11, 97:23, 98:5, 98:18, 98:19, 102:3, 102:15, 104:11, 104:12, 119:7
**U.S.-based** [1] - 101:23
**U.S.C** [11] - 4:4, 4:6, 97:15, 98:13, 99:3, 99:16, 99:20, 99:23, 103:24, 124:16
**UA** [2] - 31:11, 119:17
**Ukraine** [13] - 31:11, 37:9, 40:10, 40:17, 40:18, 40:20, 40:22, 41:1, 83:21, 105:12, 105:13, 105:18, 119:18
**Ukrainian** [2] - 25:2, 106:5
**ultimately** [8] - 25:23, 28:18, 29:12, 35:11, 74:8, 93:9, 101:1, 107:11
**um-hum** [2] - 18:14, 42:6
**un-hosted** [1] - 18:5
**unable** [5] - 5:6, 25:7, 110:2, 118:1, 123:6
**unauthorized** [1] - 100:7
**uncertain** [1] - 36:9
**unclear** [1] - 35:5
**uncommon** [1] - 53:22
**uncontroverted** [1] - 110:10
**uncovered** [1] - 26:5
**under** [22] - 4:21, 5:21, 8:9, 9:2, 12:10, 14:5, 14:9, 15:23, 33:8, 46:24, 73:4, 76:8, 77:8, 77:10, 80:12, 90:21, 97:14, 98:23, 103:24, 111:24, 124:8, 125:13
**underlying** [1] - 108:23
**undermines** [1] - 102:23
**underneath** [1] - 107:7
**understood** [3] - 39:7, 60:25, 129:1
**undertaking** [1] -

87:15
**unfortunately** [2] - 93:2, 95:2
**unhosted** [6] - 19:11, 24:3, 100:9, 100:11, 100:14, 113:18
**unidentified** [1] - 100:6
**unique** [2] - 15:6, 128:25
**unit** [2] - 14:25, 121:6
**United** [11] - 2:3, 2:11, 4:5, 67:18, 74:4, 80:10, 99:23, 116:23, 116:24, 117:2, 117:7
**UNITED** [4] - 1:1, 1:3, 1:9, 1:11
**units** [1] - 114:1
**unlawful** [7] - 10:2, 106:25, 110:14, 111:16, 113:8, 115:9
**unless** [3] - 14:22, 47:8, 98:9
**unlikely** [1] - 21:18
**unlock** [1] - 109:21
**unquote** [1] - 39:8
**untangled** [1] - 108:14
**unusual** [1] - 36:7
**unviral.com** [3] - 59:13, 59:21, 59:22
**unwitting** [1] - 46:20, 81:16, 81:19
**unwittingly** [1] - 42:22
**up** [42] - 19:14, 21:9, 25:13, 26:15, 27:5, 29:14, 31:2, 31:14, 35:2, 35:11, 36:13, 39:9, 41:1, 41:6, 41:13, 42:16, 45:13, 45:23, 45:24, 52:7, 52:14, 56:23, 58:21, 59:3, 67:23, 71:6, 86:5, 86:22, 87:5, 88:14, 88:15, 88:16, 91:9, 99:24, 100:12, 101:11, 101:19, 116:24, 117:9, 121:3, 122:22, 123:16
**urgent** [1] - 53:22
**user** [1] - 14:18
**users** [1] - 100:14
**utilize** [1] - 107:20
**utilizing** [1] - 101:14

## V

**vaccinated** [1] - 89:3

**valid** [1] - 119:9
**valuable** [1] - 110:19
**value** [2] - 18:11, 104:2
**valued** [3] - 17:11, 100:20
**vanity** [1] - 91:21
**variations** [1] - 113:2
**variety** [5] - 18:5, 19:4, 19:8, 28:2, 101:16
**various** [11] - 18:8, 19:12, 25:14, 29:9, 63:19, 64:2, 95:23, 112:7, 113:9, 121:17, 123:20
**vast** [1] - 109:12
**VC** [1] - 26:18
**VCE** [13] - 11:3, 17:5, 25:16, 25:22, 26:19, 100:2, 100:9, 102:12, 111:17, 112:18, 114:16, 115:13
**VCE's** [1] - 9:20
**VCE4** [14] - 25:16, 25:18, 25:22, 26:2, 26:9, 26:17, 26:20, 27:12, 34:18, 93:7, 93:9, 93:11, 93:17, 93:20
**VCE7** [3] - 70:25, 71:2, 84:1
**VCEs** [9] - 34:18, 70:13, 70:18, 81:21, 102:2, 102:7, 112:7, 112:22, 113:9
**vendor** [7] - 31:25, 105:4, 105:11, 105:16, 106:1, 106:2, 123:18
**vendors** [13] - 32:7, 32:13, 70:15, 71:15, 75:4, 83:6, 105:7, 105:10, 105:11, 105:16, 105:17, 119:21
**venture** [1] - 84:18
**venue** [6] - 79:22, 79:23, 80:12, 80:13, 80:14, 81:2
**verify** [2] - 31:17, 42:9
**version** [2] - 24:8, 109:19
**versus** [3] - 2:3, 57:19, 74:4
**vetted** [3] - 83:6, 105:7, 106:2
**via** [1] - 2:6
**viable** [2] - 68:23
**victim** [9] - 9:18, 9:20,

11:3, 13:5, 17:5, 62:13, 92:10, 100:9, 111:17
**videoconference** [1] - 5:23
**videoconferencing** [1] - 88:2
**view** [8] - 38:24, 38:25, 47:13, 48:23, 69:12, 69:14, 94:18, 108:25
**viewed** [1] - 114:14
**vigorously** [2] - 117:10, 117:11
**violated** [1] - 90:12
**violation** [6] - 4:4, 4:6, 5:24, 99:16, 99:19, 99:23
**Violations** [1] - 62:10
**violations** [4] - 10:4, 41:18, 62:9, 62:12
**virtual** [30] - 9:18, 17:10, 18:20, 20:19, 22:14, 24:19, 35:10, 40:1, 44:18, 45:25, 62:13, 69:18, 69:24, 72:23, 76:11, 80:3, 92:10, 92:16, 92:20, 93:1, 100:2, 101:16, 101:21, 101:22, 102:9, 103:8, 110:12, 111:25, 112:8, 122:2
**virtually** [6] - 60:19, 62:17, 69:15, 76:7, 76:12, 77:16
**visibility** [1] - 32:6
**visit** [2] - 76:16, 88:16
**visits** [4] - 87:24, 88:4, 117:9
**vitro** [1] - 68:9
**VM** [3] - 22:13, 22:16
**Vo** [1] - 104:12
**void** [1] - 130:9
**voluminous** [2] - 77:18, 117:15
**vs** [1] - 1:4

**W**

**W4S** [1] - 11:13
**wait** [1] - 3:20
**waive** [3] - 55:1, 56:15, 58:3
**waiver** [1] - 55:6
**waiving** [1] - 63:5
**walk** [1] - 36:23
**walking** [1] - 38:16
**wall** [1] - 48:21

**wallet** [38] - 9:21, 11:13, 13:15, 16:3, 19:1, 19:3, 19:6, 21:19, 22:10, 22:11, 22:17, 22:19, 24:1, 24:2, 24:4, 24:8, 24:13, 24:17, 44:2, 44:3, 44:9, 69:12, 69:21, 69:22, 71:8, 71:16, 71:20, 92:9, 92:12, 92:13, 92:15, 100:9, 100:12, 100:14, 103:6, 113:22
**Wallet** [54] - 9:21, 9:22, 10:25, 11:7, 11:22, 12:6, 12:10, 12:21, 13:1, 13:6, 13:14, 13:15, 16:12, 16:14, 16:17, 17:13, 19:20, 20:1, 20:3, 20:8, 21:14, 21:17, 22:4, 22:22, 23:19, 23:22, 23:24, 25:13, 26:21, 28:14, 34:16, 36:20, 39:14, 64:10, 64:13, 70:14, 70:17, 93:10, 100:10, 100:24, 103:3, 103:4, 109:21, 110:11, 110:23, 112:1, 113:5, 113:13, 113:19, 118:4, 121:2, 122:9, 123:23, 124:6
**wallets** [19] - 14:8, 14:9, 14:10, 15:7, 15:9, 15:10, 15:22, 18:5, 19:11, 23:24, 69:9, 71:9, 72:21, 72:22, 100:8, 100:11, 112:25, 113:1, 122:16
**wants** [4] - 44:20, 49:22, 90:23, 96:13
**warning** [1] - 61:22
**warrant** [26] - 12:14, 27:15, 29:25, 30:6, 35:17, 36:18, 37:23, 38:11, 38:19, 60:18, 61:14, 61:24, 62:2, 62:5, 63:2, 63:22, 65:4, 66:2, 67:3, 78:25, 79:3, 92:1, 108:1, 119:12, 119:13, 121:6
**warranted** [1] - 39:16
**warrants** [9] - 12:8, 12:9, 14:23, 26:1, 36:20, 64:15, 70:12,

100:17, 120:5
**Washington** [4] - 1:6, 1:14, 5:14, 126:10
**waste** [2] - 79:16, 79:18
**watching** [1] - 122:8
**ways** [2] - 57:20, 128:14
**weak** [3] - 81:8, 94:7, 109:1
**weaker** [1] - 43:13
**weakness** [1] - 85:16
**website** [2] - 71:21, 84:5
**Wednesday** [2] - 76:16, 76:17
**week** [10] - 64:18, 65:14, 65:20, 65:21, 66:9, 87:2, 87:24, 88:5, 88:16, 88:17
**weekend** [5] - 70:22, 70:24, 77:1, 77:11, 89:4
**weeks** [3] - 38:21, 87:17
**weigh** [2] - 108:7, 124:18
**weighing** [3] - 31:21, 106:21, 123:10
**weighs** [5] - 90:3, 99:12, 103:19, 110:8, 116:5
**weight** [6] - 98:2, 99:5, 108:9, 109:14, 116:17, 123:24
**weighty** [1] - 111:11
**well-educated** [1] - 119:1
**well-publicized** [1] - 92:11
**well-resourced** [2] - 28:24, 111:2
**well-secured** [1] - 29:13
**whereabouts** [1] - 106:15
**whole** [4] - 17:16, 18:16, 21:14, 71:21
**widespread** [1] - 122:23
**wife** [4] - 28:7, 42:22, 43:9, 49:10
**willing** [1] - 107:20
**willingness** [2] - 102:17, 107:13
**window** [1] - 81:1
**wire** [2] - 10:4, 62:6
**wiretap** [2] - 109:10, 109:15
**wish** [3] - 3:22, 5:18,

54:23
**withdrawing** [1] - 101:17
**witness** [1] - 109:10
**women** [1] - 83:11
**wondered** [1] - 32:19
**word** [5] - 8:25, 16:8, 22:10, 61:11, 113:2
**words** [3] - 16:9, 62:7, 108:25
**works** [4] - 10:24, 44:17, 68:2, 71:25
**world** [3] - 14:15, 31:3, 114:17
**world's** [1] - 100:1
**worth** [14] - 12:10, 14:20, 17:2, 18:10, 18:22, 24:6, 29:20, 33:6, 72:8, 78:21, 81:13, 86:11, 86:12, 103:14
**wow** [1] - 7:16
**wrest** [1] - 107:11
**writing** [2] - 47:25, 118:25
**written** [8] - 11:20, 119:4, 121:15, 121:18, 125:9, 125:10, 129:12
**WS** [1] - 11:13

**Y**

**year** [10] - 60:11, 60:12, 60:14, 61:13, 63:20, 78:17, 80:17, 120:18, 120:20
**years** [11] - 18:1, 74:14, 80:18, 89:16, 93:23, 95:5, 97:25, 99:21, 99:24, 103:22
**York** [47] - 1:19, 4:9, 4:13, 4:18, 5:5, 5:11, 5:13, 6:15, 6:17, 6:23, 32:1, 32:5, 35:14, 36:16, 37:2, 37:5, 40:6, 52:21, 52:22, 53:21, 61:10, 65:7, 65:18, 68:7, 68:8, 68:10, 68:24, 77:15, 101:4, 103:17, 104:4, 108:1, 108:3, 118:14, 124:25, 125:14, 125:21, 126:1, 126:3, 126:12, 126:13, 127:19, 127:23, 128:11, 129:8

**York's** [1] - 7:5
**you-all** [3] - 6:25, 9:3, 51:3
**young** [1] - 87:1
**youngsters** [1] - 86:25

## Z

**zero** [5] - 79:23, 80:14, 82:18, 82:23, 84:14
**zeroing** [2] - 63:8, 80:22