LEAVE TO FILE GRANTED
Leave to file Petition and
Exhibits A-F Granted
Judge CKolla- Kollar
Jan 22, 2025

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

– v –

ILYA LICHTENSTEIN AND HEATHER
MORGAN,

Defendants.

No. 23-CR-239 (CKK)

**CLAIMANTS AND THIRD-PARTY PETITIONERS iFINEX INC. AND BFXNA INC.'S
VERIFIED PETITION FOR ANCILLARY PROCEEDINGS
PURSUANT TO 21 U.S.C. § 853(n)**

iFinex Inc. and BFXNA Inc. (together, "**Bitfinex**"), through its attorneys Gibson Dunn &
Crutcher LLP, petitions this Court, pursuant to 21 U.S.C. § 853(n) and Federal Rule of Criminal
Procedure 32.2, and asserts its interest as the claimant with a superior right, title, and/or interest to
the United States, defendants Ilya Lichtenstein ("**Lichtenstein**") and Heather Morgan (together,
"**Defendants**"), and any other third party to 119,754 Bitcoins stolen from Bitfinex, including
109,728.522 Bitcoins and related assets identified among the specific property in paragraphs e, f,
g, h, s, and t of the Corrected Second Attachment (ECF No. 198-1) to the Court's Second Amended
Preliminary Order of Forfeiture, ECF No. 178 (as amended and corrected, the "**Preliminary
Order of Forfeiture**").[1]

## NATURE OF ACTION

1.      This is a rare forfeiture case where the Government and both Defendants agree that
the primary assets seized from the Defendants and subject to the Preliminary Order of Forfeiture

---

[1] "ECF No. __" refers to the document number of filings on the docket for *United States v. Ilya
Lichtenstein and Heather Morgan*, No. 23-CR-239-CKK (D.D.C.).

were stolen and should be returned directly to the victim of the crime: Bitfinex. Bitfinex is a virtual currency exchange and is referred to as "Victim VCE" throughout the charging documents in this case. Defendants admit that, as the Government charged, Lichtenstein devised and executed a scheme to defraud Bitfinex (the "**Hack**"); or as the Court described it at Lichtenstein's sentencing, "a scheme to steal money from Bitfinex." Lichtenstein Sentencing Tr., ECF No. 182 at 63:18-20. Lichtenstein compromised Bitfinex's systems, misappropriated Bitfinex's private keys to its cryptocurrency wallets, and used those private keys on August 2, 2016, to steal approximately 119,754 Bitcoins directly from Bitfinex wallets (the "**Stolen Bitcoins**") by transferring them to a wallet under his control (the "**Hack Wallet**"). For more than five years, 94,643 Stolen Bitcoins remained undisturbed in the Hack Wallet (the "**Hack Wallet Bitcoins**"). Defendants removed approximately 25,000 Stolen Bitcoins from the Hack Wallet and attempted to launder them and obscure their origin. But the Government tracked the Stolen Bitcoins to Defendants and seized the vast majority of the Stolen Bitcoins, including the 94,643 Hack Wallet Bitcoins and at least 15,085 additional Stolen Bitcoins that are directly traceable to the Hack and Bitfinex (the "**Additional Seized Bitcoins**").

2.      Bitfinex holds the superior right, title, and/or interest in the Hack Wallet Bitcoins and Additional Seized Bitcoins (together, the "**Bitfinex Bitcoins**") seized by the Government from Defendants and identified in the Court's Preliminary Order of Forfeiture. The Bitfinex Bitcoins are the same Bitcoins that Defendant Lichtenstein stole from Bitfinex and are all directly traceable to the Hack. Bitfinex owned and controlled the cryptocurrency wallets from which Lichtenstein stole the Bitcoins. Bitfinex thereby had possession, custody, and control of the Bitfinex Bitcoins in its wallets. Defendants *never* held any property interests in the Stolen Bitcoins at the time of the Hack, let alone interests superior to Bitfinex, that could be forfeited to the Government. Indeed,

Lichtenstein was only able to break into Bitfinex wallets and steal the Bitcoins therein by compromising Bitfinex's systems and misappropriating Bitfinex's private keys. Accordingly, Bitfinex respectfully submits that the Preliminary Order of Forfeiture is invalid as to the Bitfinex Bitcoins, and requests pursuant to 21 U.S.C. § 853(n)(6) that the Court remove those assets from its final order of forfeiture and order that they be returned to Bitfinex.

      3.     The Government supports returning to Bitfinex all Stolen Bitcoins directly traceable to the Hack, including the Hack Wallet Bitcoins. Indeed, the Government has requested that the Court order Defendants to pay in-kind restitution of the Hack Wallet Bitcoins to Bitfinex. *See* Lichtenstein Sentencing Memorandum, ECF No. 146 at 25. The Government recognizes that the Hack Wallet Bitcoins are "the residue of the property that was stolen from Bitfinex" and their return "represents the return of lost property to the owner of that property." Lichtenstein Sentencing Memorandum, ECF No. 146 at 25, 28; *see also* Government's Supplemental Motion Regarding Restitution, ECF No. 202 at 1, 3-4. The Government has informed the Court that it does not expect most of the seized assets in the Preliminary Order of Forfeiture to be forfeited to the Government. Rather, the Government "anticipates returning most if not all" of the assets it seized from Defendants to Bitfinex (or others) "through restitution and the third-party ancillary proceeding." Government's Motion for Amended Preliminary Order of Forfeiture, ECF No. 148 at 4.

      4.     Defendants likewise support returning the remaining Stolen Bitcoins to Bitfinex. Defendants aided the Government in recovering the remaining Stolen Bitcoins so that they can be returned to Bitfinex. In fact, Defendant Morgan affirmatively stated that "this Court should order that the assets seized from [Defendants] Mr. Lichtenstein and Ms. Morgan be applied as in-kind restitution to Bitfinex." Sentencing Memorandum by Heather Morgan, ECF No. 161 at 45. Both

3

Defendants have agreed in their plea agreements with the Government to pay restitution to Bitfinex. Lichtenstein Plea Agreement, ECF No. 96 at 9–10; Morgan Plea Agreement, ECF No. 101 at 10.

5.    Moreover, Bitfinex—the direct victim of Defendants' scheme—has a superior right, title, and/or interest in the Bitfinex Bitcoins to any potential third-party claimant. The hacked wallets were owned and controlled by Bitfinex. After the Hack, Bitfinex honored all customer Bitcoin positions and balances on the Bitfinex exchange regardless of whether such transactions involved Stolen Bitcoins. Bitfinex absorbed the loss of the Stolen Bitcoins itself, without any immediate prospect of finding, let alone recovering, them. While Bitfinex temporarily allocated its Hack losses to customer accounts on a pro rata basis (regardless of whether the customers owned Bitcoin), within months of the Hack, Bitfinex made its customers whole. Bitfinex paid tens of millions of dollars in cash, stock, and other compensation to erase the losses. Bitfinex customers or their assignees received the entire value of their assets at the time of the Hack; some customers earned significant profits by opting for stock compensation. Bitfinex's extraordinary actions after the Hack led to Bitfinex's growth and success. Now that the Stolen Bitcoins have been recovered, they should be returned to their sole source and the direct victim of Lichtenstein's heist: Bitfinex.

6.    Accordingly, pursuant to 21 U.S.C. §§ 853(n)(2) and (n)(6)(A), Bitfinex respectfully requests that the Court adjudicate, recognize, and confirm Bitfinex's superior right, title, and/or interest in the Bitfinex Bitcoins, including (i) the 94,643.298 Hack Wallet Bitcoins (identified in paragraph e of the Corrected Second Attachment, ECF No. 198-1) and related hard-fork assets (identified in paragraphs f, g, and h of the Corrected Second Attachment, *id.*), and (ii) 15,085.224 Additional Seized Bitcoins (identified in paragraphs s and t of the Preliminary Order

of Forfeiture, *id.*), and exclude the Bitfinex Bitcoins from any final order of forfeiture against Defendants.

## JURISDICTION

This petition concerns the Preliminary Order of Forfeiture, ECF No. 178. Jurisdiction in the Court is therefore proper under 21 U.S.C. § 853(n) and Fed. R. Crim. P. 32.2(c).

## PARTIES

7.    iFinex Inc. ("**iFinex**") is a corporation organized under the laws of the British Virgin Islands. iFinex Inc. owns and operates the virtual currency exchange known as Bitfinex.

8.    BFXNA Inc. is a corporation organized under the laws of the British Virgin Islands and a wholly owned subsidiary of iFinex that served as a contractual counterparty for certain Bitfinex customers (together with iFinex, "**Bitfinex**").

9.    Defendant Ilya Lichtenstein is a resident of New York. Defendant Lichtenstein pled guilty in this proceeding to an Information charging him with one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h). Information, ECF No. 89; Lichtenstein Plea Agreement, ECF No. 96.

10.    Defendant Heather Morgan is a resident of New York. Defendant Morgan pled guilty in this proceeding to an Information charging her with one count of money laundering conspiracy in violation of 18 U.S.C. §§ 371 and 1956(a)(1)(B)(i) and one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Information, ECF No. 89; Morgan Plea Agreement, ECF No. 101.

## I.    FACTUAL BACKGROUND

### A.    Cryptocurrency is a Digital Asset Transacted on a Public Ledger

11.    Digital currencies, also known as cryptocurrencies, are digital assets which are recorded on an encrypted distributed ledger known as a blockchain.  The original cryptocurrency is Bitcoin.  Declaration of Expert Matthew Price ("Price Decl."), attached hereto as Exhibit A, ¶ 11.  The ownership of and transactions in Bitcoin are recorded on the Bitcoin blockchain.  *Id.* ¶ 12.  Each copy of the Bitcoin blockchain contains a public record of every transfer of Bitcoin that has ever occurred.  *Id.*

12.    Bitcoin and other cryptocurrencies are stored by their owners in digital cryptocurrency wallets.  Price Decl., Ex. A, ¶ 20.  Wallets are like a virtual bank account.  *Id.* Wallets are used to store and transact in cryptocurrencies.  *Id.*

13.    Wallets typically have at least two keys: a public key and a private key.  Private keys are codes used to authorize cryptocurrency wallet transactions.  Price Decl., Ex. A, ¶¶ 19, 20. The private keys to a cryptocurrency wallet are like a password or PIN.  *Id.* ¶ 19.  A multi-signature wallet can require multiple private keys to authorize transactions using the wallet.  *Id.* 21.

14.    The holder of the private keys to a wallet is the owner of that wallet because he or she has the right and ability to control the wallet and the cryptocurrency therein.  Price Decl., Ex. A, ¶ 19.  Owners of cryptocurrency wallets never disclose the private keys to their wallets because, unlike a password or PIN, a private key cannot be changed.  *Id.*  Once the private keys to a wallet become known, the only way to reassert control over the cryptocurrency in that wallet is to transfer it to a new wallet with new private keys.

15.    A public key to a wallet is derived from the private key.  Price Decl., Ex. A, ¶ 18. The public key can be used to generate wallet addresses, which are akin to account numbers.  *Id.* Wallet addresses can be shared with third parties to facilitate the transfer of cryptocurrencies.  A

single wallet may include many wallet addresses, in the same way a single customer account with a bank may include both a checking and savings account. *Id.*

**B.     Bitfinex is One of the World's Premier Cryptocurrency Exchanges**

16.     Founded in 2012, Bitfinex enables customers to buy, sell, and store various types of virtual currency, including but not limited to Bitcoin. Like exchanges for traditional assets, Bitfinex offered its customers the ability to make simple spot trades (i.e., basic bids and offers to buy and sell assets), as well as the ability to conduct more sophisticated trades including through short sales, margin trading, and other financed transactions using their assets as collateral. Bitfinex customers typically engage in transactions on the Bitfinex exchange through the Bitfinex website.

17.     Historically, Bitfinex has served predominately non-U.S. customers. Since in or about 2018, Bitfinex does not permit U.S. persons to become Bitfinex customers.

18.     Notwithstanding that Bitfinex does not do business in the United States, Bitfinex is an industry leader in promoting lawful practices in the cryptocurrency industry. Bitfinex routinely collaborates with law enforcement agencies in the United States and across the world, including the Department of Justice and the Federal Bureau of Investigation, to combat the use of cryptocurrency by criminals, terrorists, rogue states, and other bad actors.

**C.     Bitfinex Owned and Controlled Its Cryptocurrency Wallets**

19.     In 2016, Bitfinex used multi-signature wallets. Multi-signature wallets require multiple private keys to authorize transactions of cryptocurrency. Price Decl., Ex. A, ¶ 21. Bitfinex's multi-signature wallets required at least two private keys to authorize transactions, and Bitfinex held at least two private keys to the vast majority of its cryptocurrency wallets. Bitfinex also contracted with a third-party security service, BitGo. Under that contract, BitGo typically held an additional private key. BitGo could only use its single private key (together with one of

7

Bitfinex's private keys) to authorize Bitfinex wallet transactions following instructions from Bitfinex.

20.     To fund a Bitfinex account, customers deposited Bitcoin (or other cryptocurrencies) with Bitfinex by sending it to a Bitfinex-created deposit wallet address associated with that customer's account.   Once Bitfinex received the Bitcoin, it would credit that deposit in the customer's account on the Bitfinex exchange.   Customers who satisfied Bitfinex's anti-money laundering requirements could also deposit fiat currency in their Bitfinex exchange accounts. Additionally, Bitfinex routinely created and controlled thousands of other wallet addresses to hold Bitcoin and facilitate Bitfinex exchange transactions.

21.     Bitfinex controlled the Bitfinex exchange wallet addresses, including the deposit wallet addresses for customer accounts.   Bitfinex customers could not directly authorize transactions involving the deposit wallet addresses or any other Bitfinex wallets.   Instead, when Bitfinex customers traded Bitcoin, those trades were entered on the Bitfinex exchange website and reflected in the customers' Bitfinex exchange accounts.   The trades would not immediately be reflected on the blockchain.   Rather, Bitfinex would periodically use its private keys (including by sending instructions to BitGo) to settle transactions and reconcile customer positions by transferring Bitcoin between the various Bitfinex exchange wallet addresses.   Only Bitfinex was able to control the movement of Bitcoin into and out of wallets on the Bitfinex exchange.   At any given time, customers had numerous open and unsettled Bitcoin positions on the Bitfinex exchange, which Bitfinex would settle by moving Bitcoins between and among the customer deposit wallet addresses and Bitfinex's own wallet addresses.

22.     For a limited time in 2016 before the Hack, a small subset of U.S. customers who had margin accounts on the Bitfinex exchange could obtain a single private key to the deposit

wallet addresses associated with their accounts. However, even those customers still lacked the two private keys necessary to directly authorize transactions using the wallets and they transacted or withdrew Bitcoin through the Bitfinex website in the same manner as all other customers.

23.     In summary, Bitfinex held or controlled the private keys to the Bitfinex wallet addresses, including for customer deposit wallet addresses. Bitfinex owned and controlled its wallets, and it had possession, custody, and control of the Bitcoin held therein. Only Bitfinex had the ability to transfer the Bitcoins in the Bitfinex wallets. And Bitfinex routinely exercised that ability to facilitate customer transactions on the Bitfinex exchange.

**D.     Defendant Lichtenstein Hacked Bitfinex and Stole Approximately 119,754 Bitcoins from Bitfinex Wallets Using Bitfinex's Private Keys**

24.     Beginning in or about early 2016, Defendant Lichtenstein devised and executed a scheme to steal Bitfinex's Bitcoins. Lichtenstein conducted online research and reconnaissance of Bitfinex's information technology infrastructure. He identified and compromised Bitfinex's computer servers. He utilized multiple advanced hacking tools and techniques, commonly known as "exploits," to gain unauthorized access to these computer servers. He also used penetration testing software frequently used by cybercriminals, as well as cybersecurity practitioners, because this software provides data about security vulnerabilities and assists in simulating a cyberattack on a computer system to see how the system would respond. *See* Lichtenstein Statement of Offense, ECF No. 95, ¶ 12; Lichtenstein Plea Tr., ECF No. 110 at 22:9-24; Morgan Statement of Offense, ECF No. 100, ¶ 12; Morgan Plea Transcript, ECF No. 111 at 21:23-23:13.

25.     Defendant Lichtenstein concealed his activities through a variety of means. He rerouted his internet traffic using compromised computers and intermediate proxy servers. He did so late at night to give the appearance that he was operating from another country. *See* Lichtenstein

Statement of Offense, ECF No. 95, ¶ 13; Lichtenstein Plea Tr., ECF No. 110 at 23:9-24:1; Morgan Statement of Offense, ECF No. 100, ¶ 13; Morgan Plea Tr., ECF No. 111 at 21:23-23:13.

26.     Defendant Lichtenstein gained access to Bitfinex's computer infrastructure. He used that access to compromise additional servers and defeat numerous security measures on Bitfinex's network. Through these activities, Defendant Lichtenstein ultimately gained access to Bitfinex's private keys for its cryptocurrency wallets, which could be used to authorize transactions involving Bitcoin held by Bitfinex in its wallets. Lichtenstein Statement of Offense, ECF No. 95, ¶ 14; Lichtenstein Plea Tr., ECF No. 110 at 24:5-25:10; Morgan Statement of Offense, ECF No. 100, ¶ 14; Morgan Plea Tr., ECF No. 111 at 21:23-23:13.

27.     On or about August 2, 2016, Defendant Lichtenstein perpetrated the Hack. Using his access to Bitfinex's private keys to its wallets, Lichtenstein initiated approximately 2,072 unauthorized Bitcoin transactions. Lichtenstein transferred approximately 119,754 Bitcoins held by Bitfinex in Bitfinex wallets to the Hack Wallet. Each of Lichtenstein's 2,072 fraudulent Bitcoin transactions was sent to a separate wallet address within the Hack Wallet. *See* Complaint Ex. A ("Statement of Facts"), ECF No. 1-1, ¶ 4; Lichtenstein Statement of Offense, ECF No. 95, ¶ 14; Lichtenstein Plea Tr., ECF No. 110 at 24:5-25:10; Morgan Statement of Offense, ECF No. 100, ¶ 14; Morgan Plea Tr., ECF No. 111 at 21:23-23:13.

28.     All 119,754 Bitcoins stolen from Bitfinex by Lichtenstein came from Bitfinex cryptocurrency wallets. The Stolen Bitcoins comprised approximately 36% of Bitfinex's total assets at the time of the Hack. Lichtenstein Statement of Offense, ECF No. 95, ¶ 14; Lichtenstein Plea Tr., ECF No. 110 at 24:5-25:10; Morgan Statement of Offense, ECF No. 100, ¶ 14; Morgan Plea Tr., ECF No. 111 at 21:23-23:13.

29.     Lichtenstein took steps to conceal his activity.  For instance, he accessed Bitfinex's computer systems and deleted credentials and certain log files that might lead investigators to determine that someone had gained unauthorized access.  Lichtenstein Statement of Offense, ECF No. 95, ¶ 15; Lichtenstein Plea Tr., ECF No. 110 at 25:15-26:1; Morgan Statement of Offense, ECF No. 100, ¶ 15; Morgan Plea Tr., ECF No. 111 at 23:16-24:8.

### E.     Bitfinex Itself Absorbed the Losses from the Hack and Provided Tens of Millions of Dollars of Compensation to Its Customers

30.     In the immediate aftermath of the Hack, Bitfinex acted urgently to protect the remaining Bitcoin and other cryptocurrency assets on the Bitfinex exchange.  Bitfinex used its private keys to move Bitcoin and other cryptocurrency assets on the Bitfinex exchange to Bitfinex wallets that were still secure.

31.     Once Bitfinex was confident the remaining assets held on its platform were secure, Bitfinex took extraordinary measures to ensure that only Bitfinex and its shareholders—not Bitfinex's customers—would ultimately bear the loss caused by the Hack.

32.     *First*, Bitfinex honored customer Bitcoin positions and balances on the Bitfinex exchange at the time of the Hack, including margin trades, short sales, and other financing transactions, regardless of whether they related to any Stolen Bitcoins.  Bitfinex settled open positions based on the value of Bitcoin or other assets before the Hack.

33.     *Second*, in the days after the Hack, Bitfinex temporarily allocated its losses from the Hack—comprising approximately 36% of Bitfinex's then total assets—pro rata across all customer accounts, regardless of whether they held Bitcoin.  For example, if an account held $100 worth of assets, Bitfinex applied an approximate 36% temporary haircut to the account, and assigned the account a $64 value.  This temporary haircut had nothing to do with whether any Bitcoin associated with a Bitfinex customer account was stolen, or whether the Bitfinex customers

even held Bitcoin at all.  For instance, if Customer A held 100 Bitcoin in the Bitfinex deposit wallet address for his or her account and all of it was stolen by Lichtenstein, after the temporary haircut Customer A's account would have held 64 Bitcoin.  If Customer B held 100 Ether (another cryptocurrency), Bitfinex applied the same 36% temporary haircut and Customer B's account would have held 64 Ether.

34.     *Third*, Bitfinex issued "BFX" tokens to each customer in an amount equal to the 36% haircut Bitfinex applied to the customer's account.  For each $1 of loss assigned to a customer account, Bitfinex issued 1 BFX token to that customer with a face value of $1.  For example, a customer with $100 of assets at the time of the Hack would receive 36 BFX tokens to reflect the $36 haircut temporarily assigned to the customer.

35.     BFX tokens were governed by the August 31, 2016, BFX Token Terms (the "**BFX Token Terms**"), attached hereto as Exhibit B.  The BFX Token Terms made clear that "the Bitfinex Group is *committing to deploy its efforts to make you whole to the extent of the full amount of your pro rata portion of the Losses*." *Id.*  The BFX tokens represented a "contingent obligation" of Bitfinex that was dependent on Bitfinex's "*recovery of stolen property*; funds raised in one or more financings; and available cash from ongoing operations." *Id.*  In other words, the BFX Token Terms contemplated that Bitfinex itself would be responsible for recovering the Stolen Bitcoin, and that it would use those funds to make its customers whole, to the extent it had not already done so.  The BFX tokens were each intended to be redeemed by Bitfinex for each customer's "*ratable share of the recoveries* and may in any event at any time be redeemed by the Bitfinex Group at the Bitfinex Group's sole option for its face value less the amount of any prior redemptions." *Id.*  In summary, Bitfinex would distribute the proceeds of any recovered Stolen Bitcoins to its customers based on their BFX token (not Bitcoin) holdings (if it had not already

made customers whole), and Bitfinex could at its sole discretion pay customers $1 to redeem each BFX token.

36.     Customers who received BFX tokens could also assign their rights to compensation and any legal claims related to the Hack to other Bitfinex customers under the Requirements for BFX Token Transfers (the "**BFX Transfer Terms**") attached hereto as Exhibit C.  The BFX Transfer Terms stated that, among other things, "[t]o transfer a token to another person, a transferor must assign to the transferee any claims that the transferor has against the Bitfinex Group on account of the Losses" and "[b]y transferring a token to another person, *all transferors thereby assign to the respective transferees any claim that the transferor has against the Bitfinex Group on account of the [Hack] Losses*." *Id.*  Accordingly, customers who sold their BFX tokens to other Bitfinex customers prior to Bitfinex's redemption of the BFX tokens assigned any claims related to the Hack, including the right to compensation from Bitfinex, to the transferee of the BFX tokens.

37.     *Fourth*, Bitfinex permitted qualifying customers to exchange their BFX tokens for newly issued iFinex stock.  Customers exchanged tens of millions of BFX tokens for iFinex stock. Customers who participated in such transactions entered subscription agreements with iFinex and received one share of iFinex common stock for each BFX token the customer redeemed.  Some customers also exchanged their BFX tokens for iFinex stock through intermediaries.

38.     Customers who elected to redeem BFX tokens for iFinex common stock before November 30, 2016, additionally received RRT tokens as part of their compensation.  The RRT tokens are governed by the Recovery Right Token (RRT) Terms ("**RRT Terms**"), attached hereto as Exhibit D.  The RRT tokens represent a "limited-recourse, contingent obligation of the Bitfinex Group . . . solely dependent on the Bitfinex Group's recovery of [Hack] Losses." *Id.* at 1.  The

RRT tokens, however, "are subordinated to any and all other claims against the Bitfinex Group, including claims related to the [Hack] Losses" that the BFX tokens represent. *Id.*

39.    The RRT Terms, like the BFX Token Terms, contemplate that any recovery of the Stolen Bitcoins would be by Bitfinex alone.  The RRT Terms specify the order of priority for compensation, and contemplate that: (i) any recovery of the Stolen Bitcoins would first be used to redeem any remaining BFX tokens to make customers whole; (ii) any additional recovered Bitcoin would be used to pay RRT holders; and (iii) any recoveries in excess of Bitfinex's outstanding BFX and RRT obligations ***would go to Bitfinex***:

> An RRT entitles the holder to a share of the recovery only after all issued and outstanding BFX tokens are redeemed. If sufficient recovery amounts remain after redemption of all BFX tokens, RRTs are entitled to share in the recovery at a rate of 1:1: one RRT entitles the holder to US$1.00 of recovery, 1/2 of an RRT entitles the holder to US$0.50 of recovery, etc. If the remaining recovery amount is less than the amount to cover RRTs on this basis, the remaining recovery amount shall be allocated among RRTs pro rata. (***Recovery amounts available, if any, in excess of 1:1 to RRT holders shall belong to and be solely vested in the Bitfinex Group.***) RRTs may be redeemed by the Bitfinex Group at any time at the Bitfinex Group's sole option, using dollars, digital tokens, or other property at current market values, in the Bitfinex Group's discretion.

Ex. D at 1.  As an express condition of receiving the RRT tokens, customers agreed that "[b]y holding, owning, or possessing RRTs, you release and hold harmless the Bitfinex Group from, and waive any claim against, the Bitfinex Group associated with the recovery efforts undertaken as a result of the" Hack.  *Id.*

40.    There are approximately 30 million outstanding RRT tokens still held by Bitfinex customers.  Should Bitfinex recover the Stolen Bitcoins, it intends to use approximately $30 million of the recovered assets toward redeeming the RRT tokens in full by making payments to

those Bitfinex customers.[2]

41.    *Fifth*, as customers exchanged more and more BFX tokens for iFinex stock and RRT tokens, Bitfinex also redeemed the remaining outstanding BFX tokens for their full value. For each BFX token, Bitfinex redeemed it by providing the token holder $1 in value. By April 3, 2017—just eight months after the Hack—Bitfinex had paid customers millions of dollars to redeem *all* outstanding BFX tokens that had not already been exchanged for iFinex stock, erasing the remaining temporary customer losses relating to the Hack. As Bitfinex publicly stated in a press release announcing the final redemptions, attached hereto as Exhibit F, Bitfinex made "the decision to reduce [its] reserves in favor of" a 100% redemption of the outstanding BFX tokens. *See* Ex. F, *100% Redemption of Outstanding BFX Tokens*, Bitfinex (Apr. 3, 2017), https://blog.bitfinex.com/announcements/100-redemption-outstanding-bfx-tokens/.

42.    Within eight months of the Hack, Bitfinex made its customers whole, through tens of millions of dollars of cash, iFinex stock, and other compensation. Bitfinex did so without any guarantee that the Stolen Bitcoins would ever be recovered and returned to Bitfinex. Bitfinex's compensation efforts were remarkably successful. Bitfinex grew and thrived after the Hack. Customers did not contest the structure of Bitfinex's compensation and its core premise: Bitfinex would make its customers whole for the value of their Bitfinex account assets at the time of the Hack, and Bitfinex alone would bear the risk (and reward) of recovering the Stolen Bitcoins.

---

[2] On July 6, 2023, Bitfinex received $312,219.71 in cash and 6.917 Bitcoin Cash, which were originally stolen from Bitfinex during the Hack, from the U.S. Department of Homeland Security. In a public statement, attached hereto as Exhibit E, Bitfinex reaffirmed that these recovered funds would be used to fulfill its obligations to RRT holders. Ex. E, *Bitfinex Announces Return of Seized Property to RRT Holders*, Bitfinex (Jul. 6, 2023), https://blog.bitfinex.com/media-releases/bitfinex-announces-return-of-seized-property-to-rrt-holders/.

**F.      Defendants Left 94,643 Stolen Bitcoins in the Hack Wallet, and Moved but Did Not Convert the More than 15,000 Additional Seized Bitcoins**

43.      Between in or about January 2017 and February 2022, Lichtenstein moved approximately 25,000 Stolen Bitcoins out of the Hack Wallet, leaving approximately 94,643 Bitcoin remaining in the Hack Wallet. *See* Lichtenstein Sentencing Memorandum, ECF No. 146 at 3; Statement of Facts, ECF No. 1-1, ¶¶ 5–6. Those Hack Wallet Bitcoins remained untouched in the Hack Wallet until the Government's seizure in February 2022. Additionally, after the Hack, there were a handful of "hard forks" in the Bitcoin blockchain—a change in the programming of the Bitcoin blockchain that results in the 1-to-1 distribution of new versions of Bitcoin to the holders of the existing version of Bitcoin. The Hack Wallet received certain alternative versions of Bitcoin as a result of the hard forks that were distributed to every wallet holding Bitcoin in the world: 117,376.52651940 Bitcoin Cash, 117,376.58178024 Bitcoin Satoshi Vision, and 118,102.03258447 Bitcoin Gold. Lichtenstein Sentencing Memorandum, ECF No. 146 at 25; Price Decl., Ex. A, ¶ 63.

44.      Lichtenstein attempted to launder the approximately 25,000 Stolen Bitcoins that he removed from the Hack Wallet in a series of small, complex transactions across multiple wallets and platforms. Statement of Facts, ECF No. 1-1, ¶ 5.; Information, ECF No. 89, ¶ 3(a); Lichtenstein Statement of Offense, ECF No. 95, ¶ 19; Lichtenstein Plea Tr., ECF No. 110 at 27:15-28:9; Morgan Statement of Offense, ECF No. 100, ¶ 18. During this period, Defendant Lichtenstein admitted to Defendant Morgan that he was responsible for the Hack and enlisted her help in laundering the stolen funds. Lichtenstein Statement of Offense, ECF No. 95, ¶ 20; Lichtenstein Plea Tr., ECF No. 110 at 28:11-29:4; Morgan Statement of Offense, ECF No. 100, ¶ 19; Morgan Plea Tr., ECF No. 111 at 25:10-25. As a result of Defendants' money laundering efforts, many of the Stolen Bitcoins were dissipated or converted in ways that made them difficult

to trace and recover.  Lichtenstein Statement of Offense, ECF No. 95, ¶ 28; Lichtenstein Plea Tr.,

ECF No. 110 at 43:2-17; Morgan Statement of Offense, ECF No. 100, ¶ 28; Morgan Plea Tr., ECF

No. 111 at 48:25-49:7.

45.    Defendants' attempts to launder the approximately 15,018 Additional Seized

Bitcoins—a subset of Stolen Bitcoins that were removed from the Hack Wallet—were less

successful.  Defendants attempted to obfuscate the origin of the Additional Seized Bitcoins by

executing a series of transactions that split these Bitcoins into small amounts and then transferred

them between and among wallets under Defendants' control (known as a "peel chain").  Price

Decl., Ex. A, ¶ 54.  Unlike some of the other Stolen Bitcoins laundered by Defendants, the

Additional Seized Bitcoins were never converted into other assets.  *Id.*, ¶ 58.  Nor were they placed

in a "mixer," where the Bitcoins are comingled with Bitcoins from others to hide their origin.  *Id.*,

¶ 50.  Because the Bitcoin blockchain contains a public record of every Bitcoin transaction, anyone

with access to a copy of the Bitcoin blockchain can trace the Additional Seized Bitcoins back to

the Hack Wallet and to Bitfinex.  *Id.*, ¶¶ 59–70.  Beyond the Additional Seized Bitcoins, there are

also other Stolen Bitcoins among the property seized from Defendants that are still the property

stolen from and traceable to Bitfinex.[3]

46.    Indeed, despite Defendants' efforts to conceal the movement of the Stolen Bitcoins,

U.S. authorities were able to trace some of the Stolen Bitcoins that Defendants attempted to launder

by analyzing the Bitcoin blockchain.  Statement of Facts, ECF No. 1-1, ¶ 5.  Specifically,

investigators traced some of the Stolen Bitcoins to an account at another cryptocurrency exchange

---

[3] Bitfinex also asserts its specific interests in any additional seized Stolen Bitcoins that are traceable to Bitfinex, including with respect to any Stolen Bitcoins identified among the Bitcoins identified in paragraphs u, bb, and hh of the Preliminary Order of Forfeiture.  Corrected Second Attachment, ECF No. 198-1.

that was opened in the name of Lichtenstein.  Statement of Facts, ECF No. 1-1, ¶¶ 19, 20.  In 2021, government agents executed a search warrant for the contents of Defendant Lichtenstein's encrypted cloud storage account.  On or about January 31, 2022, investigators succeeded in decrypting several key files, which contained a listing of all of the 2,072 wallet addresses in the Hack Wallet and their corresponding private keys.  Statement of Facts, ECF No. 1-1, ¶¶ 51, 52.

47.    The 2,072 addresses in the Hack Wallet contained either (i) Bitcoins stolen from Bitfinex, totaling 94,643 Bitcoins; or (ii) no virtual currency at all.  Statement of Facts, ECF No. 1-1, ¶ 6 n.10.  In other words, **the 94,643 Bitcoins contained in the Hack Wallet are directly traceable to the Hack *and were stolen from Bitfinex*.**  *Id.*; Price Decl., Ex. A, ¶¶ 35–44.

48.    The Government also seized the Hack Wallet "hard fork" assets.  Lichtenstein Sentencing Memorandum, ECF No. 146 at 25; Corrected Second Attachment, ECF No. 198-1 at ¶¶ f, g, h; Price Decl., Ex. A, ¶ 32.

49.    In or about February 2022, law enforcement obtained a seizure warrant and used the private keys obtained from Lichtenstein's cloud storage account to seize the remaining 94,643 Bitcoins in the Hack Wallet.  Statement of Facts, ECF No. 1-1, ¶ 6.  On February 8, 2022, Defendants were arrested, and the Government filed a criminal complaint against them.  Complaint, ECF No. 1.

### G.    Defendants Pled Guilty and Admitted that Lichtenstein Perpetrated the Hack and that the Hack Wallet Bitcoins Were Stolen from Bitfinex

50.    On August 3, 2023, Defendants Lichtenstein and Morgan waived indictment and pled guilty to an Information charging two counts of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371.  Information, ECF No. 89; Lichtenstein Plea Agreement, ECF No. 96; Morgan Plea Agreement, ECF No. 101.

51.     Defendants admitted to the Court that Lichtenstein schemed to defraud Bitfinex by hacking its computer systems and stealing its Bitcoins.  Lichtenstein admitted that he perpetrated the Hack.  Lichtenstein also admitted that the Hack Wallet contained Bitcoin stolen from Bitfinex. Information, ECF No. 89, ¶ 2; Lichtenstein Statement of Offense, ECF No. 95, ¶ 12; Lichtenstein Plea Tr., ECF No. 110 at 22:7-23:7; Morgan Statement of Offense, ECF No. 100, ¶ 12; Morgan Plea Tr., ECF No. 111 at 21:23-23:13.

52.     In pleading guilty, Defendants consented to forfeiture of the specific property listed in the Information, including the Bitfinex Bitcoins.  Lichtenstein Plea Agreement, ECF No. 96 at 10-11; Morgan Plea Agreement, ECF No. 101 at 11–12.  In doing so, Defendants acknowledged that the specific property listed in the Information, including the Bitfinex Bitcoins, were the proceeds of the Hack and Defendants' subsequent money laundering conspiracy.  Lichtenstein Statement of Offense, ECF No. 95, ¶ 29; Morgan Statement of Offense, ECF No. 100, ¶ 29.  Both Defendants also agreed to pay restitution to Bitfinex.  Lichtenstein Plea Agreement, ECF No. 96 at 9–10; Morgan Plea Agreement, ECF No. 101 at 10–11.

53.     On August 3, 2023, the Court entered preliminary orders of forfeiture against Lichtenstein and Morgan.  Order as to Ilya Lichtenstein, ECF No. 99; Order as to Heather Morgan, ECF No. 104.  Those Orders preliminarily forfeited Defendants' right, title, and interest to the proceeds of the Hack, including the Bitfinex Bitcoins, to the Government, subject to the Court's adjudication of third-party interests—such as Bitfinex's interest in the seized Bitfinex Bitcoins. Order as to Ilya Lichtenstein, ECF No. 99 at 1–2; Order as to Heather Morgan, ECF No. 104 at 1–2.

54.     On October 15, 2024, the Government moved for amended preliminary orders of forfeiture.  Motion for Amended Preliminary Order of Forfeiture, ECF No. 148.  The Government

represented to the Court that "the amended forfeiture orders list specific properties that are derived directly or indirectly from Lichtenstein's 2016 hack of Bitfinex." *Id.* at 3. The Government further informed the Court that "it anticipates returning most if not all of those assets to Bitfinex and/or other potential owners through restitution and the third-party ancillary proceeding." *Id.* at 4.

55.    On August 8, 2023, the Court signed the preliminary orders of forfeiture. Order as to Ilya Lichtenstein, ECF No. 99; Order as to Heather Morgan, ECF No. 104. On October 25, 2024, the Court amended the preliminary orders of forfeiture. Amended Order as to Ilya Lichtenstein, ECF No. 154; Amended Order as to Heather Morgan, ECF No. 155.

56.    On November 14, 2024, the Court signed the Second Amended Preliminary Order of Forfeiture (Order Granting Motion for Amended Preliminary Orders of Forfeiture, ECF No. 178); the Amended Attachment A was corrected because of a clerical error on December 11, 2024. Corrected Second Attachment, ECF No. 198-1.

57.    On December 20, 2024, the Government provided Bitfinex notice pursuant to 21 U.S.C. § 853(n)(1) of the Preliminary Forfeiture Order and the Corrected Second Amended Attachment A thereto.

58.    On January 14, 2025, the Government reaffirmed its request that the Court "[a]t a minimum" order Defendants to pay in-kind restitution to Bitfinex of "the residue of the property that was stolen from Bitfinex in 2016," including the Hack Wallet Bitcoins, which represent "the specific property lost" by Bitfinex because of the Hack. Government's Supplemental Motion Regarding Restitution, ECF No. 202 at 3-4.

## II.    BITFINEX'S INTEREST IN THE BITFINEX BITCOINS IS SUPERIOR TO THAT OF THE GOVERNMENT, DEFENDANTS, OR ANY THIRD PARTY

59.    Bitfinex's petition is timely pursuant to 21 U.S.C. §§ 853(n)(1) & (2).

60.     Bitfinex has the right to recover specific property included in the Preliminary Order of Forfeiture by establishing based on a preponderance of the evidence that it "has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner [Bitfinex] rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section." 21 U.S.C. § 853(n)(6)(A).  If Bitfinex demonstrates that it has such a right, title, or interest in the property included in the Preliminary Order of Forfeiture, the Court "shall amend the order of forfeiture in accordance with its determination." *Id.*; *see also United States v. Erpenbeck*, 682 F.3d 472, 475 (6th Cir. 2012) ("To obtain title to property through criminal forfeiture, the government must give third parties a chance to assert competing interests in the property … [i]f anyone files a petition, the court must hold an ancillary proceeding to determine the bona fides of his alleged interest.").  The scope of a legal interest in the context of the criminal forfeiture statutes is broad. *See, e.g., Russello v. United States*, 464 U.S. 16, 21 (1983) ("interest" is "[t]he most general term that can be employed to denote a right, claim, title or legal share in something" and "comprehends all forms of real and personal property") (internal quotations omitted); *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1190 (D.C. Cir. 1995) (interpreting "interest" under RICO forfeiture provision broadly).

61.     Bitfinex has a clear right, title, and/or interest in the Bitfinex Bitcoins.  At the time of the Hack, Bitfinex maintained custody and control of the Bitfinex Bitcoins in the Bitfinex wallets that Lichtenstein hacked.  Bitfinex controlled the private keys necessary to authorize transactions using the Bitfinex wallets.  Bitfinex had a direct contractual relationship with BitGo, which held one of the private keys.  Bitfinex customers executed transactions on and withdrawals

from the Bitfinex exchange through the Bitfinex website because they could not directly authorize transactions of cryptocurrency in the Bitfinex wallets.  Bitfinex's pre-Hack dominion over the hacked wallets and Stolen Bitcoins is evidenced by the fact that Lichtenstein executed the Hack by compromising Bitfinex's systems and misappropriating Bitfinex's private keys.  If Bitfinex had not owned and controlled the hacked wallets, Lichtenstein would not have been able to steal Bitcoins from them.

62.     By owning and controlling the Bitfinex wallets that Lichtenstein hacked, Bitfinex held a legal right, title, and/or interest in each and all of the Bitcoins in those Bitfinex wallets. *See United States v. All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81 (D.D.C. 2013) ("In assessing the sufficiency and probity of evidence that purports to demonstrate a colorable ownership interest, courts generally look to "'indicia of dominion and control such as possession, title, and financial stake.'") (internal citation omitted).  Courts in this District have consistently found that the owner of Bitcoin in a cryptocurrency wallet is the possessor of the private keys to that wallet.  "Ownership of bitcoin is thus based on a user's possession or knowledge of the private key associated with a public key and address." *United States v. Harmon*, 474 F. Supp. 3d 76, 82 (D.D.C. 2020); *see also United States v. Patel*, 2024 WL 1932871, at *1 (D.D.C. May 1, 2024) ("An individual's '[o]wnership of bitcoin is thus based on [his] possession or knowledge of the private key associated with a public key and address.'" (citing *Harmon*, 474 F. Supp. 3d at 82)). That is consistent with the principles underlying blockchain transactions, which only permit the holder of a private key to a wallet to authorize transactions. *See United States* v. *Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020) ("Bitcoin users send Bitcoin to other users through these addresses using a private key function that authorizes the payments."); *United States* v. *Sterlingov*, 719 F. Supp. 3d 65, 70 (D.D.C. 2024) (same).

63.    Indeed, the Government supports in-kind restitution of the Hack Wallet Bitcoins to Bitfinex because they are "the residue of the property that was stolen from Bitfinex" and their return "represents the return of lost property to the owner of that property." Lichtenstein Sentencing Memorandum, ECF No. 146 at 25, 28; *see also* Government's Supplemental Motion Regarding Restitution, ECF No. 202 at 1, 3-4.

64.    Bitfinex never conveyed any right to or interest in the Stolen Bitcoins to Defendants or to any other individual or entity. "Whether seizing direct or substitute property, the Government may only seize an interest belonging to the defendant." *United States v. Stern*, 2021 WL 3474040, at *2 (S.D.N.Y. Aug. 5, 2021) (citing *United States v. Daugerdas*, 892 F.3d 545, 553 (2d Cir. 2018)); *see also United States v. Farkas*, 2016 WL 10585041, at *2 (E.D. Va. Oct. 3, 2016) ("[A]s the government correctly argues, the forfeiture authority extends only to *defendant's property*." (citing *United States v. Hoover-Hankerson*, 511 F.3d 164, 171 (D.C. Cir. 2007))); *United States v. Wolf*, 375 F. Supp. 3d 428, 440 (S.D.N.Y. 2019) ("[C]riminal forfeiture under § 853 'reaches only the property of the criminal defendant[.]'") (quoting *United States v. Totaro*, 345 F.3d 989, 995 (8th Cir. 2003)). Defendants never had a legal right, title, or interest in the Stolen Bitcoins at the time of the Hack or at any other time. *See United States v. Emor*, 785 F.3d 671, 678-79 (D.C. Cir. 2015) (holding that a victim of "theft" or "larceny" still "retains a superior interest sufficient to defeat forfeiture," observing that "Congress designed criminal forfeiture to punish criminal defendants, not crime victims"). Rather, Defendants have admitted that Lichtenstein perpetrated the Hack and stole the Hack Wallet Bitcoins from Bitfinex. And Defendants have consented to the forfeiture of the property in the Preliminary Order of Forfeiture. As the Government explained in seeking forfeiture, "entry of the Preliminary Order of Forfeiture at sentencing will extinguish any

claim the defendants have in the specific properties subject to forfeiture." Motion for Amended Preliminary Order of Forfeiture, ECF No. 148 at 4.

65.    Moreover, because of the nature of the Hack and Bitfinex's extraordinary actions, only Bitfinex has a specific right, title, and/or interest in each and all of the Bitfinex Bitcoins today.

66.    *First*, Bitfinex honored its customers' Bitcoin positions and balances regardless of whether they related to Stolen Bitcoins, and promptly made its customers whole for losses temporarily assigned to them. Any customer (or assignee) who held BFX tokens received the full value of their assets at the time of the Hack; customers who exchanged their BFX tokens for iFinex stock earned significant profits. These compensation offerings were premised on the understanding of Bitfinex and its customers that Bitfinex itself should ultimately absorb the losses of the Hack and have the right to recover the Stolen Bitcoins. The BFX Token Terms provided that Bitfinex would seek to recover its Hack losses through the "recovery of stolen property," and that it would pay the BFX token holder his or her "ratable share of the recoveries" made by Bitfinex. Ex. B. The RRT Terms expressly provide that any recovery of the Stolen Bitcoins in excess of the assets necessary to redeem all outstanding BFX and RRT tokens "***shall belong to and be solely vested in the Bitfinex Group***." Ex. D at 1. Customers did not contest the foundational principle of these compensation efforts: Bitfinex would honor its customers' Bitcoin positions and balances and make its customers whole, and Bitfinex alone would bear the risk (and reward) of recovering the Stolen Bitcoins.

67.    *Second*, because of the nature of the Hack, the Bitfinex Bitcoins are only traceable to Bitfinex. During and after the Hack, Defendants pooled Stolen Bitcoins from various types of Bitfinex wallets together, but they are all directly traceable to a single source: Bitfinex. Only Bitfinex maintains a right, title, and/or interest in each and all of the Bitfinex Bitcoins today.

68.     *Third*, Bitfinex's remarkable efforts to ensure that it alone absorbed the loss of the Stolen Bitcoins are equitable considerations that weigh in favor of returning the Bitfinex Bitcoins to Bitfinex. *See BCCI Holdings (Luxembourg), S.A.*, 46 F.3d at 1190 ("It seems to us that it would just as much offend notions of due process for the government to scoop up property in which a third party has certain kinds of equitable interests . . . focusing on the distinction between equitable and legal interests obscures Congress' real intent."). By honoring Bitcoin positions and balances at the time of the Hack, and spending tens of millions of dollars in cash, iFinex stock, and cryptocurrency to make its customers whole, Bitfinex ensured that it and its shareholders alone bore the loss of the Stolen Bitcoins. Bitfinex engaged in these efforts without any immediate prospect of finding—let alone recovering—the Stolen Bitcoins, and certainly without any foresight that, more than eight years later, the price of Bitcoin would rise exponentially, and the vast majority of the Stolen Bitcoins would be recovered by U.S. law enforcement.

69.     Moreover, returning the Bitfinex Bitcoins to Bitfinex will benefit Bitfinex customers. There are approximately 30 million outstanding RRT tokens held by customers that were issued when Bitfinex issued iFinex stock to compensate customers for losses from the Hack. Upon return of the Bitfinex Bitcoins, Bitfinex will be able to complete the process of redeeming the RRT tokens, providing even more compensation to customers for Hack losses. And any additional gains to Bitfinex will indirectly benefit Bitfinex's customers-turned-shareholders, who themselves or through an intermediary exchanged their BFX tokens for iFinex stock.

70.     For these reasons, Bitfinex—the direct victim of the Hack—holds the superior right, title, and/or interest in the Bitfinex Bitcoins, and is entitled to their recovery.

## PRAYER FOR RELIEF

WHEREFORE, Bitfinex respectfully requests a final judgment:

I.      declaring that iFinex possesses the right, title, and interest to the following property, superior to the Government and all other petitioners:

      a.      Approximately 94,643.29837084 Bitcoins seized from wallets recovered from Defendants' online storage account and contained in the recipient virtual currency addresses of the following transactions (Corrected Second Attachment, ECF No. 198-1 at 1 ¶ e):

| |
|---|
| 6e0d701ac2ea3ad87fc8bcaa786b994aa943f5eb9a67a1e345769bb090bf5b9e |
| afdfeeadb9f0a4691cbb8ace33a7c24c052b3608c4c8cc2e25afe053926b6389 |
| 77ad70fadfbbad5191c47c951469095ca845006f25fe9814f30f2853af367459 |
| c49ff6bd054fb386cd02fc94ca34b8773229ed8a5538e023ef7bea772d70c17a |
| 9d06994238d0de958033f42db39a6d2cc0de35e84be0ed080e41f017f02dffb3 |
| ed1812e8310bb25fbd138aae17be738ad3fa20e0783a8598c8dea56d3be5dad7 |
| ee56a9957f1f6166440bea01d0c0c29e4cec6230bb8231eced6ba844bb095d2a |
| c250725cfc9671d3849a3e85343ec5f3d045f805d002e56725c8ea2aebb9131a |
| b0aa2d76fd9463da6a7aff59e37d7ebf7b6aa1b660de2b2e9ab7755cf6f60ac3 |
| b18e40d96906b7b17f337ad6250f0c5aa9db93498832125374102dd2f5e0ed47 |
| 8e5102edd876f71e3482b7602dd9141fbce3ac869fba55a757b4354c70536f34 |
| 11bae40ae4315a1e8f7d9a8df676db6bdb497b153711d1bf7952c540ed1a5966 |
| e6088723889de70fa985e7b8c012c77ea693a6ef9379fb26a951a2bb5c722525 |
| 3fe798be890c7db8beaca9d005cd650e787b1b16bc5e47eef26bfa87124b6a95 |
| d006075f40136ea7733aec2d6f32c31abc09f779de01a33e7e07804907d339c7 |
| 8e53ca8952fbf2d1a272ab376555a1ccee1ff0bcab0747a8c91b0ccfc77cc3fb |
| 97e4eb7ca5d0b2b6d501a53478486d5ed75ce58d1204c6036f25b33439d48627 |
| 658a550600e814f7bf7d032b7984912857f37c96a68e4dd3eb1dce4fc774e26f |

| |
|---|
| 98281f388a4441d7bb00537e65b1a4581dcaddd3606fc09f6cf19598343be34d |
| d1dbc472abe47902aa71e639ba2feb2098b474ab20b853168ecdb0d87ce02955 |
| 61594a56cd2ef501cdb55b9037cd5785d1ad2eedfb1a4fab7ded50b1052a0650 |
| b7bf853fd6eb27f66963d219d29b85e13796e315473b7c08484335a0b0da7669 |
| 9af41957244e97e70378a7afd2d41b73d0a64d94c9b2df9049c29dd1919741cb |

b.   Approximately 2,818.199 Bitcoins (after required fees) seized from
     wallets recovered from Defendants' online storage account (Corrected
     Second Attachment, ECF No. 198-1 at 5 ¶ s);

| |
|---|
| 20b3673bf0d6294c46faf880204349530b694902797ce726d800ab0f342cd88d4 |
| 879a2d574abe141c4a932767ec59302520f7bdda5c59e9230d32dd51fcbe5ee |

c.   Approximately 12,267.025 Bitcoins (after required fees) seized from
     wallets recovered from an external hard drive recovered from the
     Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY
     10005 (Corrected Second Attachment, ECF No. 198-1 at 5 ¶ t);

| |
|---|
| a0d8817455f004426e56cd502d2fc47d60ed1489363c97cd3ddlc2070f12659c |
| 0c425db3da697bde3277852c8cea3c9bd9adc6575e593ef349c207ee3f4ab5a2 |

d.   Approximately 117,376.52651940 Bitcoin Cash, 117,376.58178024
     Bitcoin Satoshi Vision, and 118,102.03258447 Bitcoin Gold seized from
     wallets recovered from Defendants' online storage account (Corrected
     Second Attachment, ECF No. 198-1 at 2 ¶¶ f, g, h);

| |
|---|
| c29fb28633a9bee7720f7ec021c2441dc6a2289c92e887ac5214c35d49314379 |
| 0b9013f818de45ddfa9068f548f8513fl5ae35bd711054d119b483a791c750684 |
| 0ae0e3c0db61a2542015164bdcead1636c614bdd5bf51b9537c5b8312db2b84a |
| 16elba9b30fd5c86c9dd4ef3967105c2fbfe7ed9f510900b8acd7f7a0a9cdbd8 |
| 2544551e053688217ececb544bdc065d502db4ff4f227053fa25cc41be907541 |

| |
|---|
| 4f24389c09897d50239d0be3ec39044160f65985cfb3fdf11d117a8fa39aaa24 |
| 6ad1a5ef2ed573b010e7ab32b395bed32142c07bf8bb67534880bbb03591215d |
| 7278e247fc3c7bfa81732ba63c628fe30cb160ec9b7fa357a5dcff8a2f6738e3 |
| 739b68b49039856f8db1da64c713372e04c4e09f9ca32437b639b4d37aad920b |
| 7570b746ecd24f66eb754e100f79c5259e9eecb0c7a0188e6cf5ee84f76d9b21 |
| 7cbd6e7161bbcb80865ef855128bbe1cdeb1e6b87788a99c2559046294bc898f |
| e308fc1199a044f613578e365313008762b8b779b3d92191e6e6ba9a6f5e2182 |
| f8efc360fcd7d6f27b9f7e51911f361b94cb1ff2734be5e301b3cacedda9481e |
| 2cf808c73bda45a6eelc266c60da50f01250d9452f7b51elcaaf3ecec605b416 |
| a0ede2c37597976de79a67db2096b3d8f7a4f60f357c09953a7342ad1948b4b5 |
| 6b46c0067f786acf4f5a1925f12b9860ad61817829f30fefd898ad0c3bbaeaf0 |
| a4ba827e99c6cef43ff59045671b63c0d52b2c215797e67c81fc168f499932c |
| 97263227ea621461f3d22132c3e7562b0e401853fd4aced1db1b34aba1a65ab4 |
| 41ad49ad96dfd64eb0293484d4953ccbff7d70839e4c7b75db472c5553db1532 |
| d6e8f7d9aac687cac9af801b4b38cbc8e71db2f21d41f0a6e0d8052d8087456b |
| c2d69e0a0090f201a29d6afb3655b7118b2282146abf64b044481ed99eb2fa27 |
| ec3e2b93e7f7be50bb827ebfd366e2e1f4627dd8ed4550427ec793a3ea20187c |
| 2aa7dbb29d707fb1150c13d1ee6a0a17eeef7326116251cb5d13081fcd297ad8 |
| 70ed72a2c1e2d828f314f5bb327b0e03421bf854c4aba3ea9393258af6fba044 |
| c656cd61fce6c3aebeb0f20818d5d092c04c379d3fc72e3ec7e4f019f71a40ec |
| 2238af7a93f797a32ea20492fffa5e27b4d425c46ee7cb0e4fa262e2cddf3142 |
| ec2f4d2e7c13f19657ad4559a9bfd254437989f0f45e8993a17d84c374ecb02f |
| 5e26b7706b1c53b49d99ac1f501971b3d62c6d7e0ba6a01c9791e0d675cfb6e7 |

e.      Any other Stolen Bitcoins subject to forfeiture, including among the Bitcoins identified in paragraphs u, bb, and hh of the Preliminary Order of Forfeiture.

II.      amending the Preliminary Order of Forfeiture to recognize and grant iFinex's interest in the 109,728.522 Bitcoins, 117,376.52651940 Bitcoin Cash, 117,376.58178024 Bitcoin Satoshi Vision, and 118,102.03258447 Bitcoin Gold listed above, and any other Stolen Bitcoins identified in the Preliminary Order of Forfeiture, excluding that property from any final orders of forfeiture entered in this action;

III.     ordering that the 109,728.522 Bitcoins, 117,376.52651940 Bitcoin Cash, 117,376.58178024 Bitcoin Satoshi Vision, and 118,102.03258447 Bitcoin Gold listed above, and any other Stolen Bitcoins identified in the Preliminary Order of Forfeiture, be returned to iFinex; and

IV.     providing such other further relief as the Court deems just and proper.

Dated:  New York, New York
       January 17, 2025

GIBSON DUNN & CRUTCHER LLP

By:     */s/ Barry H. Berke*
       Barry H. Berke (*pro hac vice* forthcoming)
       Daniel M. Ketani (*pro hac vice* forthcoming)
       Trevor Gopnik (*pro hac vice* forthcoming)
       200 Park Avenue
       New York, New York 10166
       Tel: (212) 351-4000
       bberke@gibsondunn.com
       dketani@gibsondunn.com
       tgopnik@gibsondunn.com

*- and -*

By:     */s/ Stephanie L. Brooker*
       Stephanie L. Brooker
       (D.C. Bar No. 475321)
       1700 M Street N.W.
       Washington, DC 20036
       Tel: (202) 955-8500
       sbooker@gibsondunn.com

*Attorneys for Third-Party Petitioners iFinex Inc. and BFXNA Inc.*

## VERIFICATION

I, Paolo Ardoino, Chief Technology Officer of iFinex Inc. (and its subsidiary BFXNA, Inc.), declare under penalty of perjury under the laws of the United States of America and pursuant to 21 U.S.C. § 853(n)(3) and 28 U.S.C. § 1746, that I have read Claimants and Third-Party Petitioners iFinex Inc. and BFXNA Inc.'s Verified Petition for Ancillary Proceedings Pursuant to 21 U.S.C. § 853(n) and verify that the statements contained therein are true and accurate to the best of my knowledge.

Dated: January 17, 2025

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing motion to be filed with the Clerk of Court via email on January 17, 2025, which will send a notice of the electronic filing to all counsel of record in this case who have registered for the receipt of documents filed in this manner. *Pro se* intervenor Francisco Cavazos was not served a paper copy pursuant to Criminal Local Rule 40(d) because his address is not available.

In addition, a paper copy of the foregoing has been sent to the following:

Assistant United States Attorney Rick Blaylock
601 D Street, N.W.
Washington, DC 20530

*/s/ Stephanie L. Brooker*
Stephanie L. Brooker