# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ILYA LICHTENSTEIN, et al.,<br><br>Defendants. | Case No. 23-cr-239 (CKK) |

**MEMORANDUM IN SUPPORT OF OBJECTION TO GOVERNMENT'S SUPPEMENTAL MOTION REGARDING RESTITUTION**

GREENSTEIN DELORME & LUCHS, P.C.
James D. Sadowski
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
202.452.1400
JDS@gdllaw.com

DAVIS+GILBERT LLP
Joseph Cioffi
H. Seiji Newman
Joel Melendez
Adam Levy
1675 Broadway
New York, NY 10019
212-468-4800
jcioffi@dglaw.com
hnewman@dglaw.com
jmelendez@dglaw.com
alevy@dglaw.com

*Counsel for Third-Party Movants Hjalmar Peters, Allan Newman, Dolan Harrington, Christian Dressler, and Juergen Lankat*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .......... 1

RELEVANT FACTS .......... 1

A. The Hack .......... 1

B. The Lost Assets .......... 2

C. The Lost Assets Belong to Movants .......... 3

D. The Criminal Proceeding, Forfeiture Orders and Restitution Hearing .......... 5

ARGUMENT .......... 6

I. MOVANTS ARE ENTITLED TO RESTITUTION .......... 6

II. MOVANTS SHOULD BE THE BENEFICIARIES OF ANY VOLUNTARY RESTITUTION .......... 7

III. BITFINEX IS NOT ENTITLED TO RESTITUTION .......... 8

IV. RELIEF REQUESTED .......... 9

CONCLUSION .......... 10

Movants Messrs. Hjalmar Peters ("Mr. Peters"), Allan Newman ("Mr. Newman"), Dolan Harrington ("Mr. Harrington,"), Christian Dressler ("Mr. Dressler"), and Juergen Lankat ("Mr. Lankat," and together with Messrs. Peters, Newman, Harrington, and Dressler, "Movants"), acting singly, by and through their undersigned counsel, respectfully submit this memorandum of law in support of its objection (the "Objection") to the Government's Supplemental Motion Regarding Restitution (the "DOJ Memo," ECF No. 202).

## PRELIMINARY STATEMENT

Movants are victims of the Defendants' scheme to steal and launder assets from the Bitfinex cryptocurrency exchange in 2016, and they collectively lost nearly 30 Bitcoin (BTC) and other assets from such scheme. Because these losses were directly and proximately caused by Defendants' crimes, Movants are victims under the Mandatory Victims Restitution Act (MVRA) and the Crime Victims' Rights Act (CVRA) – as are all similarly-situated former and current Bitfinex accountholders – and respectfully request in-kind restitution of the assets taken from their wallets. In addition, for the various reasons discussed below, Bitfinex should not receive any restitution and the DOJ Memo fails to justify awarding $10 billion of assets as "restitution" to Bitfinex.

## RELEVANT FACTS

### A. The Hack

Movants were customers of Bitfinex, an online cryptocurrency platform headquartered in Hong Kong. In late 2015 or early 2016, Defendant Lichtenstein concocted a scheme to access Bitfinex's servers and steal accountholders' cryptocurrency on the platform for themselves. *See* Government's Mot. for Downward Departure and Memo. in Aid of Sentencing, ECF No. 46, at 2 ("Beginning in or around late winter and early spring of 2016, the defendant embarked on a scheme

to steal money from Bitfinex, one of the largest virtual currency exchanges in operation at the time.”). On or about August 2, 2016, Defendant Lichtenstein hacked into Bitfinex (the “Hack”), stealing nearly $10 billion (based on current valuations) of digital assets from accountholders.

Immediately following the Hack, Bitfinex unilaterally decided “that losses [from the Hack] must be generalized across all accounts and assets.” Security Breach - Update 3 (Aug. 6, 2016), *available at* https://www.bitfinex.com/posts/129 (last accessed: Jan. 15, 2025). As a result, all accountholders “experienced a generalized loss percentage of 36.067%”—in other words, every Bitfinex accountholder had the value of its assets reduced by 36.067% after the Hack. In exchange, Bitfinex offered little more than its own “BFX” tokens, which were grossly insufficient to make accountholders whole after the Hack.

On or about February 1, 2022, the U.S. Government seized, among other things, more than 94,643.29837084 Bitcoin that Defendants stole from the Bitfinex accountholders (the “Recovered Assets”). *See* Corrected and Amended Attachment A to the Second Amended Preliminary Order of Forfeiture, at 1, 5-11.

**B. The Lost Assets**

Each Movant seeks restitution in the full amount of the assets that the Movant lost in connection with the Hack.

*Mr. Peters*: As part of the Hack, Defendants stole 12.94485805 Bitcoin (BTC) (“Mr. Peters’ Lost Assets”) from Mr. Peters by directly transferring such assets from Mr. Peters’ own multi-signature wallet into Defendants’ virtual wallet, the contents of which were later seized by

the U.S. Government. In Mr. Peters' Ancillary Petition, he provides information that directly traces Mr. Peters' Lost BTC to the Recovered Assets. *See* ECF No. 204.[1]

*Mr. Newman, Mr. Harrington, Mr. Dressler, and Mr. Lankat*: Either as direct result of the Hack, and/or due to Bitfinex's effort to "generalize" losses across accountholders:

- 8.76586537 BTC and 22.113265451 Litecoin (LTC) ("Mr. Newman's Lost Assets") were removed from Mr. Newman's multi-signature wallet and/or account;
- 2.35436113 BTC ("Mr. Harrington's Lost Assets") were removed from Mr. Harrington's multi-signature wallet and/or account;
- 0.90305977 BTC and 91.1871525 Ethereum (ETH) ("Mr. Dressler's Lost Assets") were removed from Mr. Dressler's multi-signature wallet and/or account; and
- 4.78591312 BTC ("Mr. Lankat's Lost Assets" and, together with Mr. Peters' Lost Assets, Mr. Newman's Lost Assets, Mr. Harrington's Lost Assets, and Mr. Dressler's Lost Assets, the "Lost Assets") were removed from Mr. Lankat's multi-signature wallet and/or account.

Bitfinex did not provide any information regarding whether it – *i.e.*, Bitfinex – or the hackers, took control or possession of the Lost Assets and to-date has not been made to account for the Lost Assets taken from Movants.

**C. The Lost Assets Belong to Movants**

To transact business on the platform, Bitfinex accountholders were provided with her/his own "multi-signature wallets" into which, *inter alia*, the accountholder could deposit Bitcoin for purposes of buying, selling, trading and/or engaging in other financial transactions on the platform. The Bitcoin in these multi-signature wallets belonged solely and exclusively to the respective customer. At the time of the Defendants' Hack, section 5.1 of Bitfinex's Terms of Service stated that "all bitcoins in your Multi-Signature Wallets belong to and are owned by you [the customer]."

---

[1] Further information regarding Mr. Peters' Lost Assets and Mr. Newman's Lost Assets is set forth in their respective Verified Ancillary Petitions. *See* ECF Nos. 203-204. Messrs. Harrington, Dressler, and Lankat intend to file verified ancillary petitions in the coming days.

Bitfinex, Terms of Service (June 9, 2016) (as preserved by Internet Archive); *Can Bitfinex Really Impose a $72 Million Theft on Its Customers?*, Fortune (Aug. 15, 2016), *available at* https://fortune.com/2016/08/15/bitfinex-bitcoin-hack-hong-kong-customers-law/ (last accessed: Jan. 15, 2025) (quoting Bitfinex's terms of service).

Indeed, Bitfinex championed its use of individual customer-owned wallets in its marketing materials and to the U.S. Commodities Futures Trading Commission ("CFTC") during the CFTC's 2015-16 investigation into Bitfinex's practices. *See, e.g.*, Business Wire, *Bitfinex and BitGo Partner to Create World's First Real-Time Proof of Reserve Bitcoin Exchange* (June 3, 2015), *available at* https://www.businesswire.com/news/home/20150603005462/en/Bitfinexand-BitGo-Partner-to-Create-World%E2%80%99s-First-Real-Time-Proof-of-Reserve-Bitcoin-Exchange ("Bitfinex . . . for the first time ever offers complete segregation of all customer bitcoins"; quoting Bitfinex's statement that "[t]he era of commingling customer Bitcoin and all of the associated security exposures is over") (last accessed: Jan. 15, 2025).[2]

The Government acknowledges that the Lost Assets and other assets lost in the Hack belonged to Bitfinex accountholders. For example, the *Statements of the Offense* explain that "LICHTENSTEIN ultimately gained access to the keys, or credentials, used to authorize transactions involving virtual currencies held by [Bitfinex], *including funds belonging to customers of [Bitfinex]*." ECF Nos. 95, 100 (Def. Heather Morgan's Statement of the Offense and

---

[2] In its order imposing sanctions on Bitfinex on June 2, 2016—mere months before the Hack—the CFTC found that Bitfinex abandoned its prior approach of using an "omnibus settlement wallet" that was "owned and controlled by Bitfinex" and, instead, in 2015 and January 2016, made changes to its infrastructure such that "bitcoins purchased using both the Exchange Trading and Margin Trading features [on Bitfinex] were held in individually enumerated, multi-signature wallets" for each trader. Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions, CFTC Docket No. 16-19, at 3 (June 2, 2016).

Related Conduct at 4, ¶ 14; Def. Ilya Lichtenstein's Statement of the Offense and Related Conduct) at 4, ¶ 14 (emphasis added).

**D. The Criminal Proceeding, Forfeiture Orders and Restitution Hearing**

On February 7, 2022, Defendants were charged by criminal complaint with violations of 18 U.S.C. § 1956(h) and 18 U.S.C. § 371. *See* ECF No 1. The complaint was superseded by a criminal information filed by the U.S. Government on July 20, 2023. *See* ECF No. 89. On or about August 3, 2023, Defendants each pleaded guilty to one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h), and Defendant Morgan also pleaded guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

On August 3, 2023, the Court entered Consent Orders of Preliminary Forfeiture, *see* ECF Nos. 99, 104, and, on October 25, 2024, Amended Preliminary Orders of Forfeiture as to each Defendant. *See* ECF Nos. 153, 154. On November 14, 2024, the Court entered the Second Amended Preliminary Order of Forfeiture, *see* ECF No. 178, pursuant to which, *inter alia*, Defendants forfeited to the U.S. Government their interest in certain property, including "specific properties now listed in Amended Attachment A." *Id.* at 2. The attachment, as amended and corrected, identifies in paragraph e. "approximately" 94,643.29837084 BTC (*i.e.*, the Recovered Assets) that were "seized from wallets recovered from Defendants' online storage account." ECF No. 198-1, at 1.

On November 21, 2024, the Court scheduled a Restitution Hearing to take place on February 21, 2025, and ordered any third parties to file any motions to intervene or objections to the DOJ Memo on or before January 28, 2025. *See* ECF No. 185.

## **ARGUMENT**[3]

### I. MOVANTS ARE ENTITLED TO RESTITUTION

The Government wrongly contends that accountholders are not "victims" of the Defendants' money laundering conspiracy, resting its argument on the fact that "neither defendant was convicted of the underlying wire fraud representing the hack and theft of Bitcoin" from accountholders. DOJ Memo at 2. But that is not the law.

The MVRA makes restitution to victims mandatory in cases involving an offense to property under Title 18, including for convictions of money laundering conspiracy under 18 U.S.C. § 1965. *See* 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii); *United States v. Luis*, 765 F.3d 1061, 1066 (9th Cir. 2014) (holding conspiracy to commit money laundering is "offense against property" under MVRA). As relevant here, the statute directs that "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," courts must order restitution to "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).[4]

"Federal courts therefore may order restitution encompassing losses resulting from a criminal scheme regardless of whether the defendant is convicted for each criminal act within the scheme, so long as the loss is a direct result of the defendant's criminal conduct or is closely related to the scheme." *United States v. Emor*, 850 F. Supp. 2d 176, 202 (D.D.C. 2012); *see also United States v. Pole*, Crim. Action No. 09-354 (EGS), 2024 U.S. Dist. LEXIS 31017, at *101 (D.D.C. Feb. 23, 2024); *United States v. McCormick*, Crim. Action No. 18-359-4 (JDB), 2023 U.S. Dist.

---

[3] Movants hereby join and incorporate by reference the arguments made by other present and former Bitfinex accountholders in their respective motions to intervene and/or objection filed in response to the DOJ Memo.

[4] Similarly, under the CVRA, a "crime victim" is any "person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A).

LEXIS 223353, at *10 (D.D.C. Dec. 15, 2023); *United States v. Bogart*, 490 F. Supp. 2d 885, 903 (S.D. Ohio 2007) ("[T]he Court[] under the MVRA must order restitution that relates directly to a victim's losses within the course of the entire scheme and not simply the loss caused by the specific conduct that is the basis for the offense of conviction."). In short, restitution under the MVRA is proper where, as here, the defendants' conduct in connection with their scheme or conspiracy directly harms the victim.

Here, Movants were directly and proximately harmed by the Defendants' money laundering scheme and by Defendants' conduct in connection with the scheme. The stealing and laundering of cryptocurrencies began with the planning of the Hack in late 2015 and early 2016. *See* ECF No. 146, at 2. Other acts relating to the Defendants' scheme occurred almost simultaneously with the Hack (and no later than August 2016), with the creation of the fictitious accounts for transferring and concealing the stolen assets. *See, e.g.*, ECF No. 95 (Def. Ilya Lichtenstein's Statement of the Offense and Related Conduct) at 9-11, ¶¶ 18, 25. The hacking and theft of the assets were a critical component of this scheme to launder the assets, and, as a result, Movants were directly harmed by, and victims of, Defendants' scheme.

## II. MOVANTS SHOULD BE THE BENEFICIARIES OF ANY VOLUNTARY RESTITUTION

The Government contends that, although Bitfinex is not a "victim" for purposes of the MVRA, this Court should nonetheless award Bitfinex nearly the entirety of the Recovered Assets—worth nearly $10 billion—by "agreement" between Defendants and the Government. DOJ Memo at 3. Not so. "The purpose of restitution 'is not [] to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.'" *United States v. Cavallo*, 790 F.3d 1202, 1238 (11th Cir. 2015) (quoting *United States v. Huff*, 609 F.3d 1240, 1249 (11th Cir. 2010)).

Here, neither the Government nor Bitfinex has proffered any evidence to substantiate *any* losses suffered by Bitfinex, let alone a basis to provide such an immense windfall to Bitfinex. *See* 18 U.S.C. § 3664(e). Tellingly, Bitfinex has never claimed ownership of the Recovered Assets—in fact, in its victim statements, Bitfinex states only that the Recovered Assets were taken "from Bitfinex" or from its "custody." ECF No. 175-1 (Letter from Kramer Levin dated Sept. 16, 2024), at 2, 5; *see also id.* (Letter from Gibson Dunn dated Nov. 13, 2024), at 1. But the fact that the Recovered Assets were taken *from* accountholders' wallets on the Bitfinex platform—thereby harming accountholders—does not grant Bitfinex an individual right to restitution or to "return" of assets that it never owned.

Simply put, the Government does not seek a "return of lost property to the owner of that property," as it initially suggested. ECF No. 146, at 45.[5] Rather, it seeks to bestow upon Bitfinex virtually all of the Recovered Assets, valued at approximately $10 billion in today's dollars, upon no showing of any harm or any ownership by Bitfinex. That plan would yield a vast windfall for Bitfinex at the expense of thousands of individual accountholders. *See Cavallo*, 790 F.3d at 1238; *Huff*, 609 F.3d at 1249. Instead, the Court should exercise its discretion to award any voluntary restitution from the Recovered Assets directly to Movants and other Bitfinex accountholders.

## III. BITFINEX IS NOT ENTITLED TO RESTITUTION

The Government's plan to gift the Recovered Assets to Hong Kong-based Bitfinex raises a number of additional questions, including how Bitfinex went about "generalizing" losses, whether Bitfinex kept for itself any assets taken from the accountholders, and whether Bitfinex

[5] Bitfinex has stated that it seeks the Recovered Assets for its own benefit. *See generally* Bitfinex and iFinex November victim statements, ECF No. 175-1, at 2-11; Bitfinex, Recovery Right Token (RRT) Terms, *available at* https://www.bitfinex.com/legal/token-terms/rrt/ (last visited; Jan. 28, 2025) (admitting that "recovery amounts available, if any, in excess of [the approximately $30 million that it owes customers holding RRT] shall belong to and be solely vested in the Bitfinex Group").

has violated any laws in connection with its handling of the Hack and any subsequent recoveries. As detailed above, in August 2016, Bitfinex purported to "generalize" its accountholders' losses by confiscating their digital assets, without permission or legal right, resulting in a loss of 36.067% for each accountholders. In 2016, Bitfinex stated that it would, "[i]n a later announcement . . . explain in full detail the methodology used to compute these losses." Security Breach - Update 3 (Aug. 6, 2016), *available at* https://www.bitfinex.com/posts/129 (last accessed: Jan. 15, 2025). It never did. Thus, to establish relative rights in the Recovered Assets and explore the Government's plan to give the Recovered Assets to Bitfinex, discovery is appropriate in this proceeding to explore Bitfinex's claims, its accounting of the "generalized losses," whether Bitfinex converted the non-BTC assets deducted from accountholders' accounts to restore its own BTC holdings, and whether Bitfinex took any improper acts, including actions to deprive Movants and other accountholders of the benefit of their property and further exacerbate accountholders' losses. Further, no restitution should be granted to Bitfinex in light of the scope of the open issues surrounding the Hack and Bitfinex's potential misconduct in taking accountholders' property to "generalize" losses.

## IV. RELIEF REQUESTED

As victims of Defendants' crimes and/or pursuant to this Court's discretion to award voluntary restitution in these proceedings, each Movant respectfully requests return in-kind of the Lost Assets taken from them in connection with the Hack, subject to any adjustments that the Court may deem proper, including for any recoveries obtained pursuant to the ancillary forfeiture proceeding (if any) and such other adjustments as may be ordered by the Court. As additional support for the losses suffered by Movants, each Movant incorporates by reference his Verified

Ancillary Petition, whether filed or to be filed in advance of the Restitution Hearing. *See* ECF Nos. 203-204.[6]

## CONCLUSION

For the foregoing reasons, Movants therefore seek restitution in the amount of their respective Lost Assets from the Recovered Assets.

Dated: January 28, 2025

GREENSTEIN DELORME & LUCHS, P.C.

By: */s/ James D. Sadowski*
James D. Sadowski
DC Bar # 446635
801 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone: 202.452.1400
Fax: 202-452-1410
jds@gdllaw.com

DAVIS+GILBERT LLP
Joseph Cioffi
H. Seiji Newman
Joel Melendez
Adam Levy
1675 Broadway
New York, NY 10019
212-468-4800
jcioffi@dglaw.com
hnewman@dglaw.com
jmelendez@dglaw.com
alevy@dglaw.com

*Counsel for Third-Party Movants Hjalmar Peters, Allan Newman, Dolan Harrington, Christian Dressler, and Juergen Lankat*

[6] Movants will provide any additional information as the Court may deem necessary or the Government requests to further substantiate their losses from Defendants' crimes.