**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 23-cr-239 (CKK)** |
| | : | |
| **ILYA LICHTENSTEIN, *et al.*,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S REPLY REGARDING THIRD-PARTY PETITIONS
AND RESPONSE TO THE COURT'S FEBRUARY 10, 2025 ORDER**

The United States of America, by and though the United States Attorney for the District of Columbia, respectfully submits this consolidated reply addressing third-party petitioners and in response to the Court's February 10, 2025 Order (the "February 10 Order"). The February 10 Order requires the government to address the following issues: "(1) whether, where the underlying offense of conviction is a conspiracy, courts may look to the defendants' criminal conduct during that conspiracy as a basis for restitution, and whether [that analysis] is inapplicable (or impractical) in this case; (2) whether it would be proper for the Court to award in kind restitution to Bitfinex of identifiable property in which some third-party petitioners claim competing ownership interests; and (3) whether a 'return of property' to Petitioners who are victims pursuant to the [Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A,] could be effectuated, consistent with the Government's cited language from [*United States v. Emor*, 850 F. Supp. 2d 200 (D.D.C. 2012)], without constituting an improper offset against the forfeited assets." ECF No. 247, at 8.

In light of the complex issues of fact and law raised by the parties and third-party petitioners regarding restitution, and in consideration of the Court's orders and opinions, the government has revised its original restitution and forfeiture recommendation, *see* ECF Nos. 143, 146, 202. As explained below, the government now recommends that the Court order $0 restitution and

adjudicate the disposal of the seized properties solely through the third-party forfeiture ancillary proceeding.  *See* ECF No. 220, at 4 n.1 (outlining this proposal as an alternative to the government's original recommendation).  Such an outcome would be consistent with the government's analysis of the MVRA—that no party is a "victim" of the defendants' money laundering offenses under the technical legal definition of that term in the MVRA, 18 U.S.C. § 3663A(a)(2)—as well as with the MVRA's carve-out for excessively complex restitution issues, 18 U.S.C. § 3663A(c)(3)(B) ("This section shall not apply" where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process").

## ARGUMENT

### I.     The Government's Revised Recommendation To Dispose of Seized Assets Solely Through the Third-Party Forfeiture Ancillary Proceeding

The government's original recommendation was based on two points.  First, neither Bitfinex nor its current or former accountholders qualify as "victims" of the defendants' money laundering offenses within the technical meaning of the MVRA.  *See* ECF No. 202, at 2-3.  This legal determination does not in any way diminish the experience of any party that was adversely affected by the 2016 hack of Bitfinex, and the government will continue to treat all of those affected by these events with compassion and fairness.

Second, returning the residue of the property that was stolen from Bitfinex in the 2016 hack, and subsequently recovered by the government from the Bitfinex Hack Wallet,[1] would be

---

[1]    The cryptocurrencies in the Bitfinex Hack Wallet include approximately 94,643.29837084 Bitcoin (BTC), 117,376.52651940 Bitcoin Cash (BCH), 117,376.58178024 Bitcoin Satoshi Vision (BSV), and 118,102.03258447 in Bitcoin Gold (BTG) (collectively, the "Bitfinex Hack Wallet Funds").  The Bitfinex Hack Wallet Funds are the assets that defendant Lichtenstein stole from Bitfinex's hot wallets and transferred directly to the Bitfinex Hack Wallet

authorized by the parties' plea agreements and 18 U.S.C. § 3663A(a)(3), consistent with the in-kind restitution provision in 18 U.S.C. § 3663A(b)(1)(A), and fair to all parties. Indeed, as discussed in further detail below, the government's original recommendation would simply return the Bitfinex Hack Wallet Funds to the *status quo ante*—effectively reversing the 2016 theft as to the majority of the stolen property and returning it to its original location. This would not prejudice Bitfinex accountholders: they would have the same legal rights and claims vis-à-vis Bitfinex as they did in 2016, and retain the same ability to litigate any legal disagreements with Bitfinex about the status of their accounts through the normal course of civil litigation.

The government's legal analysis with respect to the above two points has not changed. However, the government acknowledges that third-party petitioners (that is, Bitfinex accountholders) have raised complex issues of fact and law, and that resolving those complex issues may significantly complicate and prolong the restitution proceeding in this case. *See* 18 U.S.C. § 3663A(c)(3)(B) ("This section shall not apply . . . if the court finds, from facts on the record, that . . . determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process"). The government also notes that, while restitution and forfeiture are governed by different legal standards, the majority of third-party petitioners in the restitution proceeding have articulated their arguments under the MVRA in terms of title ownership over the seized funds—potentially requiring the Court to resolve the same complex question, ownership, at two stages in this proceeding, for both restitution and forfeiture. Further, the restitution and forfeiture proceedings in this case both deal

---

in August 2016, but which the defendants had not yet laundered at the time of their arrest in February 2022.

with disposition of the same discrete set of seized assets.[2]  Given these unique circumstances, the government has arrived at the conclusion that it would be more efficient and prudent for the Court to consider all claims to, and distribution of, the seized assets solely through the ancillary forfeiture proceeding rather than through a combination of restitution and forfeiture.

## II.  The Government's Response to the Court's February 10 Order

The government's revised recommendation may obviate some of the issues raised in the Court's February 10 Order, but the government responds below to each of the Court's three specific questions.

### A. Whether, Where the Underlying Offense of Conviction Is a Conspiracy, Courts May Look to the Defendants' Criminal Conduct During That Conspiracy as a Basis for Restitution, and Whether This Is Inapplicable (or Impractical) in This Case

In the February 10 Order, the Court instructed the government to address "whether, where the underlying offense of conviction is a conspiracy, courts may look to the defendants' criminal conduct during that conspiracy as a basis for restitution, and whether this is inapplicable (or impractical) in this case." ECF No. 247 at 8.

The government agrees that, where the underlying offense of conviction is conspiracy, the Court may consider a defendant's criminal conduct *during the course of that conspiracy* as a basis for ordering mandatory restitution.  Under the facts here, however, the 2016 hack of Bitfinex and the defendants' money laundering conspiracy constitute factually separate and distinct conduct. In other words, the 2016 hack was not executed "during" the defendants' money laundering conspiracy; it was prior conduct that logically and factually preceded the money laundering

---

[2] The forfeited assets are listed in the Second Amended Preliminary Order of Forfeiture and Corrected Second Amended Attachment A. ECF No. 195.

conspiracy.[3]  As explained in the government's previous filings, neither defendant was convicted of the underlying intrusion into Bitfinex's network, or the theft of cryptocurrency therefrom, as those acts were committed in 2016 and were time-barred when the government brought charges in 2022.

As set forth in Mr. Lichtenstein's Statement of Offense, ECF No. 95, the defendants engaged in money laundering to prevent the tracing and recovery of the bitcoin that defendant Lichtenstein stole from Bitfinex.  In preparing for the 2016 Bitfinex hack, defendant Lichtenstein conducted extensive online research and reconnaissance of Bitfinex's computer infrastructure. Lichtenstein ultimately gained access to Bitfinex's private keys and then used those keys to fraudulently authorize more than 2,000 transactions in which approximately 119,754 bitcoin was transferred from Bitfinex's hot wallets to the Bitfinex Hack Wallet.  Defendant Lichtenstein left those stolen bitcoin in the Bitfinex Hack Wallet for over four months while he decided what to do next.  From there, defendant Lichtenstein taught himself how to launder cryptocurrency using complicated money laundering techniques.   Then, in or around 2019, he enlisted his wife, defendant Morgan, to assist him in his laundering efforts.

To be sure, the *purpose* of the money laundering conspiracy was to launder the proceeds of the 2016 hack and prevent detection of the laundering activity.  ECF No. 89 (Superseding

---

[3] The government respectfully disagrees with the Court's suggestion that "the hacking and/or theft of cryptocurrency constitute elements of th[e] conspiracy offense" in this case.  ECF No. 247, at 6.  The elements of money laundering conspiracy do not include the underlying specified unlawful activity that generated the illegal proceeds being laundered. *See, e.g.*, *United States v. Ojedokun*, 517 F. Supp. 3d 444, 453 (D. Md.), *aff'd*, 16 F.4th 1091 (4th Cir. 2021) (collecting cases holding that "the specified unlawful activity underlying a money laundering charge is not an essential element of the charge that must be pleaded, defined in the jury charge, and proved at trial").  That is well illustrated by the facts here, where one of the co-conspirators, Ms. Morgan, did not commit the 2016 hack but subsequently entered into the money laundering conspiracy with Mr. Lichtenstein after the hack had been completed.

Information), at 2.  Indeed, as the government has previously argued, Ms. Morgan "did not participate in the original hack of Bitfinex," but she "participated in laundering the proceeds of the hack with the intent to protect her husband, Lichtenstein, from being arrested and prosecuted for it."  ECF No. 143, at 12.  The purpose of the money laundering conspiracy, however, does not alter the fact that the 2016 hack had been completed, and the harm done, prior to the acts constituting the money laundering offenses of conviction in this case.

The government acknowledges that there may be situations where a money laundering offense and the underlying specified unlawful activity that generated the funds being laundered are more closely intertwined.  In such cases, it may well be appropriate to consider victims of the predicate crime also to be victims of a related money laundering conspiracy.  But those cases are simply based on different facts than presented here.  The decisions cited by movant petitioners here involve schemes (*e.g.*, mail fraud, business email compromises, and money laundering conspiracies) where a victim was directly harmed by a defendant's conduct.  As an example, *United States v. Wilson*, 98 F.3d 281 (7th Cir. 1996), involved convictions for both mail fraud and money laundering.  The victims in that case were victims of a large-scale Ponzi scheme where each victim was directly impacted by the underlying scheme, in that they were defrauded by the defendant when he made representations about where their funds were being placed.  Those facts are easily distinguishable from this case.

Accordingly, while it is entirely appropriate to consider conduct during the course of a conspiracy in determining restitution, the conspiracy here did not include the underlying hack of

Bitfinex. Because mandatory restitution can only be based on the offenses of conviction,[4] the Court cannot order mandatory restitution based on uncharged and unconvicted conduct preceding the defendants' money laundering conspiracy.

Finally, even if the Court determines that victims of the 2016 hack qualify as victims entitled to mandatory restitution under the MVRA, the only party that was "*directly* and *proximately* harmed" by the 2016 hack, *see* 18 U.S.C. § 3663A(a)(2) (emphasis added), was Bitfinex. Former accountholder cannot be considered "victims" in this technical sense because any harm to them was derivative and flowed out of the harm more directly and proximately suffered by Bitfinex, the party that experienced the hack and theft of cryptocurrency controlled by Bitfinex's private keys. That much is apparent from the face of many third-party petitioners' pleadings: they articulate injuries arising out of the 36 percent "haircut" of their accounts imposed by Bitfinex, the forcible conversion of their account holdings by Bitfinex, the perceived inadequacy of the Bitfinex claim tokens, and so forth. All of this was activity attributable to Bitfinex, not to the defendants—let alone to the defendants' money laundering activity. In other words, the accountholders' injuries were not "directly and proximately" caused by the offenses of conviction.

---

[4] The MVRA defines "victim" in offense-specific terms as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). *See United States v. Benns*, 740 F.3d 370, 377 (5th Cir. 2014) ("[R]estitution to victims of the offense . . . can encompass only those losses that results directly from the offense for which the defendant was convicted."); *United States v. Lutz*, 237 Fed. Appx. 849, 852 (4th Cir. 2007) ("[I]t is the 'offense of conviction,' not the 'relevant conduct,' that must be the cause of losses attributable as restitutionary liability") (quotation, citation omitted); *United States v. Murry*, 395 F.3d 712, 721 (7th Cir. 2005) ("restitution may not be ordered for relevant conduct").

### B. Whether It Is Proper To Award In-Kind Restitution of Identifiable Property in Which Some Petitioners Claim Competing Ownership Interests

The Court further instructed the government to address "whether it would be proper for the Court to order in kind restitution to Bitfinex of identifiable property in which some Petitioners claim competing ownership interests." ECF No. 247 at 7.o

As courts in this District have explained, "[r]estitution and forfeiture are separate monetary obligations and distinct legal remedies that serve different purposes." *United States v. Emor*, 850 F. Supp. 2d 176, 200 (D.D.C. 2012). *See also United States v. Webber*, 536 F.3d 584, 602-03 (7th Cir. 2008) ("Forfeiture and restitution are distinct remedies. Restitution is remedial in nature, and its goal is to restore the victim's loss. Forfeiture, in contrast, is punitive; it seeks to disgorge any profits that the offender realized from his illegal activity.") (cleaned up). Restitution and forfeiture thus should be evaluated separately, within their respective legal frameworks. "Because of the distinct purposes served by restitution and forfeiture, and the mandatory language found within their respective statutory schemes, courts do not offset one based on the other. . . . Indeed, courts lack the authority to do so." *United States v. Emor*, 850 F. Supp. 2d 176, 215-16 (D.D.C. 2012). *See also United States v. Alalade*, 204 F.3d 536, 540 (4th Cir. 2000) (holding that the court lacks discretion under the MVRA to offset restitution by the amount the government seized from the defendant and forfeited administratively). Petitioners' alleged ownership interests may be addressed in the third-party ancillary proceeding, but they do not enter into the restitution proceeding to preclude a potential award to Bitfinex.

The government's original in-kind restitution proposal sought to return stolen property to the state in which it existed prior to the defendants' crimes. In 2016, defendant Lichtenstein stole approximately 119,754 bitcoin from Bitfinex, which he transferred directly from Bitfinex's wallets into the Bitfinex Hack Wallet. He subsequently withdrew and laundered a portion of the funds,

but approximately 94,643 bitcoin remained in the Bitfinex Hack Wallet, untouched and unchanged.[5]  On or about January 31, 2022, the government seized that approximately 94,643 bitcoin—the exact bitcoin that had been stolen from Bitfinex's coffers, or the "specific property lost" in the theft.  Before defendant Lichtenstein stole the funds, they were held by *Bitfinex*.  The private keys were in *Bitfinex's* control, residing on *Bitfinex*-operated servers.  Defendant Lichtenstein gained access to *Bitfinex's* computer network and initiated transfers out of *Bitfinex's* wallets.  Because defendant Lichtenstein stole the funds *from Bitfinex's possession*, voluntary in-kind restitution is available and is something the Court may consider as a mechanism to return the remaining specific stolen funds to the entity from which they were taken: Bitfinex.

This proposal does not prejudice third-party petitioners.  The majority of third-party petitioners who have intervened in this case appear to be asserting claims of ownership based on contractual rights arising out of their accountholder agreements with Bitfinex, presumably under the laws of the British Virgin Islands where Bitfinex was domiciled.  The petitioners are not, for example, disputing that the funds were in Bitfinex's possession at the time of the hack, or that Bitfinex physically held the private keys at the time.  The government emphatically takes no position on any contractual dispute between Bitfinex and its former accountholders; it notes only that the petitioners have the same legal rights and remedies against Bitfinex whether the Bitfinex Hack Wallet Funds are returned to Bitfinex as in-kind restitution or not, and they remain able to

---

[5] In addition to this volume of Bitcoin, the Bitfinex Hack Wallet also contained 117,376.52651940 Bitcoin Cash (BCH), 117,376.58178024 Bitcoin Satoshi Vision (BSV), and 118,102.03258447 in Bitcoin Gold (BTG), which were generated from the stolen Bitcoin through successive "hard forks" in the Bitcoin blockchain, roughly analogous to stock splits, during the time period between the 2016 hack and the government's 2022 seizure of the Bitfinex Hack Wallet Funds.  These additional cryptocurrencies are outgrowths of the stolen Bitcoin and thus constitute part of the specific property lost in the theft.

pursue their contract claims through civil litigation in an appropriate forum other than this criminal restitution proceeding.

This fact pattern is analogous to a home invasion burglary case where a robber stole a valued family heirloom—say, a years-old painted masterpiece inherited from the homeowner's grandmother. Upon the robber's arrest, police recover the masterpiece. That masterpiece is appropriately returned to the victim of the home invasion, the homeowner from whose home it was taken. If a member of the victim's family wanted to contest the grandmother's will and claim ownership of the painting, the proper vehicle to do so would be in a separate civil case, not by trying to intercede in the restitution proceeding for the criminal case. It would be both improper and impractical to withhold restitution because of potential civil disputes touching on the items to be returned. The same principle applies here.

In any event, the MVRA recognizes that even otherwise valid claims for mandatory restitution may be declined if "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). Those conditions are satisfied here, where third-party petitioners are effectively seeking to convert this restitution proceeding into a forum for them to litigate their civil contract claims against Bitfinex, and where doing so raises excessively complex questions of law (possibly foreign law) and fact regarding the accountholder agreements and post-hack interactions between Bitfinex and its accountholders. Petitioners appear to be doing so precisely because they perceive this Court to be a more favorable forum for their civil claims than the (presumably foreign) jurisdictions where they would otherwise have to bring suit to vindicate claims under their

accountholder agreements.[6]  *See, e.g.*, "John Doe" Motion To Intervene, for an Order of Restitution to Movant, and in Objection to Government's Restitution Memorandum (filed under seal pending proposed redactions which do not implicate the text quoted herein), at 23 ("Bitfinex has made clear that it will deny any further recovery to accountholders, based on its claims to have made them whole with a series of half-measures after the hack. . . . Distributing Bitcoin to a foreign entity would place the assets beyond this Court's jurisdiction and frustrate the ability of victims to recover their property.").  It is not this Court's responsibility to provide a convenient forum for such complex civil litigation between two intervening parties, and which involves neither the government nor the defendants in the criminal case.

Litigating these civil disputes as part of the restitution proceeding would be impracticable at scale and needlessly distract from bringing this criminal proceeding to a close.  The prosecution team emphatically has no interest, and takes no position, in bilateral contract disputes between Bitfinex and its accountholders.  And the prosecution team is ill-equipped to be helpful to the Court in resolving those civil claims.  The government is unable to independently verify or fully validate the third-party petitioners' alleged ownership interests with the information currently in the government's possession.  It does not know whether every individual petitioner was truly a Bitfinex accountholder at the time of the theft, what services they specifically used, what their account balances were, or what particular version or versions of Bitfinex's terms of service they agreed to.  As part of its criminal investigation into the defendants, the government did not seek to

---

[6] Some petitioners have expressed concern that the in-kind restitution award could go to a company based outside the United States, which they submit would complicate their ability to bring civil suits against Bitfinex.  But the petitioners (many of whom are not U.S. citizens) voluntarily decided to seek out and open accounts at a virtual currency exchange that, even at the time, was not based in the United States, and they acceded to an accountholder agreement that appears to be governed by foreign law.  They can hardly complain now at the consequences of their own voluntary actions.

obtain voluminous sensitive financial records of Bitfinex accountholders, as such records were ultimately not needed for the government's investigation of the hack and subsequent laundering of funds.  The government's criminal investigation did not delve into the complex nuances of any contractual agreements between Bitfinex and its accountholders.  Such information was not relevant to the criminal investigation, which sought to identify the perpetrator of the hack and locate the missing funds.  And undersigned counsel for the government are criminal prosecutors specializing in complex cyber crime offenses and are not specialists in contract law.  In sum, the government would stand as a bystander to the bilateral civil litigation between Bitfinex and its accountholders.

And such civil litigation promises to be complex, prolonged, and burdensome.  To date, more than a dozen third-party petitioners have submitted competing claims supported by voluminous exhibits and reams of legal briefing.  Petitioners range from individual *pro se* intervenors to major accountholders (including a former Bitfinex insider) represented by major international law firms, and in some cases seeking to proceed anonymously and under seal.[7]  Many of the petitioners seek civil discovery in support of their claims—presumably not from the government, for the reasons outlined above, but from Bitfinex.  Bitfinex will likely insist on reciprocal discovery.

---

[7] The government is mindful of the "'strong presumption in favor of public access to judicial proceedings,' including judicial records."  *In re Leopold*, 964 F.3d 1121, 1127 (D.C. Cir. 2020) (quoting *United States v. Hubbard*, 650 F.2d 293, 317 (D.C. Cir. 1980)).  The government has not objected to third-party petitioners sealing their full names and the types of personally identifiable information (PII) protected by Fed. R. Crim. P. 49.1, such as full financial account numbers and home addresses, but opposes any further sealing.  The government's briefing on this point was submitted under seal, to respond to petitioners' sealed filings, but the government anticipates that its briefing will be unsealed when the Court rules on the sealing motions.

Such a complex proceeding at the restitution stage, however, is not strictly necessary to dispose of the seized assets, because those same assets can be adequately disposed of during the third-party ancillary forfeiture proceeding based on substantially the same legal determinations. To be sure, restitution and forfeiture are governed by different legal standards: mandatory restitution depends on whether a victim suffered direct and proximate harm flowing from the offenses of conviction, 18 U.S.C. § 3663A(a)(2), while a third-party claim to forfeited property depends on a claimant's ownership interest in the property, 21 U.S.C. § 853(n)(6). Here, however, the third-party petitioners in the restitution proceeding have largely articulated their harm in terms of their title ownership interest over the stolen property. Thus, the Court would have to adjudicate the same question of ownership—a complex question of law and fact, potentially implicating foreign law—in order to resolve both restitution and forfeiture. At the same time, because the forfeiture and restitution proceedings in this particular case both concern the same set of seized assets (rather than overlapping monetary judgments), it would be equally effective to resolve these questions in a single proceeding. The third-party ancillary proceeding provides a well-defined procedural framework to resolve these issues without needlessly prolonging the defendants' sentencing process. Accordingly, under the unique facts of this case, "the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B).

As stated above, the government leaves to the Court whether an award of voluntary restitution is appropriate in this case; however, the government contends that it may be best to resolve all claims during the ancillary forfeiture proceeding.

### C. Whether a "Return of Property" to Petitioners Who Are Victims Could Be Effectuated Without Constituting an Improper Offset Against the Forfeited Assets

Finally, the Court instructed the government to address "whether, if this Court were to determine that some or all the Petitioners qualify as victims pursuant to the MVRA, who are entitled to in kind restitution of their specific property," the return of property by way of in-kind restitution "could be effectuated (without constituting an improper offset against the forfeited assets) even though such victims were not identified in the defendants' plea agreements." ECF No. 247, at 7-8.

Consistent with the Government's February 4, 2025 filing, any in-kind return of specific property does not constitute an improper "offset" of the defendants' forfeiture liability because it does not diminish the defendants' forfeiture obligation in any way. Whether property is returned to Bitfinex as in-kind restitution, or to former accountholders as in-kind restitution, the *defendants* will remain liable to forfeit any property involved in or constituting proceeds of their money laundering conspiracy, and the *defendants'* interest in all of the properties listed in the Corrected Second Amended Attachment A has been extinguished. *See* ECF No. 220, at 3-4. Thus, if the Court decides to order the return of seized cryptocurrencies to former accountholders as in-kind restitution, it would not offset the defendants' forfeiture liability.

The government writes further to underscore two related points. First, as the Court's prompt recognizes, the Court can only order restitution to former accountholders, in-kind or otherwise, if it makes a finding that they are a "victim of the offense" entitled to mandatory restitution under 18 U.S.C. § 3663A(a)(1). That is because the Court's authority to order restitution must arise out of either subsection (a)(1), for mandatory restitution to a "victim of the offense," or subsection (a)(3), for voluntary restitution to "persons other than the victim of the offense" if "agreed to by the parties in a plea agreement." 18 U.S.C. § 3663A(a)(1), (a)(3). The

Court lacks authority to order voluntary restitution to former accountholders of Bitfinex under subsection (a)(3) because they are not named in the plea agreements.  It can only order restitution to former accountholders if it finds that they qualify as "victim[s] of the offense" who have been "directly and proximately harmed as a result of the commission of [the] offense for which restitution may be ordered."  18 U.S.C. § 3663A(a)(1)-(a)(2).  For the reasons discussed above, accountholders cannot be considered "victims" in this technical sense because any harm they suffered was derivative of the harm to Bitfinex.

Second, it should go without saying that the Court cannot order in-kind restitution of the same property to two or more victims.  If the Court, for instance, finds that the approximately 94,643 bitcoin was stolen directly from Bitfinex, and that Bitfinex "passed on" that loss in some form to accountholders, it cannot order the return of 94,643 bitcoin as in-kind restitution to Bitfinex *and* the return of the same 94,643 bitcoin to accountholders to remediate their losses.  (This reinforces the government's view that, if any party was "directly and proximately harmed" by the uncharged 2016 hack within the meaning of 18 U.S.C. § 3663A(a)(2), it was Bitfinex, while accountholders were at most indirectly and derivatively harmed as a consequence of the harm to Bitfinex.)

If the Court finds that both Bitfinex and accountholders qualify as mandatory victims within the meaning of subsection (a)(2), then the return of the same property as in-kind restitution to both classes of victims would be "impossible, impracticable, or inadequate," and the Court would instead have to consider a monetary restitution order for all victims. 18 U.S.C. § 3663A(b)(1)(B).  However, as discussed above, the calculation of the exact amount owed to Bitfinex accountholders would be a complex undertaking requiring information not currently in the government's possession.  Resolving these questions would require "determining complex

issues of fact related to the cause or amount of the victim's losses," and would unnecessarily "complicate or prolong the sentencing process."  18 U.S.C. § 3663(A)(c)(3).  As the Second Circuit has observed, "Congress plainly intended that sentencing courts not become embroiled in intricate issues of proof" when crafting restitution.  *United States v. Reifler*, 446 F.3d 65, 136 (2d Cir. 2006).

Accordingly, while the Court could in theory award in-kind restitution to former accountholders without constituting an improper offset against the defendants' forfeiture judgment, it would not be a practicable or effective option under the unique facts of this case.

## CONCLUSION

For the foregoing reasons and as set forth in the government's other pleadings, there are no "victims" for purposes of mandatory restitution under the MVRA.  The instant case involves complex facts and issues, which will likely prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. The government therefore recommends that the Court order $0 restitution and adjudicate the disposal of the seized properties solely through the third-party forfeiture ancillary proceeding.

Respectfully submitted,
EDWARD MARTIN JR.
UNITED STATES ATTORNEY
D.C. Bar No. 481866

BY:    /s/ Christopher B. Brown
Christopher B. Brown, D.C. Bar No. 1008763
Special Assistant United States Attorney
Rick Blaylock Jr., Texas Bar No. 24103294
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, DC 20530
(202) 353-0018 (Brown)
(202) 252-6765 (Blaylock)
Christopher.Brown8@usdoj.gov
Rick.Blaylock.Jr@usdoj.gov

/s/ Jessica Peck
Jessica Peck, N.Y. Bar Number 5188248
C. Alden Pelker, Maryland Bar
Trial Attorneys, U.S. Department of Justice
Computer Crime & Intellectual Property Section
1301 New York Ave., N.W., Suite 600
Washington, D.C. 20005
(202) 353-9455 (Peck)
(202) 616-5007 (Pelker)
Jessica.Peck@usdoj.gov
Catherine.Pelker@usdoj.gov