# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ILYA LICHTENSTEIN, *et. al.*,<br><br>*Defendants,*<br><br>and<br><br>JOHN DOE<br><br>*Intervenor, Claimant, and Third-Party Petitioner*. | CRIMINAL NO. 23-cr-239 (CKK) |

## MOTION TO INTERVENE, FOR AN ORDER OF RESTITUTION TO MOVANT, AND IN OBJECTION TO GOVERNMENT'S RESTITUTION MEMORANDUM

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND .......................................................... 4

I.      The Criminal Case and Recovery of Stolen BTC ............................................................. 4

II.     Movant's Ownership of the Stolen BTC ....................................................................... 5

III.    The Plea Agreements .......................................................................................................... 6

IV.     Bitfinex's Post-Hack Actions ........................................................................................ 7

ARGUMENT ............................................................................................................................ 8

I.      Intervenor Has a Right to Intervene As Owner of a Portion of the Stolen Bitcoin
        and Thus A Direct and Immediate Victim. ................................................................... 8

II.     Movant Is Entitled to Mandatory Restitution For His Loss ........................................... 12

        A.      Movant Is a Direct Victim of the Money Laundering Conspiracy ..................... 14

        B.      Movant Is a Victim Under the MVRA Because the Conspiracy's Scope
                Includes All Harm Caused by the Scheme ......................................................... 18

III.    The Government's Proposal to Give Bitcoin to Bitfinex is Improper and Should
        Be Denied. ...................................................................................................................... 20

        A.      Bitfinex Is Not a Victim and Has No Ownership Claim with Respect to the
                Recovered Bitcoin ............................................................................................. 20

        B.      Allocating BTC to Bitfinex Would Create an Unjust Windfall ......................... 22

IV.     No Assets Should be Distributed Before an Ancillary Proceeding ................................ 23

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Catoggio*,
  326 F.3d at 329 .......................................................................................... 20

*In re Fairfield Sentry Ltd. Litig.*,
  458 B.R. 665 (S.D.N.Y. 2011) ...................................................................... 10

*Hoffman v. Rosewood Hotels & Resorts, LLC*,
  Civ. No. 2012-86, 2013 WL 3974098 (D.V.I. July 31, 2013) ........................ 10

*\*Lazarenko*,
  624 F.3d 1247 (9th Cir. 2010) ...................................................................... 18

*In re Lehman Bros. Holdings, Inc.*,
  439 B.R. 811 (Bankr. S.D.N.Y. 2010) ........................................................... 10

*Marine Bank v. Fulton Bank*,
  69 U.S. 252 (1864) ........................................................................................ 11

*\*Merrill Lynch Mortg. Capital, Inc. v. F.D.I.C.*,
  293 F.Supp.2d 98 (D.D.C. 2003) ...................................................... 10, 11, 12

*S.E.C. v. Paige*,
  No. CIV. A. 81-2066, 1985 WL 2335 (D.D.C. July 30, 1985), *aff'd*, 810 F.2d
  307 (D.C. Cir. 1987) ...................................................................................... 24

*\*In re Sealed Case*,
  702 F.3d at 66 (D.C. Cir. 2012) ..................................................................... 13

*In re Search of Multiple Email Accounts*,
  585 F. Supp. 3d 1 (D.D.C. 2022) .............................................................. 16, 19

*Sterlingov*,
  2024 WL 4664267 (D.D.C. Nov. 4, 2024) ..................................................... 16

*Stern v. Marshall*,
  564 U.S. 462 (2011) ................................................................................. 10, 11

*U.S. v. BCCI Holdings (Luxembourg) S.A.*,
  980 F. Supp. 2 (D.D.C. 1997) ........................................................................ 22

*U.S. v. Goodrich*,
  12 F.4th 219 (2d Cir. 2021) ........................................................................... 22

*U.S. v. Reckmeyer*,
   836 F.2d 200 (4th Cir. 1987) .......................................................................... 22

*United States v. al-Kofi*,
   2022 WL 14019560 (W.D. Pa. Oct. 24, 2022) ................................................ 20

*United States v. Aref*,
   533 F.3d 72, 81 (2d Cir. 2008) ........................................................................ 8

*United States v. Boscarino*,
   437 F.3d 634 (7th Cir. 2006), *abrogated on other grounds by United States v.*
   *Statham*, 581 F.3d 548 (7th Cir. 2009) .......................................................... 22

*United States v. Boutros*,
   No. 20-cr-82, 2020 WL 6683064 (D.D.C. Nov. 12, 2020) ............................. 13

*United States v. Brock-Davis*,
   504 F.3d 991 (9th Cir. 2007) .......................................................................... 18

*United States v. Brown*,
   665 F.3d 1239 (11th Cir. 2011) ................................................................ 17, 18

*United States v. Carboni*,
   204 F.3d 39 (2d Cir.2000) .............................................................................. 20

*United States v. Chalupnik*,
   514 F.3d 748 (8th Cir. 2008) ........................................................................... 9

*United States v. Cordo*,
   324 F.3d 223 (3d Cir. 2003) ..................................................................... 15, 16

*United States v. Dickerson*,
   370 F.3d 1330 (11th Cir. 2004) ...................................................................... 18

*United States v. Emor*,
   785 F.3d 671 (D.C. Cir. 2015) .................................................................. 17, 23

*United States v. Emor*,
   850 F. Supp. 2d 176 (D.D.C. 2012) ......................................................... 18, 23

*United States v. Fair*,
   699 F.3d 508 (D.C. Cir. 2012) ....................................................................... 13

*United States v. Foster*,
   878 F.3d 1297 (11th Cir. 2018) ...................................................................... 18

*United States v. Germosen*,
   139 F.3d 120 (2d Cir.1998) ............................................................................ 20

*United States v. Griffin*,
No. 3:17-cr-235-01-SI, 2018 WL 2320943 (D. Or. May 22, 2018).........................................9

*United States v. Guerrero*,
No. 14 CR 732-4, 2021 WL 2550154 (N.D. Ill. June 22, 2021)..........................................18

*United States v. Gushlak*,
728 F.3d 184 (2d Cir. 2013)..................................................................13, 21

*United States v. Hensley*,
91 F.3d 274 (1st Cir. 1996)..................................................................19

*United States v. Hubbard*,
650 F.2d 293 (D.C. Cir. 1980)................................................................8

*United States v. Loreng*,
956 F. Supp. 2d 213 (D.D.C. 2013)............................................................21

*United States v. Luis*,
765 F.3d 1061 (9th Cir. 2014)..............................................................12, 18

*United States v. Martoma*,
962 F. Supp. 2d 602 (S.D.N.Y. 2013)...........................................................8

*United States v. Matos*,
611 F.3d 31 (1st Cir. 2010)...............................................................18, 20

*United States v. Onimole*,
No. 23-11740, 2024 WL 1232089 (11th Cir. Mar. 22, 2024).......................................18

*United States v. Peterson*,
268 F.3d 533 (7th Cir. 2001)................................................................20

*United States v. Pole*,
Crim. No. 09-354 (EGS), 2024 WL 756781 (D.D.C. Feb. 23, 2024)..................................18

*United States v. Preston*,
123 F. Supp. 3d 117 (D.D.C. 2015).............................................................23

*United States. v. Rosabal*,
2014 WL 3672895 (D. Or. Jul. 22, 2014).........................................................13

*United States v. Savoie*,
985 F.2d 612 (1st Cir. 1993)................................................................13

*United States v. Sussmann*,
No. 1:21-cr-582-CRC (D.D.C. Apr. 26, 2022).....................................................8

*United States v. Valladares*,
    544 F.3d 1257, 1269 (11th Cir. 2008)..................................................................... 18

*United States v. Voss*,
    165 F. App'x 647 (10th Cir. 2006)........................................................................ 20

*United States v. Wilson*,
    98 F.3d 281 (7th Cir. 1996)........................................................................... 15, 16

**Statutes**

18 U.S.C. § 3663A(a)(1)...................................................................................... 14

18 U.S.C. § 3663A(a)(2).......................................................................... 1, 2, 14, 17

18 U.S.C. § 3663A(a)(3)................................................................................. 11, 20

18 U.S.C. § 3663A(b)(1)(B).................................................................................. 12

18 U.S.C. § 3663A(c)(1)(A)(ii).............................................................................. 12

18 U.S.C. § 3664(e)............................................................................................ 13

18 U.S.C. § 3771(a)............................................................................................. 8

18 U.S.C. § 3771(d)(3)......................................................................................... 8

21 U.S.C. § 853(n), and a..................................................................................... 5

Commodity Exchange Act...................................................................................... 6

Crime Victims' Rights Act...................................................................................... 8

Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A .....................................*passim*

**Other Authorities**

CFTC Docket No. 16-9 (June 2, 2016) ("CFTC Order"), *available at*
    https://www.cftc.gov/sites/default/files/idc/groups/public/
    @lrenforcementactions/documents/legalpleading/enfbfxnaorder060216.pdf ................. 6, 11

Fed. R. Crim. P. 32.2(c)..................................................................................... 23

## PRELIMINARY STATEMENT

Movant respectfully seeks to intervene to obtain mandatory restitution as a victim of Defendants' money laundering conspiracy and criminal scheme, and to avert a miscarriage of justice threatened by the government's proposal to send a multi-billion-dollar windfall to Bitfinex.

In August 2016, Defendants stole approximately 120,000 Bitcoin from Bitfinex's *accountholders*, *not Bitfinex itself.* They did so by hacking into the computer systems of Bitfinex, to obtain keys to blockchain wallets managed by Bitfinex *as an agent* for its accountholders. The theft was akin to stealing a car from a valet who fails to safeguard the car keys. The victim is the *owner* of the property, not the valet.

The government recovered substantially all of the stolen Bitcoin, including at least 94,643.29837084 Bitcoin that represents "specific property lost" in the hack. (Gov't Supp. Mot. re Restitution, ECF No. 202 at 1, 4.) Unfortunately, the government elected not to request restitution for the true victims and instead proposes granting a windfall to Bitfinex. To that end, the government asserts that it has precluded the Court from awarding restitution to accountholders for two reasons. *First*, the government asserts that by accepting a plea to the money laundering conspiracy, but not the underlying hack, it precluded accountholders from being "victims" for purposes of mandatory restitution. *Second*, the government asserts that it further curtailed the Court's authority by naming only Bitfinex as a candidate for restitution in the plea agreements, rather than the true victim accountholders.

The government is wrong on both issues. *First*, Movant is a victim for purposes of mandatory restitution, both because he is a victim of Defendants' overall criminal scheme (18 U.S.C. § 3663A(a)(2)), and because he is a direct victim of the money laundering itself. Through the accompanying declaration and supporting exhibits, Movant has established by a preponderance of the evidence that he suffered actual losses, and provided a sound evidentiary basis for

calculating the extent of his lost property. *See* Declaration In Support of Motion to Intervene, for an Order of Restitution, and in Objection to Government's Restitution Memorandum, dated January 28, 2025 ("Movant's Decl."). Accordingly, Movant should be awarded restitution for that loss in the amount of 670.68637 BTC. *See id.*

*Second*, the Court should deny the proposed "restitution" to Bitfinex. The government previously acknowledged that the Bitcoin belonged to accountholders, yet its sentencing memorandum asserts that sending Bitcoin to Bitfinex "represents the return of lost property *to the owner* of that property and is consistent with the statutory text and purpose of the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A." Lichtenstein Sentencing Memorandum, ECF No. 146 at 25 (emphasis added). The government has offered no evidence to substantiate that assertion or to meet its burden of proof to support the proposed restitution to Bitfinex. On the contrary, all evidence—including Bitfinex's terms of service, its public representations, its 2016 settlement with the CFTC, and even its "victim" statements in this proceeding—make clear that the Bitcoin was owned by accountholders and *not* Bitfinex at the time of the hack. The government appears to have simply treated Bitfinex as if it were a bank holding general deposits—it was not—with no basis for doing so and despite all evidence to the contrary.

The government is right that the Bitcoin should be returned to its owners consistent with the MVRA, but returning the Bitcoin to its owners requires an award of restitution to Movant, not Bitfinex. Moreover, any issues that might complicate awarding restitution to *unidentified* victim accountholders do not apply, and provide no basis to deny restitution, to Movant who has appeared and met the burden to prove his victim status and losses by a preponderance of the evidence. *See, e.g., United States v. McCormick*, Crim. No. 18-359-4 (JDB), 2023 WL 8697851,

at *2-*4 (D.D.C. Dec. 15, 2023) (awarding restitution to victims who had been identified while concluding that it would be too burdensome to locate other, unidentified victims who may exist).

The Court should also decline to award the seized Bitcoin to Bitfinex because any such award would constitute unjust enrichment. Bitfinex's victim statements make clear that it thinks it is the only possible victim and claims to have made accountholders whole—though it did no such thing—and on that basis it will seek to keep the entire benefit of the Bitcoin for itself. Sending billions of dollars-worth of Bitcoin, which the government and Bitfinex have acknowledged belongs to accountholders, outside the jurisdiction of the United States to an entity that will fight to deny accountholders any share of that recovery, is antithetical to the principles of victim restitution.

Movant has commenced an ancillary proceeding to assert his legal interests in the seized Bitcoin. To the extent there is any ambiguity that Movant was the owner of some of that Bitcoin, no action should be taken with respect to the seized Bitcoin until after the ancillary proceedings through which Movant's legal rights can be more fully addressed with the benefit of discovery and an evidentiary hearing. Moreover, to the extent Movant is unable to establish a claim to specific seized Bitcoin, any inability to trace to the recovered funds will be a direct result of the money laundering through which the funds were diminished and the tracing obscured, further confirming that Movant is a victim of the offense of conviction. Movant should not face the catch-22 of being denied recovery as a victim of the money laundering, only to later be denied recovery as an owner as a direct result of the money laundering.

For the foregoing reasons and those set forth below, Movant should be permitted to intervene and awarded restitution in the amount of 670.68637 BTC, and the proposal to award Bitcoin to Bitfinex as purported restitution should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Criminal Case and Recovery of Stolen BTC

In 2022, federal authorities arrested Ilya Lichtenstein and Heather Morgan for their involvement in the 2016 hack of Bitfinex, during which approximately 120,000 BTC were stolen. Statement of Facts, ECF No. 1-1 at ¶ 4. These stolen assets included BTC held in accounts belonging to Bitfinex account holders, such as Movant. *See* Lichtenstein Statement of Offense, ECF No. 95 at ¶ 14. The Defendants pleaded guilty in 2023 to conspiracy to commit money laundering, admitting that they had employed sophisticated methods to obscure the trail of the stolen BTC. *See* Plea Agreements and Statements of Offense, ECF Nos. 95, 96, 100, 101.

Defendants' scheme, as detailed in the Statements of Facts attached to their Plea Agreements, included hacking Bitfinex to ultimately "[gain] access to the keys, or credentials, used to authorize transactions involving virtual currencies" held by Bitfinex, "including funds *belonging to* customers" and fraudulently authorizing transactions to steal nearly 120,000 BTC. ECF No. 95 at ¶¶ 12, 14; No. 100 at ¶¶ 12, 14 (emphasis added). Both Defendants admitted that they laundered the stolen funds to conceal Defendant Lichtenstein's responsibility for the Bitfinex hack. ECF No. 95 at ¶ 20; No. 100 at ¶ 19; *see also* Tr. of Plea 47:15-21, ECF No. 110 ("these transactions were designed to obfuscate the source of the funds; the fact that these funds came from the 2016 hack and were designed to complicate the audit trail of anyone trying to trace…back and discover those, were, in fact, derived from that -- the 2016 hack").

Upon arresting the Defendants, the U.S. Department of Justice seized more than 94,000 of the BTC stolen from Bitfinex users. ECF No. 1-1 at ¶ 6. Subsequent to Defendants' arrest, the government seized 16,514.182 additional BTC traceable to the hack. *See id.*; *see also* Second Amended Preliminary Order of Forfeiture, ECF No. 178. Federal authorities ultimately recovered 114,601 BTC, along with other assets derived from the money laundering conspiracy,

4

representing the majority of the stolen BTC. *See id.* The recovered BTC alone is currently valued at over $11 billion.

## II.    Movant's Ownership of the Stolen BTC

At the time of the hack, Movant was the owner of over 1,735 BTC, as well as 6,842 Ether ("ETH") and $4,513.25 in USD, held in his two Bitfinex accounts. *See* Movant Decl. ¶ 6 & Exs. C through F-2. After the hack and Bitfinex's unilateral reallocation of losses among accountholders, Movant still had a net loss valued at 670.68637 BTC. *See id.* ¶¶ 13-18.[1] Movant has taken numerous steps to recover his Bitcoin, including filing a Verified Petition for Hearing to Adjudicate Third-Party Claim Asserting Legal Interest in Forfeited Property with this Court under 21 U.S.C. § 853(n), and a Petition for Remission of Criminal Forfeiture Funds with the Attorney General.

Under Bitfinex's Terms of Service, Movant retained ownership of the assets in his accounts at all times, and Bitfinex assisted with custody of those assets only as an agent. *See* Movant Decl. at ¶ 5; Exs. A and B. The Bitfinex Terms of Service make clear that all spot purchases of BTC occurred between fully funded buyers and sellers on the Site, that Bitfinex served only in an agency capacity, and that "[n]either Bitfinex nor BitGo acts as principals, counterparties, or market-makers in the transactions effected through trading on Bitfinex." Decl. Ex. A at §§ 3, 4. Moreover, the Terms of Service provided that Petitioner's assets would be held in Multi-Signature Wallets established with BitGo and that "all bitcoins in your Multi-Signature Wallets belong to and are owned by you." Decl. Ex. A at § 5.1. Those terms confirm that

---

[1] The reallocation unilaterally implemented by Bitfinex after the hack had the effect of forcibly converting a portion of Movant's ETH and USD assets into Bitcoin, and in addition providing a net recovery of 1,064.32 BTC, leaving a remaining net loss of 670.68637 BTC after the reallocation. *See id.* ¶¶ 13-18.

Bitfinex operated as a platform to facilitate custody and exchange of BTC over which its customers retained ownership, and *not* as a bank in which deposits might become assets of the bank.

Bitfinex also openly advertised its segregation of customer assets as a key feature, noting that "We are very excited to unveil our new Bitcoin settlement system and security architecture that for the first time ever offers *complete segregation of all customer bitcoins*." "Bitfinex and BitGo Partner to Create World's First Real-Time Proof of Reserve Bitcoin," Bitfinex Blog (June 4, 2015), https://blog.bitfinex.com/announcements/bitfinex-and-bitgo-partner-to-create-worlds-first/ (emphasis added).

A June 2016 CFTC Order further confirmed that BTC held on Bitfinex's platform, including in prior omnibus wallets, always belonged to account holders. *See* Order Instituting Proceedings Pursuant to Sections 6(c) and 9(d) of the Commodity Exchange Act, As Amended, Making Findings and Imposing Remedial Sanctions, CFTC Docket No. 16-9 (June 2, 2016) ("CFTC Order"), *available at* https://www.cftc.gov/sites/default/files/idc/groups/public/ @lrenforcementactions/documents/legalpleading/enfbfxnaorder060216.pdf. That CFTC Order further made clear that Bitfinex represented that it held users Bitcoin in segregated and individually enumerated wallets. *See id.*

III.    **The Plea Agreements**

The plea agreement states that: "Lichtenstein studied how transactions are traced on the blockchain and formulated a detailed plan that was designed to reduce any perceived illicit taint over time," which included "[leaving] the stolen funds sitting dormant in Wallet 1CGA4s" for an extended period and then moving portions of the BTC in a series of complex transactions designed to conceal the path of the stolen BTC.  ECF No. 95 at ¶¶ 18-19; *see also* Tr. 27:10-20, ECF No. 110. These transactions "were designed to obfuscate the source of the funds" and to

"complicate the audit trail of anyone trying to trace" the assets to the 2016 hack. Tr. 47:15-21, ECF No. 110. Ms. Morgan similarly explained in her plea that she initially thought the money laundering might have been for tax avoidance, but later learned of the hack and helped Mr. Lichtenstein "launder funds at his direction *to conceal his involvement in the hack*."  ECF No. 111, Tr. 24:7-8 (emphasis added). She later added that "we were trying to prevent detection." *Id.* 48:23.

In the Statement of Offense and in presenting the plea agreements, the government acknowledged that the stolen Bitcoin belonged to accountholders, explaining that Lichtenstein had gained access to the keys necessary to authorize transactions "involving virtual currencies *held by* victim VCE, including funds *belonging to customers* of victim VCE." ECF No. 110, Tr. 24:5-8 (emphasis added); *see also* ECF No. 95 ¶ 14.

Despite acknowledging that the stolen BTC belonged to accountholders, however, the government's plea agreements proposed restitution to Bitfinex. ECF No. 96 at ¶ 13; ECF No. 101 at ¶ 13. The government's sentencing memorandum asserts that sending Bitcoin to Bitfinex "represents the return of lost property *to the owner* of that property and is consistent with the statutory text and purpose of the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A." ECF No. 146 at 25 (emphasis added). There is nothing in the government's memoranda to suggest how it came to abandon its recognition that the Bitcoin belonged to accountholders and to instead mischaracterize Bitfinex as the owner of the lost property.

## IV.    Bitfinex's Post-Hack Actions

Bitfinex's filings in this case acknowledge that the seized Bitcoin belonged to customers at the time of the hack. To assert victim status, Bitfinex argues in its victim statement that it took action *after* the hack to "make customers whole for the Hack losses," conceding that it was the

customers who suffered losses in the first instance as the immediate victims of the hack. ECF No. 175-1 at 6.

The first step taken by Bitfinex was to make victims partially whole using the assets *of other accountholders*, not its own assets. Thus, following the hack, Bitfinex unilaterally imposed a 36.06% "haircut" on all customer accounts, redistributing the account holders' losses among them. Baldwin, *Bitfinex Exchange Customers to Get 36 Percent Haircut, Debt Token*, (Aug. 6, 2016), https://www.reuters.com/article/business/bitfinex-exchange-customers-to-get-36-percent-haircut-debt-token-idUSKCN10I06H/. This reallocation reduced Movant's account balances across all asset types and forcibly converted portions of his ETH and USD into BTC.

Bitfinex also issued claim tokens to accountholders (called "BFX tokens"), purporting to represent a "contingent obligation" that Bitfinex *may* at its "sole option", redeem the tokens for their stated dollar value at some undetermined point in the future. Decl. ¶ 20 & Ex. G. Petitioner did not agree to relinquish or transfer to Bitfinex any legal ownership of, or rights or claims to the stolen BTC in in order to obtain those tokens, and the BFX Token Terms clearly state, "The token has been issued to you without reduction of or release or waiver of any claims you may have." *See id.* Movant received nothing else from Bitfinex.

## ARGUMENT

I.    **Intervenor Has a Right to Intervene as Owner of a Portion of the Stolen Bitcoin and Thus a Direct and Immediate Victim.**

While the Federal Rules of Criminal Procedure do not address intervention, courts have long exercised their inherent authority to permit intervention when necessary to safeguard third-party interests. *See, e.g.*, *United States v. Hubbard*, 650 F.2d 293, 311 n.67 (D.C. Cir. 1980); *United States v. Martoma*, 962 F. Supp. 2d 602, 605-06 (S.D.N.Y. 2013) (citing *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008)); *see also* Minute Order Granting Motions to Intervene,

*United States v. Sussmann*, No. 1:21-cr-582-CRC (D.D.C. Apr. 26, 2022) (granting third parties' motion to intervene to oppose a government motion). This Court has already anticipated such intervention, expressly permitting third parties to move to intervene and to raise objections to the government's proposed restitution order. Order Granting Parties' Consent Motion to Schedule Restitution Hearing, ECF No. 185 (Nov. 21, 2024).

As a victim under the Crime Victims' Rights Act, Movant has rights enumerated at 18 U.S.C. § 3771(a), including the "right to be reasonably heard at any public proceeding" and to "full and timely restitution." *See also* 18 U.S.C. § 3771(d)(3) ("The district court shall take up and decide any motion asserting a victim's right forthwith."). Restitution is mandatory under the Mandatory Victim Restitution Act. *See* 18 U.S.C. § 3663A ("MVRA"). Intervention is also necessary to protect Movant's property interests and to ensure a fair resolution of this case.

The government's position that Movant is not a victim entitled to restitution is wrong and jeopardizes his ability to recover his losses. *See* Gov't Supp. Mot. re Restitution, ECF No. 202, at 2, 2 n.1. Worse, for reasons that remain unclear, the government recommended that the Court transfer that Bitcoin to Bitfinex (*see id.* at 2-3), an offshore entity that has given every indication that it will deny accountholders any recovery. *See* ECF No. 175-1 at 6 (wrongly asserting that it is the "only potential victim of Defendants' offenses" as a result of its unilateral post-hack actions). That recommendation is antithetical to the principles of restitution.

Movant is a direct victim and real party in interest because Movant was the owner of some of the stolen Bitcoin at the time of the hack. When property is stolen from the bailee of its owner, it is the owner who qualifies as a victim under the MVRA not the bailee. *United States v. Chalupnik*, 514 F.3d 748, 753-54 (8th Cir. 2008) ("Chalupnik's offense conduct included stealing or converting BMG property from BMG's bailee, USPS. That qualifies BMG as an

MVRA victim…"); *see also, e.g., United States v. Griffin*, No. 3:17-cr-235-01-SI, 2018 WL

2320943, a *5 (D. Or. May 22, 2018) ("Although the defendant stole the goods from the custody

of the freight carrier, the manufacturers were the owners of the goods and they were the parties

who actually suffered from the defendant's crime. When a person steals property belonging to

another, even from the custody of a third party, *the owner of the property is the victim*.")

(addressed in the context of the Sentencing Guidelines) (emphasis added).

Therefore, to determine the direct and immediate victims for purposes the MVRA, it is

necessary to ascertain who owned the Bitcoin at the time of the hack. In determining the

ownership rights as between Bitfinex and its accountholders, one must distinguish between

circumstances akin to (i) general deposits, where a bank becomes the owner of the funds and the

depositor has a claim for the amount of their deposit, and (ii) bailments or special deposits,

where the depositor retains legal ownership. *See, e.g., Merrill Lynch Mortg. Capital, Inc. v.

F.D.I.C.*, 293 F.Supp.2d 98 (D.D.C. 2003).

Whether a deposit is general or specific is a matter of contract between the depositor and

the entity holding the assets. *See id.*[2] Courts look to the purpose of the deposit and the terms of

the agreement, including whether the assets are intended to be segregated from other deposits.

*See, e.g., id.* at 108 (looking to whether the agreement "creates an account which the bank is

obligated to segregate from general assets"); *In re Lehman Bros. Holdings, Inc.*, 439 B.R. 811,

---

[2] Bitfinex's Terms of Service specify the law of the British Virgin Islands (BVI). *See* Movant
Decl. Ex. A. BVI law uses the common law of the United Kingdom. *See Hoffman v. Rosewood
Hotels & Resorts, LLC*, Civ. No. 2012-86, 2013 WL 3974098, at *3 (D.V.I. July 31, 2013). The
Law Commission of the United Kingdom has recognized that English common law concepts of
contract, trust, and agency undergird cryptocurrency custodial accounts like the one at issue here,
such that to legal ownership of a crypto asset one will similarly look to the terms of the contract
and the law of agency and related principles. *See* Law Commission, Digital Assets: Final Report
§§ 7.104-19 (June 28, 2023), https://lawcom.gov.uk/project/digital-assets/.

824-25 (Bankr. S.D.N.Y. 2010) (looking to the parties' mutual intent to determine that they created a special deposit account).

The relevant question is whether Bitfinex *represented* and *agreed* to segregate assets and treat its accountholders as owners, not whether it lived up to those representations in practice. If the arrangement is intended to retain ownership by the depositor, the unilateral acts of the custodian cannot change the legal relationship. "Once a bank accepts a special deposit, the fact that the bank treats the account as if it had title to the funds (*i.e.,* by using them in a way that requires title, such as loaning the funds), does not turn the account into a general deposit-such actions merely constitute a violation of the bank's obligations." *Merrill Lynch*, 293 F. Supp. 2d at 109-110 (noting that "[w]ere the law otherwise, a bank could unilaterally frustrate the terms of an explicit special deposit agreement simply by treating the account as a general deposit") (citations omitted).

Here, all evidence points to the conclusion that accountholders were the owners of the Bitcoin in their Bitfinex accounts, including:

(i)     The Terms of Service made clear that all spot purchases of BTC occurred between fully funded buyers and sellers on the Site, that Bitfinex served only in an agency capacity, and that "[n]either Bitfinex nor BitGo acts as principals, counterparties, or market-makers in the transactions effected through trading on Bitfinex," and that "all bitcoins in your Multi-Signature Wallets belong to and are owned by you." Decl. Ex. A at §§ 3, 4, 5.1.

(ii)    Bitfinex openly advertised its segregation of customer assets as key feature, noting that "We are very excited to unveil our new Bitcoin settlement system and security architecture that for the first time ever offers *complete segregation of all customer bitcoins*." *See supra* at 5-6 (emphasis added).

(iii)   Bitfinex's treatment of Bitcoin as customer assets, and its segregation of assets, was further explained in detail as a key component of the 2016 CFTC Order, which also made clear that Bitfinex took the position that Bitcoin belonged to its users even before it was segregating customer assets. *See supra* at 6.

(iv)    In its victim statement, Bitfinex argues that it took unprecedented steps to make "its customers whole for the hack losses . . . within eight months of the Hack,"

ECF No. 175-1 at 6, 10, conceding it was the customers, not Bitfinex, who suffered the immediate loss at the time of the hack.

The agreement and representations that Bitfinex would maintain segregated assets reinforces that Bitfinex acted only as a custodian, not the owner, of these funds. *See Marine Bank v. Fulton Bank*, 69 U.S. 252, 255 (1864); *Merrill Lynch Mortg. Capital Inc. v. FDIC*, 293 F. Supp. 2d 98, 102 (D.D.C. 2003).

After the high-profile trial of FTX founder Sam Bankman-Fried, the government's extensive sentencing memorandum noted that FTX had similar user agreement provisions guaranteeing that FTX had "a responsibility to ensure that customer assets are appropriately safeguarded and segregated from its own funds" because "customer assets (both fiat and virtual assets) are segregated from its own assets" and "customer funds do not represent property of [FTX]." Government's Sentencing Memorandum 5-6, *United States v. Bankman-Fried*, No. 1:22-cr-673 (S.D.N.Y. Mar 15, 2024), ECF No. 410. On those facts, the government argued that FTX accountholders—*not* FTX itself—were Bankman-Fried's "victims" for the purposes of the MVRA, even though it was FTX from which Bankman-Fried diverted funds. *Id.* at 110.

## II. Movant Is Entitled to Mandatory Restitution For His Loss.

Movant is a victim of Defendant's criminal scheme as a whole, and also of the money laundering conspiracy in particular. As a victim, Movant is entitled to mandatory restitution under 18 U.S.C. § 3663A(c)(1)(A)(ii). *United States v. Luis*, 765 F.3d 1061, 1065-66 (9th Cir. 2014) (holding that money laundering is an "offense against property" such that the MVRA applies and collecting cases).

As demonstrated in the accompanying declaration and supporting exhibits, Movant had 1735.00637 BTC in his Bitfinex accounts immediately prior to the hack, in addition to other assets. Movant Decl. ¶ 6. After Bitfinex's unilateral reallocation, he still had a net loss of

670.68637 BTC.  *See id.* ¶¶ 13-18.[3] The Court should therefore grant Movant's motion to intervene and award Movant restitution.

Restitution to Movant should be awarded in the amount of his lost Bitcoin. The MVRA permits monetary restitution in lieu of the return of the property only when the "return of the property under subparagraph (A) is impossible, impracticable, or inadequate." 18 U.S.C. § 3663A(b)(1)(B); *see also United States. v. Rosabal*, 2014 WL 3672895, at *2 (D. Or. Jul. 22, 2014) ("The MVRA provides that restitution involving damage or loss of property requires the return of such property."). There is no reason why it would be "impossible or impracticable" for Bitcoin to be returned to Movant, who has appeared in this proceeding and established by a preponderance of the evidence that he is an accountholder who suffered actual loss from Defendants' money laundering and criminal scheme. *See, e.g.*, *McCormick*, 2023 WL 8697851, at *2-*4 (awarding restitution to those victims who had been identified while concluding that it would be too burdensome to locate other, unidentified victims who may exist).

"Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). The amount of restitution need not be "proven with exactitude;" rather "the district court's charge is to estimate, based upon the facts in the record, the amount of the victim's loss with some reasonable certainty." *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012) (cleaned up). The relevant question is whether "the basis for reasonable approximation is at hand." *United States v. Boutros*, No. 20-cr-82, 2020 WL 6683064, at *2 (D.D.C. Nov. 12, 2020) (quoting *United States v. Savoie*, 985 F.2d 612, 617 (1st

---

[3] The reallocation unilaterally implemented by Bitfinex after the hack had the effect of forcibly converting a portion of Movant's ETH and USD assets into Bitcoin, and in addition providing a net recovery of 1,064.32 BTC, leaving a remaining net loss of 670.68637 BTC after the reallocation.  *See id.* ¶¶ 13-18.

Cir. 1993)); *see also United States v. Fair,* 699 F.3d 508, 515 (D.C. Cir. 2012) (requiring an

"evidentiary basis" on which to calculate restitution); *United States v. Gushlak*, 728 F.3d 184,

200 (2d Cir. 2013) ("We are persuaded, as was the district court, that this showing established by

a preponderance of the evidence a reasonable estimate of loss founded on a sound basis for

approximation.").

Through the accompanying declaration and supporting exhibits, Movant has met this

burden to establish by a preponderance of the evidence that he was an owner of Bitcoin held by

Bitfinex and that suffered losses as a victim of Defendants' criminal scheme. The net loss

suffered by Movant, as reflected by his Bitfinex account balances before and after the hack,

provides a sound basis for approximation of his losses. Accordingly, Movant should be awarded

mandatory restitution under the MVRA in the amount of 670.68637 BTC.

The government incorrectly asserts that Bitfinex accountholders such as Movant are not

entitled to restitution because they could only have been a victim of "the underlying wire fraud

representing the hack and theft of BTC," as opposed to the money laundering conspiracy to

which defendants plead guilty. Gov't Supp. Mot. re Restitution, ECF No. 202 at 2. That is wrong

for multiple reasons.

- *First*, while not every instance of money laundering has direct victims, this money laundering scheme did have as its direct victims the owners of the stolen Bitcoin. The express objective was to prevent tracing from the hack in order to enrich the Defendants by precluding any recovery of the stolen assets.

- *Second*, MVRA's definition of "victim" extends to the victims of the theft because the money laundering and the theft were part of a common scheme.

For both independent reasons, Movant is a victim for purposes of mandatory restitution.

### A.    Movant Is a Direct Victim of the Money Laundering Conspiracy.

Movant is a victim of the Defendants' money laundering conspiracy because the object of

that conspiracy was to prevent anyone from tracing and recovering the stolen Bitcoin, and thus to

enrich Defendants at the direct expense of accountholders who owned the Bitcoin. This harm satisfies the MVRA's definition of a "victim" as one "directly and proximately harmed as a result of the commission of" the offense. 18 U.S.C. § 3663A(a)(2). Movant is therefore entitled to restitution. *See id.* § 3663A(a)(1).

The government asserts that there are no victims of the offense of conviction because money laundering is, *in some circumstances*, held to be a crime for which society is the only victim. However, it is also true that in many cases money laundering does have identifiable victims, and courts readily recognize victims of money laundering are often the same as the victims of the underlying crime. *See, e.g.*, *United States v. Cordo*, 324 F.3d 223, 231-32 (3d Cir. 2003); *United States v. Wilson,* 98 F.3d 281, 283 (7th Cir. 1996). In *Cordo*, for example, the money laundering was an integral part of a scheme aimed at investors, and the Third Circuit held that money laundering had identifiable victims as part of a scheme targeting that specific group. 324 F.3d at 231-32.

Here, the victims of the Defendants' money laundering conspiracy are readily identifiable as the owners of the stolen BTC. In pleading guilty to the money laundering charges, Defendants admitted to deliberate efforts to obscure the origin and path of the stolen BTC. Lichtenstein Plea Agreement, ECF No. 96 at 1; Morgan Plea Agreement, ECF No. 101 at 1. Their conduct involved "complex transactions across multiple accounts and platforms…designed to conceal the path of the stolen BTC." Lichtenstein Statement of Offense, ECF No. 95 ¶ 19; *see also id.* ¶¶ 18-24 (detailing Lichtenstein's and Morgan's money laundering conspiracy); Morgan Statement of Offense, ECF No. 100 ¶¶ 17-23 (same).

The money laundering was integral to the objective of the theft in obtaining the benefit of the Bitcoin for the Defendants rather than its true owners. The Information explains that the

15

object of Defendants' money laundering conspiracy was "*to unlawfully enrich themselves* by laundering the proceeds of the 2016 hack . . .*" ECF No. 89. To that end, it was expressly "designed to complicate the audit trail *of anyone trying to trace*" the funds "so that they would not be able to trace the funds that had been hacked." *Id.* (emphasis added). In other words, the money laundering had a specific objective to frustrate any efforts to find and recover the hacked funds so Defendants could keep the funds.

In these circumstances, courts have held that the victims of the money laundering are the same as the victims of the underlying crime. For example, in *United States v. Wilson,* 98 F.3d 281, 283 (7th Cir. 1996), the Seventh Circuit Court of Appeals explained that:

> [W]hen the defendant is convicted of laundering the proceeds of his fraud in order to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds, ... there is intuitive force to the argument that the victim of the fraud is also a victim of the transaction designed to hide or "cleanse" the funds of which she was defrauded. More to the point, the money laundering in this case served to perpetuate the very scheme that produced the laundered funds.

*See also Cordo*, 324 F.3d at 233 (citing *Wilson* with approval and noting other cases in accord).

The fact that Movant and other accountholders were victims of the money laundering, and not just the underlying theft, is further confirmed by the government's ability to catch the Defendants and stop the conspiracy midstream. When Defendants were apprehended, the government was able to recover most of the Bitcoin taken in the theft in a form that was cleanly traceable as specific property stolen—over 94,000 BTC in the hack wallet—which represented all of the theft proceeds *except for* the portion that had been diminished through the money laundering conspiracy. If the only crime had been the theft, all theft victims would be able to trace their Bitcoin 1-for-1 to the seized Bitcoin in the first hack wallet and recover through ancillary proceedings.

Instead, the money laundering conspiracy partially diminished and obscured the funds, complicating the tracing and recovery. And that outcome—frustrating the ability to trace and recover the assets as they were diminished—was the direct object of the money laundering. As this Court has recognized, successful cryptocurrency laundering erases the blockchain's traceability, making it harder to identify specific victims. *See Sterlingov*, No. CR 21-399 (RDM), 2024 WL 4664267 at *8 (D.D.C. Nov. 4, 2024) ("The difficulty in identifying specific victims, moreover, is a product of the obfuscation inherent in the crime."); *In re Search of Multiple Email Accounts*, 585 F. Supp. 3d 1, 8 (D.D.C. 2022) (Kollar-Kotelly, J.).  The more effective the laundering, the less likely victims can recover their property.

Therefore, to the extent Movant or any victim of the hack is now unable to *recover* in an ancillary proceeding because they cannot trace their assets to the seized Bitcoin, the loss of their Bitcoin will be a loss directly attributable to the money laundering, not just the initial theft.

Movant is seeking recovery through an ancillary proceeding. And discovery from Bitfinex will be necessary to fully ascertain the particular blockchain addresses that held the Bitcoin to which Movant had a legal right prior to the hack, in order to trace those funds. But if this Court ultimately were to conclude that Movant cannot sufficiently identify the specific property to which he has a superior legal right, it will not be because of the theft itself, but because the money laundering left less than 100% of the assets in fully traceable form.

In short, Movant should recover *either* as an owner through the ancillary proceeding *or* as a victim through restitution. To deny Movant victim status, and then also deny a recovery through the ancillary proceeding, would create the sort of "heads I win, tails you lose" scenario that the D.C. Circuit warned against in *United States v. Emor*, 785 F.3d 671 (D.C. Cir. 2015).

17

To date, Movant has not recovered his assets and remains a victim of the money laundering, and so he should be awarded restitution in the amount of his net loss of 670.68637 BTC, which should be distributed to him from the forfeited assets net of any amount he is able to recover through the ancillary proceeding.

**B.    Movant Is a Victim Under the MVRA Because the Conspiracy's Scope Includes All Harm Caused by the Scheme.**

Apart from being a direct victim of the money laundering, Movant is also a victim for purposes of the MVRA because the money laundering to which Defendants pled guilty encompasses all victims of the common *scheme*, of which the theft was a part.

The MVRA defines a "victim" as "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Thus, while restitution is generally limited to victims of the offense of conviction, for conspiracy and scheme crimes restitution is mandatory for all those harmed by the overarching scheme. *See, e.g.*, *United States v. Brown*, 665 F.3d 1239, 1253 (11th Cir. 2011); *United States v. Brock-Davis*, 504 F.3d 991, 999 (9th Cir. 2007); *United States v. Pole*, Crim. No. 09-354 (EGS), 2024 WL 756781, at *30 (D.D.C. Feb. 23, 2024) (citing *United States v. Dickerson*, 370 F.3d 1330, 1339 (11th Cir. 2004)).

The Eleventh's Circuit's recent decision in *United States v. Onimole* is instructive.  *See* No. 23-11740, 2024 WL 1232089, at *6-*7 (11th Cir. Mar. 22, 2024) (including money laundering in larger scheme for purposes of restitution):

> Congress greatly expanded the definition of "victim" under the MVRA, and we have held "that by defining 'victim' expansively in scheme-based crimes, Congress partially overrul[ed] *Hughey*'s restrictive interpretation of the VWPA and expand[ed] district courts' authority to grant restitution." *Id.* at 1293 (quoting *Dickerson*, 370 F.3d at 1338).  Thus, while "[a]n award of restitution must be based on the amount of loss actually caused by the defendant's conduct," *United States v. Foster*, 878 F.3d 1297, 1307 (11th Cir. 2018), "[c]ourts have agreed that, in light of the expanded statutory language, restitution orders for

18

conduct closely related to the offense of conviction are appropriate under [the MVRA], in addition to the specific conduct for which the defendant was convicted." *United States v. Brown*, 665 F.3d 1239, 1252 (11th Cir. 2011); *see also United States v. Valladares*, 544 F.3d 1257, 1269 (11th Cir. 2008) (upholding a restitution award).

Courts in this District have also recognized the MVRA's expansive definition of "victim." *See Pole*, 2024 WL 756781, at *29-*30 (extending the MVRA's definition of "victim" to include harmed parties beyond the statute of limitations); *United States v. Emor*, 850 F. Supp. 2d 176, 210-15 (D.D.C. 2012). In addition, many courts have recognized that money laundering conspiracy in particular is the type of "scheme, conspiracy, or pattern" that widens the scope of the MVRA's victim definition to all those caught in the overarching scheme. *See, e.g., United States v. Lazarenko*, 624 F.3d 1247, 1250 n.5 (9th Cir. 2010), as amended on denial of reh'g, No. 08-10185, 2010 WL 4888164 (9th Cir. Dec. 2, 2010); *United States v. Matos*, 611 F.3d 31, 44 (1st Cir. 2010).

Here, the Information, plea agreements, and sentencing memoranda further confirm that the relevant conduct underlying Defendants' pleas was all part of an integrated scheme. The object of Defendants' money laundering conspiracy was "*to unlawfully enrich themselves* by laundering the proceeds of the 2016 hack…" Information, ECF No. 89. Of course, Defendants' theft shared that same purpose to unlawfully enrich themselves. In its Sentencing Memoranda, the government further explains that "[n]either the hack nor the laundering scheme was an impulsive decision" and the "*continuous and deliberate* nature of the defendants' criminal actions weigh in favor of a strong sentence." ECF No. 146 at 17.

Put another way, all of the relevant conduct was part of a deliberate and continuous scheme encompassing the preparation for the theft, the theft itself, and the subsequent laundering. Indeed, as this Court recognized in a search warrant application for this case,

concealment methods are central to a cryptocurrency crime precisely because cryptocurrency transactions exist on a public record. *See In re Search of Multiple Email Accounts*, 585 F. Supp. 3d 1 at 7-9.

To support a contrary conclusion, the government relies on *United States v. Hensley* for the general rule that restitution is authorized only as explicitly provided by statute. 91 F.3d 274, 276 (1st Cir. 1996). However, *Hensley* undermines the government's position. In that case, the First Circuit upheld restitution to a victim who was harmed by a scheme related to—but not charged in—the defendant's offense of conviction. *Id.* at 277. The court explained that under the MVRA's expansive definition, restitution may be ordered for all victims harmed "in the course of the scheme, conspiracy, or pattern," even if the specific conduct was not part of the offense to which the defendant pleaded guilty. *Id.* at 277-78. The First Circuit later applied *Hensley*'s rule to a case in which the district court ordered restitution to the victim of a money laundering conspiracy. *See Matos*, 611 F.3d 31, 44.

Thus, the appropriate scope of victim restitution from Defendants' money laundering is closely tied to the scope of the overall scheme articulated in the Statements of Offense underlying Defendants' plea agreements, not just the particular actions that that fall strictly within the offense of conviction.

## III.   The Government's Proposal to Give Bitcoin to Bitfinex is Improper and Should Be Denied.

### A.   Bitfinex Is Not a Victim and Has No Ownership Claim with Respect to the Recovered Bitcoin.

The Government seeks to allocate restitution to Bitfinex in the amount of more than 94,000 BTC under 18 U.S.C. § 3663A(a)(3). That provision allows restitution to "persons other than the victim" if agreed to in a plea agreement. However, the Court retains full discretion to determine the amount of restitution (*see United States v. Voss*, 165 F. App'x 647, 649 (10th Cir.

2006); *United States v. Peterson*, 268 F.3d 533, 535 (7th Cir. 2001)), and therefore need not (and should not) grant the windfall that the government is proposing.

Notwithstanding the plea agreement, the proposed award of restitution to Bitfinex is inappropriate because the government cannot establish by a preponderance of the evidence that any of the recovered Bitcoin was the property of Bitfinex, and thus fails to establish that Bitfinex is a direct victim eligible for restitution in the amount of that Bitcoin. "The purpose of restitution is not to provide a windfall, but to make a victim whole." *United States v. al-Kofi,* 2022 WL 14019560, at *4 (W.D. Pa. Oct. 24, 2022); *United States v. Carboni,* 204 F.3d 39, 47 (2d Cir.2000) ("a court's power to order restitution is limited to *actual* loss.") (emphasis added); *see also United States v. Germosen,* 139 F.3d 120, 130 (2d Cir.1998) (restitution statute "requires a showing of actual loss"); *Catoggio,* 326 F.3d at 329 (noting requirement that the district court identify victims' "actual losses prior to imposing restitution").

Bitfinex submitted victim statements in these proceedings, and notably absent from those submissions is *any* argument that it was the owner of the Bitcoin at the time of the hack, as would be required for it to recover that Bitcoin as restitution. Instead, Bitfinex argues that it took supposedly unprecedented steps to make "its customers whole within eight months of the Hack." ECF No. 175-1 at 10. Bitfinex's concession that it needed to make its customers whole is an admission that it was the customers, *not* Bitfinex, who suffered the direct and immediate loss from Defendants' scheme.

Movant stridently disagrees that Bitfinex's after-the-hack actions made him whole. In place of the stolen Bitcoin, Bitfinex offered BFX tokens purporting to provide users a "contingent obligation" that Bitfinex *may* at its "sole option" redeem the tokens for their stated dollar value at an unspecified time in the future. Decl. ¶ 20 & Ex. G. Petitioner did not agree to

relinquish or transfer any rights to the stolen Bitcoin in order to obtain these tokens and the BFX Token Terms clearly state: "The token has been issued to you without reduction of or release or waiver of any claims you may have." *See id.* Regardless, the post-hack actions Bitfinex took to save its business were not foreseeable at the time of the hack and cannot convert Bitfinex into an immediate victim of Defendants' scheme.

Lacking evidence to show a direct loss to Bitfinex itself, the appropriate amount of restitution to Bitfinex is zero. *Cf. United States v. Loreng*, 956 F. Supp. 2d 213, 223 (D.D.C. 2013) ("Where the government has failed to prove that a defendant caused any specific amount of losses with 'reasonable certainty,' the government has not met its burden, and the restitution award must be denied.") (applying an analogous restitution statute); *United States v. Gushlak*, 728 F.3d 184, 194–95 (2d Cir. 2013) ("restitution may be awarded only in the amount of losses directly and proximately caused by the defendant's conduct").

To the extent Bitfinex claims that its post-hack actions granted it any rights vis-à-vis its accountholders with respect to any subsequent recovery, those claims are best left for Bitfinex to assert under normal rules of contract and property law. *See United States v. Boscarino*, 437 F.3d 634, 637 (7th Cir. 2006) (Easterbrook, J.) ("Instead of determining the ultimate incidence of costs created by criminal activity, judges should direct restitution to the immediate victim; other persons' rights in the funds then may be sorted out under normal rules of contract and property law."), *abrogated on other grounds by United States v. Statham*, 581 F.3d 548 (7th Cir. 2009).

### B.    Allocating Bitcoin to Bitfinex Would Create an Unjust Windfall.

Restitution is intended to restore victims to their original position, not to enrich third parties. *See U.S. v. Goodrich*, 12 F.4th 219, 223 (2d Cir. 2021). Awarding $10 billion in BTC to Bitfinex would result in an unjust windfall, particularly because Bitfinex's own security failures enabled the hack. *See U.S. v. Reckmeyer*, 836 F.2d 200, 205 (4th Cir. 1987) (restitution

principles do not permit third parties to benefit from wrongdoing). Moreover, if there is any difficulty tracing the Bitcoin within Bitfinex's systems, despite their representations that those assets were fully segregated, that will be a further means by which Bitfinex's own conduct prejudiced Movant and other accountholders.

Furthermore, awarding Bitcoin to Bitfinex would undermine the principles of restitution. Bitfinex has made clear that it will deny any further recovery to accountholders, based on its claims to have made them whole with a series of half-measures after the hack. *See* ECF No. 175-1 at 6. Distributing Bitcoin to a foreign entity would place the assets beyond this Court's jurisdiction and frustrate the ability of victims to recover their property.

**IV.    No Assets Should be Distributed Before Movant's Ancillary Proceeding.**

This Court should also reject the Government's proposal to allocate the seized 94,643.29837084 BTC to Bitfinex and to subject only the "other assets seized by the government" to ancillary proceedings. *See.* Gov't Supp. Mot. re Restitution, ECF No. 202 at 1-2.

The government's proposal to exclude the bulk of the seized assets from the ancillary proceedings and send them to Bitfinex with no opportunity for third parties to assert their rights is improper. Federal Rule of Criminal Procedure 32.2(c) and the principles of due process require that third-party claimants, like Movant, have a meaningful opportunity to assert their ownership rights in those assets forfeited by Defendants, before any assets are finally forfeited to the government and distributed. *See United States v. Preston*, 123 F. Supp. 3d 117, 125 (D.D.C. 2015). Courts have repeatedly emphasized the importance of adhering to this framework. *See Emor*, 785 F.3d at 672-73, 676 (noting that fairness and due process require courts to resolve third-party claims in ancillary proceedings to avoid a "Heads, [you] win[]; tails, I lose" scenario).

The Court has taken notice that the Government's effort to "order[] Defendants to deliver assets to Bitfinex as voluntary restitution would appear to have the effect of reducing the amount

of the forfeiture order," which the Court recognizes is "improper." Order, ECF No. 208 (Jan. 28, 2025) at 3. The Court is correct: It is improper because, as the Court stated, it may not offset forfeiture and restitution against one another. *See id.* And it is also improper because there is no basis to deny third parties their opportunity to assert rights to those assets.

The preliminary order of forfeiture is final as to Defendants, but "it remains preliminary as to third parties [including Movant] until the ancillary proceeding is concluded." Fed. R. Crim. P. 32.2(b)(4)(A). Because third parties including Movant have filed ancillary petitions asserting rights in the specific property that the government proposes to release, "the court *must* conduct an ancillary proceeding" (Fed. R. Crim. P. 32.2(c)(1) (emphasis added), and after that proceeding concludes the court must enter a final order of forfeiture in order for the assets to be forfeited to the United States. As of this filing, we stand in the middle of that process, with a preliminary order that is final as to Defendants and thus precludes them from using the assets to pay restitution, but that is not final as to third parties and thus precludes the government from directing another use of those assets. Only after the ancillary proceedings, once the Court determines which assets are properly subject to forfeiture and reduces that to a final order, may the United States dispose of those assets. 21 U.S.C. § 853(n)(7) ("Following the court's disposition of all petitions filed under this subsection . . . the United States shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee"). At that time, the government may recommend that the assets be distributed in accordance with the restitution order, as it indicated it would do in its plea agreements. *See* Lichtenstein Plea Agreement, ECF No. 96 at 12 ("The Office agrees to make a non-binding referral to [MLARS] that any monies obtained from the defendant through forfeiture be distributed to the victims of the offense [*i.e.*, Bitfinex] in accordance with any restitution order

24

entered in this case."). [4] By including Movant in the restitution order, the Court can provide for Movant to recover his loss through the same process, to whatever extent he has not obtained a recovery in the ancillary proceeding.

## CONCLUSION

For the reasons set forth above, Movant respectfully requests that this Court grant his motion to intervene and award Movant restitution in the amount of 670.68637 BTC. Movant further objects to any transfer or conveyance of assets forfeited by defendants to Bitfinex.

Dated: January 28, 2025

Respectfully submitted,

By: /s/ *David Bitkower*
David Bitkower
**JENNER & BLOCK LLP**
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6000
dbitkower@jenner.com

Kayvan B. Sadeghi (*pro hac vice pending*)
Shailee D. Sharma (*pro hac vice forthcoming*)
Sara E. Cervantes (*pro hac vice pending*)
**JENNER & BLOCK LLP**
1155 Avenue of the Americas
New York, NY 10036-2711
Telephone: (212) 891-1600
ksadeghi@jenner.com
ssharma@jenner.com
scervantes@jenner.com

---

[4] In the alternative, to the extent any assets are awarded as restitution to Bitfinex prior to resolution of accountholder's rights, those assets should be allocated subject to an order imposing a constructive trust in favor of the owners of the assets, and requiring that the assets remain within the reach of this court. "Where the title to property is acquired by one person under such circumstances that he is under a duty to surrender it, a constructive trust immediately arises." *S.E.C. v. Paige*, No. CIV. A. 81-2066, 1985 WL 2335, at *6 (D.D.C. July 30, 1985), *aff'd*, 810 F.2d 307 (D.C. Cir. 1987) (internal citation omitted).