**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ILYA LICHTENSTEIN, et al.,<br><br>*Defendants*.<br><br>*************<br><br>XYZ INC.<br><br>*Intervenor, Claimant, and*<br>*Third-Party Petitioner.* | Case No. 23-cr-239 (CKK) |

**XYZ INC.'S MOTION TO DISMISS THIRD-PARTY CLAIMANTS IFINEX AND BITFINEX'S PETITION FOR ANCILLARY PROCEEDINGS AND MEMORANDUM**

Petitioner XYZ Inc. ("XYZ") respectfully moves pursuant to Federal Rule of Criminal Procedure 32.2(c)(1)(A) and this Court's Memorandum Opinion of April 4, 2025, ECF No. 300, to dismiss the ancillary petition filed by iFinex Inc. and BFXNA Inc. (together, "Bitfinex"), ECF No. 219.

Bitfinex's petition for a multibillion-dollar windfall fails for the most basic reasons: Bitfinex does not show that it owned, or that its assets were used to replace, identical coin-for-coin, any of the Bitcoin that Mr. Lichtenstein stole, such that it may now stand in its customers' shoes. Bitfinex has also failed to proffer a valid assignment from anyone who owned an interest in the Bitcoin at issue. Bitfinex—unlike XYZ and other customers who owned and lost Bitcoin— simply has not asserted a valid right to receive title to the forfeited assets. Indeed, Bitfinex's Petition acknowledges that it was "customers" like XYZ who "owned Bitcoin." (Bitfinex Petition ¶ 5, ECF No. 219). This comports with Bitfinex's unambiguous Terms of Service, which state,

***"Notwithstanding the distribution of the private keys* . . . , *all bitcoins in your Multi-Signature Wallets belong to and are owned by you*."** (XYZ Petition ¶ 10, ECF No. 289-4; XYZ Petition Ex. A § 5 and Ex. B § 5, ECF No. 289-5 (emphasis added)).

Bitfinex's petition appears premised on two fatally flawed theories. *First*, Bitfinex claims that it should be awarded this extraordinary windfall because it held enough "private keys" to unilaterally effect transfers of assets that belonged to its customers. Bitfinex strives to leap from the assertions that it "owned and controlled the cryptocurrency *wallets*" and had "possession, custody, and control" of its customers' Bitcoin to the conclusion that it has the sole right to recover the customer Bitcoin that its wallets once contained. (Bitfinex Petition ¶¶ 2, 70 (emphasis added)).[1] Bitfinex cannot make that jump. Ordinarily, "to contest a forfeiture," as an ancillary petition inherently does, "one must have an ownership interest in the res."[2] As the government has said, "The standard for a valid third-party claim . . . has to do with the claimant's ownership interest in the property." (ECF No. 202, at 5). The assets at issue here are Bitcoins that rightfully belong to customers like XYZ, not the return of the compromised, valueless *wallets* and *private keys* that Bitfinex still has.

---

[1] Bitfinex refers one time, perhaps in error, to "Bitfinex's Bitcoin." (Bitfinex Petition ¶ 24). It uses the phrase "Bitfinex Bitcoin" several times, but carefully defines that term as encompassing all of the "Seized Bitcoin." (*Id.* ¶ 2). Bitfinex also quotes the government for the false proposition that returning the Bitcoin to Bitfinex "*represents* the return of lost property to the owner of that property," *id.* ¶¶ 3, 63 (emphasis added), but it does not assert that it owned any Bitcoin on the morning of August 2, 2016 or that it acquired title to any specific portion of the Bitcoin thereafter.
[2] *United States v. One 1945 Douglas C-54 (DC-4) Aircraft, Serial No. 22186*, 647 F.2d 864, 866 (8th Cir. 1981); *see also United States v. Fifteen Thousand Five Hundred Dollars ($15,500.00) U.S. Currency*, 558 F.2d 1359, 1361 (9th Cir. 1977) ("It is not sufficient to have claimed merely an interest in the premises or area in which the contraband was found"); *Gen. Fin. Corp. of Fla. S. v. United States*, 333 F.2d 681, 682 (5th Cir. 1964) ("only an owner is entitled to set up a lack of forfeiture.").

*Second*, Bitfinex attempts to premise its claims on its complex series of unilateral distributions and repurchases of certain crypto tokens, which Bitfinex labels "extraordinary actions." (Bitfinex Petition ¶ 65). The tokens at issue did not actually put Bitfinex's skin in the game when they were issued. Their issuance cost Bitfinex *nothing*. While Bitfinex attempts to use the tokens' terms to seize the massive appreciation of its customers' Bitcoin—a windfall of more than $8 billion—it insists those terms provided its customers *a lesser recovery right* than they already had. XYZ never accepted any of these terms.

Stripped of the Petition's conclusory assertions, Bitfinex fails to show that it owned or received assignments of its customers' ownership interests. None of the documents Bitfinex has offered contains a signed assignment of title from a customer. And Bitfinex's assertion that it "made its customers whole" amounts to nothing more than accounting gimmicks associated with tokens that did not convey title.[3] XYZ does not dispute that the "acts which gave rise to the forfeiture" may postdate Defendant Lichtenstein's August 2, 2016 theft, because the Defendants were convicted of a laundering conspiracy, not theft. 21 U.S.C. 853(n)(6)(A). But despite its unique access to the relevant information, Bitfinex's Petition fails to explain what Bitfinex's legal or equitable interest is (beyond its possessory interest under the Terms of Service) and when that interest arose.

## BACKGROUND[4]

As of August 2, 2016, Bitfinex customers owned Bitcoin that was held in wallets

---

[3] Bitfinex's argument that it "made its customers whole" is demonstrably false. It is based on the (incorrect) assertion that Bitfinex paid customer the "value of their Bitfinex account assets at the time of the Hack." (Bitfinex Petition ¶ 42). Bitfinex does not state that it paid its customers the value of their lost Bitcoin as of the date it made those payments, nor were the tokens Bitfinex issued worth their nominal value of $1.00 at the time they were issued. (*See* XYZ Petition ¶ 30).
[4] This background accepts the truth of Bitfinex's allegations, many of which XYZ emphatically dispute, insofar as they are not contrary to referenced materials. We supplement those allegations

maintained by Bitfinex.  (*See* XYZ Petition ¶ 10, Exs. A and B).  Conversely, Bitfinex "owned" at least two of multiple "private keys" for "the vast majority of its cryptocurrency wallets," though some customers also held a private key.  (*See*, *e.g.*, Bitfinex Petition ¶¶ 1, 19, 22).  Bitfinex's own "Terms of Service" recognized that "[n]otwithstanding the distribution of the private keys . . . all bitcoins in [customers'] Multi-Signature Wallets belong to and [were] owned by" its customers.  (XYZ Petition Ex. A § 5 and Ex. B § 5).  For example, as of the morning of August 2, 2016, XYZ owned 2,705.40228 BTC, which Bitfinex held per its Terms of Service.  (XYZ Petition ¶¶ 17, 19).  Bitfinex's petition does not assert that it held or obtained title in August 2016 to any discrete amount of Bitcoin, even as to the assets in "Bitfinex's own wallet addresses."  (Bitfinex Petition ¶ 21).[5]

Defendant Lichtenstein used "Bitfinex's private keys to its cryptocurrency wallets, and used those private keys on August 2, 2016, to steal approximately 119,754 Bitcoins directly from Bitfinex wallets."  (Bitfinex Petition ¶ 1).  Bitfinex states repeatedly that it owned the *wallets* and the associated *private keys*, but Bitfinex's petition leaves no doubt that Bitfinex customers—not Bitfinex—owned the Bitcoins that Defendants stole and later laundered.  (*See, e.g.*, Bitfinex Petition ¶¶ 2, 5, 23, 26 (repeatedly noting the Bitfinex owned only the "private keys" and "wallets")).

Bitfinex says it "temporarily allocated" the losses to "pro rata across all customer accounts, regardless of whether they held Bitcoin."  (Bitfinex Petition ¶ 33).  Specifically, in the immediate aftermath of the hack, Bitfinex unilaterally sold a portion of its customers' non-Bitcoin assets and

---

with sworn facts shown by XYZ's Petition that are relevant to standing.  *See United States v. Preston*, 123 F. Supp. 3d 24, 28 (D.D.C. 2015).
[5] Bitfinex's petition draws a distinction between "customer deposit wallet addresses and Bitfinex's own wallet addresses," but Bitfinex combines those categories by asserting that "Bitfinex wallet addresses" included "customer deposit wallet addresses."  (Bitfinex Petition ¶¶ 21, 23).

used those non-Bitcoin assets to buy Bitcoins that replaced, coin-for-coin, the stolen Bitcoin that belonged to other Bitfinex customers. (*See* Bitfinex Petition ¶ 33). For example, XYZ lost 975.75744033 Bitcoin that it owned and held in its Bitfinex account, and then Bitfinex converted another 1,794.72289971 Bitcoin worth of XYZ's non-Bitcoin assets into Bitcoin. (XYZ Petition ¶¶ 19-20; *see* Bitfinex Petition ¶ 33). Those additional 1,794.72289971 Bitcoins provided coin-for-coin replacements to other Bitfinex customers for Bitcoins that Defendant Lichtenstein stole in the days immediately following the hack. (XYZ Petition ¶¶ 19-20; *see* Bitfinex Petition ¶ 33).

Bitfinex asserts that its customers' losses were "temporary" because "within eight months of the Hack, [it] made its customers whole." (Bitfinex Petition ¶ 42). Principally, Bitfinex says it did so by issuing BFX tokens, which were the weakest, contingent IOUs imaginable—more aptly, they were "I *might* OUs." (Bitfinex Petition ¶ 34). The BFX token terms assign no title in stolen Bitcoins to Bitfinex. (*See generally* Bitfinex Petition Ex. B). The terms explicitly state that the BFX tokens have "been issued to you without reduction of or other release or waiver of any claims you may have against the Bitfinex Group." (*Id.*) The BFX tokens represented only "a limited-recourse, contingent obligation" that served as a "notional credit" and bore "no interest and [was] not entitled to dividends, distributions, or other income amounts of any kind." (*Id.*)

For some unidentified set of customers "who elected to redeem BFX tokens for iFinex common stock before November 30, 2016," Bitfinex also issued RRT tokens. (Bitfinex Petition ¶¶ 37-38). XYZ never received any RRT tokens. (*See* XYZ Petition ¶ 38). The RRT token terms have a parenthetical that states, "(Recovery *amounts available*, if any, *in excess* of 1:1 to RRT holders shall belong to and be solely vested in the Bitfinex Group)," but Bitfinex's Petition does not show an acceptance of this term by any identified person. (*See generally* Bitfinex Petition (emphasis added)).

5

The maximum theoretical value associated with each BFX and RRT tokens was capped by both their terms and economic logic at $1.00, as the tokens represented a non-interest bearing, contingent liability subordinate "to any and all other claims against the Bitfinex Group." (Bitfinex Petition Exs. B and D). In other words, issuing these tokens didn't cost Bitfinex anything. The tokens provided for a possible recovery of up to $1.00 per token, but only promised to make those payments if Bitfinex obtained enough of its customers' Bitcoin to pay its customers this dollar using their own assets. (*See id.*). Bitfinex insists that the tokens granted it something much more valuable: an option to seize *customers'* "ratable share of the recoveries" (i.e. any coins Bitfinex gets through this ancillary process) for $1.00 per token. (Bitfinex Petition ¶ 35). The terms make clear, however, that any redemption by Bitfinex allocated, at most, monetary recoveries associated with "*the token['s]* . . . ratable share of *the recoveries*," i.e., $1.00 per token relative to the dollar value of the ultimate value of the recovery. (Bitfinex Petition Ex. B (emphasis added)).

For its part, XYZ sold the vast majority of the BFX tokens it received to another party in a private transaction at a severe discount to the tokens stated $1.00 notional value. (XYZ Petition ¶ 38). XYZ suffered a real and substantial loss of Bitcoin and other assets because of Defendants' conduct, and it has neither been made whole nor assigned its rights to the stolen Bitcoins. (XYZ Petition ¶¶ 38-39). Indeed, Bitfinex's Petition identifies no person by name who provided any such assignment.

On or about August 3, 2024, Defendants Lichtenstein and Morgan each pled guilty to one count of money laundering conspiracy, and Defendant Morgan also pled guilty to one count of money laundering conspiracy against the United States. (Bitfinex Petition ¶¶ 9-10). On December 11, 2024, the Court entered its most recent judgment in this case, ordered forfeited "any property, real or personal, involved in the offense alleged in Count Two to which you are pleading guilty,"

6

and attached a "Corrected Second Amended Attachment A" that identifies specific such assets. (ECF Nos. 198, 198-1).

On January 22, 2025, Bitfinex filed the Petition that is the subject of this motion. (*See* Bitfinex Petition). Bitfinex seeks a declaration that iFinex "possesses the right, title, and interest" in property identified in the Corrected Second Amended Attachment A, ECF No. 198-1, and for a "grant" of "interest" in 109,728.522 Bitcoins, 117,376.52651940 Bitcoin Cash, 117,376.58178024 Bitcoin Satoshi Vision, and 118,102.03258447 Bitcoin Gold. (Bitfinex Petition 26-28).

## LEGAL STANDARD

A petitioner under 21 U.S.C. 853(n)(6)(A), which Bitfinex relies exclusively on, must be able to establish that they had a "right, title, or interest [that] was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property."

"A motion to dismiss a petition under Section 853(n) prior to discovery or a hearing is treated similarly to a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)." *United States v. Preston*, 123 F. Supp. 3d 24, 28 (D.D.C. 2015). "A third-party petition must only provide 'enough facts to state a claim to relief that is plausible on its face' to survive dismissal." *Id.* (quoting *United States v. Church & Dwight Co.*, 510 Fed.Appx. 55, 57 (2d Cir. 2013)). But "[i]n determining whether to dismiss a petition on jurisdictional grounds, such as standing, courts may consider evidence outside the petition." *Id.* at 29.

## ARGUMENT

To prevail, Bitfinex must show that it holds a "vested" or "superior" "right, title, or interest" in the stolen assets. 21 U.S.C. 853(n)(6)(A). But Bitfinex cannot prevail, because Bitfinex had no ownership interest in the stolen property at the time of the theft, and it has not asserted a valid

7

assignment or engaged in a conveyance that gave it the right to recover the stolen property. Moreover, gifting the stolen assets to Bitfinex would cause their value to be distributed to non-owners, thereby obstructing the purpose of the ancillary petition process.[6]

## I. Bitfinex Did Not Own The Bitcoin It Held.

The ancillary petition process "carefully balance[s] the need to provide all potential third party claimants with an opportunity to contest the forfeiture against the government's need for certainty of title before it liquidates forfeited property." *37 Assocs., Tr. for the 37 Forrester St., SW Tr. v. REO Const. Consultants, Inc.*, 409 F. Supp. 2d 10, 14 (D.D.C. 2006) (internal citation omitted). The process is designed to ensure that forfeiture does not work an unjust taking against a party who has vested or superior "right, title, or interest," 21 U.S.C. 853(n)(6)(A), and thus, to contest forfeiture, a petitioner must generally have some species of "ownership interest in the res." *United States v. One 1945 Douglas C-54 (DC-4) Aircraft, Serial No. 22186*, 647 F.2d 864, 866 (8th Cir. 1981). A mere "possessory interest" is "insufficient to prevent forfeiture." *United States*

---

[6] Bitfinex's Petition acknowledges that if it is given the stolen Bitcoin, only about $30 million of the roughly $8 billion at issue (about 0.3%) will be used to compensate customers who may have lost Bitcoins that were in their Bitfinex account. (Bitfinex Petition ¶ 39). Bitfinex tries to spin this as a reason it should receive the Bitcoin. (*Id.* ¶ 69 (claiming that "[u]pon return of the Bitfinex Bitcoins, Bitfinex will be able to complete the process of redeeming the RRT tokens, providing even more compensation to customers for Hack losses[, a]nd any additional gains to Bitfinex will indirectly benefit Bitfinex's customers-turned-shareholders, who themselves or through an intermediary exchanged their BFX tokens for iFinex stock")). What Bitfinex's Petition fails to explain, but an attachment to its Petition notes, is that Bitfinex would redeem RRT tokens for "$1" and then pay "up to 80 percent of any remaining recovered assets . . . to UNUS SED LEO token holders." (Bitfinex Petition Ex. E). Because Bitfinex has promised to use any tokens it receives to buy up yet another token, customers like XYZ who rightfully own those Bitcoins could find it impossible to get their Bitcoins back, notwithstanding their superior right and interest. Moreover, Bitfinex is asking for an award of "title" from this Court, which Bitfinex would likely seek to use as a shield in any other proceeding. Far from being a "victim," publicly available information about the LEO tokens shows that Bitfinex has already leveraged the prospect of recovery from this Court to raise $1 billion in a private sale. *See* Yogita Khatri, *Bitfinex's Private Token Sale Raised $1 billion in 10 Days, Exec Says*, COINDESK (May 13, 2019) (updated Sept 13, 2021).

*v. Totaro*, 345 F.3d 989, 998 (8th Cir. 2003) (citing *United States v. Strube*, 58 F. Supp. 2d 576, 584 (M.D. Pa. 1999)); *see also United States v. Porchay*, 533 F.3d 704, 709 (8th Cir. 2008) ("Porchay's failure to present ownership evidence in support of her claim irreparably crippled her claim. Consequently, the district court did not err in denying her § 853(n) petition.").

Here, at the time of the theft, Bitfinex had a contractual interest akin to that of a bailee. As far as the Bitfinex's Petition alleges, the Bitcoin at issue all belonged to Bitfinex's customers. That would be consistent with Bitfinex's Terms of Service, which state that the Bitcoin at issue "belong to and are owned by" Bitfinex's customers. (XYZ Petition Ex. A § 5 and Ex. B § 5); *see Mac'Avoy v. The Smithsonian Inst.*, 757 F. Supp. 60, 65 (D.D.C. 1991) (A "bailee does not acquire title to the property but merely holds the property according to the terms of the bailment[.]"); *see also United States v. Alcaraz-Garcia*, 79 F.3d 769, 775 (9th Cir. 1996) ("Ordinarily, a bailment does not alter the bailor's title interest[.]").

Despite having unique access to the relevant information, Bitfinex leaves thoroughly unclear what the precise nature of its asserted interest in the stolen Bitcoin is, if any beyond prior possession, and when that interest arose. Bitfinex nevertheless has the audacity to demand title to substantially all of the forfeited assets. By trying to claim title to the Bitcoin for itself, Bitfinex is improperly attempting to seize customer assets that it does not have title to. The Court should dismiss this sly claim.

**II.     Bitfinex Has Not Shown That It Obtained Title To The Forfeited Bitcoins.**

An interest in forfeited property may be assigned or otherwise conveyed. *See Lucas v. United States*, 775 F.3d 544, 548 (2d Cir. 2015); *United States v. Currency Totalling $48,318.08*, 609 F.2d 210, 214 (5th Cir. 1980). A petitioner may, for example, recover forfeited assets where she can trace her interest through another innocent victim whose rights were superior to the

government's forfeiture interests at the time of the relevant criminal acts. *Cf. United States v. Ovid*, No. 09-CR-2216 (JG)(ALC), 2012 WL 2087084, at *8 (E.D.N.Y. June 8, 2012). However, Bitfinex—unlike XYZ and other customers—has not shown that it ever received an ownership interest, constructive or otherwise, in Bitcoin.

To rely on an assignment, a plaintiff or petitioner must generally assert facts that show that "(1) their assignors would have standing to sue and [] (2) those assignors validly assigned their claims to the plaintiffs." *MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, 728 F. Supp. 3d 89, 99 (D.D.C. 2024) (citing *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 274-75 (2008)).[7] Bitfinex seemingly points to the BFX and RRT token terms as conveying the relevant rights. These terms are insufficient to carry Bitfinex's burden because: (1) the BFX token terms clearly do not assign any ownership or recovery rights, and Bitfinex has, in any event, failed to show acceptance of those terms by any identified Bitcoin owner; and (2) the RRT token terms do not clearly assign ownership rights; they apply, at most, to an unspecified portion of customers' interests in the Bitcoin; and Bitfinex has failed to identify acceptances of the RRT token terms by any customer who owned Bitcoin.

The RRT term that, if accepted by a customer, would come closest to an assignment is, oddly, a parenthetical. It states: "(Recovery amounts available, if any, in excess of 1:1 to RRT holders shall belong to and be solely vested in the Bitfinex Group)." (Bitfinex Petition Ex. D). Bitfinex does not identify anyone who agreed to this term, and no similar term appears in the BFX terms. Notably, Bitfinex asserts that its terms, not Bitfinex customers, merely "*contemplate* that any recovery of the Stolen Bitcoins would be by Bitfinex alone." (Bitfinex Petition ¶¶ 38-39

---

[7] Unlikely XYZ and other customers who may need discovery to detail the transactions associated with their assets, Bitfinex is the party that possesses any assignments or any records of transfers of Bitcoins that conveyed rights relevant to its claims.

(emphasis added)). And even if some Bitfinex customer who lost Bitcoin agreed to this term, it does not convey title to Bitfinex, it merely contemplates an allocation of "recovery amounts." (Bitfinex Petition Ex. D). Bitfinex's Petition asserts that the unidentified subset of customers who received RRT tokens "agreed that '[b]y holding, owning, or possessing RRTs, you release and hold harmless the Bitfinex Group from, and waive any claim against, the Bitfinex Group associated with the recovery efforts undertaken as a result of the' Hack," but that purported agreement is likewise not an assignment of ownership, and it does not relinquish owners' right to recover their property to Bitfinex. (Bitfinex Petition ¶ 39).

Bitfinex also suggests that it is entitled to the Bitcoin because its "extraordinary actions" "made its customers whole." (Bitfinex Petition ¶¶ 5, 42, 66). Absent agreements, the only mechanism of making customers whole that could rightfully transfer ownership interest in stolen Bitcoin to Bitfinex would have been replacing customers' stolen Bitcoins with fungible Bitcoins that Bitfinex owned. Had Bitfinex done *that*, it would have actually "made its customers whole," and it would be entitled to recover the stolen Bitcoins that it was out. Bitfinex didn't. As explained above, when Bitfinex says it "made its customers whole," it means only that it issued tokens that were not actually worth their supposed face value at the time they were issued, and that Bitfinex subsequently bought most of the tokens back for a fraction of 1 percent of the windfall it now seeks.

Bitfinex therefore cannot proceed on the basis of a constructive or actual assignment. At the very least, because Bitfinex fails to plead that it received title, the Court should dismiss Bitfinex's request for "right, title, *and* interest," to avoid awarding Bitfinex an asset it lacks.

11

**CONCLUSION**

For those reasons, Bitfinex's petition should be dismissed. Alternatively, Bitfinex's Petition should be dismissed to the extent it seeks title.

Date: April 21, 2025

Respectfully submitted,

/s/ Christopher R. MacColl
Aitan D. Goelman (DC Bar 446636)
Christopher R. MacColl (DC Bar 1049153)
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
AGoelman@zuckerman.com
CmacColl@zuckerman.com

*Attorneys for Intervenor, Claimant, and Third-Party Petitioner XYZ.*